**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| EXPRESS MOBILE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-01937-RGA |
| | ) | |
| GODADDY.COM, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>JOINT CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

I.     AGREED-UPON CONSTRUCTIONS ............................................................... 1

II.    DISPUTED CONSTRUCTIONS ..................................................................... 2

    A.    INTRODUCTION ............................................................................. 2

        1.    EXPRESS MOBILE'S OPENING BRIEF ............................. 2

        2.    DEFENDANTS' ANSWERING BRIEF ............................... 2

        3.    EXPRESS MOBILE'S REPLY BRIEF ............................... 3

        4.    DEFENDANTS SUR-REPLY BRIEF ................................ 3

III.   CLAIM CONSTRUCTIONS OF THE '397 AND '168 PATENTS ................................ 3

    A.    "virtual machine" ............................................................................ 3

        1.    EXPRESS MOBILE'S OPENING BRIEF ............................. 4

        2.    DEFENDANT'S ANSWERING BRIEF ................................ 6

        3.    EXPRESS MOBILE'S REPLY BRIEF ............................... 9

        4.    DEFENDANT'S SUR-REPLY BRIEF ................................ 11

    B.    "virtual machine commands / commands to said virtual machine" ..................... 13

        1.    EXPRESS MOBILE'S OPENING BRIEF ............................. 13

        2.    DEFENDANTS' ANSWERING BRIEF ............................... 13

        3.    EXPRESS MOBILE'S REPLY BRIEF ............................... 14

        4.    DEFENDANTS' SUR-REPLY BRIEF ................................ 15

    C.    "one or more run time files / at least one run time file" ........................... 16

        1.    EXPRESS MOBILE'S OPENING BRIEF ............................. 16

        2.    DEFENDANTS' ANSWERING BRIEF ............................... 16

        3.    EXPRESS MOBILE'S REPLY BRIEF ............................... 17

        4.    DEFENDANT'S SUR-REPLY BRIEF ................................ 18

    D.    "build tool" .................................................................................. 18

        1.    EXPRESS MOBILE'S OPENING BRIEF ............................. 19

        2.    DEFENDANTS' ANSWERING BRIEF ............................... 19

        3.    EXPRESS MOBILE'S REPLY BRIEF ............................... 20

        4.    DEFENDANT'S SUR-REPLY BRIEF ................................ 21

    E.    "build engine" ............................................................................... 22

        1.    EXPRESS MOBILE'S OPENING BRIEF ............................. 22

        2.    DEFENDANTS' ANSWERING BRIEF ............................... 23

3.      EXPRESS MOBILE'S REPLY BRIEF...................................................... 26

4.      DEFENDANT'S SUR-REPLY BRIEF................................................... 27

F.      "database" ................................................................................................... 27

1.      EXPRESS MOBILE'S OPENING BRIEF............................................ 28

2.      DEFENDANTS' ANSWERING BRIEF............................................... 28

3.      EXPRESS MOBILE'S REPLY BRIEF................................................ 29

4.      DEFENDANT'S SUR-REPLY BRIEF................................................ 30

G.      "multi-dimensional array structured database"........................................... 30

1.      EXPRESS MOBILE'S OPENING BRIEF............................................ 31

2.      DEFENDANTS' ANSWERING BRIEF............................................... 31

3.      EXPRESS MOBILE'S REPLY BRIEF................................................ 32

4.      DEFENDANT'S SUR-REPLY BRIEF................................................ 33

H.      "a timelines / timelines"............................................................................. 33

1.      EXPRESS MOBILE'S OPENING BRIEF............................................ 33

2.      DEFENDANTS' ANSWERING BRIEF............................................... 34

3.      EXPRESS MOBILE'S REPLY BRIEF................................................ 35

4.      DEFENDANT'S SUR-REPLY BRIEF................................................ 35

I.      "child element / child element style / child / child object / child button…"........ 35

1.      EXPRESS MOBILE'S OPENING BRIEF............................................ 36

2.      DEFENDANTS' ANSWERING BRIEF............................................... 36

3.      EXPRESS MOBILE'S REPLY BRIEF................................................ 37

4.      DEFENDANT'S SUR-REPLY BRIEF................................................ 38

J.      "run time engine / runtime engine"............................................................ 38

1.      EXPRESS MOBILE'S OPENING BRIEF............................................ 38

2.      DEFENDANTS' ANSWERING BRIEF............................................... 40

3.      EXPRESS MOBILE'S REPLY BRIEF................................................ 43

4.      DEFENDANT'S SUR-REPLY BRIEF................................................ 44

IV.    CLAIM CONSTRUCTIONS OF THE '755, '287, AND '044 PATENTS ................... 45

A.      "registry"..................................................................................................... 45

1.      EXPRESS MOBILE'S OPENING BRIEF............................................ 45

2.      DEFENDANTS' ANSWERING BRIEF............................................... 45

3.      EXPRESS MOBILE'S REPLY BRIEF................................................ 46

4.      DEFENDANT'S SUR-REPLY BRIEF................................................ 47

B.    "web component"................................................................................... 47
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 47
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 48
    3.    EXPRESS MOBILE'S REPLY BRIEF................................................ 48
    4.    DEFENDANT'S SUR-REPLY BRIEF.................................................. 49
C.    "web service"..................................................................................... 49
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 50
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 50
    3.    EXPRESS MOBILE'S REPLY BRIEF................................................ 51
    4.    DEFENDANT'S SUR-REPLY BRIEF.................................................. 52
D.    "symbolic name(s)".............................................................................. 52
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 52
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 53
    3.    EXPRESS MOBILE'S REPLY BRIEF................................................ 54
    4.    DEFENDANT'S SUR-REPLY BRIEF.................................................. 55
E.    "Application / application"................................................................... 55
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 56
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 57
    3.    EXPRESS MOBILE'S REPLY BRIEF................................................ 60
    4.    DEFENDANT'S SUR-REPLY BRIEF.................................................. 62
F.    "Player / player".................................................................................. 62
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 63
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 64
    3.    EXPRESS MOBILE'S REPLY BRIEF................................................ 65
    4.    DEFENDANT'S SUR-REPLY BRIEF.................................................. 67
G.    "preferred UI object"............................................................................ 68
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 68
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 69
    3.    EXPRESS MOBILE'S REPLY BRIEF................................................ 69
    4.    DEFENDANT'S SUR-REPLY BRIEF.................................................. 69
H.    "related settings"................................................................................. 69
    1.    EXPRESS MOBILE'S OPENING BRIEF.............................................. 70
    2.    DEFENDANTS' ANSWERING BRIEF................................................. 70

3. EXPRESS MOBILE'S REPLY BRIEF...................................................... 70

4. DEFENDANT'S SUR-REPLY BRIEF.................................................. 71

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*3M Innovative Properties Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)............................................................................61

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    No. CV 16-453-RGA, 2017 WL 3738383 (D. Del. Aug. 29, 2017)......................................52

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002)............................................................................25

*Backyard Nature Prods., Inc. v. Woodlink, Ltd.*,
    81 F. App'x 729 (Fed. Cir. 2003) .........................................................................44

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed.Cir.2008)............................................................................16

*Biovail Corp. Int'l v. Andrx Pharm., Inc.*,
    239 F.3d 1297 (Fed. Cir. 2001).....................................................................40, 67

*Bushnell Hawthorne, LLC v. Cisco Sys.*,
    813 F. App'x 522 (Fed. Cir. 2020) .......................................................................23

*Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005)............................................................................59

*Convolve, Inc. v. Compaq Computer Corp.*,
    812 F.3d 1313 (Fed. Cir. 2016)............................................................................32

*Cordance Corp. v. Amazon.com, Inc.*,
    636 F. Supp. 2d 310 (D. Del. 2008), aff'd, 658 F.3d 1330 (Fed. Cir. 2011) ..........................52

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008)............................................................................29

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
    540 F.3d 1337 (Fed. Cir. 2008)............................................................................32

*Immersion Corp. v. Motorola Mobility LLC*,
    No. 17-cv-1081-RGA, 2018 U.S. Dist. LEXIS 183117 (D. Del. Oct. 25, 2018) ....................21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
    381 F.3d 1111 (Fed. Cir. 2004).....................................................................32, 64

*Intermec Techs. Corp. v. Palm Inc.*,
   738 F. Supp. 2d 522 (D. Del. 2010)......................................................................................13

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002).............................................................................................34

*Kaneka Corp., v. Xiamen Kingdomway Group Co.*,
   790 F.3d 1298 (Fed. Cir. 2015).............................................................................................34

*Kx Indus., L.P. v. Pur Water Purification Prods.*,
   108 F. Supp. 2d 380 (D. Del. 2000).......................................................................................42

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)...........................................................................................4, 45

*Nautilus, Inc. v. Biosig Instruments*,
   572 U.S. 898 (2014)...............................................................................................................22

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
   No. C 12-01106 WHA, 2012 U.S. Dist. LEXIS 181308 (N.D. Cal. Dec. 21,
   2012) ......................................................................................................................................12

*Novo Industries, L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 .............................................................................................................23, 25, 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008).......................................................................................15, 50

*Orthophoenix LLC, v. Stryker Corporation, et. al.*,
   C.A. No. 1:13-cv-01628-LPS, ECF No. 180 (D. Del. Feb. 2, 2016)...........................23, 24, 26

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
   952 F.3d 1336 (Fed. Cir. 2020).............................................................................................40

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005).............................................................................................41

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..........................................................................................2, 21

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   CA-08-309-LPS, 2012 WL 938926 (D. Del. Mar. 13, 2012).................................................6

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
   660 F. Supp. 2d 1037 (D. Minn. 2009).................................................................................54

*ResQNet.com, Inc. v. Lansa, Inc.*,
   346 F.3d 1374 (Fed. Cir. 2003).............................................................................................66

*SAS Institute, Inc. v. ComplementSoft, LLC*,
    825 F.3d 1341 (Fed. Cir. 2016) .................................................................................55

*Savvy Dog Sys., LLC v. Pa. Coin, LLC*,
    No. 3:19-CV-01470, 2020 U.S. Dist. LEXIS 239416 (D. Del. Dec. 21, 2020) .....................12

*Smithkline Beecham PLC v. Teva Pharms. USA, Inc.*,
    No. 04-0214, 2007 U.S. Dist. LEXIS 45703 (D.N.J. Jun. 22, 2007) .....................................67

*Southwest Software, Inc. v. Harlequin Inc.*,
    226 F.3d 1280 (Fed. Cir. 2000) .................................................................................25

*Superior Fireplace Co. v. Majestic Prods. Co.*,
    270 F.3d 1358 (Fed. Cir. 2000). (Ex. 8, ¶¶88-97.) .................................................27

*Tate Access Floors v. Interface Architectural Res.*,
    279 F.3d 1357 (Fed. Cir. 2002) .................................................................................59

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
    728 F.3d 1309 (Fed. Cir. 2013) .................................................................................66

*Truinject Corp. v. Galderma*,
    No. 19-592-LPS-JLH, 2020 U.S. Dist. LEXIS 107331 (D. Del. June 18, 2020) ...................23

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) .................................................................................40

*Viiv Healthcare Co. v. Gilead Scis., Inc.*,
    437 F. Supp. 3d 395 (D. Del. 2020) ..........................................................................11

*Virentem Ventures, LLC v. YouTube, LLC*,
    No. 18-917 (MN), 2019 U.S. Dist. LEXIS 215006 (D. Del. Dec. 13, 2019) .........................46

*Voice Techs. Grp., Inc. v. VMC Sys.*,
    164 F.3d 605 (Fed. Cir. 1999) .................................................................................32

*XMTT, Inc. v. Intel Corp.*,
    2020 U.S. Dist. LEXIS 83339 (D. Del. May 12, 2020) (Andrews, J.) ...............................45

**Statutes**

35 U.S.C. § 112 .................................................................................................59, 62

## TABLE OF ABBREVIATIONS / EXHIBITS

| Description | Exhibit or Abbreviation |
|---|---|
| Declaration of Timothy Devlin in support of Express Mobile's Opening Claim Construction Brief | Ex. 1 |
| *Express Mobile, Inc. v. eGrove Sys. Corp.*, No. 1:17-cv-00703-RGA (D. Del. Aug. 22, 2018), D.I. 35 | Ex. 1A |
| *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-00130-JRG-RSP, (E.D. Tex. Feb. 7, 2018), D.I. 97 | Ex. 1B |
| *X.Commerce, Inc. v. Express Mobile, Inc.*, 3:17-cv-02605-RS, (N.D. Cal September 10, 2018), D.I. 79 | Ex. 1C |
| *Express Mobile, Inc. v. eGrove Sys. Corp.*, No. 1:17-cv-00703-RGA (D. Del. Aug. 22, 2018), D.I. 23 | Ex. 1D |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. June 23, 2020), D.I. 137 (*Shopify* Claim Construction Opinion) | Ex. 1E |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. June 30, 2020), D.I. 142 (*Shopify* Claim Construction Order) | Ex. 1F |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. June 5, 2020), D.I. 128 (*Shopify* Claim Construction Hearing Transcript, held on May 20, 2020) | Ex. 1G |
| Excerpt from Reply Expert Report of Kevin C. Almeroth, dated November 3, 2020 submitted in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 1H |
| Certificate of Correction for U.S. Patent No. 6,546,397 | Ex. 1I |
| *Orthophoenix LLC, v. Stryker Corporation*, et. al., C.A. No. 13-1628-LPS (D. Del.), D.I. 180, dated February 2, 2016 | Ex. 1J |
| *Express Mobile, Inc. v. Svanaco, Inc.*, 2:17-cv-00130-JRG-RSP, D.I. 82-10, dated December 11, 2017 | Ex. 1K |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. May 8, 2020), D.I. 117 (*Shopify* Joint Claim Construction Brief) | Ex. 1L |
| Declaration of Glenn E. Weadock regarding Claim Construction, dated January 8, 2021 | Ex. 2 |
| Curriculum Vitae of Glenn E. Weadock | Ex. 2A |
| Excerpt from '397 File History, June 5, 2001 Appl. Amendment | Ex. 2B |
| https://javascript.info/intro | Ex. 2C |
| Excerpt from John P. Slone, *Local Area Network Handbook* (6th Ed. 1999) | Ex. 2D |

| Description | Exhibit or Abbreviation |
|---|---|
| https://www.stackchief.com/blog/The V8 JavaScript Engine | Ex. 2E |
| Excerpt from *The Dictionary of Computing & Digital Media: Terms & Acronyms* (Brad Hansen, 1999) | Ex. 2F |
| Excerpt from *The Dictionary of Multimedia: Terms and Acronyms* (Brad Hansen, 1999) | Ex. 2G |
| Excerpt from *Encyclopedia of Computers and Computer History*, Vol. 2 (Rojas, 2001) | Ex. 2H |
| Excerpt of Blackie's Dictionary of Computers (2008) | Ex. 2I |
| Definition of "abstract machine" from Wolfram Mathworld | Ex. 2J |
| Definition of "abstract machine" from Wikipedia | Ex. 2K |
| Reply Expert Report of Bhuvan Urgaonkar, Ph.D., dated November 3, 2020 submitted in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 2L |
| Excerpt from *Virtual Machines*, (Smith and Nair, 2005) | Ex. 2M |
| Excerpt from Microsoft Press Computer Dictionary, Fourth Edition (1999) | Ex. 2N |
| Excerpt from Microsoft Press Computer Dictionary, Third Edition (1997) | Ex. 2O |
| Excerpt from Webster's New World Computer Dictionary, Tenth Edition (2003) | Ex. 2P |
| Excerpt from *Administering Active Directory* (Mark Wilkins, McGraw-Hill 2001) | Ex. 2Q |
| Excerpt from *Managing the Windows 2000 Registry* (Paul Robichaux, 2000) | Ex. 2R |
| D. Theotokis et al., *Distributed Information Systems Tailorability: A Component Approach, in Future Trends of Distributed Computing Systems* (IEEE 1999) | Ex. 2S |
| Excerpt from Glenn E. Weadock & Mark Wilkins, *Windows 95 Registry For Dummies* (1998) | Ex. 2T |
| Excerpt from Merriam Webster's Collegiate Dictionary, Tenth Edition (1996) | Ex. 2U |
| W3C, Web Services Glossary, W3C Working Group Note (February 11, 2004) (https://www.w3.org/TR/2004/NOTE-ws-gloss-20040211/) | Ex. 2V |
| Excerpt from the '755 File History, Reply "B" Under 37 C.F.R. § 1.116(e), May 30, 2013 | Ex. 2W |
| Excerpt from *Web Server Technology* (Yeager and McGrath, Morgan Kaufmann, 1996) | Ex. 2X |

| Description | Exhibit or Abbreviation |
|---|---|
| Transcript of S. Rempell Deposition, taken on March 29, 2018 in *Express Mobile, Inc. v. Svanco, Inc.*, 2:17-cv-00130 (E.D. Tex.) | Ex. 2Y |
| Transcript of S. Rempell Deposition, taken on May 1, 2018 in *Express Mobile, Inc. v. Svanco, Inc.*, 2:17-cv-00130 (E.D. Tex.) | Ex. 2Z |
| Declaration of Timothy Devlin in support of Express Mobile's Reply Claim Construction Brief | Ex. 3 |
| Deposition Transcript of Christopher Schmandt, taken on December 13, 2017 in *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-00130-JRG-RSP (E.D. Tex.) | Ex. 3A |
| Deposition Transcript of Christopher Schmandt taken on April 17, 2020 in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 3B |
| Deposition Transcript of Glenn Weadock taken on March 25, 2020 in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 3C |
| Declaration of Chris Schmandt, dated April 2, 2020 submitted in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 3D |
| Express Mobile Inc.'s Opposition to Shopify's Motion for Summary Judgment and to Exclude Expert Opinions Relating to Damages, dated December 15, 2020, D.I. 273, *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 3E |
| Second Supplemental Declaration of Chris Schmandt in Support of Defendants' Claim Constructions, dated January 25, 2021 submitted in *Express Mobile, Inc. v. Wix.com, Ltd., et al.,* 3:19-cv-06559-RS (N.D. Cal.) | Ex. 3F |
| Deposition Transcript of Christopher Schmandt taken on February 24, 2021 | Ex. 3G |
| Supplemental Declaration of Glenn E. Weadock regarding Claim Construction, dated February 26, 2021 | Ex. 4 |
| Williams College "Programming Languages" (CS334) Spring 2000 Lecture Notes (retrieved from https://cs.pomona.edu/~kim/cs334/s00/Lectures/Lec6/Lec6.html) | Ex. 4A |
| Virginia Tech "Programming Languages" Lecture Notes, Benjamin J. Keller, Spring 2002 Lecture Notes (retrieved from http://courses.cs.vt.edu/~cs3304/Spring02/lectures/lect02.pdf) | Ex. 4B |
| Princeton University "Programming Languages" (CS 441) Fall 1998 Lecture Notes (retrieved from https://www.cs.princeton.edu/courses/archive/fall98/cs441/Lectures/Lec5/Lec5.html) | Ex. 4C |
| Excerpt from David Flanagan, *JavaScript: The Definitive Guide*, Fourth Ed. (2001) | Ex. 4D |
| *Manipulating Strings with JavaScript*, TechRepublic (2004) | Ex. 4E |

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpt from Robert W. Sebesta, *Tenth Edition of Concepts of Programming Languages* (2012) | Ex. 4F |
| Excerpt from M. Gabbrielli, S. Martini, *Programming Languages: Principles and* <br> *Paradigms, Undergraduate Topics in Computer Science*, DOI 10.1007/978-1-84882-914-5_1, (Springer-Verlag London Limited 2010) | Ex. 4G |
| Excerpt from McGilton and Morgan, *Introducing the UNIX System* (1983) | Ex. 4H |
| Excerpt from Danesh, *Teach Yourself JavaScript in a Week* (1996) | Ex. 4I |
| Excerpt from Husain and Levitt, *JavaScript Developer's Resource* (1997) | Ex. 4J |
| Excerpt from McFarlane, et. al., *Professional JavaScript* (1999) | Ex. 4K |
| Excerpt from Jaworski, *Mastering JavaScript* (2001) | Ex. 4L |
| U.S. Patent No. 6,201,611 (Carter) | Ex. 4M |
| Robb, *Managing OS Diversity*, ComputerWorld, Nov. 19, 2001 | Ex. 4N |
| Excerpt from *Microsoft Computer Dictionary* (Fourth Ed. 1999), pp. 317, 441 | Ex. 4O |
| Excerpt from Martin and Weadock, *Bulletproofing Client/Server Systems* (1997) | Ex. 4P |
| Excerpt from *The Dictionary of Multimedia: Terms and Acronyms*, definition of "abstract machine" (Brad Hansen, 1999) | Ex. 4Q |
| Excerpt from *The New Penguin Dictionary of Computing* (2001) | Ex. 4R |
| What Is Node.js for Java Developers (Dzone Java) (Ratha KM Dec. 22, 2016) | Ex. 4S |
| *U.S. v. Microsoft Corp.*, 253 F.3d 34, 66 (D.C. Cir. 2001) | Ex. 4T |
| "An examination of software engineering work practices," Singer, Lethbridge, Vinson and Anquetil, *Proceedings of the 1997 conference of the Centre for Advanced Studies on Collaborative research* (1997) | Ex. 4U |
| Declaration of Jonathon A. Talcott in support of GoDaddy's Claim Construction Sur-reply Brief | Ex. 5 |
| Dictionary of Information Technology (3d. Ed. 2002), *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-1, Exhibit 19) | Ex. 5A (GD_Ex. 5A)[1] |
| U.S. Patent No. 5,842,020 ("Faustini") | Ex. 5B (GD_Ex. 5B) |

---

[1] The parties have renumbered exhibits originally cited in GoDaddy's Response Brief as "GD_Ex. 3[X]" to "Ex. 7[X]" and exhibits originally cited in GoDaddy's Sur-Reply Brief as "GD_Ex. 5[X]" to "Ex. 5[X]" so as to correct inadvertent overlap that had occurred in the parties' exhibit numbering schemes.

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpts from Donald Turnbull's May 16, 2018 deposition transcript in *Express Mobile, Inc. v. Svanaco, Inc.,* No. 2:17-cv-00130 (E.D. Tex.) (Dkt. 123-2 Exhibit 13) | Ex. 5C (GD_Ex. 5C) |
| Excerpts from Robert W. Sebesta, *Concepts of Programming Languages* (10th Ed. 2009), *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-2, Exhibit 22) | Ex. 5D (GD_Ex. 5D) |
| Excerpts from Ian D. Craig, *Virtual Machines* (2006) | Ex. 5E (GD_Ex. 5E) |
| Brent W. Benson, *JavaScript*, in ACM SIGPLAN Notices, April 1999, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-2, Exhibit 29), available at https://dl.acm.org/doi/10.1145/312009.312023) | Ex. 5F (GD_Ex. 5F) |
| About MathWorld, content from https://mathworld.wolfram.com/about/, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-2, Exhibit 30) | Ex. 5G (GD_Ex. 5G) |
| Using a Mac at Goizueta, content from https://community.bus.emory.edu/ITHelp/Documents/Mac%20Requirements.pdf | Ex. 5H (GD_Ex. 5H) |
| Supplemental Declaration of Christopher Schmandt in support of GoDaddy's Claim Construction Sur-reply Brief      Appendix A – Schmandt References Cited | Ex. 6 |
| [Corrected] Declaration of Jonathon A. Talcott in support of GoDaddy's Claim Construction Response Brief | Ex. 7 (GD_Ex. 1) |
| Microsoft Press Computer Dictionary (3rd Ed. 1997), excerpt for definition of "database" | Ex. 7A (GD_Ex. 3A) |
| March 25, 2020 Deposition Transcript of Glenn E. Weadock, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 7B (GD_Ex. 3B) |
| [RESERVED] | Ex. 7C (GD_Ex. 3C) |
| McGraw-Hill Dictionary of Scientific and Technical Terms (6th Ed.), and Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/machine (accessed 2/5/2021) | Ex. 7D (GD_Ex. 3D) |
| The New Penguin Dictionary of Computer (2001), at 532 (XMO_GD00030649-30654) | Ex. 7 E (GD_Ex. 3E) |

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpts of March 25, 2020 Deposition Transcript of Glenn E. Weadock, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.,* 1:19-cv-00439-RGA (D. Del.), and *Express Mobile, Inc. v. iCrossing, Inc.,* 1:18-cv-01176-RGA (D. Del.) (Dkt 120-1) | Ex. 7F (GD_Ex. 3F) |
| Excerpts from December 6, 2017 Deposition Transcript of Andre Kruetzefeldt, *Express Mobile v. Svanaco, Inc.,* 2:17-cv-00130 (E.D. Tex.) and *Shopify v. Express Mobile,* 1:19-cv-00439, RGA (Dkt. 120-1) | Ex. 7G (GD_Ex. 3G) |
| Excerpts from Microsoft Computer Dictionary (4th Ed.), *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.,* 1:19-cv-00439, RGA (D. Del.) and *Express Mobile, Inc. v. iCrossing, Inc.,* 1:18-cv-01776-RGA (D. Del.) (Dkt. 120-2, Exhibit 10) | Ex. 7H (GD_Ex. 3H) |
| Microsoft Computer Dictionary, 4th Ed. At 332 (XMO_GD00156617) | Ex. 7I (GD_Ex. 3I) |
| Shopify's (redacted) Opening Brief in Support of its Motion for Summary Judgment and to Exclude Opinions of Express Mobile's Experts Relating to Damages, Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc., 1:19-439-RGA, (D.Del.) (Dkt. 219) | Ex. 7J (GD_Ex. 3J) |
| (a) Excerpts from B. Hansen, Dictionary of Computer & Digital Media: Terms & Acronyms (1999), p. 2, defining "abstract machine" (Dkt. 120-2, Exhibit 6); (b) Excerpts from B. Hansen, Dictionary of Multimedia: Terms and Acronyms (1999) (Dkt. 120-2, Exhibit 7); and (c) Excerpts from Microsoft Computer Dictionary (3d. Ed.), Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc., 1:19-cv-00439, RGA (D. Del.) 1997 (Dkt. 120-2, Exhibit 9) | Ex. 7K (GD_Ex. 3K) |
| [Corrected] Declaration of Christopher Schmandt in support of GoDaddy's Claim Construction Response Brief, with: Appendix A – Schmandt Curriculum Vitae Appendix B – Schmandt References Cited | Ex. 8 (GD_Ex. 2) |
| Defendant GoDaddy.com, LLC | GoDaddy or GD |
| Plaintiff Express Mobile, Inc. | XMO |
| Java Virtual Machine | JVM |
| Virtual Machine | VM |
| Person of Ordinary Skill in the Art | POSA |
| U.S. Patent No. 6,546,397 | '397 |
| U.S. Patent No. 7,594,168 | '168 |
| U.S. Patent No. 9,063,755 | '755 |
| U.S. Patent No. 9,928,044 | '044 |

| Description | Exhibit or Abbreviation |
|---|---|
| U.S. Patent No. 9,471,287 | '287 |
| Joint Claim Construction Chart (D.I. XX) | JCCC |
| "run time engine" or "runtime engine" | RTE |
| "run time file" | RTF |
| "virtual machine" | VM |
| Java Virtual Machine | JVM |
| Certificate of Correction | COC |

## I.    AGREED-UPON CONSTRUCTIONS

| Claim Term | Agreed Construction |
|---|---|
| multi-dimensional array(s) / multidimensional array(s) | a uniquely identifiable indexed set of related elements, wherein each element is addressed by a set of two or more indices, each index corresponding to a dimension of the array |
| storing information representative of said one or more user selected setting in a database | storing data in a database, which data pertains to one or more attributes of an object available for selection by a user |
| transformation | the changing of an object from one state to another based on a timer control, subject to user settings |
| settings | attributes of an object available for selection |
| authoring tool / authoring tool configured to | a system, with a graphical interface, for generating code to display content on a device screen |
| device-dependent code | code that is specific to the operating system, programming language, or platform of a device |
| device-independent code | code that is not specific to the operating system, programming language, or platform of a device |
| where said application is device-dependent code | where said Application is a device-independent code |
| for evoking one or more web components | for calling up one or more web components |

1

## II.    DISPUTED CONSTRUCTIONS

### A.    INTRODUCTION

#### 1.  Express Mobile's Opening Brief

This Court previously construed several terms of the asserted patents. (Exs. 1E & 1F (Shopify Orders); Ex. 1A, eGrove Order).[2] Express Mobile generally applies the Court's prior constructions, while GoDaddy generally deviates from this Court's constructions and proposes new constructions that attempt to add narrowing limitations or redefine terms contrary to their ordinary meaning and well-established law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13, 1323 (Fed. Cir. 2005). Express Mobile's constructions are consistent with the plain meaning of the terms and supported by the intrinsic and extrinsic evidence and the understanding of one of skill in the art.[3] GoDaddy has also asserted that other terms that have a plain meaning to the POSA or are readily understood from the claims must be construed. GoDaddy's constructions are a transparent attempt to rewrite the claims to try to avoid liability and should be rejected.

#### 2.  Defendants' Answering Brief

The Court is well versed in these patents and claims terms. GoDaddy's proposals are consistent with the Court's prior constructions, in some cases building upon or modestly clarifying them to address new evidence and resolve the current parties' underlying disputes. GoDaddy's constructions in this case are the only ones anchored in the intrinsic record and corroborated by the preponderance of both parties' extrinsic evidence. And unlike XMO's "no construction necessary" or other vague proposals, GoDaddy's constructions translate these highly technical terms concretely for a jury, while staying true to how a POSA would interpret

---

[2] Ex. 1 refers to the Devlin Decl. and Ex. 2 refers to the Weadock Decl.
[3] Glenn Weadock has an engineering degree from Stanford University and has nearly 30 years of experience in computer programming, web design, and the IT field. (Ex. 2 ¶¶ 3-13).

them. By contrast, XMO's constructions (to the extent they even exist) are detached from the intrinsic evidence in an apparent attempt to broaden the claims beyond anything supported by the patents' disclosures to support XMO's overreaching infringement contentions.

### 3. Express Mobile's Reply Brief

GoDaddy attempts to rewrite and narrow the disputed claim terms and the Court's prior constructions. The claims, however, should not be rewritten simply because GoDaddy does not like the Court's prior constructions. GoDaddy's constructions are allegedly supported by Mr. Schmandt, but he has changed his opinion regarding the meaning of these terms over 15 times in an effort to circumvent the Court's rejection of his prior opinions.

### 4. Defendants Sur-reply Brief

XMO seeks the best of both worlds. It claims GoDaddy's positions and Mr. Schmandt's opinions are "inconsistent" with prior *Markman* proceedings, yet it is XMO that has created a mixed record from its dozens of other patent lawsuits leading up to this one. Regardless, no such inconsistencies really exist. XMO grossly exaggerates the record to assert Mr. Schmandt has "changed his opinion" numerous times. Not true. Mr. Schmandt has accounted for this Court's and others' rulings to bring harmony of the same with his present opinions, as has GoDaddy with its proposed constructions. And notably, realizing its positions lacked support, XMO now dumps voluminous extraneous exhibits into the record, which are improper for a *reply* brief, and irrelevant to boot.

## III.   CLAIM CONSTRUCTIONS OF THE '397 AND '168 PATENTS

### A.   "virtual machine"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| abstract machine emulated in software  -or- | software that emulates a physical processor |

| Express Mobile Construction | Defendant's Construction |
| --- | --- |
| software that emulates a physical machine | |

### 1. Express Mobile's Opening Brief

Express Mobile proposes the same alternative constructions that were previously adopted by this Court—whether the adopted construction is "abstract machine emulated in software" or "software that emulates a physical machine." (Ex. 1A; Ex. 1E; Ex. 1F). Express Mobile's construction is supported by the claims, specification, prosecution history and extrinsic evidence. (Ex. 2 ¶¶ 23-32). The claims use the virtual machine term broadly without limitation: claim 1, for example, recites "virtual machine commands" that correspond to "user selectable settings" and are used to render the web page. ('397 at 65:53-54). Both constructions proposed by Express Mobile are appropriately broad, and consistent with this Court's previous statement that it would "give virtual machine as broad a definition as I can since it seems to be a broad term, and I don't expect to take the derivative of a definition to indicate what it means." (Ex. 1G, Tr. at 39:25:40:3).

Here, GoDaddy proposes a purported derivative of the court's construction of "software that emulates a physical machine." It insists that the virtual machine must "emulate[] a physical *processor*." This construction appears to be another attempt to import additional extraneous limitations—including "that executes intermediate code" and "in the instruction set of that machine"—into the claim construction. This Court and another court have already rejected adding the "intermediate code" limitation because this claim term is not so limited and claims are not limited to preferred embodiments (Ex. 1E at 4-5, Ex. 1C at 6). *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

There are numerous other reasons that the proposed construction of "emulate[] a physical processor" is inappropriate. Nothing in the specification states that the virtual machine must

emulate a physical processor. Indeed, the specification does not reference physical processor or hardware processors *at all*.[4]  Moreover, no fewer than three technical experts, including an expert on virtual machines, have rendered opinions that virtual machines within the scope of the claims are not limited to those that emulate physical processors. Ex. 2K (Urgaonkar Reply Report ¶¶ 2-10, 25, 28-31); Ex. 1H (Almeroth Reply Report ¶¶ 17-18); Ex. 2 ¶¶ 34-35 (Weadock). Even *Shopify's* expert in a prior case, Mr. Schmandt, testified that a virtual machine "[i]n the context of the asserted patents . . . emulates ***not a 'real machine' (i.e., a computer having actual, physical hardware, such as an Intel x86 processor)***, but an 'abstract' or 'hypothetical' machine." (*See* Ex. 1K, 17-cv-00130-JRG-RSP (E.D. Tex.), Dkt. 82-10, Ex. 8 ¶ 6).

Moreover, the specification's actual teachings underscore that virtual machines need not emulate physical processors. Other programming languages besides Java can be used to practice the virtual machines within the invention, particularly as browsers develop over time. (*See* '397 at 32:21-25, 62:33-36). One of ordinary skill in the art would understand a "full-featured programming language" and "popular browsers" with "more robust versions of programing languages" to disclose the use of other virtual machines. (Ex. 2 ¶ 27). These programming languages could employ "high level language virtual machines" (a type of process virtual machine). (Ex. 2 ¶¶ 32-35). Such virtual machines can be contrasted with system virtual machines, which emulate functionalities of specific hardware systems, such as those implemented on a particular physical processor. (*Id.*)

In sum, no Court has adopted the requirement that a virtual machine emulate a "physical processor," and no other party besides GoDaddy has even proposed such a construction. To the

---

[4] In two instances, the specification refers to "word processors," such as Microsoft Word, but never to a physical processor or a hardware processor.

extent that this Court included "physical machine" language in its claim construction of virtual machine in the *Shopify v. Express Mobile* case, it did so because the Court "believe[d] it will be easier for a jury to readily understand," not for any substantive reason, and certainly not because it believed that the virtual machine term was neither "abstract" nor "broad." (Ex. 1E at 5).

### 2.  Defendant's Answering Brief

The parties agree that "virtual machine" is "software that emulates" something "physical," but disagree whether that something "physical" must be a generic "machine" or "processor." GoDaddy's proposed construction is consistent with and largely reflects the Court's prior construction, only replacing "physical *machine*" with "physical *processor*." The intrinsic record supports this construction and it avoids construing "virtual machine" circularly using the vague term "machine" that is already in the term "virtual machine" itself—which will be more helpful to a jury, which will be far more familiar with the concept of a "processor" in the computer context. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, CA-08-309-LPS, 2012 WL 938926, at *6 (D. Del. Mar. 13, 2012).

XMO's construction begs the question of what type of "machine" is required, especially since the plain and ordinary definition of a "machine" is essentially any "device for performing a task." (Ex. 8 ¶¶1-63, 64-65; Ex. 7D.)[5]  GoDaddy's construction answers that very question: the machine must be like a virtual processor, emulating its functions in software rather than hardware.  Certainly, a "virtual machine" in the context of the claims cannot just be any "machine" such as a piston or sensor—it must be construed in the context of the software that is claimed to generate webpages.  As such, GoDaddy's construction is the only one that makes

---

[5] Exhibits 7[x] (formerly GD_Ex. 3[x]) refer to exhibits attached to Ex. 7, the Declaration of Jonathon A. Talcott.

sense in the context of the processor-type functions performed by the '397 patent's Java Virtual

Machine, VMs more generally, and the claimed "run time engine" that "generate[s] virtual

machine commands." ('397, 35:33-36, 45:45, 46:19-27, 46:43-44.)  For instance, the run time

engine "*read(s)* the external database," which is a function performed only by a processor. ('397,

45:45.) The patent also describes the virtual machine's "run time engine" functionality as

performing physical processor tasks, such as "read[ing] the external database," "execut[ing] ....

By means of multiprogramming using thread technology," initializing variable data types, and

arithmetic "calculations." ('397, 45:45, 46:19-44.) These VM functions are clearly those that

emulate a physical *processor*, not just any machine. (Ex. 8 ¶¶65-68.)

Tellingly, neither XMO nor its expert provides any example of what a "physical machine"

would be or do *other* than what would require a computer's processor, and the objective extrinsic

evidence upon which XMO relies actually supports GoDaddy's construction. (Ex. 8 ¶69; Ex. 2M

at XMO_GD00156994 (in context of VMs, "the meaning of 'machine' is a matter of perspective.

From the perspective of a *process* executing a user program, the machine consists of a logical

memory address space that has been assigned to the process, along with user-level registers and

instructions that allow execution of code belonging to the process" – i.e., attributes of a

processor); *see supra,* p. 5; Ex. 2 ¶¶34-35.)

Despite XMO claiming otherwise, the parties actually agree that the "virtual machine"

does not need to emulate a *particular* or *specific* real machine. (Ex. 8 ¶¶66, 70.) XMO

misconstrues Mr. Schmandt's prior statements on this point which, when taken in proper context,

are consistent with GoDaddy's position that the "emulation of a physical processor" does not

require emulations of a particular known physical processor, such as an ARM or Intel x86. (Ex. 8

¶¶66, 71.) Rather, a POSA would understand that such "virtual machine" software is essentially

that of an "emulator" that performs the same tasks occurring in a generic physical processor, only using software instead of hardware logic and memory circuits that are standard physical processor components. (*Id.* ¶66.)

XMO claims that three prior experts (one being its current one, Dr. Weadock) opined that the claimed VM is "not limited to those that emulate physical processors," but Drs. Urgaonkar and Almeroth did nothing of the sort. Instead, those prior XMO experts opined on the entirely separate issue of whether the VM required "intermediate code." (Exs. 1H ¶17 & 2L ¶¶28-31.) Regardless, XMO attacks a straw man when arguing GoDaddy's construction is an end-around attempt to add "intermediate code" and "instruction set" requirements on this term, as those words are not recited by GoDaddy's construction. (Ex. 8 ¶75.)

XMO's assertions that the patent's references to "[o]ther programming languages" undermine GoDaddy's construction as do unspecified distinctions between "system" and "process" VMs are likewise misplaced. GoDaddy's VM construction does not exclude any other programming language. To the contrary, emulation of a "physical processor" better captures the '397 patent's disclosure that a VM acts as a virtual processor so that it is platform-independent to be able to execute nearly any programming language, regardless of the actual, specific processor architecture (e.g., ARM or x86) running the underlying computer. (Ex. 8 ¶71.) GoDaddy's construction is also broad enough to cover both types of "system" and "process" VMs identified by XMO's expert (though unexplained by XMO's brief), for both kinds require emulation of a physical processor (*Id.* ¶¶72-74 (explaining Ex. 2M at XMO_GD00156991, -156996, -157000, -157008-157010).)

Finally, XMO provides no support for its "alternative" construction of "abstract machine emulated in software," which this Court previously rejected as "lead[ing] to unnecessary

confusion around the word 'abstract.'" (Ex. 1E at 5.)  Regardless, even an "abstract machine" invokes the concept of a "processor" according to dictionary definitions, including those from XMO's own expert. (*See* JCCC_Ex. 6; JCCC_Ex. 11; Ex. 7K.) Thus, intrinsic and extrinsic evidence demonstrates that a "virtual machine" is software that emulates a physical processor.

### 3. Express Mobile's Reply Brief

GoDaddy rejects the Court's prior construction, brands it as "circular[]," and redefines it in a transparent attempt to narrow it. (*Supra*, p. 6).  In the Shopify case, both parties (and Mr. Schmandt) agreed virtual machine was an "abstract machine emulated in software."  The Court rejected Mr. Schmandt's attempt to narrow that construction (i.e., intermediate code) and construed "virtual machine" broadly as "software that emulates a physical machine." (Ex. 1E). The Court substituted the term "physical machine" for "abstract machine" not to narrow or change the meaning of the construction, but to make it more jury-friendly. (*See* Ex. 1E at 5.)  Express Mobile thus submits that its prior construction or the Court's prior construction should be adopted.

GoDaddy attempts to narrow the meaning of the Court's prior construction by requiring emulation of a "physical processor."  This is not the same as the Court's prior construction.  First, the construction is based on Mr. Schmandt contradicting his prior sworn testimony to this Court.[6]

| Schmandt Shopify Declaration | Schmandt GoDaddy Declaration |
|---|---|
| In the context of the asserted patents, a "virtual machine" emulates, *not a "real machine"* (i.e., a computer having actual, *physical hardware*, such as an Intel x86 *processor*), but an "abstract" or "hypothetical" machine. (Ex. 3D ¶ 65). | In the context of the asserted patents, a "virtual machine" *is* a software abstraction, or emulation of *a physical processor* (i.e., a processor of a computer). (Ex. 8 ¶ 64) |

---

[6] Mr. Schmandt has offered testimony in support of four different constructions of the virtual machine claim term, including two different claim constructions over the course of the last two months to two different courts.  (Ex. 3F ¶ 10; Ex. 8 ¶ 63).

Mr. Schmandt's 180-degree flip, which came after this Court rejected his prior attempt to limit this claim term, should be rejected.

GoDaddy also asserts the term "machine" is vague.  But Mr. Schmandt readily used and found the term machine adequate in his prior constructions.[7]  Both this Court and the N.D. California also included "machine" in the construction of the term and did not find it vague.  The real reason GoDaddy attempts to rewrite the construction is to add additional limitations into the Court's construction.  Mr. Schmandt states that a processor includes registers, stack, logic units, circuits, random access memory, and numerous other components, and admitted that his "physical processor" construction would require some of these components, and at minimum an instruction set and a memory model.  (Ex. 8 ¶ 65; Ex. 3G at 87:13-88:7, 90:22-91:17).  GoDaddy seeks to read these unwritten elements into the construction of virtual machine, contrary to the Court's prior "broad" construction.  (Ex. 4 ¶¶ 11-15).

GoDaddy's "physical processor" requirement is also unsupported by the intrinsic record.  GoDaddy's citations do not refer to such a requirement for the virtual machine.[8]  Instead, its specification cites refer to the Java Virtual Machine (35:33-36), and to embodiments that reference certain threading functionalities that might be performed by a processor (45:45, 46:19-27, 46:19-44).  GoDaddy's efforts to infer a "physical processor" requirement from these disclosures are improper and strained.

GoDaddy attempts to distinguish expert testimony contradicting its construction.  The

---

[7] Despite the numerous dictionaries Mr. Schmandt cited to in all of his prior declarations he never asserted the term was unclear or cited to a definition of "machine." (Ex. 3F ¶ 10; Ex. 3G at 74:6-75:7). Now GoDaddy and Mr. Schmandt claim that the concept of machine is "broad and ambiguous." (*Supra*, p. 7; Ex. 8 ¶ 69; Ex. 4 ¶ 28).

[8] GoDaddy does not and cannot cite the prosecution history or claims because there is nothing in either that supports such an argument.  And GoDaddy's citations to run time engine and the tasks it performs does not support limiting the term virtual machine to emulating a physical processor.

opinions of Drs. Urgaonkar and Almeroth did not relate only to "intermediate code," but also to high-level language virtual machines, such as JavaScript engines, that fall within the Court's prior construction.  (Ex. 1H, ¶ 19; Ex. 2L, ¶¶ 34, 37, 39.)  Such virtual machines emulate processes or tasks, and not necessarily the functions of a physical processor.  Some such virtual machines act as interpreters or compilers to execute code and emulate the functionality of physical machines.  But Mr. Schmandt himself argued that interpreters would not fall under his revised "processor" construction.  (Ex. 3G at 73:10-24; Ex. 4 ¶¶ 16-23, 28).

GoDaddy asserts that Express Mobile's alternative construction of "abstract machine emulated in software" supports its argument.  Not so.  Shopify, like GoDaddy, attempted to use dictionary definitions of "abstract machine" to further limit the claims (e.g., intermediate code).  The Court rejected those efforts then and should again reject GoDaddy's attempt to impart limitations from extrinsic evidence of extrinsic evidence.  (Ex. 1L at 11, 15; Ex. 1E at 4-5).  As relevant here, several dictionary definitions in the record only reinforce to the POSA that a virtual machine is not limited to "emulating a physical processor."  (Ex. 4 ¶¶ 24-27).

### 4.  Defendant's Sur-Reply Brief

XMO's maze of convoluted extrinsic "evidence" fails to identify what precisely XMO suggests is the "physical machine" emulated by VM software. This document dump serves only to obfuscate the meaning of "virtual machine," underscoring the need for the Court to clarify the scope of "physical machine." (Ex. 6, ¶¶7-11; Ex. 2M.) *Viiv Healthcare Co. v. Gilead Scis., Inc.*, 437 F. Supp. 3d 395, 402 (D. Del. 2020) (revisiting construction "[g]iven the parties' fundamental disagreements" about its meaning).

XMO manufactures a dispute about whether the "physical processor" must be a "particular" processor, when GoDaddy and its expert have repeatedly explained that is not the

case, and such a limitation is nowhere in GoDaddy's construction. (Ex. 3G, 63:12-68:7; Ex. 8, ¶¶66-70.) XMO also mischaracterizes Mr. Schmandt's discussion of typical processor elements, which was not specific to the claimed "virtual machine," and those elements are also not in GoDaddy's construction. (Ex. 3G, 84:1-108:12; Ex. 6, ¶¶12-15.) But the VM must virtualize *something*, and while Mr. Schmandt certainly identified additional processor functionality, his opinion is clear that the construction's "processor" need only have a basic instruction set for processing commands, and memory. (*Id.*) These are of course consistent with the patent's disclosed VM functions ("generating," "reading," "executing," "using thread technology," etc.). (Ex. 6, ¶¶8, 53-56; Ex. 8, ¶¶67-68; Ex. 2M.)

The term "processor" is also plainly self-evident for the jury. *See Savvy Dog Sys., LLC v. Pa. Coin, LLC*, No. 3:19-CV-01470, 2020 U.S. Dist. LEXIS 239416, at *28-30 (D. Del. Dec. 21, 2020) (construction with "microprocessor"). Again, XMO fails to identify any superior characteristics that would be inherent in a "machine" – the list of possible "components" for which far exceeds those Mr. Schmandt listed for a processor. (Ex. 6, ¶14.) The sweeping breadth of using "machine" in the construction itself will lead a juror to consider anything virtually representing a mechanical device, engine, or equipment.

Confusing matters even more, XMO's references to "high-level language" VMs, "JavaScript engines," the "evolution" of JavaScript after the patents issued, and "interpreters or compilers" amount to non-sequiturs accompanied by a labyrinth patchwork of handpicked excerpts from undergraduate course notes, textbooks, and even more dictionaries added anew to XMO's reply.[9] The Court need not wade through these highly technical, peripheral concepts, especially

---

[9] GoDaddy asks the Court to strike these references as extraneous and inappropriate for a reply brief. *See Network Prot. Scis., LLC v. Fortinet, Inc.*, No. C 12-01106 WHA, 2012 U.S. Dist. LEXIS 181308, at *4-5 (N.D. Cal. Dec. 21, 2012).

given the disclosures plainly support the claimed VM as software emulating a physical processor. (Ex. 6, ¶¶16-60.)[10]

### B. "virtual machine commands / commands to said virtual machine"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary | code in the instruction set of the virtual machine that directs actions of the virtual machine |

#### 1. Express Mobile's Opening Brief

The term "virtual machine" is already being separately construed and it is unnecessary to construe "commands," a term well-known in the field of computing. (Ex. 2 ¶¶ 36-38). GoDaddy's construction introduces ambiguity and imports additional unsupported limitations. First, commands are broader than just "code." The specification describes various types of commands, such as "user commands (actions)" to the virtual machine that are not code. ('397 at 6:15, 10:33-34, 19:44-45; Ex. 2 ¶ 37). Second, GoDaddy's attempt to an "in the instruction set of the virtual machine" limitation is unsupported by the intrinsic evidence and introduces needless ambiguity.

#### 2. Defendants' Answering Brief

The dispute here is whether a virtual machine "command" can be something other than software code. It cannot. A POSA would understand that code in the instruction set of the virtual machine is the *only* type of "command" that a virtual machine can execute to "display at least a portion of said one or more web pages" as the claims require. (*E.g.*, '397, claims 1-2; Ex.

---

[10] Nearly all of XMO's references post-date the patents by years, and none of them define VM or support XMO's proposition that a VM can equate to an "interpreter" or "compiler," which sit between the VM and processor. (Ex. 6, ¶¶17-60; Ex. 7G, 69:6-13; Ex. 5B, 9:20-34.) XMO also conflates the patent's fanciful notion of a "full-featured programming language" with the different, known concept of "high-level languages." (Ex. 6, ¶¶41-46.) The supposed evolution of JavaScript into a "full-featured" language after the filing date of the '397 patent application is also irrelevant to claim construction. (Ex. 6, ¶¶38-49; '397, Background, 15:6-11 (disparaging JavaScript.) *See Intermec Techs. Corp. v. Palm Inc.*, 738 F. Supp. 2d 522, 546-49 (D. Del. 2010).

8 ¶¶77, 80.)  The claims language further requires that the "user selectable settings" in the display panel "correspond to commands to said virtual machine." (*Id.*)  Clearly, it is only the code for the settings themselves – not the user's human act of choosing the settings – which correspond to the virtual machine commands, because those settings instruct the VM how to draw on the display screen. (Ex. 8 ¶¶78-79.) XMO's three specification citations referring to "user commands," "feature commands," and "icon commands" are *user* commands to the user interface of the build tool – not virtual machine commands. (*Id.* ¶79.)

Like a processor, virtual machines also have an "instruction set" consistent with GoDaddy's construction—a point on which XMO's experts agree. (*Cf.* Ex. 8 ¶¶80-81; Ex. 7F, 79:14-80:3, 82:17-24, 86:18-87:4, 113:11-16, 222:1-17; Ex. 7G, 68:13-17.) One of XMO's experts cites several dictionary definitions of "command" to argue that "a command is an instruction to a computer program." (Weadock ¶37.)  GoDaddy agrees, as "instruction[s] to a computer program" are by definition code, and specifically code in the computer processor's "instruction set." (Ex. 8 ¶¶81-82; Ex. 7H at 238 (defining "instruction set" to mean the "set of machine instructions that a processor recognizes and can execute"). As such, commands to the "virtual machine" must constitute "code in the instruction set" of those virtual machines, per GoDaddy's construction.

### 3.   Express Mobile's Reply Brief

GoDaddy does not dispute that commands are "a term well-known in the field of computing" (*Supra*, p. 13 (citing Ex. 2 ¶¶ 36-38)), underscoring that this term does not require construction.

GoDaddy's construction should be rejected because "commands to said virtual machine" are not necessarily "code in the instruction set of the virtual machine that directs actions of the virtual machine." (Ex. 4 ¶¶ 29-33).   GoDaddy admits that the specification teaches "*user*

commands to the user interface of the build tool." (*Supra*, pp. 13-14). These are the very commands that are used to select settings in the display panel and that the patentee contemplates as being commands to the virtual machine. ('397 at 6:15, 10:33-34, 19:44-45). GoDaddy agrees that "the 'user selectable settings' in the display panel 'correspond to commands to said virtual machine.'" (*Supra*, p. 14). GoDaddy's argument about "commands" being "code" is therefore a red herring, and does not address why commands *to* a virtual machine must be code *"in the instruction set of the virtual machine."* GoDaddy's construction would exclude these user commands and other commands that are not necessarily in the instruction set of the machine. (Ex. 4 ¶¶ 29-33).

### 4. Defendants' Sur-reply Brief

The Court should construe these terms to resolve the parties' dispute over "commands" as including code in the instruction set of the VM. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008). XMO's "high-level formatting commands," which the intrinsic record does not mention, are fundamentally different from software commands to the VM. (Ex. 6, ¶61.) As XMO's expert admits, such user-generated commands may "ultimately" get translated into code that is in the VM's instruction set (i.e., VM commands). (Ex. 4, ¶31.) But they do not start out that way, so they are not themselves VM commands. Rather, XMO's citations to the patent refer to *human* interactions with the build tool, on-screen tool bars, and mouse clicks. (Ex. 6, ¶62.) Likewise, if the VM receives "commands" as claimed, then those commands must be in the instruction set of the VM, which is just the set of commands that the VM executes. (Ex. 6, ¶62; Ex. 8, ¶80.)

C.    "one or more run time files / at least one run time file"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| one or more files, including a run time engine, that are downloaded or created when a browser is pointed to a web page or website | one or more files, including a run time engine, that are downloaded or created and executed by a browser when a browser is pointed to a web page or website |

### 1.  Express Mobile's Opening Brief

Express Mobile's construction was previously adopted by this Court—twice. (Ex. 1A; Ex. 1F).   GoDaddy's construction requiring run time files to be executable by a browser is unsupported, and would make its separate construction of "run time engine" redundant because that term also includes an execution requirement and violates the rule that "[d]ifferent claim terms are presumed to have different meanings." *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed.Cir.2008).   While some run time files might be executed, not all files that are downloaded and used by a browser to display a web page are even executable, but are instead data files like images, audio, or video. ('397 at 2:60-66; Ex. 2 ¶¶ 39-42).

### 2.  Defendants' Answering Brief

The parties' only dispute for these terms is whether at least one of the run time files must be executable. The '397 specification and file history confirm that they are, explaining that at least the "run time engine" file (out of the overall set of run time files) reads information stored in a database to generate virtual machine commands for displaying a web page. ('397 claims 1, 2, and 37; *id.*, 5:53-62; JCCC_Ex. 7 at 5 (specifying that the run time file must generate virtual machine commands); Ex. 8 ¶¶84-86.)  For a file to perform these functions, it must be executable. (Ex. 8 ¶85.)  Indeed, the specification instructs that the runtime "CAB and JAR files both include the runtime engine and database in compressed *executable* form." ('397 at 8:24–28 (emphasis added); Ex. 8 ¶86.) The fact that the CAB/JAR files may contain other non-executable

files, such as image files ('397, 44:37–41) does not change the fact that at least one "run time file" must be executable (e.g., the runtime engine). (Ex. 8 ¶86.)

XMO argues that a run time file could be a non-executable data file like an image, audio, or video, citing to a single passage in the specification that does not support this finding and otherwise contradicts all other unambiguous intrinsic evidence. But that is beside the point, because GoDaddy's construction requires only that at least one run time file must be executable. Yet, none of the media files to which XMO points can contain an executable run time engine and therefore cannot satisfy the claimed requirement that "at least one run time file utilizes information stored in said database to generate virtual machine commands." ('397, claims 1(e), 2(d), 37(c); Ex. 8 ¶¶87-88.)

XMO's statement that this Court twice previously construed these terms (and any other terms) according to its construction is inaccurate. The Court simply adopted the parties' stipulated construction in *Shopify* and did not address the "executable" language in *eGrove* (and regardless, this Court has advised that its *eGrove* constructions for all terms should be treated "as ***having no weight at all***"). (Ex. 1G, 7:7-15 (emphasis added).) XMO's argument that including the executable requirement is redundant and violates claim differentiation is also not persuasive – the claimed "runtime engine" and "runtime files" can share the executable characteristic while still maintaining different scope.

### 3. Express Mobile's Reply Brief

GoDaddy mischaracterizes the dispute as "whether at least one of the run time files must be executable." (*Supra*, p. 16). But there is no dispute on that score. The parties agree that the "one or more files" must "include[e] a run time engine," and agree on the construction of runtime engine to the extent that a runtime engine is a "file that is executed at runtime." (D.I. 42, JCCC at

7).   Reading another "execution" requirement into this separate claim term would thus be redundant to the "run time engine" construction.  The construction is also improper because *other* runtime files are not executable.  GoDaddy's brief admits that the CAB/JAR files that comprise run time files "may contain other non-executable files, such as image files," and Express Mobile agrees that these are run time files.  (*Supra*, pp. 16-17 (GD) (citing '397 at 44:37-41); *Supra*, p. 16 (EM) (citing '397 at 2:60-66; Ex. 2 ¶¶ 39-42)).  This should end the matter.  Moreover, parties previously agreed to this construction without an executable requirement, including parties who retained Mr. Schmandt as their expert, reinforcing that GoDaddy's construction is wrong.  (*See* Ex. 3G at 55:7-60:11).

### 4.   Defendant's Sur-Reply Brief

Consistent with GoDaddy's construction, XMO agrees that "at least one of the run time files" must be executable. (*Supra,* p. 17-18.) There is no redundancy in construing at least one RTF to be executable beyond the RTE itself, because the patent discloses that more than one RTF may be executable (e.g., the CAB/JAR files). ('397, 44:37-41; Ex. 8, ¶¶84-85.) GoDaddy's construction does not require "all" RTFs to be executable, so XMO's reference to "other runtime files" is irrelevant and, regardless, not *claimed*. Mr. Schmandt's assistance to other parties who stipulated to a construction for this term without the executable requirement is irrelevant. He was not asked to opine on the issue (Ex. 3G, 57:3-17), and those parties are not before the Court here.

### D.      "build tool"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| a tool operable to facilitate the building of one or more webpages or websites | a tool operable to construct one or more run time files and an associated database that describe, and when the run time file(s) are executed, produce web page(s) |

### 1. Express Mobile's Opening Brief

Express Mobile's construction for "build tool" ("a tool operable to facilitate the building of one or more webpages or websites") comports with the claim language and specification. ('397 at 5:48-62; Ex. 2 ¶¶ 44-47). GoDaddy's construction requires the build tool to "construct one or more runtime files and an associated database that describe, and when the run time file(s) are executed, produce web page(s)." This construction is unduly limiting, confusing, and appears to be based on a single embodiment that references the build tool being used to construct a "single run time file and an associated database," along with other embodiments that generate multiple runtime files. ('397 at Abstract; 7:61-64 ("method for creating the run time files")).

GoDaddy also incorrectly attempts (for a third time) to inject its "executable" runtime file requirement into a construction, proposing that the build tool "describe[s], and when the run time file(s) are executed, produce web page(s)."  Beyond the odd wording, which is sure to promote jury confusion, this executable runtime file requirement is "inappropriate and unsupported by the specification." (Ex. 2 ¶ 47).

### 2. Defendants' Answering Brief

GoDaddy's proposed construction is consistent with the intrinsic record and provides an explanation of what the claimed build tool actually is and does. (*See* '397, Abstract, Fig. 2; JCCC_Ex. 6 at 9-10; Ex. 8 ¶90.) First, the patent clearly explains that the build tool is "operable to construct a single run time file and an associated database that describe, and when executed, produce the web page." ('397, Abstract, Fig. 2 ("Build Tool Creates an Object Database"), 40:63 & Fig. 24 (describing build tool's "creation of the external database"); Ex. 8 ¶92.) Other intrinsic evidence clarifies that the build tool may construct more than just a single

run time file (or "one or more run time files"), also consistent with GoDaddy's construction. ('397, 7:61-64; JCCC_Ex. 6 at 9; Ex. 8 ¶90.)

Second, GoDaddy's construction reflects how the claims and specification define the build tool's process for producing web pages, *viz*: after constructing the one or more run time files and database, at least one of those run time files (i.e., "run time file(s)") is executed and reads information from the database to produce the web page (the database is not executed). (JCCC_Ex. 6 at 10 ("The websites are generated by the runtime engine reading and interpreting the external database and then building the web pages dynamically."); Ex. 8 ¶90.) As with "run time file," XMO's concerns with the "executable" aspect of GoDaddy's construction are misplaced, as the construction only requires at least one run time file to be executable (e.g., the runtime engine). (*Id.* ¶91.)

XMO's one-sentence support for its own construction is conclusory, and the single intrinsic record citation upon which XMO relies actually supports GoDaddy's construction. (*Supra,* p. 19 (citing '397, 5:48-62 which explains the build tool "creates a . . . database"); Ex. 8 ¶92.) Worse, XMO's construction confuses rather than clarifies. XMO defines the disputed term in circular fashion, e.g., a "build tool" facilitates "building." The construction sheds no light on what constitutes a "build tool" or what it does, let alone how it "facilitate[s]" building. (*Id.* ¶94.)

### 3. Express Mobile's Reply Brief

Express Mobile's construction that the build tool is used to build "webpages or websites" is consistent with the specification and claims.  GoDaddy admits that the build tool is used for "producing web pages," which is consistent with Express Mobile's construction.  (*Supra*, p. 20).

Once again, however, GoDaddy seeks to add numerous limitations, including requirements of constructing "run time files" and an "associated database," and (once again) an "execution"

requirement.  GoDaddy's additional requirements are based on certain embodiments where the build tool constructs databases.  ('397 at Abstract; 7:61-64).  Other embodiments do not require constructing a database, and instead simply require that the build tool *utilize* a database.  ('397 at 66:3-23 (independent claim 2); Ex. 4 ¶¶ 34-36).  GoDaddy's construction therefore improperly excludes embodiments from the scope of the claims.[11]  Finally, GoDaddy's attempt to read an "executed" limitation and other requirements into the construction is improper and at best redundant because, to the extent they apply to the invention at all, they are recited in the claims or are already included in the construction of "run time engine."

### 4.  Defendant's Sur-Reply Brief

XMO's referenced "embodiment" where the "build tool" allegedly does not "construct" a database is not really an embodiment at all, but instead bare claim language pertaining to the RTF, which "operates to utilize information stored in [the] database." (*Supra,* p. 21 (citing '397, claim 2).)  While the RTF is a component of the build tool in that particular claim, the RTF's operation of "utiliz[ing]" (reading) information from the database is not inconsistent with the build tool constructing that database before it is read.  All other embodiments disclose this. (*Supra,* p. 20-21; Ex. 6, ¶63.) *Immersion Corp. v. Motorola Mobility LLC*, No. 17-cv-1081-RGA, 2018 U.S. Dist. LEXIS 183117, at *20-21 (D. Del. Oct. 25, 2018) (construing software consistent with all disclosed embodiments).

XMO overstates the prosecution's incidental removal of a claim reciting the build tool as "constructing" the database, because all the applicant did was delete the entire claim. *Phillips v.*

---

[11]     The claims were also amended to *eliminate* a requirement that the build tool "construct" run time files and a database.  (Ex. 4 ¶ 36; D.I. 42-6, JCCC, Ex. 6 at 2; D.I. 42-7, JCCC, Ex. 7).

*AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (where prosecution statement "lacks the clarity of the specification" it is "less useful for claim construction").

### E.   "build engine"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary<br><br>*Alternative*: a software component for processing user input related to building a website/webpage(s) for database storage | '397 Patent:  Indefinite. *Alternatively*, same construction as '168 Patent.<br><br>'168 Patent:  component that receives data or information regarding the creation, editing and/or display of a web page and updates one or more databases, including a database internal to the build engine, in response to that information or data |

### 1.   Express Mobile's Opening Brief

No construction is necessary for the term "build engine" claim phrase in light of the construction of "build tool." The specification expressly equates the term "build engine" with "build tool," referring to the "build engine (*i.e. build tool*)." ('397 Patent at 2:1-4). The POSA would understand that the reference to "build engine" in the specification refers to the "build tool" and vice versa. (Ex. 2 ¶¶ 48-50).

GoDaddy's positions lack merit. *First*, the "build engine" is not indefinite in the '397 patent. It would have been reasonably certain to the POSA that the "said build engine" claim language in dependent claims 9, 14, 19, and 23 referred to the "build tool" recited in independent claim 2. (Ex. 2 ¶¶ 48-49; *See Nautilus, Inc. v. Biosig Instruments*, 572 U.S. 898 (2014)). Underscoring this, the USPTO issued a certificate of correction for the '397 confirming that each instance of "build engine" language in the claims would be changed to "build tool." (Ex. 1I, '397 Patent, Certificate of Correction). The certificate of correction confirmed that the "build engine" in the dependent claims referred to the "build tool."  This change would never have been subject to reasonable debate in light of the specification, prosecution history, and claim language of that

patent. (Ex. 2 ¶ 49). Therefore, this Court should hold as a matter of law that the antecedent of the "said build engine" recited in the '397 claims is the "build tool."[12] In *Orthophoenix LLC v. Stryker Corp.*, a court in this district did just that where dependent claims erroneously referenced a "tool" when they plainly referred to a "system" recited in the independent claim, and the PTO had "issued a Certificate of Correction to this effect." (Ex. 1J, *Orthophoenix* Opinion at 7). Likewise, here, the "build engine" in the dependent claims referred back to the "build tool," a certificate of correction to that effect has issued, and this Court should construe the term accordingly.

*Second*, to the extent that GoDaddy proposes an alternative construction, GoDaddy grafts numerous improper and extraneous limitations onto the claims with another unnecessarily verbose and confusing construction. GoDaddy's wordy proposal is unnecessary because the claim language speaks for itself, and clarifies the role that the build engine plays in both the '397 and '168 patents. (Ex. 2 ¶ 50). Moreover, the notion that a database that is updated as a result of inputs to a build engine must therefore be "internal to the build engine" is belied by the claims, which generically refer to databases and selectively recite "internal databases" (for example, in claim 37 of the '397 patent), when appropriate. (Ex. 2 ¶ 50).

### 2. Defendants' Answering Brief

The "build engine" is indefinite for the '397 claims because it lacks antecedent basis.

*See, e.g.*, *Bushnell Hawthorne, LLC v. Cisco Sys.*, 813 F. App'x 522, 527 (Fed. Cir. 2020);

*Truinject Corp. v. Galderma*, No. 19-592-LPS-JLH, 2020 U.S. Dist. LEXIS 107331, at *27 (D.

---

[12] The Court can correct the claim construction retroactive to the date of issuance where (1) the correction is not subject to reasonable debate; and (2) the prosecution history does not suggest a different interpretation. *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357–55 (Fed. Cir. 2003).

Del. June 18, 2020). Here, a POSA would not understand with reasonable certainty what "said build engine" means in the claims, given the lack of antecedent basis and distinctions between "build engine" and "build tool" described in the specification. (Ex. 8 ¶96.)

XMO claims that the specification "equates" build tool with build engine so that a POSA would understand "said build engine." That is a bridge too far. For example, Figure 3A of the patent shows the "build engine" as merely one of several "build tool components." Even the passage to which XMO cites proves these two concepts are not equivalent, stating that a "build engine" alternatively can be more than one "build tool<u>s</u>." ('397, 2:2-3 (emphasis added); Ex. 8 ¶96.)

Moreover, a POSA would understand "engine" and "tool" to describe different, distinct software components. (Ex. 8 ¶97.) An "engine" is a specialized piece of software optimized to perform a specific, limited task, separate from the "look and feel" of the user interface (hence the under-the-hood nature of the "engine"). (*Id.*) By contrast, a "tool" is a software application designed for user interaction including, for example, menus, drop down menus, buttons, sliders, toolbars (hence the name "tool"). (*Id.*) The specification confirms these distinctions, illustrating a build tool in Figure 3A with eight components, including the build engine, but also including a control panel and pop-up windows (user interface) and "processing direct user interactions with the panel's interface objects." ('397 patent at 9:1-30, Fig. 3a.) As "build engine" cannot be mistaken for "build tool," the term is indefinite for the '397 patent claims. (Ex. 8 ¶97.)

Although the USPTO issued a Certificate of Correction ("COC") for this term in the '397 patent, this Court is not bound by that administrative action. The *Orthophoenix* case upon which XMO relies is inapposite. There, Judge Stark construed the term according to its COC without

any analysis because the construction was "apparent from the face of the patent," and neither antecedent basis nor indefiniteness were at issue. (Ex. 1J at 7.) Both are before the Bench here. It is certainly not this Court's "function to rewrite claims to preserve their validity." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002). The Court should decline to rewrite '397 claims 9, 14, 19 and 23 and, instead, should hold these claims indefinite.[13] At a minimum, this Court should hold that the COC for the '397 patent is *not* retroactive and, instead, only effective as of its issuance date, February 13, 2018.  *See Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1297 (Fed. Cir. 2000). XMO's own authority counsels against "retroactively" correcting the errors here, as GoDaddy has demonstrated that the correction is clearly "subject to reasonable debate." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003).

XMO's thin substantive attacks on GoDaddy's construction for "build engine" in the '168 patent also fall flat. GoDaddy's straight-forward construction clarifies the '168 patent's claimed functions for the "build engine," i.e., processing information required to build the web page based on information from the database and updating the database in response. (Ex. 8 ¶98.) GoDaddy's proposed requirement that the build engine update its "internal" database is also rooted in the specification, which consistently (at least 27 times) refers to the build engine as updating its *internal* database among other databases during the build process. (*Id.* ¶99; *e.g.*, '397, 5:48-6:9, 6:33-36, Figs. 3a-3b, 8, 13, 17-18, 20 (all referring to build engine as "update[ing] internal data base and set[ting] feature flags").)

---

[13] While GoDaddy addresses this indefiniteness issue here, other indefiniteness issues will also be raised at other appropriate stages in the litigation.

### 3.  Express Mobile's Reply Brief

The POSA would have understood the antecedent of "said build engine" in claims 9, 14, 19, and 27 of the '397 patent to have been the build tool recited in independent claim 2 which all of these claims depend from.  GoDaddy does not dispute that the only language to which the "said build engine" could have logically referred back to is the "build tool" language of claim element 2(d).  This is why the Patent Office already issued a Certificate of Correction changing build engine to build tool in these claims.  The antecedent of "said build engine" is not "subject to reasonable debate," is apparent from the face of the '397 patent, and the Court should construe "said build engine" as "said build tool," consistent with the previous Certificate of Correction. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003); *Orthophoenix*, Ex. 1J.  GoDaddy's arguments about the specification's disclosure of "build engine (i.e. build tools)" and Figure 3A reinforce that "said build engine" should be corrected to "said build tool" because the POSA would have understood that "build engine" and "build tool" were used interchangeably and were related to one another, underscoring that "said build engine" could only have referred to the "build tool" in independent claim 2. (Ex. 4 ¶¶ 37-38; Ex. 3G at 124:11-13).

With regard to the construction of "build engine" for the '168 patent, GoDaddy's construction is wordy and confusing.  Also, the claim language of the '168 patent accounts for the presence or absence of a database "internal to the build engine."  There can be no dispute that the elements of the build engine, including the role of a database *vis a vis* the build engine, is recited in detail in claim 1 of the '168 patent.  GoDaddy's construction is too narrow, unnecessary and will only inject confusion.  (Ex. 4 ¶ 39).

To the extent any construction is required in the '168 patent claims, this term should be construed as "a software component for processing user input related to building a

website/webpage(s) for database storage." The specification makes it clear that the role of a build engine in the invention is to process user input related to building a website and web pages so that the information related to building a website and web pages can be stored in databases. (*See*, e.g., '168 at 2:43-45, 10:16-42, 13:45-47, 16:3-6, 16:45-51, Figs. 3b, 9; Ex. 4 ¶ 40.)

### 4. Defendant's Sur-Reply Brief

XMO raises a good point about whether the "build tool" of claim is the only "candidate" for the missing antecedent basis of "build engine" in the '397 patent. It is not, and therein lies the problem. The patent clearly treats "build tool" and "build engine" as two significantly different things, and courts invalidate COCs on far fewer distinctions. *See Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358 (Fed. Cir. 2000). (Ex. 8, ¶¶88-97.)

XMO cites to Mr. Schmandt's testimony to support its argument that a POSA would use these terms "interchangeably," but Mr. Schmandt said nothing of the sort. Rather, he was simply interpreting Figure 3A of the patent, which shows the build engine as a *component of* the build tool – underscoring their differences. (Ex. 3G, 123:7-124:12.) XMO now proposes for the first time that "build engine" should be construed as "a software component for processing user input related to building a website/webpage(s) for database storage." That improperly conflates the "build engine" with the "build tool," because it is only the latter that accepts user inputs and changes settings. (Ex. 6, ¶¶64-65; '397, 40:62-45:2.) Plus, "user input related to building" is vague and inadequate. (*Supra*, p. 25; Ex. 6, ¶65.)

### F. "database"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| an electronic information storage system offering data storage and retrieval | an electronic information storage system offering data storage and retrieval and that stores information on a record-by- record basis, each record divided into one or more fields |

### 1. Express Mobile's Opening Brief

Database is a well-known term in computer science and does not require construction. To the extent that this term requires construction, Express Mobile's proposed construction of database ("an electronic information storage system offering data storage and retrieval") is consistent with the ordinary meaning of database as would have been understood by the POSA as of the priority date of the '397 and '168 patents. (Ex. 2 ¶ 43). Databases take many forms, and Express Mobile's construction is consistent with that understanding. Indeed, to the extent that any court has construed the database term in this patent, Judge Seeborg in the Northern District of California adopted Express Mobile's proposed construction and stated that it "adequately capture[s] the meaning of the term as it would have been understood by a person of ordinary skill in the art," and rejected the same "lengthy" construction proposed now by GoDaddy. (Ex. 1C at 9).

### 2. Defendants' Answering Brief

XMO agreed to GoDaddy's proposed construction for this term in *Shopify*, which this Court adopted, so XMO has admitted it is a proper construction. (Ex. 1F.) Here, XMO offers no explanation for departing from this admission other than an obvious attempt to broaden its construction to eliminate the requirement that the database stores "information on a record-by-record basis" with "each record divided into one or more fields." However, a POSA would recognize that, in the context of the asserted claims, individual records divided into one or more fields are structural requirements that distinguish databases from other data storage structures. (Schmandt ¶101.) This is consistent with the definition of "database" provided in the 1997 Microsoft Computer Dictionary, which specifies that a database has "records, each containing fields." (*Id.*; Ex. 7A at 129.)

The specification also supports GoDaddy's construction. For example, Figure 29 of the '397 patent identifies header records and styles records, which will include one or more fields. ('397 at Fig. 29, 45:44-46:48; *see also id.* at 41:31-48 (describing various fields in the header records).) This is consistent with how a POSA would understand the term database, which has a specific structure, and does not refer to any storage system that facilitates storage and retrieval. (Ex. 8 ¶102.) XMO's construction would encompass almost any electronic file, eviscerating "database" as a claim limitation, which is improper. (*Id.*) *See Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1330 (Fed. Cir. 2008) (finding district court's construction of "information database" too broad for not accounting for its "context" in the specification). As Mr. Schmandt explains, even a Microsoft Word file is an "electronic information storage system," for it electronically stores information (a representation of the text and formatting of the document) in a "system" (the .docx format is a standardized system for representing the content of word processing documents). A Word file also "offers data storage and retrieval" in that one can "store" text and formatting data in it, and one can "retrieve" the same, by e.g., opening the file in Microsoft Word. (Ex. 8 ¶¶103-106.) Yet, no POSA would consider a given Microsoft Word document to be a "database," demonstrating XMO's proposal is incorrect.

### 3. Express Mobile's Reply Brief

Express Mobile's construction was previously argued and adopted by Judge Seeborg in the Magento case as "adequately captur[ing] the meaning of the term as it would have been understood by a person of ordinary skill in the art." (Ex. 1C at 9). That the construction was not disputed in a prior case is not meaningful or dispositive here. Express Mobile's construction is consistent with the Webster's New World Computer Dictionary, which defines a database as "a collection of related information that provides a base or foundation for procedures, such as retrieving

information, drawing conclusions, and making decisions." (Ex. 2 ¶ 43 (citing Ex. 2P at XMO_GD00156950)). Some databases use record-based structures, as the Webster's definition acknowledges when it states that database information is "*usually* [] divided into data records, each with one or more data fields" (Ex. 2P, XMO_GD00156947 (emphasis added)), but that is not a requirement of all databases, underscoring why Judge Seeborg rejected GoDaddy's "lengthy" construction. (Ex. 1C at 9). GoDaddy's suggestion that a Microsoft Word File would somehow fall within Express Mobile's construction of database is both flawed and a red herring, as a Microsoft Word file is not an "electronic storage system offering data storage and retrieval"— rather, it is simply a format for storage. (Ex. 4 ¶¶ 41-43).

### 4. Defendant's Sur-Reply Brief

XMO imports Judge Seeborg's ruling from *Magento* notwithstanding XMO agreed to GoDaddy's proposed construction before this Court in *Shopify*. XMO admits its own dictionary (Ex. 2P) supports a "database" containing records divided into fields, which is consistent with the intrinsic record (*Supra,* p. 28-29). XMO's expert does not meaningfully distinguish a simple Word file from XMO's construction, which XMO's own dictionary also confirms. (Ex. 8, ¶¶99-105; Ex. 2P ("predecessors of today's ... database systems were files kept on index cards").)

### G.    "multi-dimensional array structured database"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary | database that adheres to a data model structured in the form of a multidimensional array, where the different dimensions of the array each correspond to a different layer of the overall web site stack and where each layer has fields for each of its attributes |

### 1.   Express Mobile's Opening Brief

The terms "multidimensional array" and "database" already have agreed or proposed constructions. GoDaddy nevertheless maintains that "multidimensional array <u>structured</u> database" must also be construed. The term "structured" does not need to be independently construed, and certainly should not be construed according to GoDaddy's six-line construction—including the terminologies of "different layer" and "overall website stack" that do not appear anywhere in the claims or the specification. (Ex. 2 ¶¶ 51-52).

### 2.   Defendants' Answering Brief

XMO's argument that this term does not require construction separately from "multidimensional array" and "database" fails to acknowledge that the term "multi-dimensional array *structured* database" refers to a distinct concept coined by Mr. Rempell himself. (Ex. 8 ¶¶108-109.) Mr. Rempell stated that this term "came out of his brain," that he "wasn't aware" of anyone else having used it, and that the term referred to a "unique" concept in the context of the claimed invention. (Ex. 2Y at 272:4-20, 274:3-275:16.) XMO's expert, Mr. Weadock, agrees. (*See* Ex. 2Z at 120:24-121:1, 123:16-124:17.)

Mr. Rempell also testified in his deposition that his definition of the term is consistent with GoDaddy's proposed construction, agreeing that a "[m]ultidimensional array structure database is a database that adheres to a data model, where it's structured in the form of a multidimensional array where the different dimensions of the array each correspond to a different layer of the overall website stack" where "each layer has fields for each of the attributes that could be used for whatever the purpose is." (Ex. 2Y at 230:11-232:3 (emphasis added); *see also id.* at 228:5–17, 270:20–272:20.) Thus, GoDaddy's construction mirrors the meaning coined

by the inventor and should be adopted. (Ex. 8 ¶109.) *See Voice Techs. Grp., Inc. v. VMC Sys.*, 164 F.3d 605, 615 (Fed. Cir. 1999).

Further, the term "multi-dimensional array *structured* database" is distinguishable from the concept of a database having a multidimensional array (i.e., a multidimensional array stored within a database). (Ex. 8 ¶¶110-112.) The disputed claim term requires the database itself to have the structure of a multidimensional array in which different dimensions of the array correspond to different layers of the overall website stack. (*Id.*) By contrast, a multi-dimensional array could be stored in any compatible field in any database, regardless of the structure of the database. (*Id.*) The patentee distinguished between the concept of a "multi-dimensional array structured database" and a database having a multidimensional array, as shown by the fact some of the claims of the '397 and '168 patents require a "multi-dimensional array structured database" whereas others recite only a "database with a multidimensional array." (*Compare, e.g.*, '397 claim 3, *with* '168 claim 1.) Thus, claim differentiation also supports GoDaddy's construction. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119-20 (Fed. Cir. 2004).

### 3.  Express Mobile's Reply Brief

GoDaddy does not dispute that its six-line construction does not appear anywhere in the claims or specification, or that this court will separately construe the terms "multi-dimensional array" and "database."  Nonetheless, it asserts that its construction should be adopted because it was allegedly "coined" by the inventor, Mr. Rempell.  (*Supra*, p. 31).  Inventor testimony is generally irrelevant to claim construction, and inventor testimony must be rejected where, as here, it is inconsistent with the intrinsic evidence.  *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (collecting cases); *Convolve, Inc. v. Compaq Computer*

*Corp.*, 812 F.3d 1313, 1319 (Fed. Cir. 2016) (rejecting inventor testimony that was the "only evidence" and "not enough to overcome" intrinsic evidence). Here, GoDaddy's construction, which limits a "multi-dimensional array structured database" to storage of array formatted data, is inconsistent with the specification, which states that such databases can include both conventional and array formatted data. ('168 at 2:13-17; Ex. 4 ¶ 44).

### 4. Defendant's Sur-Reply Brief

The patentee distinguished this term from other claimed databases by reciting it using different words, adding a "structured" limitation in '397 claim 3. XMO's new citation ('168, 2:13-17) does not counsel otherwise, as it simply discloses the patent's database as containing conventional data *in addition* to the array structured data, which GoDaddy's construction does not exclude. (Ex. 6 ¶66.)

### H. "a timelines / timelines"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| independent process that defines one or more values for an object, including its appearance, animation, speed, and/or resolution over time | sequence of changes that define the attributes of a text button or image object as the changes occur |

### 1. Express Mobile's Opening Brief

Express Mobile's construction is consistent with the specification and was previously adopted by this Court. (Ex. 1D). The specification expressly states: "[a] time line is an independent asynchronous process," and that the timeline values include the object's "appearance," "animation type, speed, and animation resolution." ('397 at 36:50-52, 31:22-40).

GoDaddy's construction improperly limits timelines to only a text button or image object and is contradicted by the intrinsic record. While certain exemplary embodiments of the timeline feature only reference text button and image objects, the specification is not so limited. (Ex. 2 ¶¶ 53-54). For example, Figure 20 discloses a time line associated with a web page and a web page

thread object. ('397 at Fig. 20). The specification also discloses that a time line can be associated with all objects defined on a web page. ('397 at 48:47-54). GoDaddy's construction would exclude preferred embodiments, which is "rarely if ever correct." *See Kaneka Corp., v. Xiamen Kingdomway Group Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015).

### 2. Defendants' Answering Brief

The specification expressly defines a time line: "A time line is an independent asynchronous process that defines the existence of a given text button or image object," which GoDaddy's construction reflects and is consistent with how a POSA would understand this term. ('397, 36:50-52; Ex. 8 ¶114.) *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) (patentee's definition "is the single best guide to the meaning of a disputed term"). The specification otherwise confirms GoDaddy's construction. For example, column 37 of the '397 patent enumerates a list of time line settings, which the specification characterizes as "[t]he currently available settings, for both text button and image objects." ('397, 37:10-34; Ex. 8 ¶115.) GoDaddy's construction also uses the phrase "sequence of changes," which explains in simplified language what the patentee meant by an "independent asynchronous process" in the specification's definition of a "time line." (Ex. 8 ¶115.)

XMO's proposed construction improperly broadens the term beyond the applicant's express definition to encompass any button, element, or object, not just a "text button or image object," referenced in the applicant's definition. In support, XMO selectively quotes the patentee's definition of "time line" and omits the portion of the definition that limits a time line to "defining the existence of a given text button or image object." ('397, 63:50-52; Ex. 8 ¶¶116-119. XMO cites other passages from the specification, but those do not support its construction. The first refers to "image objects" consistent with GoDaddy's proposal. (*Id.*; '397, 31:2.) The second passage refers

to objects "defined by a time line in which there is a delayed entrance," but does not suggest a time line for anything other than a text button or an image object.[14] ('397, 48:51-52.)

### 3. Express Mobile's Reply Brief

Express Mobile's construction is consistent with the "[a] time line is an independent asynchronous process" language that GoDaddy says is definitional, and with disclosures that timeline values can include an object's appearance, animation, and speed. ('397 at 36:50-52, 31:22-40). While GoDaddy insists that timelines are limited to image and button objects, timelines are also referenced more broadly in the specification—both in reference to "web page timelines" and "object timelines" generally, including those defined within "th[e] universe of possible objects" on the webpage. ('397 at 48:47-54; Fig. 20; 37:52-38:36). These disclosures refer to timelines, do not restrict timelines solely to image or button objects, and the construction should thus not be limited to certain timeline embodiments pertaining to image and button objects. (*See* Ex. 4 ¶¶ 45-48).

### 4. Defendant's Sur-Reply Brief

The specification defines this term, and the claims only recite this term in connection with text button and image objects—both per GoDaddy's construction. XMO's other specification references are ambiguous as to whether they refer to "timelines" or other concepts, such as "transitions." (Ex. 6 ¶67; '397, 66:41-44.)

### I. "child element / child element style / child / child object / child button…"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| an element with one or more properties that depends on another element / a style related to a child element / no construction necessary / | element/object/button/style that is spawned by another element/object/button/style (i.e., the parent element/object/button) |

---

[14] XMO also cites Figure 20, but nothing in this figure or the associated text suggests that a "timeline" recited in the claims exists for anything other than a text button or image object. (Ex. 8 ¶118.)

| Express Mobile Construction | Defendant's Construction |
|---|---|
| an object with one or more properties that depends on another object / a button with one or more properties that depends on another object / an image object with one or more properties that depends on another object registry | |

### 1. Express Mobile's Opening Brief

Express Mobile's construction of "child" elements or objects as being "an object that is related to another object" is consistent with the specification of the '397 patent, which generically references parent and child objects that have a relationship with one another. (*See, e.g.*, '397 patent at 31:22-40, 52:66-53:3, 53:28-37, 61:23-61, 64:16-23, Fig. 34).

GoDaddy's proposed construction improperly adds a "spawning" requirement to the definition. Although there are references to spawning in the specification, the POSA would understand that child objects or elements need not necessarily be spawned, and numerous portions of the specification relevant to the "child" elements do not reference spawning at all. (Ex. 2 ¶¶ 55-59; '397 Patent at 31:22-40, 53:28-37, 61:23-61, 64:16-23, Fig. 34). Even the portions of the specification that do reference spawning state that that certain objects "*may* spawn" or "*can* spawn" child objects, not that all child objects necessarily have that characteristic. (*See, e.g.*, '397 Patent at 53:3, 36:59-60 (emphases added)). The claim language also does not support a "spawning" requirement. (Ex. 2 ¶¶ 57-58).

### 2. Defendants' Answering Brief

The '397 specification repeatedly refers to child elements and objects, but does not explicitly define what makes the relationship between two elements a parent/child relationship as opposed to some other general dependency or relation. However, the specification repeatedly refers to child elements being "spawned" from parent elements, which is consistent with the

ordinary usage of parent/child and is consistent with how a POSA would understand the term in the context of the claimed invention. ('397 patent at 60:39–44, 61:10–13, 62:1–7; Ex. 8 ¶121.)

XMO's proposed construction is too broad for several reasons. It requires only that the two elements "relate" in some undefined way, and it does not accurately capture the concept that a parent-child relationship in this context requires the child element to be created from or under the parent object. (Ex. 8 ¶¶122-123.) Indeed, XMO has broadened the relationship between these elements even further from its prior proposed constructions, which at least required a "dependency" between the elements. Even for the "dependency" requirement, XMO's expert, Mr. Weadock, essentially testified in a prior deposition that almost any dependency could be considered a parent/child relationship. (Ex. 7B at 148:4-152:5 (stating belief that an "If 'A,' then 'B'" dependency would constitute a parent-child relationship). Mr. Weadock also could not identify any dependency that would not be considered a parent-child relationship under XMO's construction, and the same logic applies to XMO's even broader "relate" proposal. (*Id.*, 145:20-151:5.) A construction of "child element" this broad is inconsistent with how a POSA would understand the term, is unsupported by the intrinsic evidence, and would render the term "child" virtually meaningless.[15] (*See* Ex. 8 ¶123-24.)

### 3.  Express Mobile's Reply Brief

Express Mobile's construction is consistent with how "child" is used throughout the specification to describe a general dependency relationship of one object (the child) to another object (the parent).  ('397 at 31:22-40, 13:8-13).  GoDaddy admits that the specification "does not explicitly define what makes the relationship between two elements a parent/child relationship as

---

[15] Taken to its logical extreme, XMO's proposed construction would mean if two elements "relate" to each other in some way, they can both be considered child elements. Such a result finds no support in the intrinsic or extrinsic evidence.

opposed to some other general dependency." (*Supra*, p. 36). This underscores that the "relates to" (or, alternatively, "depends on") language in Express Mobile's construction is appropriate. GoDaddy admits that some "child" disclosures in the specification do not refer to spawning, and that others suggest that objects "*may* spawn" or "*can* spawn" child objects, not that spawning is a mandatory requirement. ('397 at 53:3, 36:59-60 (emphases added)). Express Mobile's construction is consistent with the POSA's understanding of the meaning of "child" in view of the general disclosures of the '397 patent, while GoDaddy's construction is grounded in Mr. Schmandt's shifting and inconsistent testimony about child elements requiring "tree" structures (in previous testimony) and "spawning" (in current testimony). (*Cf.* Ex. 3D ¶ 139; Ex. 8 ¶ 119; Ex. 3G at 115:20-117:19; Ex. 4 ¶¶ 49-52).

### 4. Defendant's Sur-Reply Brief

On their face, these terms all recite the relational concept of a "child," consistent with being "spawned," which XMO's overbroad "related to" construction excludes. XMO's retreat to "depends on" is equally unhelpful. (Ex. 6, ¶68.)

### J.     "run time engine / runtime engine"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| file that is executed at runtime that utilizes information from the database and generates commands to display a web page or website, or if the Court applies its prior construction | file that is executed at runtime that reads information from the database and generates virtual machine commands to display a web page or website |

### 1.  Express Mobile's Opening Brief

This Court previously construed this term to mean "file that is executed at runtime that reads information from the database and generates commands to display a web page or website." (Ex. 1E; Ex. 1F). Express Mobile respectfully disagrees with that construction to the extent that it requires that run time files are limited to "read[ing] information from the database," given that

the claims of the '397 patent expressly recite that "run time files *utilize* information stored" in databases, rather than "read" that information. '397 Patent at 65:66-67, 66:19-20, 69:1-2, 70:13-14 (Claims 1, 2, 37, 39). Express Mobile therefore believes that its prior proposed construction of "file that is executed at runtime that ***facilitates the retrieval of information from the database*** and generates commands to display a web page or website" is more appropriate, or that, at minimum, the construction should be "file that is executed at runtime that ***utilizes*** information from the database and generates commands to display a web page or website," consistent with the claim language. Express Mobile understands that the "facilitates the retrieval of information" language in the prior proposal was "vague" and "not grounded in anything" in the Court's view, but also notes the Court's acknowledgment that a "reading" requirement "appear[ed] in descriptions of embodiments," reflecting the Court's possible concern that the "reading" requirement limited the construction to preferred embodiments. (Ex. 1E at 5-6). The "utilizes information from the database" construction, on the other hand, would address both of these concerns. "Utilizes information" is not vague, is consistent with the specification's exemplary use of "read from the database," and is expressly supported by the intrinsic record (namely, the claims and the prosecution history). (Ex. 2 ¶ 60.). Indeed, the prosecution history confirms that a run time engine can utilize information from the database in a number of ways, including by acting as a template shell that is combined with a database to generate the appropriate commands. (D.I. 42-11, Ex. 11 at 6). Express Mobile respectfully submits that this alternative construction would be in better harmony with the intrinsic record.

Regardless of whether a "runtime engine" reads from a database, utilizes information from a database, or both, GoDaddy attempts to add the requirement that a runtime engine is limited to generating "virtual machine commands." The Court already rejected this argument in the *Shopify*

39

case, "find[ing] that the [run time] file executes 'commands,' not necessarily 'virtual machine commands.'" (Ex. 1E at 5-6). Consistent with the Court's prior ruling, the claims broadly recite that the "runtime engine is configured to generate the web-site from the objects and style data extracted from the provided database" and do not refer to such commands. ('168 at 65:3-6). Aside from virtual machine commands, the specification also confirms that a run time engine can generate other types of commands to display a web page or website, such as commands for downloading image, audio and video files. *(See Id.* at 5:49-68; Ex. 2 ¶¶ 61-63). The phrase "virtual machine" in GoDaddy's construction also does not appear in any of the '168 patent claims, yet GoDaddy's construction would import it into those claims.

### 2.  Defendants' Answering Brief

***Reads from the database.*** The Court should reject XMO's three attempted bites at the run time engine ("RTE") apple. The intrinsic record supports requiring the RTE to "read" information from the database. As this Court noted in *Shopify*, "the specification repeatedly describes the run time engine as 'read[ing]' from the database." (Ex. 1E (citing '397, 5:52-57, 45:44-57); '397, 3:18-19, 5:57-62, 45:44-57, Figs. 2 & 29; Ex. 8 ¶¶126-28.) Additionally, during prosecution, the applicant distinguished the claimed RTE from a prior art RTE and explicitly referred to "the runtime engine ***reading*** and interpreting the external database."[16] (Ex. JCCC_EX. 6 at 10 (emphasis added); JCCC_Ex. 11 at 5-9; Ex. 8 ¶¶29-31.)

---

[16] Although these statements were made during prosecution of the '397 patent, they are applicable to "runtime engine" in the '168 patent, because the '168 patent is a continuation of the '397 patent. *Biovail Corp. Int'l v. Andrx Pharm., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001). Also, the prosecution history is relevant to claim construction regardless of whether applicant's statements rise to the level of a disclaimer. *E.g.*, *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1345 (Fed. Cir. 2020); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016).

XMO has offered no good reason to depart from the "reading" aspect of the Court's prior construction for RTE. As XMO admits, this Court rejected XMO's prior proposal to construe the RTE as merely "facilitat[ing]" retrieval of information from the database, and "utilize" is just as "needlessly vague" and unsupported by the intrinsic record. (*See Shopify* (Ex. 1F) at 5; *X.Commerce* (Ex. 1C) at 7.) XMO first points to the claims language as allegedly showing the RTE "utilizes" information from the database, but the references actually concern one or more run time *files*. (*E.g.*, '397, claims 1(e), 2(d).)

XMO then argues (as it did for "facilitates") that its "utilizes" language is supported by applicant's statement during prosecution that the RTE "can be considered to be a shell of a virtual machine command that is combined with the database to generate the appropriate virtual machine commands." (*Supra,* p. 39 (citing JCCC_Ex. 11 at 6).) But the requirement that the RTE be "combined" with the database favors GoDaddy's construction, because it would require the RTE to *read* the database to get the information required for creating the VM commands. (Ex. 8 ¶137.)

***Generates virtual machine commands.*** As a threshold matter, despite XMO arguing to the contrary, GoDaddy's construction does not exclude the possibility that the RTE may generate other commands, but rather only clarifies that the RTE "generates virtual machine commands to display a web page or website." This is consistent with this Court's previous acknowledgement that the RTE file executes "commands." (*See Shopify*, Ex. 1F at 6.) This Court previously declined to construe the RTE as "generat[ing] virtual machine commands," finding that Shopify presented "less intrinsic evidence" to support that proposal. (Ex. 1E at 6.) Respectfully, however, that construction is not controlling here and should be revisited in light of GoDaddy's additional intrinsic support. *See Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir.

2005); *Kx Indus., L.P. v. Pur Water Purification Prods.*, 108 F. Supp. 2d 380, 389 (D. Del. 2000).

Starting with the claims language itself, the '397 claims expressly recite that "at least one run time file" uses information stored in the database "to generate virtual machine commands," and XMO agrees that the RTE is part of those run time files. ('397 claims 1-2, 37.) Though '168 claims do not recite this same language, they state that the RTE "generates the web-site" from information extracted from the database, which the specification confirms is accomplished by issuing commands to the "virtual machine." ('168 claim 1; Ex. 8 ¶¶129-138.) The '397 specification describes the run time process for displaying a webpage as using the run time engine code that is "extracted from inside a compressed CAB file or a compressed JAR file," which a POSA would understand as generating commands to a virtual machine because Java would be stored in the CAB/JAR files and Java runs on a JVM according to the patent itself. ('168, 35:8-12, 42:58-62; 44:44-46, 65:4-6; Ex. 8 ¶133; *see generally* '168, 44:32-64:30.)

As Shopify noted, the applicant also clearly stated during prosecution that the RTE "is used to accept the attributes [from the database] and ***generate virtual machine commands***, which then generate a display." (JCCC_Ex. 11 at 5 (emphasis added); *id.* at 6-7; Ex. 8 ¶132.) While the '397 applicant may have been distinguishing the Faustini patent as containing all of the web page "attributes" codes within its RTE instead of separating out the database of "attributes" from the RTE as in the '397 claims, the applicant still unequivocally (and repeatedly) stated that both the claimed RTE *and* the Faustini RTE must "generate virtual machine commands" to generate the display. (Ex. 8 ¶¶129-31, 135-38.) At a minimum, these statements are highly relevant to construing RTE in both patents and support GoDaddy's construction. *See supra*, footnote 5.

### 3. Express Mobile's Reply Brief

GoDaddy agrees that the claims require that at least one run time file "*utilize* information stored in database," rather than *read* information from the database.  GoDaddy likewise admits that "the [run time engine]" that utilizes information from the database "is part of those run time files." (*Supra*, p. 42).  Therefore, the claim language alone supports Express Mobile's "utilizes information from the database" construction.  Moreover, GoDaddy does not dispute that the prosecution indicates that a run time engine can be a template shell that is *combined* with a database.  Such a combination would entail *utilizing* information from the database, but not necessarily reading it.  (Ex. 4 ¶¶ 53-55).  The prosecution history excerpts that GoDaddy cites reinforce this point.  In distinguishing the invention over the prior art, the prosecution emphasized that "the pending claims now recite that run time files *utilize information* stored in the database," and reference "the *use* of the run time engine to *use* database information."  (D.I. 42-11, JCCC, Ex. 11 at 5 (emphases added)).  Additionally, in reference to combining the run time engine with the database, the prosecution history explains that upon execution, "the database is read *or downloaded*" by the runtime engine.  (D.I. 42-11, JCCC, Ex. 11 at 7 (emphasis added)).  GoDaddy's expert admitted that the patentee viewed downloading as a distinct concept from reading.  (Ex. 3G at 45:6-17).  A POSA would also view downloading a database as conveying something different from reading.  (Ex. 4 ¶ 54).

This court already rejected GoDaddy's "virtual machine commands" limitation and should again.  GoDaddy's construction would improperly inject a "virtual machine commands" requirement into the claims of the '168 patent, which do not recite virtual machines at all.  And with regard to the '397 patent, the claims already recite the presence of virtual machine commands where they are used in conjunction with run time files or a run time engine, as GoDaddy expressly

admits.  (*Supra,* p. 42 (citing '397 claims 1-2, 37)).  Ultimately, this Court was correct that the run time engine "executes 'commands,' not necessarily virtual machine commands'" (Ex. 1E at 5-6), and this holding is consistent with the specification and claims, which refer to other types of commands.  ('168 at 65:3-6; 5:49-68; Ex. 4 ¶ 56).

### 4.    Defendant's Sur-Reply Brief

XMO makes too much of a thin slice of prosecution history concerning the RTE reading or downloading the database, for those terms are interchangeable here. Mr. Schmandt did not agree the file history revealed more than "reading" as a form of accessing the database information, stating instead that they are "fundamentally the same concept ... downloading is reading over a network." (Ex. 3G, 44:17-45:23; Ex. 6, ¶69.) XMO offers no counterexamples showing how the RTE can obtain information directly from the database *other* than by reading it. XMO's cryptic references to "some other software component," "intermediary process," "mechanism," and an entirely new concept of a .DLL "helper file" find no support in the patents. (Ex. 4 ¶ 53; Ex. 6, ¶¶70-73.)

Moreover, GoDaddy's construction does not limit the RTE's "commands" to VM commands. They are required, but may be part of the overall set of commands. (Ex. 6, ¶¶74-76.) VM commands were required for the '397 patent to issue over the prior art, so the Court should construe the later '168 patent as requiring them, too. *See Backyard Nature Prods., Inc. v. Woodlink, Ltd.*, 81 F. App'x 729, 732 (Fed. Cir. 2003).

## IV.     CLAIM CONSTRUCTIONS OF THE '755, '287, AND '044 PATENTS

### A.     "registry"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary<br><br>*Alternative*: a database or lookup table used for computing functionality | a database, XML file, or Portable Description Language file that exists on a computer |

### 1.  Express Mobile's Opening Brief

No construction is needed for "registry." A registry is a generic term of art that is well known in the computer field. (Ex. 2 ¶ 64). A POSA would understand a "registry" to refer to a generic lookup table or database. (*Id.*)

GoDaddy attempts to limit this term to "a database, XML file, or Portable Description Language" based on a single quote from one embodiment that references the "web component registry." ('755 at 8:19-22). However, other embodiments disclose the registry in different ways. (*See, e.g.*, '755 at 9:16-26, 22:26-29; Ex. 2 ¶ 65). It is thus improper to limit the construction as GoDaddy proposes. *Liebel-Flarsheim Co.*, 358 F.3d at 913.

### 2.  Defendants' Answering Brief

XMO claims that "registry" is a "generic term" of art, but in fact the computer science and web design fields often have "slightly different definitions depending on context." (Ex. 8 ¶140.) Here, the specification provides the requisite context for a POSA because it unequivocally defines what the "web component registry 230" *is*: a "database, XML, or PDL that exists on a computer." ('755, at 8:18-22; *id.*, 6:4-6 (defining "PDL" as "Portable Description Language")). XMO calls this just "one embodiment," but the assertion is not so qualified. *See XMTT, Inc. v. Intel Corp.*, 2020 U.S. Dist. LEXIS 83339, at *15 (D. Del. May 12, 2020) (Andrews, J.) (specification description is "not an embodiment" where it "is not introduced by any words

suggesting that th[e] version of [the claim term] is only one possibility"); *accord Virentem Ventures, LLC v. YouTube, LLC*, No. 18-917 (MN), 2019 U.S. Dist. LEXIS 215006, at *19 (D. Del. Dec. 13, 2019). The specification later reiterates this "registry" definition, disclosing an embodiment for where to load the "XML web component registry 220" as being loaded "into authoring platform 110." ('755, 8:54-56; Ex. 8 ¶¶141-43.) The passages upon which XMO relies to suggest the specification discloses other "registry" embodiments in fact only reinforce GoDaddy's construction. (Ex. 8 ¶143.)

### 3.  Express Mobile's Reply Brief

GoDaddy does not dispute that a registry is a generic term of art that is well understood by the POSA.  (Ex. 2 ¶ 64; Ex. 4 ¶ 57).  Accordingly, no construction is needed for this term.  To the extent the Court believes any construction is necessary, Mr. Weadock's cited dictionary definitions show that a registry is "a database or lookup table that is used for computing functionality."  (*Id.* (collecting definitions)).

Although GoDaddy asserts that the specification provides "context" that limits the registry to a "database, XML file, or Portable Description Language," it is wrong. (Ex. 2 ¶ 65).  GoDaddy incorrectly asserts that the quotation it relies on is not from a single embodiment ('755 at 7:63-64 ("an embodiment"); Ex. 3G at 146:18-22).  The patent also discloses other embodiments that refer to the web component registry in ways that could be implemented, for example, via a table that lists the relevant information rather than a traditional "database, XML file, or Portable Description Language." (Ex. 4 ¶ 58; '755 at 9:16-26, 22:26-29).  Mr. Schmandt dismisses these references, but admits that the registry data referenced in the specification can be stored in a table. (Ex. 3G at 146:23-149:14). GoDaddy's construction is therefore overly limiting, would exclude disclosures in the specification, and is contrary to the understanding of the term to POSA.  (Ex. 4 ¶¶ 57-58).

### 4. Defendant's Sur-Reply Brief

Although XMO hypothesizes that the claimed registry "could" be implemented with other embodiments (i.e., "tables or other stores"), XMO's citations do not disclose as alternatives to the patent's clear definition. (Ex. 6, ¶¶77-78.) Mr. Schmandt does not state otherwise. (*Id.*, ¶79; Ex. 3G, 148:14-149:10.)

### B. "web component"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| one or more functionalities associated with one or more web page elements to be displayed on a device | software object, which has a clearly defined interface, conforms to a prescribed behavior common to all components within an architecture, is meant to interact with other components, and encapsulates certain functionality or a set of functionalities |

### 1. Express Mobile's Opening Brief

Express Mobile's construction, "one or more functionalities associated with one or more web page elements to be displayed on a device," is consistent with the claims and specification. (Ex. 2 ¶ 66; '755 Patent Claims 1, 12 (37:9-10, 38:16-17), 8:22-26, 22:15-17, 22:40-43, 25:6-15; *see also id.* at 2:33-34, 9:16-20, Figs. 3E & 3F).

GoDaddy's six-line construction is both unduly narrow and confusing to a jury. (Ex. 2 ¶ 67). It contains numerous requirements that are either not referenced in the specification or are confined to preferred embodiments. GoDaddy's construction uses language such as "encapsulates" and "architecture" that is hardly discussed in the specification, and never in reference to "web components." GoDaddy's construction also introduces potential ambiguity—what is a "clearly defined interface"? GoDaddy's construction also improperly adds an "intent" aspect to the meaning of "web component" when it says that the software "is meant to interact with other components."

### 2.   Defendants' Answering Brief

GoDaddy's proposed construction is consistent with the specification, and comes directly from the W3C[17] web services glossary. (Ex. 8 ¶¶145-46.) The specification discusses web components in the context of web services and describes them as software objects that provide certain functionalities of a web service. (*See* '755, 2:33-34, 8:18-26, 8:36-47, 8:58-63, 22:15-17, 22:40-43, 25:6-15, Figs. 3E, 3F; Ex. 8 ¶¶149-50, 153-55.) During prosecution, XMO relied on the W3C glossary definitions to explain the background of the purported invention. (*See* JCCC_Ex. 15 at 5-6; JCCC_Ex. 16 at 1011; Ex. 8 ¶¶147-48; *see also* Ex. 7F (Weadock Tr.) at 46:12-47:5.) Exhibit 2V to XMO's opening brief is the W3C glossary and includes the definition of "component" on which GoDaddy relies, which XMO's expert agrees is a "valid definition of component." (Ex. 7F at 260:10-261:2; Ex. 2V at 5.) XMO's proposed construction, on the other hand, is untethered to the claimed invention, inconsistent with the W3C glossary, overly broad, and unhelpful in explaining what constitutes a web component. (Ex. 8 ¶¶151-56.)

### 3.   Express Mobile's Reply Brief

GoDaddy admits, consistent with Express Mobile's construction, that "[t]he specification discusses web components in the context of web services and describes them as software objects" (e.g., web page elements) "that provide certain functionalities of a web service." (*Supra*, p. 48). Mr. Schmandt also agrees that "web components" relate to "functionalities." (Ex. 8 ¶ 152). Given that the claim language already ties web components to web services, "web services" should not be read into the construction. (Ex. 4 ¶¶ 62-64). GoDaddy provides no specification support for its

---

[17] W3C is the World Wide Web Consortium, an international organization that "develops open standards to ensure the long-term growth of the Web." (*See* www.w3c.org; Ex. 8 ¶35.) XMO relies on this glossary in support of its own arguments for other claim terms. (*Infra*, p. 50 (citing Ex. 2 ¶69).)

requirements of a "clearly defined interface," "architecture," and "encapsulation," which are unnecessary and confusing to a jury. (Ex. 2 ¶ 67). Although those words come from a W3C definition referenced in the prosecution history, that portion of the prosecution history provided general background and was not relied on to disclaim claim scope or to overcome a prior art reference. (Ex. 4 ¶¶ 59-60). Moreover, Mr. Weadock has previously testified and explained that the definition is for "component," not "web component"; that the W3C definition contains *three* possible definitions; and that other, broader definitions within the W3C dictionary would be more appropriate here and are consistent with Express Mobile's proposal (Ex. 4 ¶ 61).

### 4. Defendant's Sur-Reply Brief

The claims language "ties" this term to web services in an unintelligible way, which favors construing this term. (*E.g.*, '755 claims 1, 12 (web components "relate to" or are "associated with" web services).) The prosecution's W3C block quote for this term was more than just "general background" – it was definitional. (Ex. 6, ¶¶80-81; Ex. 3B, 315:8-316:10.) XMO's other W3C definitions for this term reinforce GoDaddy's "interface" and "architecture" proposals, as does the intrinsic record. (Ex. 4 ¶61; Ex. 2V; Ex. 6, ¶¶82-85; '755, 8:48-63, 9:30-31; JCCC_Ex. 22, pp. 313-341.)

### C. "web service"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary<br><br>*Alternative*: A software system that supports interaction between devices over a network | A software system designed to support interoperable machine-to-machine interaction over a network. It has an interface described in a machine-processable format called "WSDL" (web service description language). Other systems interact with the web service in a manner prescribed by its description using Simple Object Access Protocol ("SOAP") messages, typically conveyed using HTTP with an XML serialization in conjunction with other web-related standards. |

### 1. Express Mobile's Opening Brief

A "web service" is a well understood term in the art and does not need to be construed. Definitions of "web service" abound in computer dictionaries and technical literature. (Ex. 2 ¶¶ 69-72). For example, a POSA would understand a "web service" to refer to "an application or data source that is accessible via a standard web protocol" or other similar definitions. (*Id.*) To the extent any construction of this term is necessary, an appropriate construction would be "a software system that supports interaction between devices over a network." (Ex. 2 ¶¶ 69-72). This meaning is consistent with the specification, which simply describes a "web service" as "a plurality of services obtainable over the Internet." ('755 at 8:18-19). The specification provides examples of web services including searching from Google or Yahoo, map applications, social networking through Facebook, video chatting services, and more. ('755 at 9:27-43, 10:4-11, 10:44-49, 12:29-38, 25:1-4, 26:51-59). Express Mobile's proposed construction (to the extent one is needed) is also consistent with the claims and prosecution history. (Ex. 2 ¶¶ 69-72).

GoDaddy's paragraph-long construction also improperly limits web services to specific interfaces and protocols, such as WSDL and SOAP, even though others are possible. (Ex. 2 ¶ 72). It also contains characterizations of what a web service "typically" does, not what it must do, which is unhelpful and confusing.

### 2. Defendants' Answering Brief

The term "web service" is a technical term of art in computer science, but regardless of how "well-known" it is to a POSA as XMO alleges, the Court should construe this term concretely so that a jury can understand it. (Ex. 8 ¶158.) *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). During prosecution, the application stated that "a 'web service' [], it is well known, is a method of communication between two

electronic devices over the World Wide Web." (JCCC_Ex. 15 at 5; JCCC_Ex. 16 at 10.) In doing so, the applicant referenced the W3C definition, which corresponds verbatim to GoDaddy's proposed construction of "web service" and comports with how a POSA would understand the term. (Ex. 8 ¶158; Ex. 2W at 5; Ex. 2V.)

XMO's web services examples from the specification do not shed light on a construction for this technical term, but they are consistent with GoDaddy's construction. (Ex. 8 ¶¶159-61.) XMO also claims that GoDaddy's industry-standard construction excludes other "possible" web services' "interfaces and protocols," but the only allegedly excluded protocol identified by XMO's expert – "REST" remote services – is in fact not a web services protocol. (*Id.*)

### 3. Express Mobile's Reply Brief

GoDaddy and its expert admit that the term is "well known" and therefore no construction is necessary. (*Supra*, pp. 50-51; Ex. 8 ¶ 158). However, to the extent this term requires construction, Express Mobile's construction appropriately captures the meaning of this term in the context of the specification and claims. (Ex. 4 ¶¶ 65-66). GoDaddy's construction adds unnecessary complexity and is unduly limiting. Indeed, Mr. Schmandt previously proposed a construction consistent with Express Mobile's and stated his agreement that a web service "generally refers to a software system designed to support interoperable machine-to-machine interaction over a network." (Ex. 3D ¶ 192). Mr. Schmandt cannot reconcile his new position with his old one, and even admits that web services can support REST, as contemplated by the specification. (Ex. 3G at 154:2-6, 155:5-156:3; '755 at 28:14-17). Express Mobile's construction is also consistent with its statement during prosecution that a web service is "a method of communication between two electronic devices over the World Wide Web." (*Supra*, p. 51). The mere reference to W3C during prosecution does not redefine this term as GoDaddy argues.

### 4.  Defendant's Sur-Reply Brief

The patentee's statements concerning this term were definitional. (*Supra,* p. 50-51.)
Mr. Schmandt testified the SOAP protocol *is* a requirement for the claimed "web service"
interface. Beyond that, he opined only that the "completely different" REST protocol to
which XMO points *could* be added to the claimed interface as "optional," but the patent's
reference to REST is "unintelligible." (Ex. 3G, 153:6-156:3; Ex. 6, ¶¶86-88.) A precise
construction is critical for the two networked entities to communicate. (Ex. 6, ¶87.)

### D.      "symbolic name(s)"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary | parameters specifying inputs and/or outputs associated with web services |

### 1.  Express Mobile's Opening Brief

No construction is necessary for this term because the plain language of the claims provides
a ready definition for "symbolic names"—"the symbolic names are character strings that do not
contain either a persistent address or pointer to an output value accessible to the web service."
(*See, e.g.*, '755 Patent, claim 1). A POSA would understand that this is the plain meaning of the
word "symbolic name(s)." (Ex. 2 ¶¶ 73-75). When the plain language of a claim defines a claim
term, courts, including this Court, have held that no construction is necessary. *See, e.g.,
Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. CV 16-453-RGA, 2017 WL 3738383, at *8
(D. Del. Aug. 29, 2017) (finding that no construction is necessary because "[t]he plain language
of the claims provides a ready definition for the concept of 'm' at least when used in isolation.");
*see also Cordance Corp. v. Amazon.com, Inc.*, 636 F. Supp. 2d 310, 322 (D. Del. 2008), aff'd, 658
F.3d 1330 (Fed. Cir. 2011).

GoDaddy's attempt to limit the term to "parameters specifying inputs and/or outputs associated with web services" is wrong. First, the claims use "symbolic name" broadly as a name and not specifically as a parameter, i.e., a value associated with variables or functions. (Ex. 2 ¶ 74). The claim language plainly differentiates a symbolic name from the values associated with the symbolic name: "the web service utilizes the input symbolic name and the user provided one or more input values for generating one or more output values having an associated output symbolic name…." ('755 at 37:39-42). Second, the claims use symbolic name to reference more than just inputs and outputs of a web service but also to reference a UI object: "produce an Application including the selected symbolic name of the defined UI object." ('755 at 37:26-27; Ex. 2 ¶ 75).

### 2. Defendants' Answering Brief

Defendants' proposed construction of "symbolic name(s)" is rooted in the specification and the meaning given to the term by applicant during prosecution, which confirms that symbolic names are (i) "parameters" and (ii) that these parameters specify "inputs and/or outputs associated with web services" per GoDaddy's construction.[18] (JCCC_Ex. 15 at 6, 9, 10 (all referring to symbolic names as parameters); JCCC_Ex. 16 at 11-12, 16 (symbolic names specify inputs/outputs of web services); JCCC_Ex. 14 at 9; *compare* JCCC_Ex. 16 at 11-12 (explaining that "a registry is provided of parameters"), *with* '755 claim 1 (claiming a registry of symbolic names); Ex. 8 ¶¶162-65.)

---

[18] The specification includes only one reference to the term "symbolic name" in "one embodiment" outside of the claims, providing little guidance for construing this term but which is consistent with GoDaddy's proposal that the symbolic names are parameters for specifying (or "binding") web service inputs/outputs for the webpage display's UI components. (*See* '755, 9:11-16; Ex. 8 ¶163.)

The "priority documents" (upon which XMO relies to try to swear behind the '755 family's filing dates) also describe "parameters" in the same way the applicant described symbolic names in the file history. (Ex. 8 ¶¶166-68 (discussing JCCC_Ex. 22 at ECF pages 313-337 (Appendix C)). The Court should reject XMO's argument that the term "symbolic name" requires no construction, because it is not a commonly understood term and because the claims language defines only what a "symbolic name" is *not*—not what it *is*. *Cf. Regents of the Univ. of Minn. v. AGA Med. Corp.*, 660 F. Supp. 2d 1037, 1051 (D. Minn. 2009) ("The question before the Court is not what the term does *not* mean."). XMO's assertion that symbolic names are not "parameters" is also inconsistent with the intrinsic evidence discussed above. (Ex. 8 ¶¶66-71.) Additionally, XMO's assertion that GoDaddy's construction is too narrow because a symbolic name can reference a UI object ignores the fact the UI objects are themselves associated with inputs and outputs of a web service. (*Id.*)

### 3.   Express Mobile's Reply Brief

No construction is necessary for "symbolic name" because the term is already defined by the claim language. *All* of the independent claims of the patents in the '755 Patent family state that "symbolic names are character strings that do not contain either a persistent address or pointer to an output value accessible to the web service." GoDaddy asserts that the claims "define[] only what a 'symbolic name' is *not*—not what it is." (*Supra*, p. 54).  Not so.  The claims affirmatively define symbolic names as "character strings" that meet certain recited criteria. (Ex. 4 ¶ 67).

GoDaddy relies on statements in the prosecution history that "the symbolic names [] of inputs and/or outputs associated with web services are merely parameters, and are not pointers to information."  These statements relate to the *Sidman* prior art reference cited in prosecution, which

the Applicant explained "teaches a directory of ***persistent addresses (pointers)*** for information on the Internet." (D.I. 42-15, JCCC Ex. 15 at 10; Ex. 4 ¶ 68.)  This language thus distinguished only "symbolic names" that were "persistent addresses" or "pointers."   The claim language already includes this negative limitation.  (*Id.*).  GoDaddy's attempt to further redefine this term based on the prosecution history is unnecessary and legally improper.  *SAS Institute, Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1348 (Fed. Cir. 2016) ("no unmistakable evidence that the patentee disclaimed more" than what the reference suggested).

### 4.  Defendant's Sur-Reply Brief

As XMO notes, the only non-negative guidance the claims give to "symbolic names" is that they are "character strings," which hardly helps. (Ex. 6, ¶89 ("character strings" are any "alphanumeric characters").)  XMO also ignores the primary reference to this term in the specification, which describes symbolic names as "bindings" and which a POSA would understand are parameter specifications for web services inputs/outputs. ('755, 9:11-26; Ex. 6, ¶¶91-92.) XMO is also wrong that the specification does not discuss "parameters." (*Id.*; '755, 8:54-10:11, 27:39-46, 34:4-9.)

### E.   "Application / application"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| device-independent software code containing instructions for a device | device-independent code which contains instructions for a device and which is separate and independent from the Player<br><br>-or-<br><br>device-independent code which contains instructions for a device and which is separate and distinct from the Player |

### 1. Express Mobile's Opening Brief

The appropriate construction of "application" is "device-independent software code containing instructions for a device." The parties agree that "application" is code that is "device-independent." This is consistent with the specification, which repeatedly refers to the "application" as being "device independent." ('755 at Abstract, 2:1-2; 5:14-15, 6:4-6). Express Mobile's construction also includes "software code containing instructions for a device." (*See, e.g.*, 5:34-41, 56-59, 11:44-51, 13:46-49. Ex. 2 ¶¶ 76-77). These elements were included in the Court's previous construction of Application. (Ex. 1E at 6-8; Ex. 1F).

GoDaddy impermissibly adds the requirements that an Application be both "separate" and "independent" from the Player. (Ex. 2 ¶¶ 78-79). *First*, the "Application" is not necessarily "separate from the Player"—it can be integrated with the "Player." The specification notes that "[i]n one embodiment," the Application can be extended "on the Player so that *it is efficiently integrated into a comprehensive client/server Application*." ('755 at 7:30-3, 17:66-18:3; Ex. 2 ¶ 79). Indeed, even though this court included the word "separate" in its prior construction, it acknowledged that the "Player and Application" can be "integrated on a single server," and that there need not be "some physical barrier between the Application and the Player." (Ex. 1E at 7-8).

*Second*, even if the Court believes that the word "separate" should remain in the construction, there is no basis for the requirement that the Application need also be "independent" from the Player. This imposes limitations beyond the Court's previous construction, and the requirement of an "independent" Application does not make any logical sense.  In the '755 Patent, there is often an interdependency between the Application and Player. (Ex. 2 ¶ 80). For example, to be properly executed on a device, an Application must be intercepted by a device with the appropriate Player code. ('755 Patent at 8:27-35, 13:46-49). And, to be executed properly, an

Application is sometimes adapted by the Player to the "resources and limitations of any particular device." ('755 Patent at 34:51-64). The Application and Player are also described as working in tandem to generate "designed displays" of web service content. ('755 Patent at 5:32-41). Given these disclosures, the Application and Player are not "independent," and GoDaddy's construction is unduly limiting and would only engender unnecessary jury confusion.

### 2. Defendants' Answering Brief

GoDaddy's construction for this term is identical to how this Court construed it in *Shopify*, with the additional clarification that the Application code is not just "separate" from the Player code, but also "independent" (or, alternatively, "distinct") from that code.

As this Court previously acknowledged, during prosecution, the applicant touted separation of the Application and Player as a novel innovation over the prior art. (Ex. 1E at 7.) Indeed, the '755 file history is replete with applicant's reliance on the fact that the Application and Player codes are "separate," "partitioned," "not self-contained," or "distinct" from each other to distinguish the claimed invention from the prior art:

- "[T]he claimed invention, in contrast, operates by partitioning the code required for functionality into device-independent code and device-dependent code." (JCCC_Ex. 17 at 12, 13);

- ("[P]artitioning code for accessing web services into an Application and a Player has an advantage for maintaining websites.") (JCCC_Ex. 18 at 8);

- Acknowledging that prior art reference, "McCain," discloses an authoring tool that provides code stored in a database, but arguing that "[t]here is no teaching or suggestion in McCain of an authoring tool that provides two separate codes.") (JCCC_Ex. 14 at 11);

- McCain, which applicants argued "clearly teaches combining all code (executable, device dependent code[]) as well as parameters (device-independent code) into C2 components, which are then provided to the browser to generate a display." (JCCC_Ex. 14 at 10); and

- "The solution of *McCain* is one code that is delivered to the device, where it is

executed by a browser on the device. ...“There is no teaching or suggestion in *McCain* of separating binary, non-binary, or executable components into different codes.” (JCCC_Ex. 18 at 9).[19]

(Ex. 8 ¶¶172-75.) The foregoing statements demonstrate that the applicant distinguished the prior art based on *separateness* and *independence*, claiming that in contrast McCain delivered all of its software in a single, combined, package. (*Id.* ¶¶176-79.) A POSA would recognize that the claimed Application and Player are entirely *separate* sets of code, so that one or the other could be changed, debugged, and updated *independently*. (*Id.* ¶179.)

XMO argues that this Court missed the mark by construing the Application and Player to be “separate” from each other. In doing so, XMO regurgitates the same argument that the codes cannot be separate or independent from each other because of the patents’ single embodiment where Application and Player are integrated on a single server. This fails for several reasons. First, the single part of the specification upon which XMO relies for this argument is, at best, ambiguous:

> In one embodiment, the architecture of Player P includes an abstraction interface that separates all device, operating system and virtual machine dependencies from the Player’s Application model business logic (that is, the logic of the server-side facilities) that extend the Application on the Player so that it is efficiently integrated into a comprehensive client/server Application.

(’755, 7:30-36; Ex. 8 ¶183.) This passage is confusing and lacks specificity, at a minimum due to the ambiguous antecedent basis for “it.” (Ex. 8 ¶183.) Second, even accepting XMO’s interpretation of this passage, this Court already rejected XMO’s argument, noting that even if the Application and Player code may be “integrated” on a single server (which the above

---

[19] XMO’s expert also previously admitted that “creating a separate application and player— having two different things, having an application and a player that are distinct from each other has certain benefits.” (Ex. 7F at 175:24-176:16).

passage does not actually support), then they still "**remain separate sets of code**." (Ex. 1E at 8 (emphasis added); '755, 7:30-33.) The Court's only concern with including a "partitioning" or "physical barrier" requirement in the Application's construction was that it would exclude the single embodiment disclosed in the specification where the Application/Player are integrated on a single server. In software parlance, however, being "integrated" on a "single server" simply means that the Application/Player must be capable of being stored in the same memory or operated on the same server computer—not that they share the same body of code or same code base in a single file. (*See* Ex. 1E at 8; Ex. 8 ¶184.)

Third, GoDaddy's proposed constructions would not erect any such physical barrier – requiring only that the Application/Player code be separate and independent (or distinct) from each other. This would improve upon the Court's prior "separate" requirement to expressly exclude XMO's attempt at claiming the Application and Player can simply be different branches of self-contained code—claim scope that was expressly disclaimed during prosecution but which XMO is improperly trying to reclaim now to allege infringement against GoDaddy and others. *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384-85 (Fed. Cir. 2005). GoDaddy's proposed clarification to the Court's prior construction is thus necessary to resolve the parties' dispute and to construe the claim so as to avoid invalidity for failure to satisfy 35 U.S.C. § 112. (*See* Ex. 7J at 21-32.) *Tate Access Floors v. Interface Architectural Res.*, 279 F.3d 1357, 1369 (Fed. Cir. 2002) (stating that "if possible, claims are construed to preserve validity").

XMO's argument that the Application being "independent" from the "Player" does not make sense also fails. Relying on its expert, XMO claims the Application and Player code cannot be "independent" because their functionality must be "interdependent." (Ex. 2 ¶80.) This is a red herring. GoDaddy does not dispute whether the Player and Application interact

with each other, as code from nearly all software programs do. (Ex. 8 ¶¶180-82.) But that does not mean the Application and Player can be combined, self-contained code as XMO essentially claims by attempting to eliminate their required separateness and independence.

What's more, the specification portions to which XMO points are entirely consistent with GoDaddy's construction. The fact that the Application code may be interpreted by a device running the Player code, or that the Player code may "adapt" the Application code for execution on a particular device has nothing to do with whether the code of each is separate and independent (e.g., in separate files). The separate code only demonstrates that the Player carries out the Applications directives (e.g., in creating the UI objects on the device display) in a manner which is most appropriate for the device. (Ex. 8 ¶¶180-85.)

### 3. Express Mobile's Reply Brief

Express Mobile submits that the Court's construction need not include a requirement of "separate" code. The specification does not disclose or require that the Player be "separate" from the Application. When the applicant argued during prosecution that "partitioning code for accessing web services into an Application and a Player was advantageous," or that there "is no teaching or suggestion in [the prior art] McCain of an authoring tool that provides two separate codes" (*i.e.,* the Application and Player), he merely acknowledged that the Application is a device-independent code that is functionally distinct from the Player. Indeed, the applicants distinguished the invention from McCain because "***McCain teaches only providing a self-contained, device-dependent code*** to a device that can communicate with a web service"—not a device-independent code found in an Application or in an Application and a Player as recited in the claims. (D.I. 42-18, JCCC, Ex. 18 at 17 (emphasis added); Ex. 4 ¶¶ 69-71). The prosecution history citations GoDaddy provides are entirely consistent with Express Mobile's proposed

construction of Application and its functional relationship to the Player, which are already recited separately in the claims.  (Ex. 4 ¶ 71).  There is therefore no "clear and unmistakable" disclaimer that should limit the construction of Application to require that Application be construed as "separate" from the Player, let alone both "separate and independent" from the Player.  *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) (no disclaimer where there is a "reasonable, contrary reading of the prosecution history").

To the extent the Court is inclined to retain "separate" in its construction, it certainly should not add the requirement that the Application be "separate *and independent*" from the Player. (Ex. 4 ¶¶ 72-74).  The prosecution history, specification, and claims do not state that the Application and Player must be "independent" or "distinct" from another.  These additional requirements did not appear in any of Mr. Schmandt's prior proposed constructions of Application, but rather were created out of whole cloth in an attempt to reargue his previously rejected "partitioned" argument.  (*See* Ex. 3G at 129:2-130:13).

GoDaddy's revised construction is a transparent attempt to rewrite the claims to require that the Application and Player be stored "in separate files," and to exclude embodiments of the Application and Player that are allegedly not "self-contained." (*Supra*, pp. 59-60).  However, in the context of computer programs, code, including separate modules of code or functions, can be separate yet part of the same file.  (Ex. 4 ¶¶ 75-78).  Indeed, besides being "integrated into a comprehensive client/server Application" ('755 at 7:30-36, 17:66-18:3), the POSA reading the specification would have understood that one possible implementation of the invention could be that the Application and Player reside in a single CAB or JAR file.  (Ex. 4 ¶ 78).  GoDaddy's

construction is therefore contrary to the understanding of the POSA and is not supported by the specification, prosecution history, or claim language.[20]

### 4. Defendant's Sur-Reply Brief

XMO once again cherry-picks portions of the prosecution, but even its expert admits that these show the Application/Player must at least be "distinct" from each other. (Ex. 4, ¶71; Ex. 6, ¶¶93-94.) XMO's contention that these terms need only be "functionally distinct" cannot be correct, since any two lines of code could be considered "functionally distinct" from each other, but that conflicts with the overwhelming weight of intrinsic evidence on Application/Player. (Ex. 6, ¶¶95-98.) XMO's constructions (*Supra,* p. 61-62; Ex. 4, ¶¶75-78) clash with the intrinsic record, which requires these "two separate codes" to be transmitted separately and independently in separate files from each other for the "device" to operate them according to the claimed invention. (Ex. 6, ¶¶99-102; '755, 7:63-8:17, Figs. 2A, 13.)

XMO's expert's *ipse dixit* that the Application/Player can reside in a single CAB/JAR file conflates two separate columns of the specification that distinctly address the CAB/JAR files as being applied separately to each of the Application/Player, not combined. (Ex. 6, ¶¶102-103; *cf.* Ex. 4 ¶78, '755, 32:10-45, 34:4-11).)

### F. "Player / player"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| software code that facilitates the execution of an application on a device | device-specific code which contains instructions for a device and which is separate and independent from the Application<br><br>-or- |

---

[20]     GoDaddy's suggestion that Section 112 is a basis for the Court to narrow the claims is without merit.  GoDaddy's reference to summary judgment briefing from the Shopify case is irrelevant and relates to fact intensive and heavily disputed issues.  (Ex. 3E at 30-31).

| Express Mobile Construction | Defendant's Construction |
|---|---|
| | device-specific code which contains instructions for a device and which is separate and distinct from the Application |

### 1. Express Mobile's Opening Brief

The appropriate construction of "player" is "software code that facilitates the execution of an application on a device." (Ex. 2 ¶¶ 81-83). Express Mobile previously set forth its position on this term in its briefing in *Express Mobile v. Shopify*, and has provided expert testimony here. (*See* Ex. 1L, *Express Mobile v. Shopify*, No. 19-cv-439 (D.I. 117), at 73-75, 76-79; Ex. 2 ¶¶ 81-83). Express Mobile understands that this Court did not adopt its previous proposed construction in the Shopify case, but respectfully maintains its view that its proposed construction is correct.

*First*, Express Mobile respectfully disagrees that the Player term necessarily requires device-dependent code. The specification of the '755 Patent in the "Disclosure of the Invention" section explains that the invention "produc[es] code that, when executed on the platform, provides . . . selected component on the display of the platform," and that one of the produced codes is a "Player." ('755 at 1:55-67). The specification teaches that a "Player" can be such that it has "*no device specific dependencies*" (i.e., device-independent), or it can be such that it "extends the operating system and/or virtual machine of the device" (i.e., device-dependent).  (*Id.*)  In either case, a Player can facilitate the execution of an application on a device. Additionally, the Player "*may*"—but not must—"include code that is device-specific." ('755 at 1:55-67, 6:9-11). Each claim in the patent family specifies whether the Player requires device-specific code when intended. *Compare* '755 claims 1, 12, 27 and '287 claim 1, *with* '044 claims 1, 15.

Other disclosures in the specification show that "Players" within the '755 Patent family may be either device-dependent or device-independent. (*See, e.g.*, '755 at 3:58-62, 5:8-24, 42-55, 56-6:3, 6:9-17, 7:13-20, 30-40, 8:7-17, 27-35, 9:4-10, 11:41-51, 17:66-18:3, 23:43-46, 33:12-15,

26-28, Figs. 2A, 2B). Although the Abstract of the '755 Patent states that "[d]evices are provided with Players specific to each device," that language does not restrict Players to device-specific code. (Ex. 2 ¶ 83).  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004) (the patent abstract "does not weigh heavily when considering" the meaning of a claim term).

*Second*, GoDaddy's requirements that the "Player" be both "separate" and "independent" from the Application are again inappropriate for the same reasons given above with respect to the Application claim term. (Ex. 2 ¶¶ 78-80). This is particularly true for the addition of the word "independent" to the claim construction, which was not even in this Court's previous construction of Player, and simply reflects another effort by GoDaddy to improperly narrow claim scope.

### 2.  Defendants' Answering Brief

The Court should reject XMO's proposed construction for this term for the same reasons it did so in *Shopify*. (Ex. 1E at 9-14.) There, the Court thoroughly analyzed whether the "Player" requires "device-dependent" (or "device-specific") code, finding conclusively that it does. As the Court noted, the specification repeatedly refers to the Player as device-dependent code that provides instructions for a device, for example, stating that instructions "in the form of a device- or device-platform specific instructions for [a] processor of the device" is "referred to herein and without limitation as a 'Player[.]'" ('755, 5:8-24; *see also* '755, Abstract, 3:58-62, 5:8-24, 5:42-55, 5:56-6:3, 6:9-17, 8:7-17, 11:41-51, 23:43-46, 33:12-15, 33:26-28; Ex. 8 ¶¶189-92, 195-96; Ex. 1E at 9-13.) The device-specific nature of the Player was also repeatedly confirmed during prosecution: "The present patent application consistently use [sic] the words 'Application' (with a capital A) and 'Player' (with a capital P) to refer to code that is provided to devices for

accessing web services, where . . . a Player is ***device-dependent code***." (JCCC_Ex. 18 at 9-10 n.1, 12; JCCC_Ex. 14 at 11, 12; JCCC_Ex. 17 at 11.)

XMO relies entirely on the specification's single alleged description of the Player possessing device-independent characteristics, which as the Court noted in *Shopify* states the Player "is a thin client architecture that operates in a language that manages resources efficiently, is extensible, supports a robust application model, and has no device specific dependencies." ('755 at 1:59-62.) But a POSA would interpret this passage as the "*language*" having no device specific dependencies—not the Player—because a POSA would understand the four criteria listed are characteristics of a *language* rather than of the Player architecture. (Ex. 8 ¶¶192-94.) Other than this thin reed, XMO has provided no new arguments or evidence for the Court to consider, except to attack GoDaddy's proposal that the "Application" and "Player" code be both "separate" and "independent" (or, alternatively, "distinct") from each other, which is the only difference between GoDaddy's proposed construction and this Court's construction in *Shopify*. XMO's arguments fail for the same reasons set forth by GoDaddy in support of that aspect of its construction for "Application." (Ex. 8 ¶190.)

### 3. Express Mobile's Reply Brief

For the same reasons given above, Express Mobile submits that it is not necessary to construe the Player as separate from the Application, but that if the Court includes the "separate" requirement it should not include a "separate and independent."

Second, Express Mobile respectfully submits that the "device dependent code" requirement should not be included in the Court's construction. (Ex. 4 ¶¶ 80-83). GoDaddy highlights portions of the prosecution history from the '755 Patent family to assert that that the patent applications used "the words 'Application' (with a capital A) and 'Player' (with a capital

P) to refer to code that is provided to devices for accessing web services, where . . . a Player is device-dependent code." (*Supra,* p. 64-65). This was true for the '755 and '287 patents, which likewise refer to the Player with a capital "P" in the claims and expressly recite a device-dependent code requirement for the Player in each and every claim. But this is not true for the claims of the '044 patent, which recite the player with a lowercase "p" and recite different substantive functions from those in the claims of the '755 and '287 patents, including functions related to databases. (Ex. 4 ¶¶ 82-83). Given the differences in claim scope, the arguments the patentee made to overcome *McCain* that might have been relevant to the scope of the Player in '755 and '287 prosecution were ancillary to the scope of the player in the '044 patent's claims.

In the '044 patent prosecution history, the Applicant did not make any affirmative statements or characterizations of the invention as necessarily containing a "device-dependent" or "device-specific" Player, reflecting that the claims of the '044 patent had substantive differences from the claims of the '755 and '287 patents. The material differences between the prosecution history and claims of the '755 and '287 patents, and those of the '044 patent, underscore that this court should not construe the "Player" recited in *all three patents* to require device-specific code. *See Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) (noting that "arguments made in a related application do not automatically apply in a separate application," and that "disclaimers do not apply" "[w]hen . . . purported disclaimers are directed to specific claim terms that that have been . . . materially altered in subsequent applications"); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("Although a parent patent's prosecution history may inform the claim construction of its descendent . . . prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language.").

Ultimately, the Court acknowledged the differences between the capitalization of the claims between the '755 and '287 patents as opposed to the '044 patent (Ex. 1E at 12), but did not consider the differences in the claims' substance or their distinct prosecution histories. Meanwhile, the Court acknowledged that the Player is expressly referred to in the specification as having "no device specific dependencies" ('755 at 1:55-67), and expert testimony confirms that this referred to the Player, not simply to a programming language as Shopify suggests. (Ex. 4 ¶ 81). While this may not have been enough to "override" the prosecution history disclosures in the Court's previous opinion, Express Mobile submits that the '044 patent's player should not be construed as necessarily being device dependent in light of this disclosure and the differences in the prosecution histories and claim scopes.

### 4. Defendant's Sur-Reply Brief

Citing no legal authority, XMO's new capitalization-based argument is as inappropriate[21] as it is unpersuasive. The intrinsic record, including the same typo-ridden specifications for all three patents, shows the patentee used both capital and lower-case letters interchangeably when referring to Application and Player. (Ex. 6, ¶¶104-106; *e.g.*, '755, 23:34-46, 34:37-45.) The prosecutions of the earlier applications govern here which, contrary to XMO's contention, this Court already considered in *Shopify*. *Biovail Corp. Int'l v. Andrx Pharm., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001). XMO's "thin client" Player embodiment (supported by another parade of new extrinsic evidence) speaks nothing about whether the *Player* itself is device-independent code, but only to a device-independent client-server interface architecture for the Player and Application communicate. (Ex. 6, ¶¶107-113.)

---

[21] *Smithkline Beecham PLC v. Teva Pharms. USA, Inc.*, No. 04-0214, 2007 U.S. Dist. LEXIS 45703, at *3 (D.N.J. Jun. 22, 2007) ("Reply briefs are not the time to present new argument.").

### G.    "preferred UI object"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| a UI object associated with a data type that is favored | a UI object associated with a data type that is favored over the other UI object candidates for that data type |

#### 1.   Express Mobile's Opening Brief

The '287 and '044 patent claims (which recite this claim term and share the specification of the '755 Patent) teach that "preferred UI objects" are objects associated with a particular data type that is favored. (Ex. 2 ¶¶ 84-85). Table 1 shows, for example, that the "Text Field (Alpha)" preferred UI object is associated with a favored "String" data type; a "Check Box" with a favored Boolean data type; and a "Single Item List" with a favored "List" data type. *See* '755 Patent, Table 1. Indeed, "preferred UI objects" are associated with data types such as strings, lists, URL, among others. (*See* '755 at 14:26-33, 14:64-67, 17:4-15, Table 1). "UI objects" are not necessarily associated with a particular data type and therefore are not "preferred UI objects." That is why, for example, "Any" UI object may be suitable for the String data type or the ServiceActivation data type, as Table 1 shows.

It is unnecessary to include language that "preferred UI objects" are "favored over the other UI object candidates for that data type." Preferred UI objects are not necessarily favored over other UI object candidates for a particular data type because there are instances where only one such candidate exists. For example, the snippet of Table 1 below shows that for the Boolean data type, there is only one UI object—a "Check Box"—and there are not "other UI object candidates for that data type." Thus, the common trait of "preferred UI objects" is that they are bound to a "favored" data type in a general sense.

TABLE I

| | | One embodiment of supported objects | | |
|---|---|---|---|---|
| Data Types | Preferred Input | Input Candidates | Preferred Output | Output Candidates |
| boolean<br>Int | Check Box<br>Text Field (integer) | Check Box<br>Text Field (integer)<br>Text Field (Phone #)<br>Text Field (SMS #)<br>Choice<br>List (single select) | Check Box<br>Text Field (integer) | Check Box<br>Text Field (integer)<br>Text Field (Phone #)<br>Text Field (SMS #)<br>Choice<br>List (single select)<br>Text Button |

### 2. Defendants' Answering Brief

The parties largely agree on the construction of this term. XMO's proposal falls short of answering for the jury exactly what the referenced "data type" is being favored *over*. GoDaddy's construction clarifies that a "preferred UI object" is one whose data type is favored over *the other UI object candidates*. XMO's suggested scenario where there is only one other data type is misplaced because in that case the preferred UI object would simply be that specific data type. (Ex. 8 ¶¶197-98.)

### 3. Express Mobile's Reply Brief

Express Mobile's construction allows for the favored UI object to be the only possible UI object for a particular data type, which is disclosed for example in Table I. Therefore, there are not necessarily "other UI object candidates in that data type," and GoDaddy's construction is therefore too narrow. (Ex. 4 ¶ 84.)

### 4. Defendant's Sur-Reply Brief

XMO is incorrect that GoDaddy's proposed construction excludes any embodiments or the "check box" of Table I, while XMO fails to explain what "is favored" means. (Ex. 6, ¶114.)

### H.    "related settings"

| Express Mobile Construction | Defendant's Construction |
|---|---|
| No construction necessary | settings for a particular UI object |

### 1. Express Mobile's Opening Brief

No construction is necessary for this term from claims 1 and 15 of the '044 patent. The claim language speaks for itself and states that the invention "store[s] information representative of said defined UI object and related settings in a database." ('044 Patent at 38:15-16). The invention retrieves "one or more UI object settings" to generate a portion of a webpage, but nothing in the specification or claim language necessarily requires that all "related settings" must be "for a particular UI object." (Ex. 2 ¶ 86). The settings must simply be "related" in some way to the "defined UI object" recited in the claims, as the plain language of the claim establishes.

### 2. Defendants' Answering Brief

XMO asserts that "related settings" need only be "related in some way" to the claimed UI object, which essentially admits the term is overly vague absent a construction. (Ex. 8 ¶¶199-200.) GoDaddy's construction merely clarifies that the claimed "settings" must be those of a particular UI object, which is the only type of "settings" that make sense to a POSA based on the intrinsic record. (*Id.*)

### 3. Express Mobile's Reply Brief

No construction is necessary for this term.  The claim language makes clear that the settings are "'related' in some way to the 'defined UI object' recited in the claims" (*Supra,* p. 70), and GoDaddy's expert seems to agree that the settings are related to "the particular UI object with which they are representative." (Ex. 8 ¶ 201).  This is not vague, and the claim language speaks for itself—GoDaddy provides no intrinsic support for a requirement that the settings are "for a particular object," rather than related to that object.  (Ex. 4 ¶ 85).

### 4. Defendant's Sur-Reply Brief

XMO's reply fails to explain what "related settings" are, other than the "particular UI object" of GoDaddy's construction. (Ex. 6, ¶115.)

Dated: March 19, 2021

BALLARD SPAHR LLP

By: */s/ Beth Moskow-Schnoll*

Beth Moskow-Schnoll (No. 2900)
Brittany Giusini (No. 6034)
Brian S.S. Auerbach (No. 6532)
**BALLARD SPAHR LLP**
919 N. Market Street, 11th Floor
Wilmington, DE 19801-3034
(302) 252-4465
moskowb@ballardspahr.com
giusinib@ballardspahr.com
auerbachb@ballardspahr.com

OF COUNSEL:

**BALLARD SPAHR LLP**
Brian W. LaCorte (*pro hac vice*)
Jonathon A. Talcott (*pro hac vice*)
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
(602) 798-5400
lacorteb@ballardspahr.com
talcottj@ballardspahr.com

*Counsel for Defendant/Counterclaimant
GoDaddy.com, LLC*

DEVLIN LAW FIRM LLC

By: */s/ Timothy Devlin*

Timothy Devlin (No. 4241)
Robert Kiddie (*pro hac vice*)
Texas Bar No. 24060092
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010
tdevlin@devlinlawfirm.com
rkiddie@devlinlawfirm.com

*OF COUNSEL:*
James R. Nuttall (*pro hac vice*)
Michael Dockterman (*pro hac vice*)
Katherine H. Johnson (*pro hac vice*)
Robert F. Kappers (*pro hac vice*)
Tron Fu (*pro hac vice*)
**STEPTOE & JOHNSON LLP**
227 West Monroe, Suite 4700
Chicago, IL 60606
(312) 577-1300
jnuttall@steptoe.com
mdockterman@steptoe.com
kjohnson@steptoe.com
rkappers@steptoe.com
tfu@steptoe.com

Christopher Suarez (*pro hac vice*)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
csuarez@steptoe.com

*Attorneys for Plaintiff Express Mobile, Inc.*