# Exhibit 8
# (I FaGz.'2)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EXPRESS MOBILE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 19-1937-RGA |
| | ) | |
| v. | ) | |
| | ) | |
| GODADDY.COM, LLC, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**CORRECTED DECLARATION OF CHRIS SCHMANDT IN SUPPORT OF
<u>DEFENDANT GODADDY.COM, LLC'S CLAIM CONSTRUCTION RESPONSE BRIEF</u>**

**TABLE OF CONTENTS**

**Page**

I.      QUALIFICATIONS…………………………………………………………………1

II.     COMPENSATION AND PRIOR TESTIMONY ...................................................3

III.    MATERIALS CONSIDERED ...............................................................................3

IV.     LEGAL UNDERSTANDING ................................................................................3

        A.      General Principles of Claim Construction ..................................................3

        B.      Construing Claims Under 35 U.S.C. § 112 ¶ 6 ........................................4

V.      TECHNOLOGY BACKGROUND ........................................................................6

        A.      The Internet & World Wide Web ................................................................6

        B.      Web Site and Web Page Creation in the Late 1990s, Early 2000s ...........9

        C.      Dynamically Generated Web Pages ..........................................................11

        D.      Virtual Machines and the World Wide Web ..............................................14

        E.      Web Site and Web Pages in the Mid-2000s, and the Rise of Web Services ........16

VI.     OVERVIEW OF THE ASSERTED PATENTS ...................................................19

        A.      The '397 and '168 patents ........................................................................19

        B.      The '755, '287, and '044 patents .............................................................20

VII.    SKILL LEVEL OF PERSON HAVING ORDINARY SKILL IN THE ART ................22

VIII.   DISPUTED TERMS OF THE '397 AND '168 PATENTS ..............................23

        A.      virtual machine .........................................................................................23

        B.      virtual machine commands / commands to said virtual machine ............28

        C.      one or more run time files / at least one run time file .............................30

        D.      build tool ...................................................................................................32

        E.      build engine ...............................................................................................34

        F.      database .....................................................................................................36

        G.      multi-dimensional array structured database ............................................38

        H.      a timelines / time lines .............................................................................40

        I.      child element /child element style / child / child object / child button / child image objects ...........................................................................................43

i

J.      run time engine / runtime engine ........................................................44

IX.     DISPUTED TERMS OF THE '755, '287, AND '044 PATENTS................................50

A.      registry ........................................................................................50

B.      web component ...............................................................................52

C.      web service....................................................................................57

D.      symbolic name(s) ............................................................................59

E.      Application / application....................................................................65

F.      Player / player ...............................................................................70

G.      Preferred UI object..........................................................................76

H.      Related Settings .............................................................................77

I, Christopher Schmandt, declare as follows:

1.       I have been retained by GoDaddy.com ("GoDaddy" or "Defendant") to submit this declaration to assist the Court in determining how certain terms used in the claims of the Asserted Patents (defined and described below) would have been understood by a person having ordinary skill in the art at the relevant time.

2.       I reserve the right to supplement or amend this declaration based on any new information that is received and is relevant to my opinions, including any additional claim construction briefing from Express Mobile, Inc. ("Express Mobile"), and any additional declarations or other testimony from any witness testifying on Express Mobile's behalf.

3.       I further reserve the right to supplement or amend this declaration in view of any relevant Order of the Court or any papers served or filed by Express Mobile in this case, or in any other case brought by Express Mobile relating to the Asserted Patents.

4.       I make this declaration based on my own personal knowledge, information and belief, and the materials set forth below.  I would and could competently testify to the matters set forth herein if called upon to do so.

## I.       QUALIFICATIONS

5.       A copy of my curriculum vitae is attached as Appendix A.  Below, I provide a brief summary of qualifications relevant to my opinions set forth in this declaration.

6.       I received my B.S. degree in Electrical Engineering and Computer Science from M.I.T. in 1978, and my M.S. also from M.I.T., in Visual Studies (Computer Graphics).  I had been employed at M.I.T. since 1980 until my recent retirement in 2018, initially at the Architecture Machine Group, which was an early computer graphics research laboratory.  In 1985, I helped found the Media Laboratory and continue to work there to date.  My research spans distributed communication and collaborative systems, with an emphasis on multi-media and user interfaces; I have over 70 published conference and journal papers and one book in these fields.

7.       Until my recent retirement, I was employed as a Principal Research Scientist at the Media Laboratory at M.I.T.  In that role, I also served as faculty for the M.I.T Media Arts

and Sciences academic program.  I have 40 years of experience in the field of Media Technology, and was a founder of the M.I.T. Media Laboratory.

8.      Most recently in my previous role, I ran a research group titled "Living Mobile." Students under my direct supervision and I have built client software on desktop computers, wearable computers, PDAs, mobile phones, pagers, and other ad hoc devices of our own design. In my faculty position, I taught courses and directly supervised student research and theses at the Bachelors, Masters, and PhD level.  The research that I supervised included the use of Java to create applications and applets.  I oversaw the Masters and PhD thesis programs for the entire Media Arts and Sciences academic program.  I also served on the Media Laboratory intellectual property committee for many years.

9.      I have personally used many of the technologies at issue in this case and feel comfortable with rendering technical opinions relating to the operation of such technologies.  For example, I have written HTML code to directly generate web pages and I have also written code generators to programmatically generate HTML documents.  I have also written parsers to interpret HTML code.  I have set up and used various databases on a variety of occasions to store data, I have also designed and coded a number of databases of my own.

10.     I have been familiar with the World Wide Web since shortly after its creation in the early 1990s.  I am familiar with the creation of web sites and web pages, including those that are dynamically created using a database, by personally engaging in website development and in the context of my experience as a businessman and also as an academic researcher.  I have founded two companies and have advised another—all of these companies have engaged in web site development in one form or another.  I have also directly taught and worked with numerous individuals who have engaged in web site development and the use of What You See Is What You Get ("WYSIWYG") developer tools, database technology, and virtual machine programming languages.

11.     Since the mid-1980s, my work was heavily oriented around client-server software architectures for distributed computing, both to handle low-level resource management such as

files and media, and higher level aspects such as providing applications and user interfaces to thin clients such as mobile phones.

12.     In the late 1980s and early 1990s, I served on a Working Group reporting to the Internet Activities Board (IAB) which later became the Internet Engineering Task Force (IETF) on network requirements for multimedia computing, which required extensive knowledge of various Internet protocols.

## II.     COMPENSATION AND PRIOR TESTIMONY

13.     I am being paid my standard consulting rate of $500 per hour for my time spent working on this case.  I am also being reimbursed for any expenses I incur (e.g., travel expenses). My compensation is not contingent on any findings or opinions herein, and I will be paid for my services regardless of the outcome.  Thus, no part of my compensation is dependent upon the outcome of this case.

14.     In the past four years, I have been deposed or testified at trial and IPR proceedings in a number of cases representing both plaintiffs and defendants.  These prior proceedings are detailed in Appendix A attached to this declaration.

## III.     MATERIALS CONSIDERED

15.     In forming the opinions I express in this declaration, I have reviewed U.S. Patent No. 6,546,397 ("the '397 patent"), U.S. Patent No. 7,594,168 ("the '168 patent"), U.S. Patent No. 9,063,755 ("the '755 patent"), U.S. Patent No. 9,471,287 ("the '287 patent"), and U.S. Patent No. 9,928,044 ("the '044 patent") (collectively, the "Asserted Patents"), the file histories for the Asserted Patents, the documents to which the '755 patent, '287 patent, and '044 patents claim priority, and all the documents I cite in this declaration.

## IV.     LEGAL UNDERSTANDING

16.     I am not an attorney, but counsel has explained to me the following legal principles, which I applied in conducting the analyses expressed in this declaration.

### A.     General Principles of Claim Construction

17.     I understand that the purpose of claim construction is to give claim terms the meaning understood by a person having ordinary skill in the art ("POSA" or "ordinary artisan")

at the time of the claimed invention, when considered in the context of the patent.  For the purposes of this declaration, I have been asked to assume that the time of the purported inventions claimed in the '397 patent and '168 patent is December 2, 1999 and the time of the purported inventions claimed in the '755 patent, the '287 patent, and the '044 patent is November 11, 2008.

18.     I understand that claim terms are interpreted in the context of not only the claim in which the disputed term appears, but in the context of the entire patent, including the specification.  I also understand that history of that patent's prosecution before the U.S. Patent & Trademark Office ("PTO") is relevant to the meaning of the claims.

19.     To that end, I understand that that claims are not to be interpreted in a vacuum and must be considered within the context of this intrinsic evidence.  I understand that this "intrinsic evidence" includes the subject patent itself, the history of that patent's prosecution before the PTO, patents (or other materials) incorporated by reference into the subject patent, and patents (or other materials) cited to or by the PTO during the prosecution of the subject patent. Additionally, I understand that the patentee can act as his or her own "lexicographer" and provide his or her own special definition of a claim term, even if the patentee's definition is different than the ordinary usage of that term.  When a patentee clearly acts as his or her own lexicographer, I understand that the definition provided by the patentee should be applied.

20.     I further understand that dictionary definitions and other extrinsic evidence, such as expert testimony, may be considered to the extent it aids in the understanding claim terms, but extrinsic evidence may not be used to vary the meaning given to a claim term based on the intrinsic evidence.

**B.     Construing Claims Under 35 U.S.C. § 112 ¶ 6**

21.     I understand that, according to 35 U.S.C. §112 ¶ 6, an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such a claim must be construed to cover only the corresponding structure, material, or acts described in the specification and equivalents thereof.

22.     I understand that, with this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, material, or acts described in the specification corresponding to the claimed function, and equivalents thereof.

23.     When a claim term lacks the word "means," there is a presumption that that term is not subject to §112 ¶ 6.  I understand, however, that this is not a strong presumption and can be overcome.  The key inquiry in determining whether a claim term is subject to §112 ¶ 6 is whether the words of the claim are understood by persons having ordinary skill in the art to have a sufficiently definite meaning as the name for structure.  Where the words of the claim fail to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function, I understand that the presumption is overcome and the corresponding claim term must be construed under §112 ¶ 6 as discussed above.

24.     I understand when a limitation subject to §112 ¶ 6 is claims a functionality that is performed by a computer, the corresponding structure should not be construed as being limited to a general purpose computer or a microprocessor, unless the claimed function is one that any processor can perform without special programming.  Instead, the corresponding structure must include the algorithm disclosed in the specification for performing the claimed function, and equivalents thereof.  I understand that the algorithm can be expressed in a mathematical formula, in prose, in a flow chart, or in any other manner that provides sufficient structure, such that a POSA would understand the boundaries of the claim.  I further understand that if a specification fails to recite, or does not recite a sufficient algorithm where one is required, the claim term at issue is indefinite.

## V.     TECHNOLOGY BACKGROUND

25.     I may offer a tutorial regarding the subject matter of the asserted claims[1] of the Asserted Patents.  For example, I may offer testimony regarding the Internet and the technologies underpinning the Internet, including the concepts of web sites, web pages, markup languages, scripting, programming languages, code execution (including virtual machines), document design tools, software development tools, databases, data structures and web site and web page creation tools (including WYSIWYG).  Below is a summary of the testimony that I may provide on technology relevant to the Asserted Patents.

### A.     The Internet & World Wide Web

26.     The concept of sending information over computer networks has been known in the art at least since the Department of Defense's ARPANET project in the 1960s.[2]  In the early 1990s, the Internet connected thousands of computers located in over a hundred countries around the globe through a distributed interconnected set of networks.[3]  By 1999, millions of people were using the Internet.  By that time, the World Wide Web was one of the primary ways that people used the Internet.

27.     The World Wide Web was first developed by Tim Berners-Lee in and around 1990 using the Uniform Resource Locator (URL) to locate information and Hypertext Markup Language (HTML) to describe information.[4]  It was designed to provide a "universal linked information system" that would be de-centralized and allow for remote access to information

---

[1] I have been informed that Express Mobile has asserted or charted claims 1–6, 9, 11–15, 19, 23 and 37 of the '397 patent; (2) claims 1–3 and 6 of the '168 patent; (3) claims 1, 3, 5–7, 11–12, 14, 16–18, and 22 of the '755 patent; (4) claims 1, 3, 5–7, 11–13, 15, 17, 19–21, and 25–27 of the '287 patent; and claims 1, 3, 5–7, 11–13, 15, 17, 19–21 and 25–27 of the '044 patent (collectively, the "Asserted Claims").

[2] http://www.nethistory.info/History%20of%20the%20Internet/beginnings.html.

[3] http://www.nethistory.info/History%20of%20the%20Internet/global.html.

[4] http://www.nethistory.info/History%20of%20the%20Internet/web.html.

across different types of computer systems.[5]  One of the primary goals of the World Wide Web was to permit access to information in the same way across different operating systems.  Any computing device with compatible software (e.g., a browser) can use the World Wide Web because it uses universal languages (e.g., HTML and JavaScript) and a universal scheme for accessing information (e.g., URL).

28.     From its start in 1990, the World Wide Web was envisioned as a client/server system where client "browsers" (a.k.a. web browsers) would access documents[6] from a "server" (a.k.a. web server).  The browser transmits a request including a URL that specifies the server and the location of the document on the server (typically in the form of "http://[server]/[path to information]").  The information available from a webserver using an individual URL is generally referred to as a "web page."  A collection of related web pages available through a server can be referred to as a web site.  Web pages can enable access to other information (e.g., web pages) on the same and different servers using hypertext links (a.k.a. "hyperlinks") that can be embedded in each web page.  The browser receives this information, interprets any HTML code, and displays the resulting content.  This paradigm, which was incorporated in the original proposal for the World Wide Web by Tim Berners-Lee as illustrated below, applied at the time the Asserted Patents were filed and continues to apply today.

---

[5] *See, e.g.*, Berners-Lee, T.J., 1989. Information management: A proposal (No. CERN-DD-89-001-OC) (Retrieved from http://cds.cern.ch/record/369245/files/dd-89-001.pdf) ("BL 1"); Berners-Lee, T.J., 1992. The world-wide web. Computer networks and ISDN systems, 25(4-5), pp.454-459 (Retrieved from: http://cds.cern.ch/record/245440/files/p69.pdf) ("BL 2"); Berners-Lee, T., Groff, J.F. and Cailliau, R., 1992. Universal Document Identifiers on the Network (Retrieved from: http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.45.1836&rep=rep1&type=pdf) ("BL 3").

[6] Usually the documents are HTML-formatted documents.



Fig 2.   *A client/server model for a distributed hypertext system.*

7

29.     Shortly after its creation, HTML became an international standard, and, by 1998, version 4 of the standard had been promulgated.[8]  HTML 4 included the ability to use cascading style sheets (CSS) and client-side scripting (e.g., JavaScript) with HTML.  CSS provides a mechanism to apply styles (e.g. fonts, colors, and spacing) to HTML documents.  Client-side scripting (e.g., through the use of JavaScript) provides a mechanism for embedding code in an HTML document (or providing JavaScript code to the browser in a separate file) for execution on the client machine.  Support for client-side scripting allowed HTML documents to include active and interactive content capable of responding to events and conditions on the client machine.

30.     JavaScript was first introduced in 1995 by Netscape in Netscape Navigator.  Microsoft implemented scripting in Internet Explorer in the form of Jscript and VBscript in 1996.  These scripting languages interacted with a Document Object Model (DOM), which provides scripting languages with the ability to receive events from HTML elements (e.g., a click event) and to change properties of HTML elements (e.g., changing the background color of a

---

[7] BL 1 at 16.

[8] https://www.w3.org/TR/1998/REC-html40-19980424/.

8

table cell).[9]  The early implementations may have been platform-specific (e.g., Microsoft's DHTML), but were later standardized in, for example, HTML 4.  The DOM allowed client-side code (e.g., JavaScript) to change the presentation or content of a web page.[10]  These technologies formed an integral part of major web browsers including Microsoft Internet Explorer and Netscape Navigator.  These browsers also supported additional scripting languages through plug-ins (e.g., ActionScript, which was introduced with Macromedia Flash 4).[11]

> **B.   Web Site and Web Page Creation in the Late 1990s, Early 2000s**

31.     One of the original goals of developing the World Wide Web was to distribute and present documents and other information in a structured way across various systems.  HTML provided a framework to describe document structure and content.

32.     The following figure depicts HTML code and the output produced by a web browser after processing that HTML code.  As the example demonstrates, the structure of an HTML document is defined by "tags" which typically include an opening tag (e.g., "<a>"), a closing tag (e.g., "</a>"), and contents in between the opening and closing tags upon which the tag operates.  A tag may also have an attribute which affects the function of the tag.  For example "<a href="index.html">Click Here</a>" creates a hyperlink with the text "Click Here" that points to the file "index.html" in the same directory or location as the current web page.  Some tags, such as the image (<img>) tag may not require a closing tag or end with "/."  As further examples, images, scripts, and applets[12] can be inserted using the following tags:

- <img src="[image file]">

- <script>[JavaScript, such as document.write("hello world.")]</script>

- <applet code="[class file]"></applet>

---

[9] *See, e.g.*, http://archive.oreilly.com/pub/a/javascript/2001/04/06/js_history.html.

[10] *See e.g.*, https://web.archive.org/web/19981206091707/https://www.awn.com/mag/issue3.3/3.3pages/3.3gonzalestools.html (describing the use of DHTML and other tools for animation on the web).

[11] *See, e.g.*, https://en.wikipedia.org/wiki/ActionScript.

[12] The term "applet" refers to a small program, often designed to be incorporated within a more full-featured application, such as a web browser.

33.     While web pages can be created and edited directly by typing in HTML code, this process requires some level of programming knowledge.  Authoring tools for generating the HTML marked-up content were needed for wide adoption.  For this reason, WYSIWYG techniques from existing document editing and software design tools were adapted for use with the World Wide Web.  WYSIWYG techniques have been known since the 1970s when the first WYSIWYG editor, the Alto Bravo, was created for document word processing.[13]  WYSIWG editors have since become ubiquitous and at least by 1999 were shipped with every copy of Windows in the form of the WordPad WYSIWYG document editor.[14]  More advanced versions, such as in the form of Microsoft Word and Corel WordPerfect were also widely used by computer users.

34.     A WYSIWYG editor generally provides a combined user interface for authoring and viewing HTML content that presents content editing controls, accepts user input, and dynamically displays the content as it will be viewed on the web.  For example, content editing controls, such as menus and toolbars, can include various options that a user can select to edit the web page, such as inserting an image or changing the style of text in the web page.  The HTML markup code may be created automatically by the editor in response to user input, such as a drag-and-drop, point-and-click, clicking on a button, selecting an item from a menu, or text entry.  The HTML markup may be hidden from view so that the resulting display appears as it would when viewed on the web.

35.     The very first web browser, WorldWideWeb, written by Tim Berners-Lee in 1990-1991, had built-in WYSIWYG editing capability.[15]  As the popularity of the web expanded, other browsers were developed or proposed with editing capabilities, including

---

[13] Xerox Document System: Reference Manual (Rev. 1980) (Retrieved from http://www.bitsavers.org/pdf/xerox/alto/BravoXMan.pdf).

[14] https://en.wikipedia.org/wiki/WordPad.

[15] *See, e.g.*, https://www.w3.org/History/1991-WWW-NeXT/WorldWideWeb.html; https://www.w3.org/History/1991-WWW-NeXT/MakingDocuments.html; https://www.w3.org/People/Berners-Lee/WorldWideWeb.html.

tkWWW and Htmltext.[16]  For example, tkWWW provided the ability to edit "live" web pages, where the edits to the web page, such as a link, would be immediately visible.  In 1996, the World Wide Web Consortium ("W3C")[17] introduced Amaya, a combined browser/editor where "[e]diting and browsing functions are integrated seamlessly in a single tool."[18]  In that same year, WebWriter, a browser-based editor for constructing web applications was introduced by researchers at Stanford and the Xerox Palo Alto Research Center.  In 1997, the popular web browser, Netscape Communicator, included Netscape Composer, a WYSIWYG web page editor.[19]  Up to and including 1999, numerous other WYSIWYG web page editors were made available or sold in the marketplace.  For example, Microsoft distributed the FrontPage web page editors, starting with an initial release in November 1995 (when the product was known as Vermeer FrontPage), followed by inclusion in the Microsoft Office Suite starting in 1997.[20]  WYSIWYG editors were commonly and predominantly used in 1999 to create web sites and web pages.[21]

### C.    Dynamically Generated Web Pages

36.    One of the reasons that the World Wide Web was different as compared to earlier systems was its ability to provide a universal, common interface to disparate information, including information stored in databases.  For example, in Tim Berners-Lee's original proposal, he envisioned that a server could automatically convert information stored in a database to hypertext, as illustrated in the figure reproduced below.

---

[16] Williams, N. and Wilkinson, T., 1994. *Experiences in Writing a WYSIWYG Editor for HTML.* Computer Networks and ISDN Systems, 27(2), pp.310-311 (available at http://www.cern.ch/www94/PapersWWW94/njw.ps).

[17] The W3C is the main international standards organization for the World Wide Web.  *See* https://en.wikipedia.org/wiki/World_Wide_Web_Consortium.

[18] https://web.archive.org/web/19990501075439/http://www.w3.org:80/Amaya/.

[19] *See, e.g.*, http://math.hws.edu/TMCM/java/labs/WebPublishingLab.html.

[20] https://en.wikipedia.org/wiki/Microsoft_FrontPage.

[21] *See, e.g.*, https://www.w3.org/MarkUp/tims_editor.



Fig 3.    *A hypertext gateway allows existing data to be seen in hypertext form by a hypertext browser.*

[22]

37.     Several of the early web server implementations provided access to a database. For example, one provided hypertext access to an Oracle database, and another provided access to a database of documentation through hypertext.[23]  At the same time, the architects of the World Wide Web contemplated a system where database-driven applications could be accessed through the web without (a) direct access to the application database and (b) without changing the database driven application to produce web pages.  Instead, the web server could be configured to call the already existing client of the database driven application and then transform the output to hypertext.  In this way, the database driven application would maintain control over its data—and could be maintained and modified in many cases without changing the web server, and vice versa as shown below. [24]

---

[22] BL 1 at 17.

[23] BL 2 at 72.

[24] BL 2 at 70, 72.



Fig. 4: No operative changes for the provider

38. This paradigm of database-driven web pages, where a web page is wholly or partially generated based on data stored in a database continued to develop throughout the 1990s and at least by 1999 was pervasive. For example, instead of creating and storing web pages as files on a server that do not change until they are manually updated, scripting technologies were used to dynamically create web pages using databases at the time of a request from a web browser.[25] Major Internet web sites by 1999, such as Google, Amazon, and Yahoo, used scripts and databases to dynamically create web pages.

39. For example, by 1999, many web sites had a search function that accepted a search string from the user to perform a search. The user would retrieve a web page from a web server with a form including a text box and a submit button. The user would type in the search string and click the submit button to transmit the search string to the server. The server would look up a set of results using a database. The results would be organized into an HTML

---

[25] *See e.g.*, https://msdn.microsoft.com/en-us/library/aa260509(v=vs.60).aspx (describing the use of DHTML for the generation of dynamic web page content from a database).

document and transmitted back to the user for display.  A picture of the now-ubiquitous Google interface is shown below, as it existed in 1998:[26]



40.     JavaScript could also be used to dynamically change and create web pages at least as of 1999.  As previously mentioned, JavaScript is a client-side scripting language—it is processed by the browser when displaying the web page.  It is simple to update and add JavaScript to a web page because it is stored on the web server and received by the web browser in plain text—typically as a part of a web page (e.g., in a <script> tag).

**D.     Virtual Machines and the World Wide Web**

41.     By at least 1999, HTML had evolved to support various plugins, including but not limited to Java applets, Flash animations, ActiveX controls, and multimedia players for presenting video and audio content.  Generally, these plugins were separately developed applications or applets that could be installed on the client computer to extend the functionality of the browser.  Content utilizing these browser plugins could be embedded in an HTML document, such as by using the APPLET or OBJECT tags.  When the browser processed these tags, it would determine the plugin configured for the content, and activate the respective plugin-related program to execute or render the content.

---

[26] https://web.archive.org/web/19981202230410/http://www.google.com:80/.

42.     For example, if a Java applet was not already on the client computer when the browser processed its respective tag, the browser would download the applet from the web server for immediate execution, often without requiring any further software installation.  The browser would execute the Java applet using a Java Virtual Machine (JVM) previously installed on the same computer as the browser.  The most popular browsers available at least by 1999 incorporated support for Java applets.  As a result, Java applets were widely used in web pages and were well known by 1999.

43.     Java is a high-level, human-readable, programming language that was developed by Sun Microsystems, Inc. in the early 1990s and released in 1995.[27]  Programs written in most high-level programming languages are compiled into platform-dependent executables that require a particular operating system and hardware.  Such a program must be separately compiled for each platform.  To overcome this limitation, Java was designed so that programs written in Java would be compiled into an intermediate code known as bytecode.  Bytecode is executed by the Java Virtual Machine (JVM) by interpreting and/or compiling it into operating system- and hardware-specific machine code.  For this reason, bytecode can be executed on any computer that has a JVM which extends to nearly any operating system and hardware.

44.     A JVM is one example of a virtual machine, which as the name suggests is a virtualization of a physical machine (specifically a processor), implemented in software instead of hardware.  As of 1999, there were various virtual machines that had been developed, including VM/370, an IBM operating system that provided users with virtual machines that emulated the IBM mainframe hardware.[28] A few months before the December 1999 filing date of the application that issued as the '397 patent, in May 1999, VMWare released Workstation 1.0, which allowed users to set up multiple virtual machines on top of a single physical machine and

---

[27] https://en.wikipedia.org/wiki/Java_(software_platform)#History.

[28] https://en.wikipedia.org/wiki/VM_(operating_system); Creasy, R.J., *The Origin of the VM/370 Time-Sharing System*, IBM J. Res. Develop., 25(5):483-490 (1981).

use them simultaneously.  Each virtual machine could execute its own operating system and was an emulation of the x86 architecture common to many PCs.[29]

### E.       Web Site and Web Pages in the Mid-2000s, and the Rise of Web Services

45.       The web as initially conceived was relatively one way: information primarily flowed from a server to a client, in response to a user request.  The client, however, had minimal ability to transmit complex information back or seek out additional services in an interactive way.  Businesses soon began to develop their own proprietary methods to exchange information, but there were no standardized methods.  So, for example, each business could have a different way of providing services to its customers (whether internal or external), and the different services could not readily be integrated.

46.       As a result of this lack of easy interoperability, in the early 2000s, the concept of "service-oriented architectures" rose to prominence.  A service-oriented architecture is defined by the W3C as "[a] set of components[30] which can be invoked, and whose interface descriptions can be published and discovered."[31]  Established characteristics of service-oriented architectures include service discoverability (i.e. services include metadata that communicates how the service can be discovered and interpreted); service composability (i.e. services can be used to compose other services); and standardized service contracts (i.e. a service is defined by a document and users of that service can expect certain behaviors based on that definition).[32]

---

[29] https://en.wikipedia.org/wiki/VM_(operating_system); Bugnion, *et al.*, *Bringing Virtualization to the x86 Architecture with the Original VMware Workstation*, ACM Transactions on Computer Sys., 30(4):12 (2012).

[30] A component is defined by the W3C as "a software object, meant to interact with other components, encapsulating certain functionality or a set of functionalities. A component has a clearly defined interface and conforms to a prescribed behavior common to all components within an architecture."  W3C Working Group Note 11 February 2004.

[31] W3C Working Group Note 11 February 2004.

[32] *See* https://en.wikipedia.org/wiki/Service-oriented_architecture.

47.     One such service-oriented architecture is "web services."  Generally, web services are software systems designed to support interoperable machine-to-machine interaction over a network.[33]  The WC3 defines a web service as:

> a software system designed to support interoperable machine-to-machine interaction over a network. It has an interface described in a machine-processable format (specifically WSDL). Other systems interact with the Web service in a manner prescribed by its description using SOAP-messages, typically conveyed using HTTP with an XML serialization in conjunction with other Web-related standards.[34]

48.     In order to use a web service, there must be a way of discovering the service and communicating with it.  In the mid-2000s, the W3C worked on developing two related relevant specifications, namely the Universal Description, Discovery and Integration (UDDI) protocol (in order to help with discovery of web services) and the Web Services Description Language (WSDL) (in order to define how to communicate with web services).

49.     As described in the Introduction of the UDDI specification:

> Web services are meaningful only if potential users may find information sufficient to permit their execution.  The focus of Universal Description Discovery & Integration (UDDI) is the definition of a set of services supporting the description and discovery of (1) businesses, organizations, and other Web services providers, (2) the Web services they make available, and (3) the technical interfaces which may be used to access those services.  Based on a common set of industry standards, including HTTP, XML, XML Schema, and SOAP, UDDI provides an interoperable, foundational infrastructure for a Web services-based software environment for both publicly available services and services only exposed internally within an organization.[35]

The UDDI protocol allowed service providers to make their web services known to the world through the use of what was called a registry.  That is, a web services provider could register their services with a UDDI registry by allowing the registry to publish the WSDL document (discussed below) describing the web service.[36]  A service requestor could then query this

---

[33] W3C Working Group Note 11 February 2004.

[34] W3C Working Group Note 11 February 2004.

[35] UDDI Version 3.0.2 Specification (Oct. 19, 2004), *available at* http://www.uddi.org/pubs/uddi_v3.htm ("UDDI Specification").

[36] *See id.*

17

registry to learn how to query the web service of interest by analyzing the relevant WSDL document stored in the registry.[37]

50.     As mentioned, WSDL was developed to standardize the description of web services and their related components.  As described in the Introduction of the WSDL specification:

> Web Services Description Language Version 2.0 (WSDL 2.0) provides a model and an XML format for describing Web services. WSDL 2.0 enables one to separate the description of the abstract functionality offered by a service from concrete details of a service description such as "how" and "where" that functionality is offered.
>
> This specification defines a language for describing the abstract functionality of a service as well as a framework for describing the concrete details of a service description.  It also defines the conformance criteria for documents in this language.[38]

51.     As stated in the WSDL Specification, "a WSDL 2.0 service description indicates how potential clients are intended to interact with the described service.  It represents an assertion that the described service fully implements and conforms to what the WSDL 2.0 document describes."[39]  "At an abstract level, WSDL 2.0 describes a Web service in terms of the messages it sends and receives."[40]  WSDL documents are made up of "a set of components with attached properties, which collectively describe a Web service."[41]  Thus, as of the mid-2000s, registries with documents describing web services via a set of components were well-known and well-defined by the W3C, whom the applicant of the '755 patent described as "the main international standards organization for the World Wide Web."[42]

---

[37] *See generally id.*

[38] Web Services Description Language (WSDL) Version 2.0 Part 1: Core Language, W3C Recommendation (June 26, 2007), *available at* https://www.w3.org/TR/wsdl/ ("WSDL Specification").

[39] WSDL Specification.

[40] *Id.*

[41] *Id.*

[42] *See* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5.

## VI.     OVERVIEW OF THE ASSERTED PATENTS

### A.     The '397 and '168 patents

52.     The '397 and '168 patents are each entitled "Browser based web site generation tool and run time engine."  The '397 patent was filed December 2, 1999.  The '168 patent is a continuation of the '397 patent, and the '397 and '168 patents share a substantively identical specification.  Both are directed towards building a web site using a browser-based build engine.  The '397 and '168 patents attempt to rectify perceived shortcomings of markup and scripting languages (e.g., HTML and JavaScript) using Java.  Because the specifications are substantively identical, unless material differences exist, citations below when referring to the '397 and '168 patents are only to the '397 patent.  Similar disclosures can be found in the '168 patent.

53.     The purported invention's authoring environment runs in a browser and provides an interface for a web site creator to create web pages of a web site.  The web page is made up of elements (objects) created based on settings selected by the user and stored in an internal database within and constructed by the build tool.  The data relating to the web page is then stored in an external database and one or more run time files, including a run time engine, are created by the build tool.  The databases can be implemented using a "multidimensional array structured database."

54.     At run time, a user requests a web page using a web browser, which downloads a run time engine that is executed by a virtual machine associated with the web browser.  The run time engine facilitates retrieval of data from the external database and uses that data to generate virtual machine commands for displaying the web page.[43]

---

[43] '397 patent at Fig. 2.



**Fig. 2**

### B.    The '755, '287, and '044 patents

55.    The '755 patent is entitled "Systems and Methods for Presenting Information on Mobile Devices."  The titles for the '287 and '044 patents are similar.  The '287 patent is entitled "Systems and Methods for Integrating Widgets on Mobile Devices."  The '044 patent is entitled "Systems and Methods for Programming Mobile Devices."  The '755 patent was filed on April 6, 2009.  The '287 and '044 patents are both continuations of the '755 patent and the three share a substantively identical specification.  All three are directed to "generating and distributing programming to mobile devices over a network."[44]  Each patent's Abstract states that "Devices are provided with Players specific to each device and Applications that are device independent.  Embodiments include a full-featured WYSIWYG authoring environment,

---

[44] '755 patent at Abstract; '287 patent at Abstract (same); '044 patent at Abstract (same).

including the ability to bind web components to objects."[45]  Because the specifications are substantively identical, unless material differences exist, citations below when referring to the '755, '287, and '044 patents are only to the '755 patent.  Similar disclosures can be found in the '287 and '044 patents.

56.     The purported invention disclosed is an authoring tool that allows a designer to create Applications and Players that integrate with third-party web services.  The invention is generally directed to two concepts: (1) an authoring tool that allows a user to customize the display for receiving inputs and displaying outputs of web services; and (2) an authoring tool that generates a device-independent Application and a device-specific Player that generates this user-customized display for use by another on a client device.  Because the user of the authoring tool may be different than the ultimate end-user of the Application and Player, I will generally refer to the former as the "creator" and the latter as the "end-user" or "client."  Each of these concepts is discussed below.

57.     The first general concept of the '755, '287, and '044 patents is the idea of allowing a creator to customize the display by matching UI objects to inputs and outputs of web services.[46]As described in the '755 patent at 8:18–53, the purported invention allows the creator to choose various web services it would like to integrate into an Application, and choose the UI object that will be used to receive inputs or display outputs.  For example, the creator may want to display an RSS feed.[47]  The creator would select the RSS feed she wants from the registry of feeds available.[48]  The creator could then bind the outputs of that web service (e.g. the "item-description" shown at XMO_GD00157455) to any UI object that is useful to display that

---

[45] '755 patent at Abstract; '287 patent at Abstract (same); '044 patent at Abstract (same).

[46] '755 patent at 8:18–53; *see also* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 4 (quoting paragraphs [0066] and [0069], corresponding to the first two paragraphs above).

[47] *See* '755 patent at 9:17-26.

[48] *See* Excerpt from 9,063,755 File History, U.S. Prov. Pat. Appl. No. 61/113,471, Nov. 11, 2008 at XMO_GD00157455 (showing a "USA Today Top Stories" RSS feed in the web component registry).

datatype.[49]

58.     The second general concept of the '755, '287, and '044 patents is the idea of separating the code generated by the authoring tool into a device-independent Application and a device-dependent Player and providing those codes to the end-user's device.[50]

59.     The specification claims the advantage of this system is that "all of the device-dependent programming is provided to the device only once (or possibly for some small number of upgrades), permitting a smaller Application, which is the same for each device."[51]

## VII.   SKILL LEVEL OF PERSON HAVING ORDINARY SKILL IN THE ART

60.     I have previously offered opinions in cases involving that Asserted Patents that a person having ordinary skill in the art in this technical field would be someone with at least a Bachelor of Science in Computer Science or three years of experience as a web developer.  Such a person of ordinary skill would be well versed in HTML, JavaScript, and CSS and would be familiar with server-side scripting and developing programs using higher level languages, such as Java, C++, or Visual Basic.  I still believe this to be correct.

61.     I understand that the claims should be construed consistent with how an ordinary artisan at the time of the invention (or "POSA") would understand the terms.  For purposes of this declaration, I understand that Express Mobile contends that both the '397 and '168 patents are entitled to claim priority to at least December 2, 1999, the filing date of the '397 patent, and the inventions claimed in the '397 and '168 patents were conceived of as early as April 1999.  I also understand that Express Mobile contends that the '755 patent, the '287 patent, and the '044 patent are entitled to claim priority to at least April 7, 2008.  I have considered the constructions of the relevant terms from the perspective of the ordinary artisan at the relevant time period.

---

[49] *See* '755 patent at 9:17-26.

[50] Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 8.

[51] '755 patent at 5:51-55.

## VIII.   DISPUTED TERMS OF THE '397 AND '168 PATENTS

62.     The subsections below set forth my opinions regarding how a POSA would have understood each of the disputed claim terms at the time of the claimed invention.  For all of the disputed terms, it is my opinion that, unlike Express Mobile's proposed constructions, Defendant's proposed constructions accurately reflect how a POSA would have understood these terms at the relevant time, and I explain the basis for those conclusions in greater detail for each term below.

### A.      virtual machine

63.     The term "virtual machine" appears in claims 1–6, 9, 11–15, 19, 23, and 37 of the '397 patent.[52]  The parties' proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| Software that emulates a physical processor | abstract machine emulated in software, or software that emulates a physical machine |

64.     In the context of the asserted patents, a "virtual machine" is a software abstraction, or emulation of a physical processor (i.e., a processor of a computer).  The Court's prior construction in Shopify, "software that emulates a physical machine," largely reflects this construction, except for replacing "machine" with "processor."   In my opinion, "machine" is an unspecific concept whose plain and ordinary meaning is literally any "device for performing a task."  That is less helpful for a jury's understanding than "processor," a more familiar and specific term in the context of computers.  Further, it is preferred to avoid defining a term by using the term ("machine") itself in the definition.

65.     The "processor" is the component portion of a computer which actually performs processing, i.e. executes programs, by performing arithmetic and logical operations.  In so operating, a processor uses such well known components such as registers (fast on chip

---

[52] Throughout this declaration, where I refer to a term "appearing in" a particular dependent claim, I mean that the term is in either the language of that patent claim or in the language of one of the claims from which that dependent claim depends.

memory), a stack and associated stack pointer (a particular structure for access to temporary memory storage), an arithmetic / logic unit or circuits which can perform program steps, a flag register (which indicate the result of an instruction, such as zero, carry, or arithmetic sign), etc. Any processor also has a set of instructions which it can perform, such as ADD, SUBTRACT, COMPARE, etc., and each instruction has an associated opcode (a number indicating which instruction to perform) and operands (the data entities which are to be operated upon). The processor also has associated random access memory (RAM) and various addressing modes and perhaps base registers with which memory contents are read and written; these components specify the address space utilized by the processor.

66.    Note that "emulation of a physical processor" does not require emulations of a *particular* known physical processor, such as an ARM or Intel x86 microprocessor any more than the Court's previous construction (and one of the suggested constructions by XMO) of "physical machine" requires a *particular* physical machine. In fact, software to perform the function of virtualizing a particular physical processor, which was used, for example, to allow early Apple computers with Motorola MC68000 series processors to execute programs compiled for Intel processors, is more correctly referred to as an *emulator*. The essence of "emulate a physical processor" is that a virtual machine consists of software which performs the types of processing which occur in a conventional physical processor, by doing so entirely in software. Thus programs can be compiled to execute on a virtual machine just as they are compiled to run on some physical processor, and the virtual machine can read the compiled code and execute it.

67.    Execution of code in various forms and to perform various tasks is how the virtual machine is consistently utilized in the '397 patent family specification. For example, consider the "run time engine" component, which is claimed to "generate virtual machine commands" during its operation. (See, e.g., claims 1, 2, and 34, the three independent claims of the 397 patent). The run time engine "*read(s)* the external database" (45:45, emphasis added); reading is an input operation to memory for access by and computation upon by a processor. It is described

to "Process step 191 is *executed* simultaneously with the generation of all the other web pages at 192 by means of *multiprogramming* using *thread technology.*" (46: 19-21, emphasis added); these are terms of the art for running or executing software by a processor,  "The *Boolean, integer, string, and floating point* fields for these web pages are initialized (46:26-27); these are computer variable data types.  "If the centering attribute is on, then a *calculation* for the object's width is performed" (46:43-44); calculation refers to an arithmetic operation.

68.    There are a multitude of other places in the specification wherein both the run time engine and the build engine are described as performing various sorts of processing, in the form of software execution, by means of a virtual machine.   This comports well with the proposed construction, which reveals the core concept of execution of code by the virtual machine.  The code which the virtual machine executes is in the instruction set of the emulated processor, because the instruction set completely encapsulates each arithmetic or logical operation which the given processor can perform.

69.    XMO has repeatedly pointed to a wide range of texts and dictionary definitions to attempt to avoid a precise construction of "virtual machine", but these are simply not supported by the intrinsic evidence.  The only virtual machine cited by the patent is the Java VM, a well-known process virtual machine that can be defined by its instruction set and is consistent with the proposed construction of emulating a processor.   All the discussion of processing in the various steps of the embodiments in the patents also speak to executing a program, i.e., running a process.   While the concept of "machine" can be broad and ambiguous, Mr. Weadock cites a well-regarded text book, Smith-Nair, which helps dispel the ambiguity:  "To understand what a virtual machine is, we must first discuss what is meant by *machine*, and, as pointed out earlier, the meaning of 'machine' is a matter of perspective.  From the perspective of a *process* executing a user program, the machine consists of a logical memory address space that has been assigned to the process, along with user-level registers and instructions that allow execution of

code belonging to the process."[53]  Hence my position that a construction of "emulating a physical processor" adds clarity to the construction and is consistent with the intrinsic evidence.

70.    Previously, in *Shopify*, I opined that a virtual machine emulates an "abstract" or "hypothetical" machine, as opposed to a particular physical component "such as an Intel x86 processor".  In its construction in that case, the Court construed as "software which emulates a physical machine".  As I have not taken a position that a virtual machine emulates a *particular* physical machine (i.e., the virtual machine need never be instantiated in hardware, yet it emulates properties of other processors which are hardware), my current opinion aligns well with the Court's construction.  The only change I propose is to replace "machine" with "processor", which is a more specific and better understood term to the non-artisan.

71.    Mr Weadock, apparently in support of a broader construction of "virtual machine" conflates the issues of programming language with attributes of a virtual machine (Weadock Decl. ¶ 27), citing to "more robust versions of programming languages" and "An example of a process virtual machine is a high level language virtual machine" (Weadock Decl. ¶ 34) .  The two are not the same.  Although the JVM was, in fact, designed to support the Java language, because the two were developed as a pair, there is no reason why the JVM could not execute any other language, as long as it were compiled into the JVM's instruction set (bytecode). And similarly, a particular programming language could be run on a physical processor or a virtual one.  The motivation for using the JVM in the '397 patent family is to achieve the ability to run on multiple processors, i.e. different computers on which browsers could be running, to achieve consistent web page looks across browser versions and computers.  A virtual machine achieves the second objective in that a virtual machine such as a JVM, being a software program, can be (and was) compiled to run on various processor architectures, e.g. both Apple and Windows. The JVM can be used to draw a web page (instead of relying on allegedly inconsistent browser

---

[53] Smith-Nair p. 9,  XMO_GD00156994, emphasis original

rendering of pages) because browser builders chose to allow the JVM, in particular, to execute under the browser's supervision and draw on the actual browser display window.

72.     Mr Weadock differentiates system virtual machines and process virtual machines, but incorrectly argues that GoDaddy's proposed construction somehow limits the definition to system virtual machines.   This could not be farther from the truth, although it is worth noting that a system virtual machine must include a virtualized processor in order to execute any software, so the processor is still at the core of the meaning of "virtual machine".   A construction which limited to system virtual machine would be inappropriate as the patents disclose only a Java Virtual Machine (JVM) and the JVM is a process virtual machine.   The JVM has access to some peripheral functionality, such as networking and display, but these are not virtualized at all, but rather are simply the hardware that exists on the real computer on which the virtual machine executes.   Mr. Weadock seeks to extend the concept of a virtual machine to include peripherals such as a "display" (Weadock Decl. ¶ 35), but this is inappropriate for a process virtual machine, which Mr. Weadock emphasizes over system virtual machines in his own analysis (Weadock Decl. ¶ 34).   In the case of the JVM, there is no virtualized display; rather the JVM writes directly to the portion of the computer display contained within the browser window.   In fact it is precisely because the browser grants this access to the JVM that the JVM became popular as a means of executing web software via a browser, as taught in the '397 patent.

73.     Mr Weadock's equating GoDaddy's proposed construction to a *system* virtual machine is based on the misunderstanding that GoDaddy's construction requires emulation of a *particular* hardware processor, and as just stated, it does not.   A system virtual machine often does emulate a specific real processor, but the term means much more than that: "In contrast, a *system virtual machine* provides a complete system environment.   This environment can support an operating system along with its potentially many user processes."[54] (Again, this definition is from the Smith-Nair text invoked by Mr Weadock.)   The '397 patent family does not require

---

[54] Smith-Nair p. 11, XMO_GD00156996, emphasis original.

emulation of a particular operating system; quite the contrary, it uses the JVM running in a browser window to impart operating system *independence*, as one of the goals of the alleged invention is that its web sites will run consistently on any platform.  As Smith-Nair states: "The power of this approach has been clearly demonstrated with the Java high level language and the Java virtual machine, where a high degree of platform independence has been achieved, thereby enabling a very flexible network computing environment."[55]

74.     Finally, I note that Mr. Weadock continues to argue against a limitation of "intermediate representation" or "intermediate code" (Weadock Decl. ¶ 30).  Although I still believe it is correct to construe a virtual machine as requiring its own intermediate representation (reflecting the instruction set of the virtual machine), I have dropped that requirement from my proposed construction in deference to the Court's previous construction in *Shopify*.

### B.     virtual machine commands / commands to said virtual machine

75.     The terms "virtual machine commands" / "commands to said virtual machine" appear in claims 1–6, 9, 11–15, 19, 23, and 37 of the '397 patent.  The parties' proposed construction are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| code in the instruction set of the virtual machine that directs actions of the virtual machine | No construction necessary |

76.     In my opinion, a POSA at the time of the claimed invention would have understood the phrases "virtual machine commands" and "commands to said virtual machine" to refer to commands that could be executed by the virtual machine.  As I explained above with respect to the term "virtual machine," in order for a virtual machine to execute a command, the command must take the form of code in the instruction set of the virtual machine.  Thus,

---

[55] Smith-Nair p.6, XMO-GD00156991

Defendant's proposal accurately captures the meaning that a POSA would have ascribed to these claim terms at the time of the claimed invention.

77.     Express Mobile's expert, Mr. Weadock, argues that this construction is too narrow, because a command does not necessarily need to be code.  In the context of this claim element, I disagree.  A POSA would not construe the term "command" in isolation, as Mr. Weadock did.  Instead, a POSA would recognize that the claim refers to "virtual machine commands" (or "commands to the virtual machine"), which requires commands in a form usable by the virtual machine, which is necessarily code.

78.     User actions which Mr. Weadock calls out as "commands" and imputes to be "commands to a virtual machine" are in fact user commands – in the form of mouse clicks – to the browser running the website building tool.  At cited 6:15 we actually see "… the build tool 350 interacts with the user, receiving user commands (actions), for example, to build a web site".  At cited 10:33, the specification actually states "The tool bars 440 include various icons that are shortcuts to feature commands that are also available through the menu bar and its menus."   And at cited 19:44 "Screen shot FIG. 38 shows a visualization of for several inactive tool icons including the icon commands for bold, italic, underline, left, and centered"   Thus all Mr. Weadock's citations point to are *user commands to the user interface* of the build tool, and so do not per se represent actual instructions exeouted by the virtual machine.  Although they may be used to change settings, it is only the settings themselves, not the act of changing them, which constitute command to the virtual machine, i.e. actually drawing web page elements. Thus, the specification confirms the ordinary usage of the word "command" standing on its own, but a person of ordinary skill in the art would not read any of these passages to mean that a "virtual machine command" can be something other than code in the instruction set of the virtual machine, in the context of the claimed invention.

79.     I further note that this distinction is preserved in the claims.  Claim 1, for example, refers to "a panel of settings being presented through a browser adapted to accept one or more of said selectable settings in said panel as inputs therefrom".   But it is only the settings themselves, not the act of choosing the settings, which correspond to the virtual machine

commands "where at least one of said user selectable settings in said panel corresponds to commands to said virtual machines."  This clearly supports my interpretation that the virtual machine commands correspond to the *settings*, because they instruct the virtual machine how to draw on the screen (e.g., to use an italic font).  Mr. Weadock's position that user inputs to a menu constitute such commands is not rooted in the specification or claims.

80.   Within the specification, the association between virtual machine commands and the virtualized processor is also clear.  The patents disclose a specific virtual machine, the Java Virtual Machine, which was well known to operate on Java "bytecode" as an instruction set.  The bytecode constitutes the commands to the virtual machine, consistent with the position that these commands are in the instruction set of the virtual machine processor, and not so broad as to simply cover any user interaction with a browser.  In his declaration in *Shopify* Mr. Weadock opined that "a command is an instruction to a computer program" (¶ 34).  I agree, as "instruction[s] to a computer program" are by definition code, and specifically code in the computer processor's "instruction set."

81.   Finally, I note that while Mr. Weadock suggests that Defendant's proposed construction is too narrow, Mr. Weadock does not actually offer any example of a "virtual machine command" that is not code in the instruction set of that machine, nor does he suggest that a virtual machine can actually interpret or execute any of the higher level "instructions" he discusses, unless and until the instructions are reduced to code.

### C.   one or more run time files / at least one run time file

82.   The terms "one or more run time files" / "at least one run time file" appear in asserted claims 1, 2, and 37 of the '397 patent.  The parties' presently proposed construction is set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| one or more files, including a run time engine, that are downloaded or created, and executed by a browser when a browser is pointed to a web page or website. | one or more files, including a run time engine, that are downloaded or created when a browser is pointed to a web page or website |

83.     In prior litigation, the parties agreed that run time files include a run time engine and are downloaded or created when a browser is pointed to a webpage.  This is supported by the specification, which states that:

> A run time generation process is then invoked to create the necessary run time files at 8 (including HTML shell, CAB/JAR files and a customized runtime engine) which are then loaded to a user's web site at 9. The web page(s), when viewed by a web surfer, **are activated by the browser calling the customized run time engine at 10**. The run time engine then begins to read the database and down load image, audio and video files, while simultaneously drawing the first web page for viewing or user interaction at 11.[56]

84.     The additional requirement that the runtime files are executable is also supported by the specification and file history, both of which explain that the claimed runtime files utilize information stored in a database to generate virtual machine commands for displaying a web page.[57] For a file to perform these functions, it must be executable.

85.     Indeed, the specification discloses that the "CAB and JAR files both include the runtime engine and database in compressed executable form."[58]  The fact that the CAB and JAR files may contain other non-executable files, such as image files,[59] does not change my opinion that for a given file to be considered the claimed "run time file," it must be executable; otherwise it would not perform the required functions.

86.     Mr. Weadock suggests that various ancillary media files, such as images, video, and audio, constitute run time files.   While this may be correct, none of these files can contain an executable run time engine, therefore cannot perform the claimed "at least one run time file utilizes information stored in said database to generate virtual machine commands,"  Media files are incapable of "utilizing" any database, much less generating virtual machine commands.

87.     Mr. Weadock argues that media files "utilize information stored in a database (e.g. 'image scaling attribute' and 'image width') for display…" (¶ 41) This is misguided.  An image file cannot scale itself. Some executable software must make that determination and

---

[56] '397 patent at 5:53-62 (emphasis added).

[57] *See* '397 patent claims 1, 2, and 37; Dec. 13, 2001 OA Resp. at 5 (specifying that the run time engine must generate virtual machine commands).

[58] '397 patent at 8:24–28.

[59] '397 patent at 44:37–41

process the image appropriately; this is simply the executable run time engine.  And anything the run time engine does is by definition a virtual machine command, because the run time engine is virtual machine code, in all embodiments of the specification.  Noting that GoDaddy's construction of run time file does not require that *every* file be executable, but only requires at least one executable file, there is no contradiction implied by processing media files.

### D.    build tool

88.     The term "build tool" appears in claims 1–6, 9, 11–15, 19, 23, and 37 of the '397 patent.  The parties' presently proposed construction are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| a tool operable to construct one or more run time files and an associated database that describe, and when the run time file(s) are executed, produce web page(s) | a tool operable to facilitate the building of one or more webpages or websites |

89.     In my opinion, Defendant's proposed construction reflects the meaning that a POSA would have given this term based on the intrinsic record.  The specification teaches that the build tool is "operable to construct a single run time file and an associated database that describe, and when executed, produce the web page."[60]  Defendant's proposed construction differs from this disclosure in only two respects.  First, whereas the disclosure refers to the construction of "a single run time file," Defendant's proposal refers to "one or more run time files."  This is consistent with the intrinsic record as a whole, including a remark by the applicant in the prosecution history that the build tools can be "configured for constructing one or more run time files."[61]  Second, Defendant's proposal reflects that only the run time file(s)—and not the database—are executed to produce the web page(s).  The language of Defendant's proposal is technically correct on this point because the database itself is not executed to produce the web page; instead, the run time file is executed and reads information from the database to produce

---

[60] '397 patent at Abstract.

[61] Excerpt from 6,546,397 File History, Applicant Amendment dated June 5, 2001 at 9.

the web page. For example, when amending the claims in response to a prior art rejection, the applicant explained: "The websites are generated by the runtime engine reading and interpreting the external database and then building the web pages dynamically."[62]

90.     Mr. Weadock argues extensively that the build tool should not be limited to producing a single run time file, but that limitation is not found in Defendant's proposed construction. (Weadock Decl. ¶¶ 44-46). He also argues (¶ 47) that "executed" is an inappropriate limitation, for no particular reason. Defendant's construction is, in fact, entirely consistent with the specification language as cited above.

91.     To the extent that XMO argues that this construction is incorrect because the build tool need not *create* the database, I disagree. The specification clearly shows creation of the database as step 150 of FIG 24, titled "External Data Base Creation…" and the specification explicitly refers to "creation of the external database."[63] Similar reference to creating the database is found in FIG 4, which in turn cites to FIG 24.

92.     To the extent that XMO argues that this construction is incorrect because the build tool generates multiple run time files, or that the run time files require execution, I disagree. GoDaddy's proposed construction of "run time file(s)" allows for the presence of multiple run time files, only one of which is required to be executable. As I discuss further under "run time file," the additional requirement that the runtime files are executable is also supported by the specification and file history, both of which explain that the claimed runtime files utilize information stored in a database to generate virtual machine commands for displaying a web page.[64]

93.     Finally, I note that XMO's construction using the term "facilitating" is vague and conveys no real import as to how the build tool might operate or what its function is in the context of the claimed invention. This would not clarify the claims to a jury. This broad

---

[62] *Id*. at 10.

[63] '397 patent at 40:63

[64] '397 patent at 44:37–41

understanding is not supported by the specification, which states that the build tool is "operable to construct a single run time file and an associated database that describe, and when executed, produce the web page."[65]

### E.   build engine

94.   The term "build engine" appears in claims 9-20, 28 and 35 of the '397 patent and claims 1-6 of the '168 patent.  Defendant's presently proposed construction are set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| '397 patent:  Indefinite.  Alternatively, same construction as '168 patent.<br><br>'168 patent: component that receives data or information regarding the creation, editing, and/or display of a web page or updates one or more databases, including a database internal to the build engine, in response to that information or data | No construction necessary |

95.   In the '397 patent claims the term "build engine" appears explicitly in claims 9, 14, 16, 17, 18, 19, 20, 23, 24, 28 and 35.  In all except claim 35, the claims read "said build engine".  Claim 35 reads "the build engine".   All depend from claim 2, which does not recite a "build engine".   There is no mention of any "build engine" elsewhere in the claims, hence there is no antecedent, rendering the claims indefinite.  Mr. Weadock suggests (¶ 49) that "build engine" refers to the "build tool" recited in claim 2, the independent claim.  But this is not appropriate for several reasons.  First, the patent specification distinguishes the two terms.  For example, in Fig 3a, the build tool 350 is shown to *contain* the build engine 352; Fig 3a is described as "a schematic diagram showing the main components of a build tool…"[66]

96.   Second, "engine" and "tool" are known to a POSA as describing different, distinct software components.  An "engine" is a specialized piece of software optimized to perform a specific, limited task.  As such it usually acts as the logical core of a program, and is separate

---

[65] '397 patent at Abstract.

[66] 397 patent at 3:20-22

from the "look and feel" thereof.  A "tool" is a software application designed for user interaction. As such it has user interface affordances such as menus, drop down menus, buttons, sliders, toolbars (whence the name "tool"), etc.  That the two terms are to be used in these ordinary meanings is illustrated in the specification under the description of FIG 3a, in which the build tool is listed as having 8 components, including the build engine, but also including a control panel and pop-up windows (user interface) and "processing direct user interactions with the panel's interface objects."[67]  As "build engine" cannot be mistaken for "build tool", the term is indefinite for the '397 patent.

97.     For the '168 patent, Mr. Weadock (¶50) suggests that the construction of "build tool" should suffice if any construction of "build engine" is deemed necessary, but as I have pointed out immediately above, it is inappropriate to equate the software component concepts of "engine" and "tool."   The suggested terse construction "to facilitate the building of one or more webpages or websites" is in itself vague and imprecise ("facilitate") and belies the rich details provided by the patent specification in its description, throughout, of the detailed operation of the "build engine".

98.     With respect to the "internal database" of Defendant's proposed construction, Mr. Weadock simply points to the claims themselves as not specifying detail about the claimed database.  But at the very least, the build engine is described in the specification as updating its internal database.  For example, step 127 in Fig 17 states "the build engine updates its internal database".  This is indicated again in Fig 8, which is described as "FIG 8 is a flow chart that shows a detailed view of the build time techniques of updating the internal databases…."[68]  This is also shown in FIG 3B as step 14 ("update internal database and set feature flags") where the "internal database" is later specifically referred to as being a component of the build engine.[69] There are at least 27 addition recitations in the specification of the build engine updating its internal database.  So whatever "database" is being referred to in the claims, it must at least, per

---

[67] 397 patent at 9:1-30

[68] '168 patent at 4:65-68

[69] '168 patent at 6:5

the specification, include a database internal to the build engine.

### F.     database

99.     The term "database" appears in claims 1-6, 9, 11-15, 19, 23, and 37 of the '397 patent, and claims 1-4 and 6 of the '168 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| an electronic information storage system offering data storage and retrieval and that stores information on a record-by-record basis, each record divided into one or more fields | an electronic information storage system offering data storage and retrieval |

100.     I understand that Express Mobile agreed to this construction in its pending litigation with Shopify, but in this litigation, it has sought to eliminate the requirement that a database stores "information on a record-by-record basis, each record divided into one or more fields."  I disagree that elimination of this requirement is appropriate, because a POSA would recognize that in the context of the asserted claims, individual records divided into one or more fields are structural requirements that distinguish databases from other data storage structures.  This is consistent with the definition of "database" provided in the 1997 Microsoft Computer Dictionary, which specifies that a database has "records, each containing fields."[70]

101.     The proposed requirement of records divided into fields is also supported by the specification.  For example, Figure 29 of the specification for the '397 patent identifies header records and styles records, which will include one or more fields.[71]  This is consistent with how a POSA would understand the term database, which has a specific structure, and does not refer to any storage system that facilitates storage and retrieval.  Such a construction would encompass almost any electronic file.  For instance, a Microsoft Word file is an "electronic information storage system": it electronically stores information (a representation of the text and formatting

---

[70] Microsoft Press Computer Dictionary (3rd Ed) at 129 (GD Ex. 3A).

[71] '397 patent at Fig. 29, 45:44-46:8; *see also id*. at 41:31-48 (describing various fields in the header records).

of the document) in a "system" (the .docx format is a standardized system for representing the content of word processing documents). And, a Word file "offers data storage and retrieval": one can "store" text and formatting data in it, and one can "retrieve" the same, by e.g., opening the file in Microsoft Word.   Yet, no POSA would consider a given Microsoft Word document to be a "database."

102.    Mr. Weadock cites to Webster's New World Computer Dictionary, Tenth Edition (2003) and states that Express Mobile's construction of this term "comports with" the Webster definition of "a collection of related information about a subject organized in a useful manner that provides a base or foundation for procedures, such as retrieving information, drawing conclusions, and making decisions."[72]  Yet what Express Mobile's proposes is ***broader*** than the definition included in the Webster dictionary, and in material ways.  For example, as I explained above, a Word file "offers data storage and retrieval": one can "store" text and formatting data in it, and one can "retrieve" the same, by e.g., opening the file in Microsoft Word.  Thus it would meet the definition of "database" under Express Mobile's construction.  However, a POSA would ***not*** understand a Word document, by its nature, to include "a collection of related information about a subject organized in a useful manner that provides a base or foundation for procedures, such as retrieving information, drawing conclusions, and making decisions." Generally, Word documents do not provide "a base or foundation for procedures."  The only reason Express Mobile's construction can be said to "comport with" the Webster's definition is because it is broader than the Webster's definition.

103.    Indeed, Mr. Weadock does not include in his discussion the entirety of the definition of "database" that is provided in the Webster's dictionary.  The entirety of the definition confirms that the Webster's definition Mr. Weadock points to is ***not*** what a POSA would understand the term "database" to mean in the context of the '397 patent and its claims.  Specifically, the entirety of the definition is:

> A collection of related information about a subject organized in a useful manner that provides a base or foundation for procedures, such as retrieving information, drawing conclusions, and making decisions.  Any collection of information that

---

[72] Weadock Decl. ¶ 43 (citing XMO_GD00156950).

serves these purposes qualifies as a database, even if the information is not stored on a computer.  In fact, important predecessors of today's sophisticated business database systems were files kept on index cards and stored in file cabinets.  Information usually is divided into data records, each with one or more data fields. See *relational database*.[73]

104.     There are several things to note here.  First, this definition states that any collection of information, including those that are not computer-based, could be considered a database.  However, I do not understand Mr. Weadock to be claiming that the database referenced in claims 1-6, 9, 11-15, 19, 23, and 37 of the '397 patent, and claims 1-4 and 6 of the '168 patent is referring to, e.g., index cards.  Indeed, Mr. Weadock agrees that a database is, at the very least, an electronic record.  Mr. Weadock does not explain why he relies on only one part of the definition of "database" to support his argument when the other part is clearly contradictory, or how the two positions are reconciled.

105.     Second, this definition from Webster's also states that "information is usually divided into data records, each with one or more data fields."[74]  This is consistent with Defendant's construction, which includes the fact that "each record [is] divided into one or more fields."  Mr. Weadock does not explain why he has ignored this aspect, or why Defendant's construction is incorrect in light of the definition he points to.

### G.     multi-dimensional array structured database

106.     The term "multi-dimensional array structured database" appears in claims 3, 4, and 5 of the '397 patent.  The parties' presently proposed constructions are set forth below:

---

[73] XMO_GD00156947.

[74] XMO_GD00156947.

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| Database that adheres to a data model structured in the form of a multidimensional array, where the different dimensions of the array each correspond to a different layer of the overall web site stack and where each layer has fields for each of its attributes | No construction necessary |

107.    The term "multi-dimensional array structured database" is not expressly defined in the '397 and '168 patents, and this is not a term has a known, definite meaning to a POSA. Indeed, I have searched for literature using this term using Google Search, Google Patents, and Google Scholar, and—other than the '397 and '168 patents or documents discussing the '397 and '168 patents—there were no documents I found that used this term.

108.    Based on my review of the intrinsic record of the '397 and '168 patents, and the deposition testimony of inventor Steven Rempell from a previous case, this term appears to have been coined by the inventor.  Mr. Rempell testified that this term "came out of his brain" and "wasn't aware" of anyone else having used that term.[75]  Further, in his deposition, the inventor testified that his definition of the term is consistent with Defendant's proposed construction:

> Q. Multidimensional array structure database is a database that adheres to a data model, where it's structured in the form of a multidimensional array where the different dimensions of the array each correspond to a different layer of the overall website stack?
>
> A. Excellently put.[76]

Mr. Rempell when on to clarify that "each layer has fields for each of the attributes."[77]

109.    Mr. Rempell's testimony confirms that this term refers to a particular concept that differs from its component words.  More specifically, the term "multi-dimensional array structured database" is distinguishable from the concept of a database having a multidimensional

---

[75] Rempell Tr. at 272:4-20 (XMO Ex. 2Z). Consistent with Mr. Rempell's testimony, one of Express Mobile's prior experts, Mr. Weadock testified that he was "not sure that this was a term of art" and the phrase was "not a concatenation of terms" that he recalled "seeing in the literature in a common way."  Weadock Tr. at 120:24-121:1 (GD Ex. 3F).

[76] Rempell Tr. at 230:12–231:24; *see also id.* at 228:5–17, 270:20–272:20 (XMO Ex. 2Y, 2Z).

[77] Rempell Tr. at 231:20-232:3 (XMO Ex. 2Y).

array (i.e., a multidimensional array stored within a database).  The disputed claim term requires the database itself to have the structure of a multidimensional array in which different dimensions of the array correspond to different layers of the overall web site stack.  By contrast, a multi-dimensional array could be stored in any compatible field in any database, regardless of the structure of the database.  My opinion that the patentee distinguished between the concept of a "multi-dimensional array structured database" and a database having a multidimensional array is supported by the fact some of the claims of the '397 and '168 patents require a "multi-dimensional array structured database"[78]  whereas others recite only a "database with a multidimensional array."[79]

110.    Mr. Weadock does not claim that this is a term known in the art to a POSA.[80] Instead, he claims that a POSA would understand the "constituent terms".[81]  I do not disagree, but that does not mean that the term as a whole would be understood by a POSA.  But as I explained above, it is not a term known to a POSA.  Mr. Weadock's argument is basically that because a POSA would understand the terms "laser printer" and "monitor," a POSA would also understand the term "laser printer structured monitor."  That some constituent terms have meaning to a POSA does not mean that a combined term, especially one including another term, has a readily understood meaning.  As I explained in above Mr. Rempell's testimony confirms that this term refers to a particular concept that differs from its component words.

111.    I note that Express Mobile does not propose what meaning it believes this term has.  If the meaning was readily understood, Express Mobile has not explained what that readily understood meaning was, and certainly has not suggested a jury would understand this term without construction.

**H.    a timelines / time lines**

112.    The terms "a timelines" / "time lines" appear in claims 11–15, 19, and 23 of the

---

[78] S*ee, e.g.*, '397 patent, claim 3

[79] S*ee, e.g.*, '168 patent, claim 1.

[80] Weadock Decl. ¶¶ 47–48.

[81] Weadock Decl. ¶ 47.

'397 patent and claims 1–4, and 6 of the '168 patent.  Defendant's presently proposed construction is set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| Sequences of changes that define the attributes of a text button or image object as the changes occur | independent process that defines one or more values for an object, including its appearance, animation, speed, and/or resolution over time |

113.    A POSA would have understood that the patentee provided his own definition of the term "time line" in the specification.  That definition is:

> A time line is an independent asynchronous process that defines the existence of a given text button or image object.[82]

114.    Based on this express definition and the specification's other disclosures, I believe that Defendant's proposed construction reflects how a POSA would have understood the term "timeline."  In particular, the patentee's definition of the term "time line" in the specification explains that in the context of the claimed invention a "time line" is a process that defines the existence of a "text button or image object," which Defendant's proposed construction reflects. The specification's other disclosures confirm this understanding.  For example, column 37 of the '397 patent enumerates a list of time line settings, which the specification characterizes as "[t]he currently available settings, for both text button and image objects."[83]  Additionally, I believe that Defendant's use of the phrase "sequence of changes" explains in simplified language what the patentee meant by an "independent asynchronous process," in the definition of a "time line."

115.    Express Mobile's proposed construction applies to *any* object, which is inconsistent with the patentee's express definition of "time line," which was limited to text buttons and image objects.  Mr. Weadock contends that this broader definition is justified by two

---

[82] '397 patent at 36:50–52.
[83] '397 patent at 37:10–34.

disclosures in the specification, but neither disclosure actually suggests that the phrase "time line" in these claims refers to anything other than a text button or image object.

116.    First, Mr. Weadock cites a sentence from column 48 that reads: "[W]ithin this universe of possible objects, if the object exists, and it is defined by a timeline in which there is a delayed entrance, then a [B]oolean flag is set for those objects that causes the draw system to suppress drawing these objects."[84]  Mr. Weadock apparently infers from this sentence that a time line can exist for any object[85]; however, nothing in this sentence is inconsistent with the patentee's earlier definition of "time line" as applying only to text buttons and image objects or otherwise suggests that the patentee intended to expand the scope of the term "time line."

117.    Second, Mr. Weadock cites Figure 20, which refers to both "object time lines" and "web page time lines."[86]  The former concept (object time lines) is the subject of this claim limitation, for which the patentee provided an express definition restricting its applicability to text buttons and image objects; the latter concept (web page time lines) refers to a distinct concept that is not the subject of this claim limitation and is not used in any of the claims of the '397 or '168 patents.

118.    Express Mobile's proposed construction that the time line must define the object's attributes "over time" injects unnecessary ambiguity into the term, because it does not actually require any changes to occur.  For example, setting an initial value for a text button or image object defines an attribute of the button or object, but if no further changes occur, one or ordinary skill would not consider it to be a time line.  The patentee instead contemplated changes occur, and specified that a time line "begins at the time a given web page makes its appearance" and

---

[84] '397 patent at 48:47-54.

[85] Weadock Decl. ¶ 58.

[86] Weadock Decl. ¶ 57.

continues thereafter.[87]  Defendant's proposed construction accurately captures this concept,

whereas Express Mobile's proposed construction does not.

**I.      child element /child element style / child / child object / child button / child image objects**

119.    The terms "child element" / "child element style" / "child" / "child object" /

"child button" / "child image objects" appear in claims 12, 13, 19, and 23 of the '397 patent and

claims 2 and 3 of the '168 patent.  Defendant's presently proposed construction is set forth

below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| Element/object/button that is spawned by another element/object/button (i.e., the parent element/object/button). | an object that is related to another object;<br><br>an element with one or more properties that depends on another element /  a style related to a child element / no construction necessary / an object with one or more properties that depends on another object / a button with one or more properties that depends on another object / an image object with one or more properties that depends on another object registry |

120.    The specification of the '397 patent repeatedly refers to child elements and

objects, but does not explicitly define what makes the relationship between two elements a

parent/child relationship as opposed to some other general dependency.  However, the

specification repeatedly refers to child elements being "spawned" from parent elements,[88] which

is consistent with the ordinary usage of parent/child and is consistent with how a POSA would

understand the term in the context of the claimed invention.

121.    Mr. Weadock argues that the specification supports a reading that "child"

suggests only one element that "depends" on another.[89]  I disagree.  Express Mobile's proposed

---

[87] '397 patent at 36:52-54.

[88] '397 patent at 60:39–44, 61:10–13, 62:1–7.

[89] Weadock Decl. ¶ 61.

construction does not provide any meaning to parent/child and Mr. Weadock's insistence that only dependency is required would read "child" out of the claim.[90]

122.   One of ordinary skill in the art would recognize that the use of the term "child" indicates a specific relationship, not just a general dependency.  For example, one part of the specification describes how "[t]he pop-up window's JavaScript opens the child pop-up window and sets its initial values.  The child pop-up window's JavaScript calls the pop-up window's JavaScript when a completion event occurs."[91]  Another section states that "[c]hild text button object time lines and child image object time lines are subsets of their parent object time lines."[92]  Based on these disclosures and in view of the ordinary meaning of the term "child," one of ordinary skill in the art would understand that a child relationship refers to something different from "dependency."  As the specification repeatedly refers to a child element being "spawned" from its parent element, Defendant's construction is consistent with the specification.

123.   Finally, XMO's proposed construction incorporating the term "relate" is hopelessly vague and not at all helpful.   As I describe above, the concept of a "child" in software engineering has a meaning which a POSA would appreciate is much more precise and implies a stronger interdependence on parent and child than simply "relating", which can be taken to mean almost anything.   Such ambiguity would not be helpful to a jury.

**J.    run time engine / runtime engine**

124.   The terms "run time engine" / "runtime engine" appear in claims 24 and 25 of the '397 patent and claims 1–4, and 6 of the '168 patent.  Defendant's presently proposed construction is set forth below:

---

[90] Additionally, "dependence" is a term of art.  I see no reason why the applicant would not have used the term "dependent element" if the "child" actually meant only "dependence."

[91] '397 patent at 12:11-13.

[92] *Id.* at 61:25-27.

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| File that is executed at runtime that reads information from the database and generates virtual machine commands to display a web page or web site | file that is executed at runtime that reads [or "utilizes" or "facilitates" the retrieval of] information from the database and generates commands to display a web page or website; |

125.    I believe that Defendant's proposed construction accurately reflects how a person or ordinary skill in the art would have understood this claim term based on the claims, the specification, and the prosecution history.

126.    The requirement that the claimed "run time engine" reads information from the database is supported by the specification and prosecution history. This is described in greatest detail with respect to Figure 29, which is captioned "Read Data Base and Generate Necessary Objects":

> FIG. 29 shows the techniques employed by the ***run time engine to read the external database*** and to generate the necessary web page objects (35 of FIG. 4). The run time engine reads a "PARAM value at 186, from HTML Code that was generated above (see FIG. 26), which points to the "Website name'.dta external database that is compressed into the JAR or CAB File (that was loaded and accessed in FIG. 28).  The run time engine then initiates the read operation.  In one implementation, the read technique is always non-privileged.  If permitted by the current browser as a non-privileged operation, the "Websitename'.dta file will be extracted and read from the CAB/JAR file residing in temporary local storage. If not, the run time engine A will read the "Websitename'.dta file directly from the server.[93]

The first step shown in Figure 29 (marked as number 186) depicts that there is a "runtime engine to data base linkage" and that the "runtime engine reads a PARAM value which points to the database and initiates the read operation."[94]  A POSA would understand from these disclosures that the specification is describing a process in which the runtime engine reads information from the database.

---

[93] '397 patent at 45:44–57 (emphasis added).

[94] '397 patent at Fig. 29.

127.    Similarly, Figure 2 depicts a more general "conceptual overview of how a user
interfaces with a web browser when implementing the present invention to construct a website."
The text regarding that web site states that:

> The web page(s), when viewed by a web surfer, are activated by the browser
> calling the customized run time engine at 10.  The run time engine then begins to
> read the database and down load image, audio and video files, while
> simultaneously drawing the first web page for viewing or user interaction at 11.[95]

Similarly, the final step in Figure 2 (marked as number 11) states: "Run engine reads database
and executes the entire website."[96]  Thus, based on these disclosures, a POSA would understand
that "when implementing the present invention to construct a website,"[97] "[t]he run time engine
then begins *to read the database* and down load image, audio and video files, while
simultaneously drawing the first web page."[98]

128.    All of these disclosures describe the runtime engine itself as the file that reads
from the database, not simply a file that is executed as part of a process that ultimately results in
the database being read.  These disclosures are consistent with the prosecution history, which
likewise confirms that in the claimed invention, the runtime engine must read information from
the database.  For example, when amending the claims in response to a prior-art rejection based
on the Faustini reference, the applicant remarked:

> Amended claim 1, as well as the new claims presented herewith are not
> anticipated by Faustini, who discloses software for designing applets that runs
> within a browser.  In contrast, the claimed invention is for an apparatus that
> produces and generates websites within a browser.  The invention accomplishes
> this by first creating the runtime files. *The websites are generated by the runtime
> engine reading and interpreting the external database* and then building the web
> pages dynamically.[99]

---

[95] '397 patent at 5:57–62.

[96] '397 patent at Fig. 2.

[97] '397 patent at 3:18-19

[98] '397 patent at 5:59–62 (emphasis added).

[99] Excerpt from 6,546,397 File History, Applicant Amendment dated June 5, 2001 at 10
(emphasis added).

Thus, based on the disclosures of the specification and the prosecution history, a POSA would understand that as a defining feature of the claimed invention, the runtime engine reads information directly from the database.

129.     The prosecution history also supports the portion of Defendant's proposed construction requiring the runtime engine to generate "virtual machine commands."  For example, the applicant distinguished over the Faustini prior art patent and confirmed that the runtime engine generates virtual machine commands:

> The Applicants note that the claims recite clearly structure that is neither anticipated nor obvious over either Faustini or the knowledge of one skilled in the art.  In particular, web pages generated by Faustini result from a Faustini run time engine which is an interpreted or executable file, such as virtual machine commands, and which contains within the Faustini run time code all of the information necessary to generate a display (the display data is embedded within the Faustini run time code).  In contrast, the claimed invention generates web pages using two features: a run time engine and a database of user settings.  As described in the specification of the claimed invention, the database contains user settings, which may be thought of as attributes of display objects. ***The run time engine is used to accept the attributes and generate virtual machine commands, which then generate a display***.[100]

130.     In other instances during prosecution, that applicant again distinguished over the prior art and argued that the runtime engine generates virtual machine commands:

> The claimed invention, in contrast, generates a run time engine and a database that are then used to produce virtual machine commands on the fly from the database and the run time engine.  The run time engine can be considered to be a shell of a virtual machine command that is combined with the database ***to generate the appropriate virtual machine commands.***[101]

131.     Additionally, the Patent Examiner cited this same limitation—the generation of virtual machine commands—in explaining the reasons for allowing the patent.  The Patent Examiner explained:

> The closest prior art of record Faustini (US 5,842,020) discloses dynamic editing of object oriented components in a web site.  Another close prior art of record Wishnie et al (US 6,148,311) disclose web site construction by importing

---

[100] Excerpt from 6,546,397 File History, Amendment After Final, Jan. 17, 2002 at 5 (emphasis added).

[101] Excerpt from 6,546,397 File History, Amendment After Final, Jan. 17, 2002 at 6 (emphasis added).

> previously constructed pages.  However, Faustini and Wishnie do not show a run time file utilizing user selected settings stored in a database to *generate virtual machine commands for generating web sites* as recited in [the independent claims].[102]

Thus, a POSA, after reading the prosecution history, would recognize that the claimed runtime engine must "generate virtual machine commands," as set forth in Defendant's proposed construction.

132.    Statements throughout the specification support the construction that the run time engine generates virtual machine commands to display a web site.  The last requirement is clear from the claims which state "a runtime engine is configured to generate the web-site from the objects and style data extracted from the provided database."[103]  It is also abundantly clear that the specification discloses that the run time engine is, at least in large part, compiled Java code; as Java runs on the Java VM, this would clearly constitute generating virtual machine commands to a POSA, who would appreciate that is how Java code executes.

133.    In its description of the run time processing to display a web site, the specification states "This code defines whether the executable files and databases will be extracted from inside a compressed CAB file or a compressed JAR file…" 44:44-46.  A POSA would appreciate that compiled Java code is stored in either CAB (for Microsoft browsers) or JAR (for other browsers) files, and although other information can be stored in these files, the "executable" part would be Java.  When the run time engine was built, it was clearly Java code. "The customized run engine and a library of the referenced run time classes are *compiled and converted into byte code* at 165. Finally the run time engine for the web site is created at 166.  The required set of *class objects* required at run time is flagged for inclusion into the CAB/JAR file."[104] Java applets compile into bytecode, which constitute commands in the instruction set of the Java VM; bytecodes *are* the instruction set.  Java "classes" are compiled libraries of support functions, also in Java bytecode. The description quoted indicates that only the classes actually needed for the particular web page

---

[102] Excerpt from '397 Patent File History at 2.

[103] '168 patent at 65:4-6

[104] '168 patent at 42:58-62, emphasis added.

are merged with the main Java code, as one of the goals of the alleged invention is to minimize storage size and transmission speed of the web pages.  Large portions of the specification support how the run time engine executes, using processing terms such as "reading" "executing" "initializing" "calculating" and "spawning"[105]  Throughout this lengthy description of how the compiled Java code displays the web site, a POSA would appreciate that this is done by executing virtual machine commands.   Although there are several initialization steps described as using HTML or Javascript, these are minor, and it is *only* compiled Java code which draws on the display.

134.    Mr. Weadock argues that the commands do not need to be "virtual machine commands."  I disagree.

135.    First, Mr. Weadock argues that "the run time engine generates commands to display a web page or website, including commands for downloading image, audio and video files—commands that are not necessarily virtual machine commands."[106]   But the claims do not recite "commands to display a web page or website"; this is language from the parties' proposed constructions.  In any event, Mr. Weadock fails to mention the numerous instances in the prosecution history where the applicant argued that the runtime engine (the actual claim element) generates virtual machine commands, including those I discussed above.

136.    Second, Mr. Weadock challenges "generates virtual machine commands" apparently because the run time engine may perform additional tasks, such as downloading media files.  First, how could the runtime engine download files other than by the execution of virtual machine?   The runtime engine is not part of the browser code; it is loaded at run time.  Where can it execute?   It cannot execute directly on the native processor; otherwise multiple versions of the runtime engine would be required, defeating the purpose of the invention.  The runtime engine in the specification is Java code, and Java code is executed on the virtual machine.   While Java is not required by the claims, the virtual machine is required, so this reading of media files must be limited to commands to the virtual machine.

---

[105] '168 patent at 44:32-64:30, generally

[106] Weadock Decl. ¶ 68.

137.    But third, even if the reading of media files somehow did not require use of the virtual machine, everything else described in the specification does require execution on the virtual machine.   So even in this impossible scenario, the runtime engine would still be generating virtual machines commands, perhaps *in addition* to any other operations it could perform without use of the virtual machine.

138.    XMO further suggests that an applicant's statement in the prosecution that the run time engine can be considered a shell which is combined with the database to generate virtual machine commands supports the proposed inclusion of "utilizes" in the construction.   But in addition to failing to impart any clarity to the term, this construction avoids the issue that in order to "combine" with the database the database must still be read.   Something must read the database, and it is not described as read by the browser, so once again, as above, how could this occur without having at least some portion of the claimed run time engine execute and read the database?  It would not be possible.

## IX.    DISPUTED TERMS OF THE '755, '287, AND '044 PATENTS

### A.    registry

139.    The term "registry" appears in claims 1, 3-7, 11-12, 14-18, and 22 of the '755 patent and claims 1, 3-7, 11-13, 15, 17-21, and 25-27 of the '287 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| a database, XML file, or Portable Description Language file that exists on a computer | No construction necessary |

140.    Registry is a term of art in the computer science and web design fields and can often have slightly different definitions depending on context.   Here, the specification provides the requisite context for a POSA because it explicitly discloses that the "web component registry 230," is a "database, XML, or PDL that exists on a computer."[107]

---

[107] '755 patent at 8:18–22.   "PDL" is defined in the specification as Portable Description Language.  *Id*. at 6:4–6.

141.    Mr. Weadock states that this reference in the specification relates to a "single embodiment."[108]  I have reviewed the specification, and in particular the passage where this statement is included.  The passage does not limit the description of the registry to a single embodiment.  First, the paragraph itself does not state that it relates only to one embodiment.  Second, the specification states that "Fig. 2A is a schematic of system 200 of an embodiment of system 100 illustrating the communications between different system components."[109]  The specification then, two paragraphs later, states that "Web service 230 is a plurality of services obtainable over the Internet.  Each web service is identified and/or defined as an entry in web component registry 230, which is a database, XML file, or PDL that exists on a computer that may be a server previously described or another server 120."[110]  Thus to the extent the definition of the registry could be said to relate to Figure 2A, Figure 2A is described as an embodiment of the system "illustrating the communications between different system components."[111]  That is, Figure 2A is not described as only an embodiment with respect to the system components themselves.[112]

142.    The '755 patent specification makes multiple additional references to the XML format of the registry, referring to it as "an XML component registry for each registered web service"[113], "information provided in an XML file to web component registry 220 for each registered components of each web service 230"[114] and "inputs and outputs of XML web services."[115]  Even if these citations refer to particular embodiments, there is no evidence in the

---

[108] Weadock Decl. ¶ 65.

[109] '755 patent at 7:63–65.

[110] '755 patent at 8:18–22.

[111] '755 patent at 7:63–65.

[112] I also note that element 230 appears to be referenced in the specification as both the "web service," *see, e.g.*, '755 patent at 7:66, and the "web component registry," *see, e.g., id.* at 8:20, 8:23.  However, on other occasions, the "web component registry" is described as being element 220.  *Id.* at 8:40–41 ("information is provided in an XML file to web component registry 220").  This is yet another example where the specification contains typos and errors.

[113] '755 patent at 8:54-55

[114] '755 patent at 8:41-42

[115] '755 patent at 9:44-45

specification of any contrasting embodiment which would show that the applicants own language defining the registry is inappropriately limiting.

143.    Although XMO cites to other passages in the specification which allegedly require a less-specific construction, these are not convincing.  The passage cited as 9:16-26 is mute as to the structure or format of the registry, only stating that if a particular desired web service, in the form of an ATOM feed, is wanted for an application, it can be *added* to the registry.   The citation to 22:26:29 merely says that the list of entries in the registry is presented to a user in a menu when the user wishes to select a web component, and that the web components are obtained from the registry.   Neither of these citations is at all informing as to the format of the registry, and indeed their scant relevance to construction only reaffirms my observation that the specification offers no evidence for a broad or vague construction of "registry."

### B.    web component

144.    The term "web component" appears in claims 1, 3–7, 11–12, 14–18, and 22 of the '755 patent, claims 1, 3–7, 11–13, 15, 17–21, and 25–27 of the '287 patent, and claims 1, 3-7, 11–13, 15, 17–21, and 25–27 of the '044 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| software object, which has a clearly defined interface, conforms to a prescribed behavior common to all components within an architecture, is meant to interact with other components, and encapsulates certain functionality or a set of functionalities | one or more functionalities associated with one or more web page elements to be displayed on a device |

145.    The term "component" is a term of art in computer science and web design fields, and I agree with Defendant's construction, which is based directly on the definition set forth in

the W3C glossary,[116] which the patentee relied on during prosecution to explain the underlying technology to the examiner.[117]

146.    The first W3C definition for "component" is:

> A component is a software object, meant to interact with other components, encapsulating certain functionality or a set of functionalities. A component has a clearly defined interface and conforms to a prescribed behavior common to all components within an architecture.[118]

Defendant's proposed construction is a restatement of this definition and is consistent with how a POSA would understand the term.

147.    Additionally, one of ordinary skill in the art would recognize that the WSDL specification, which was published by the W3C and referenced by the applicant during prosecution, comports with Defendant's proposed construction of "web component" and confirms its accuracy.  More specifically, the WSDL sets out specific requirements for the interface that make how to interpret the component unambiguous.[119]  The WSDL specification also defines the "prescribed behavior common to all components within an architecture."[120]  Consistent with the POSA's understanding, during prosecution, the applicant relied on WSDL's definition of web services and components when it described its purported invention.[121]

148.    The file history, which includes the priority documents further describing web components, provides additional support for Defendant's proposed construction.  For example,

---

[116] *See* W3C Working Group Note 11 February 2004.

[117] *See* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 11.

[118] W3C Working Group Note 11 February 2004.

[119] *See* Discussion of WSDL, *supra*.

[120] *Id.*

[121] Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5-6; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R. §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 10-11.

one of these documents describes an Appendix of "Web Component Models."[122]  These exemplary models are XML formatted documents that appear to define inputs and outputs for various web services.[123]  They are clearly defined (meaning they have a structured format) in the same way (i.e. conform to a prescribed behavior common to all components within an architecture), are meant to interact with other components (e.g. components at the computer of the web service), and encapsulates certain functionality or a set of functionalities (e.g. functionalities relating to web services).

149.    The specification further confirms that functionalities associated with each web component are related to a web service.  For example, the specification discusses how "[e]ach web service is identified and/or defined as an entry in web component registry 230 . . . . Web component registry 230 is provided through server 120 to authoring platform 110 so that a user of the authoring platform may bind web services 230 to elements to be displayed on the device 130[.]"[124]  The specification also discusses how "[a]uthoring platform 110 further permits a user of the authoring platform to associate objects, such as objects for presenting on screen 137, with components of one or more web services 230 that are registered in web component registry 220. In one embodiment, information is provided in an XML file to web component registry 220 for each registered components of each web service 230. Web component registry 220 may contain consumer inputs related to each web service 230, environmental data such as PIM, time or location values, persistent variable data, outputs related to the web service, and/or optional hinting for improving the user's productivity."[125]  Additionally, the specification discloses that "[i]n one embodiment, a component of web service 230 is selected from authoring platform 110 which presents the user with WYSIWYG dialog boxes that enable the binding of all the inputs and outputs of component of web service 230 to a GUI component of the Application as will be

---

[122] Excerpt from 9,063,755 File History, U.S. Prov. Pat. Appl. No. 61/113,471, Nov. 11, 2008 at XMO_GD00157454.

[123] *Id.* at XMO_GD00157455-68.

[124] '755 patent at 8:18–26.

[125] *Id.* at 8:36-47.

displayed on screen 137."[126]  This aspect is shown additionally in FIGs 3E and 3F, showing "a pop-up menu for adding web components."[127]

150.    GoDaddy's proposed construction emphasizes the modularity of web components and the fact that they are meant to be added as needed to an application, made possible by having well defined programmatic interfaces.   This is further supported in how the specification describes utilizing web components to build an application.  Web components may be "added, edited, or removed from a selected object."[128] Menus are provided to "select a Web Component…presents a list of web components…obtained from web component registry 220."[129]  In fact the web components are well enough specified that portions of the application may be created with automatic binding between UI objects and web components.[130]

151.    Mr. Weadock argues that Express Mobile's construction is supported by the '755 patent specification.[131]  I disagree.  None of Mr. Weadock's citations define a "web component" as "one or more functionalities associated with one or more web page elements to be displayed on a device."  Indeed, 2:33–34 and related Figures 3E and 3F support Defendants, as they relate to binding web components defining web services to UI objects, as do 22:15-17, 22:40–43, 25:6–15.  The citation to 8:22–26 is also irrelevant to Express Mobile's construction and supports Defendants.  It relates to the registry of web components.

152.    I agree with Mr. Weadock that at the very least, web components relate to "functionalities."  However, the construction proposed by Express Mobile is too broad, as it does not capture the meaning of the term "web component" as it would be understood by a POSA.  Express Mobile's construction would, for example, cover any display effect on a page such as a

---

[126] *Id.* at 8:58–63.

[127] *Id.* at 2:33-34.

[128] *Id.* at 22:15-16

[129] *Id.* at 22:23-29

[130] *Id.* at 25:12-15

[131] Weadock Decl. ¶ 83 (citing '755 patent at 2:33–34; 8:22–26; 22:15–17, 22:40–43, 25:6–15; Figs 3E and 3F).

pop-up message displayed when a button is pressed.  This possibility bears no relationship to the discussion and disclosure of web components in the specification.[132]  The addition of "associated with one or more web page elements to be displayed on a device" in Express Mobile's construction is also superfluous, as the claim language itself discloses how the web components are associated with UI objects (i.e. web page elements to be displayed on a device).[133]

153.    These portions of the specification are all referring to how a user can take a function corresponding to a web component that is defined by the inputs and outputs of the web service it relates to, and bind those inputs and outputs to various UI objects.[134]

154.    The specification also confirms that a web component "conforms to a prescribed behavior common to all components within an architecture."  The specification and file history confirm that the web components of the '755 patent have this characteristic.  In the specification, a process is described that "allows a user to associate certain objects for display that provide input or output to components of web service 230."[135]  The specification goes on to state that "a component of web service 230 is selected from authoring platform 110 which presents the user with WYSIWYG dialog boxes that enable the binding of all the inputs and outputs of component of web service 230 to a GUI component of the Application as will be displayed on screen 137."[136]  The specification also states that "System 200 permits an expanding set of components of web services 230[.]"[137]

---

[132] *See, e.g.*, U.S. Provisional Patent Application No. 61/113,471 at Chapter 11, Appendix C; '755 patent at Fig. 3F and associated text; *id.* at 14:14–21, 6:31–47, 9:44–49, 10:4–11, 22:14–27, 22:40–43.

[133] *See, e.g.*, '755 patent at claim 1 ("associate the selected symbolic name with the defined UI object"); *id.* at claim 12 (similar); '287 patent at claims 1 and 15 (similar); '044 patent at claims 1 and 15 (similar)

[134] *See* Part VI.B, *supra* (discussing the purported inventions described by the '755, '287, and '044 patents).

[135] '755 patent at 8:48–57.

[136] '755 patent at 8:58–63.

[137] '755 patent at 9:30–31.

155.    Based on these disclosures, a person of ordinary skill would understand that the web components described have a common prescribed behavior.  The ability of a user to associate objects with web components and at the same time allow expanding sets of components implies that the components all act similarly.  That is, if they did not have a common behavior (a relationship with inputs and outputs of web services), it would not be possible to predict how the components would operate, thus frustrating the user's ability to associate objects with web components.  This understanding is confirmed by the prosecution history.  The priority documents indicate the web components have a model that describes the common behavior (inputs and outputs to web services).[138]  The priority documents include a discussion of how to create a web component that has this common behavior

156.    Finally, I note that Mr. Weadock argues against imposing requirements beyond the simplistic construction proposed by Express Mobile because such detail is not found in the specification of the 755 patent.   I disagree.  Simply because a patent treats established technologies in a superficial manner is no reason to "dumb down" the construction of terms which would be well defined to a POSA.

## C.    web service

157.    The term "web service" appears in claims 1, 3-7, 11, 12, 14–18, and 22 of the '755 patent, claims 1, 3, 5–7, 11, and 13 of the '287 patent, and claims 1, 3–7, 11–13, 15, 17–21, and 25–27 of the '044 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| a software system designed to support interoperable machine-to-machine interaction over a network.  It has an interface described in a machine-processable format (specifically WSDL).  Other systems interact with the Web service in a manner prescribed by its description using SOAP messages, typically conveyed using HTTP with an XML serialization in conjunction with other Web-related standards. | No construction necessary<br><br>Alternative: A software system that supports interaction between devices over a network |

---

[138] Excerpt from 9,063,755 File History, U.S. Prov. Pat. Appl. No. 61/113,471, Nov. 11, 2008 at XMO_GD00157455-79.

158.     The term "web service" is a term of art in computer science and web design fields, and generally refers to a software system designed to support interoperable machine-to-machine interaction over a network.  During prosecution, the application stated that "a 'web service' [], it is well known, is a method of communication between two electronic devices over the World Wide Web."[139]  In doing so, the applicant referenced the W3C definition, which corresponds verbatim to Defendant's proposed construction of "web service."[140]  Given applicant's own reliance on the W3C glossary and the importance of it in the computer science and web design fields, I believe Defendant's proposed construction accurately reflects how a POSA would understand the term.

159.     Mr Weadock attempts to explain away the need for a detailed construction of "web service" on the basis of several examples (web search, maps, social media, etc.) but mere examples do not define a term of art.   The concept and specification of web services clearly arises from the need for a consistent and specific software protocol to access those services over the World Wide Web.   Rather than have every application provide its own *ad hoc* interface protocol, the very nature of the web service specification is to express a standard, which allows multiple parties to publish web applications and multiple other parties to utilize them.   It is in the very nature of open architecture multi-vendor services to provide well-defined interfaces, and it was the task of the W3C to gather industry experts and publish such interface specifications.

160.     Finally, Mr. Weadock argues that REST calls may be used instead of "SOAP/WSDL". (Weadock Decl. ¶ 72).   This could not be correct, because REST is a simple method using basic HTTP calls to invoke remote services, i.e. a method to pass parameters.  WSDL, in contrast, is not a method to pass parameters, but rather a method to *specify* the

---

[139] Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 10; *see also* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5 ("A 'web service' is a method of communication between two electronic devices over the World Wide Web.").

[140] Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; W3C Working Group Note 11 February 2004

parameters (all the inputs and outputs) and the names of functionalities which might be invoked in a web service.   WSDL by convention if not specification requires SOAP as an invocation method.  That being said, WSDL, being XML-based, could possibly be used to specify other invocation methods (usually, by specifying both SOAP and also alternate methods).  If the web service were to support methods other than SOAP, this would be stated in the WSDL describing the web service.  SOAP is oriented toward actions, i.e. methods, acting as a form of remote procedure call, while REST is oriented toward resources, i.e. getting and retrieving resources from the remote end.  They are not considered equivalent, but rather as alternate approaches.   As my understanding of "web services" is based on the accepted W3C specification, I disagree that REST methods could replace SOAP.

161.    Mr. Weadock agrees that a web service is at the very least "a software system designed to support interoperable machine-to-machine interaction over a network."[141]  Mr. Weadock, however, ignores the remaining parts of the definition that the applicant specifically referenced during prosecution.[142]  Defendant's proposed construction includes the entirety of the definition referenced by the applicant.

### D.    symbolic name(s)

162.    The term "symbolic names" appears in claims 1, 3, 5–7, 11, 12, 14–18, and 22 of the '755 patent, claims 1, 3, 5–7, 11, and 13 of the '287 patent, and claims 1, 3–7, 11–13, 15, 17–21, and 25–27 of the '044 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| parameters specifying inputs and/or outputs associated with web services that are not pointers to information | No construction necessary |

---

[141] Weadock Decl. ¶ 85.

[142] *See* '755 patent file history at XMO_GD00157520 (referencing the construction proposed by Defendants, not only the portion quoted by Express Mobile and Mr. Weadock).

163.    The term "symbolic" appears in only one sentence in the specification outside the claims, in the following quotation: "In one embodiment, the mechanism for binding the outputs of the web service to the UI components is through symbolic references that matches each output to the symbolic name of the UI component."[143]

164.    The file history, however, does include a discussion of the term "symbolic name." During prosecution, the applicant defined symbolic names as inputs and outputs associated with web services, and specifically excluded the possibility that they were pointers to information.[144] The applicant also noted that the symbolic names were parameters on numerous occasions.[145] Defendant's construction of "symbolic names" is consistent with how a POSA would understand the term based on applicant's statements during prosecution.

---

[143] '755 patent at 9:11–14.

[144] *See* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 10 ("The symbolic names, however, of inputs and/or outputs associated with web services are merely parameters and are not pointers to information."); Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 9; *see also* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 9 ("[the prior art]] does not make reference to any of the symbolic names associated with an input or output of a web service."); Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 12 ("the present invention includes a database of the web service parameters"); *id.* at 11– 12.

[145] Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 16 ("symbolic names. . ., of inputs and/or outputs associated with web services are merely parameters."); Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 9, 10 (same); *see also id.* at 6 ("the Application includes these symbolic names, as parameters, . . ."); *id.* at 10 ("[the prior art's] calls to a web service require symbolic names of inputs and/or outputs associated with a web service. The required information is parameters that are passed to the web service[.]"); *see also* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 11 ("In the present application, such parameters are stored separately in a registry separate from any addresses or pointers to the information. Specifically, a registry is provided of parameters . . . "); *compare* Excerpt from 9,063,755 File History, Reply "B" Under 37 C.F.R. §1.116(e), May 30, 2013 at 5; Excerpt from 9,063,755 File History, Response to Office Action After Final Under 37 C.F.R §1.116 and Request for Continued Examination (RCE) Under 37 C.F.R. 1.114, Sept. 26, 2013 at 11 (explaining that "a registry is provided of parameters") *with* '755 patent at claim 1 (claiming a registry of symbolic names).

165.     A POSA would also understand that a parameter is simply an argument name assigned to a value that is then passed to a function.  For example, suppose a computer program exists to calculate the area of any triangle.  In order to calculate the area, the program needs to know measurements for the specific triangle at issue.  The program would need to know the measurements for base ($b$) and height ($h$), which are then used in the function: Area $= bh$ /2.  To write this program, a programmer may write a function such as the following:

```
public static float area (float base, float height) {
    return (base * height) / 2;
}
```

The above is Java code that defines a function (area) that takes two arguments, named base and height.  At run time, the two argument names are assigned a value when the function is called.  So, for example, if a triangle has a base of length 3 and a height of length 4, when this function will be called, the function assigns the value "3" to the argument base and the value "4" to the argument height, so that in the calculation (base * height) / 2, the computer calculates (3 * 4) / 2 and returns the result (6).  In this example, base and height are parameters because they are argument names are assigned a value that is passed to the function.

166.     Symbolic names are referred to in the priority documents as "parameters" in the same way, consistent with the applicant's description of symbolic names as parameters during prosecution.  One of the priority documents contains a description of "Web Component Models,"[146] which include the tag "<Parameter>", as shown below:[147]

---

[146] *See* Excerpt from 9,063,755 File History, U.S. Prov. Pat. Appl. No. 61/113,471, Nov. 11, 2008 at XMO_GD00157454.

[147] Excerpt from 9,063,755 File History, U.S. Prov. Pat. Appl. No. 61/113,471, Nov. 11, 2008 at XMO_GD00157456 (annotated).

2: Yahoo Search

```xml
<?xml version="1.0" encoding="utf-8" ?>
<WebComponentModel xmlns:xsi="http://www.w3.org/2001/XMLSchema-instance" xsi:
  schemaLocation="http://webcomponents.xpressmo.com ../webcomponentmodel.xsd" xmlns="http://
  webcomponents.xpressmo.com" name="WebSearch" group="Yahoo" XpathNS="urn:yahoo:srch"
  PlayerURL="http://localhost:8080/wcm/playerreq" ServiceURL="http://api.search.yahoo.com/Web-
  SearchService/V1/webSearch?appid=dgSG0s_V34EXXzvP1a_evRroETboFkDl9KlmJiHL4Ky7hmZ3Of.
  usRnThe1n.I8-">
  <Inputs>
    <Parameter name="in1" dataType="String" parmType="request" use="required"
      ServiceMapping="query">
        <Comment>the search term string</Comment>
    </Parameter>
    <Parameter name="in2" dataType="Int" parmType="request" use="optional" ServiceMapping="results"
      defaultValue="10">
        <Comment>The number of results to return, defaults to 10</Comment>
    </Parameter>
  </Inputs>
  <Outputs>
    <Parameter ServiceMapping="//ns:ResultSet/@totalResultsAvailable" name="totalResultsAvail"
      dataType="Int" use="optional">
        <Comment>The total results available</Comment>
    </Parameter>
    <Parameter ServiceMapping="//ns:ResultSet/@totalResultsReturned" name="totalresultsReturned"
      dataType="Int" use="optional">
        <Comment>The total results returned</Comment>
    </Parameter>
    <List ServiceMapping="//ns:ResultSet/ns:Result" name="searchResults" controlParm="Title">
        <Parameter name="Title" dataType="ComplexList" use="optional" ServiceMapping="Title">
            <Comment>The title of the search result link</Comment>
        </Parameter>
        <Parameter name="URL" dataType="String" ServiceMapping="Url" use="optional">
            <Comment>The URL to the search result</Comment>
        </Parameter>
        <Parameter name="ClickURL" dataType="String" use="optional" ServiceMapping="ClickUrl">
            <Comment>The click thru URL to the search result</Comment>
        </Parameter>
        <Parameter name="DisplayURL" dataType="String" use="optional" ServiceMapping="DisplayU
          rl">
            <Comment>A display URL for the user to see for the search result</Comment>
        </Parameter>
        <Parameter name="Summary" dataType="multiLineString" use="optional" ServiceMapping="S
          ummary">
            <Comment>Short paragraph of the search result page</Comment>
        </Parameter>
    </List>
  </Outputs>
</WebComponentModel>
```

62

167.   In this embodiment, the applicant is defining "parameters" in its web component model.  For example, in the excerpt below, "in1" is the symbolic name of the parameter that will later be provided by the end user as an input to the web service "Yahoo Search":[148]

```
2: Yahoo Search

<?xml version="1.0" encoding="utf-8" ?>
<WebComponentModel xmlns:xsi="http://www.w3.org/2001/XMLSchema-instance" xsi:
    schemaLocation="http://webcomponents.xpressmo.com ../webcomponentmodel.xsd" xmlns="http://
    webcomponents.xpressmo.com" name="WebSearch" group="Yahoo" XpathNS="urn:yahoo:srch"
    PlayerURL="http://localhost:8080/wcm/playerreq" ServiceURL="http://api.search.yahoo.com/Web-
    SearchService/V1/webSearch?appid=dgSG0s_V34EXXzvP1a_evRroETooFkDl9KImJiHL4Ky7hmZ3Of.
    usRnThe1n.I8-">
  <Inputs>
    <Parameter name="in1" dataType="String" parmType="request" use="required"
        ServiceMapping="query">
      <Comment>the search term string</Comment>
    </Parameter>
    <Parameter name="in2" dataType="Int" parmType="request" use="optional" ServiceMapping="results"
        defaultValue="10">
      <Comment>The number of results to return, defaults to 10</Comment>
    </Parameter>
  </Inputs>
```

168.   Mr Weadock argues that "symbolic name" has other uses in the 755 patent, citing to claim 1 (Weadock Decl. ¶ 75).  The cited claim limitation recited "produce an Application including the symbolic name of the defined UI object…" but this does not imply that the UI object itself has the symbolic name, or if it does, this reflects a poorly drafted claim with no support in the specification.  The antecedent to "symbolic name" is found early in the claim, as "symbolic names required for evoking one or more web components each related to a set of inputs and outputs of a web service…"   The UI object antecedent is found as "define a user interface (UI) object for presentation on the display, where each said UI object corresponds to the web component included in said registry selected from the group consisting of an input of the web service and an output of the web service".   The UI object is not named or selected by name,

---

[148] Excerpt from 9,063,755 File History, U.S. Prov. Pat. Appl. No. 61/113,471, Nov. 11, 2008 at XMO_GD00157456 (annotated).

it is defined, per this limitation.   The limitation immediately before the cited limitation links the two: "associate the selected symbolic name with the defined UI object".

169.    At this point, the UI object is associated with symbolically named inputs and outputs, and the Application requires the names of the inputs and outputs because they must be supplied when the web service is invoked.  So yes, the UI object at that point does have symbolic names associated with it, but they are precisely the symbolic names I refer to in my construction, and these names must be *included* with the Application in order to successfully invoke the web service.

170.    Mr. Weadock criticizes Defendant's construction, because in his view, a "name" is not a parameter.[149]  Mr. Weadock argues that a "parameter" "would be understood to be a value associated with variables, functions, or commands," and cites to two Microsoft Computer Dictionaries in support of this argument.[150]  Mr. Weadock misreads the definitions in those dictionaries.  Specifically, the definitions are:

> In programming, a value that is given to a variable, either at the beginning of an operation or before an expression is evaluated by a program. Until the operation is completed, a parameter is effectively treated as a constant value by the program. A parameter can be text, a number, or an argument name assigned to a value that is passed from one routine to another. Parameters are used as a means of customizing program operation.[151]

This definition states that a parameter can be the argument name assigned to a value that is passed from one routine to another.

171.    Mr. Weadock also argues that Defendant's proposed construction is wrong, because the claims state that the invention can "produce an Application including the selected symbolic name of the defined UI object."[152]  A POSA, however, would recognize that the use of

---

[149] Weadock Decl. ¶ 90.

[150] Weadock Decl. ¶ 90 (citing Microsoft Computer Dictionary, Fourth Edition at 332 (XMO_GD00156617) (GD Ex. 3I) and Microsoft Computer Dictionary, Third Edition at 354 (XMO_GD00156629) (XMO Ex. 2O)).

[151] XMO_GD00156617; XMO_GD00156629 (same).

[152] Weadock Decl. ¶ 91.

the term "the" when referencing this symbolic name means it refers to a symbolic name previously referenced in the claim, and that the only time "symbolic name" is referenced without a "the" in front of it is in connection with the symbolic names referenced in the registry.  With this understanding, an ordinary artisan would therefore understand that an arbitrary symbolic name in the registry can also be related to a UI object, not that there exist symbolic names that aren't related to inputs and/or outputs associated with web services.

### E.    Application / application

172.    The terms "Application" / "application" appear in claims 1, 3–7, 11, 12, 14–18 and 22 of the '755 patent, claims 1, 3–7, 11–13, 15, 17–21 and 25–27 of the '287 patent, and claims 1, 3–7, 11–13, 15, 17–21, and 25–27 of the '044 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| device-independent code which contains instructions for a device and which is separate and independent from the Player | Device-independent software code containing instructions for a device |

173.    This construction is identical to that as construed by this Court in *Shopify*, with the additional requirement of "independent".   I will clarify the import of "independence" further below.

174.    The specification makes it clear that the Application / application is "device-independent code," when it states that a "device-independent program" is "referred to herein and *without limitation* as an 'Application[.]'"[153]  The two additional requirements present in Defendant's proposed construction are also supported by the intrinsic record.

175.    First, the claims and the prosecution history support Defendant's proposed requirement for the Application to be partitioned from the Player.  The asserted claims refer to

---

[153] '755 patent at 5:8-24; *see also id.* at 6:4–5; Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 3.

the Player and Application separately, which would suggest to one or ordinary skill in the art that they are partitioned, and the prosecution history confirms it.

176.    The applicant specifically distinguished the claimed invention over prior art on the basis of this partitioning requirement.  For example, the applicant argued that there "is no teaching or suggestion in McCain [the prior art] of an authoring tool that provides two separate codes: a device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application)."[154]  As the applicant explained, "the claimed invention, in contrast, operates by partitioning the code required for functionality into device-independent code and device-dependent code."[155]  According the applicant, "[b]y partitioning code for accessing web services into an Application and a Player has an advantage for maintaining websites." [sic][156]

177.    For the Application to be separate and partitioned from the Player as applicants were using the terms during prosecution, a POSA would recognize that the application and player must be entirely different sets of code.  Again, this is reflected in the applicants' characterization of McCain, which applicants argued "clearly teaches combining all code (executable, device dependent code[)] as well as parameters (device-independent code) into C2 components, which are then provided to the browser to generate a display."[157]  Or, as applicants succinctly told the Examiner, "[t]he solution of *McCain* is one code that is delivered to the device, where it is executed by a browser on the device."[158]  Applicants further emphasized that: "There is no teaching or suggestion in *McCain* of separating binary, non-binary, or executable components into different codes."[159]   Specifically, these statements during prosecution

---

[154] Excerpt from 9,063,755 File History, Reconsideration after Non-Final Rejection, Jan. 17, 2014 at 12, 13.

[155] Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 11

[156] Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 8.

[157] Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 10.

[158] Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 9.

[159] *Id*. (emphasis in original).

demonstrate that the applicants distinguished over McCain on the basis of *separateness*, claiming that in contrast McCain delivered all of its software in a single, combined, package.  I note additionally that the arguments made by the applicants to distinguish over McCain have nothing to do with how the various components interact *during execution;* that is an entirely separate issue which is not addressed because it is not relevant to the applicant's position.   Raising that argument today does not change the statements made in prosecution.

178.   The applicants further explained the alleged advantages provided by the separate application and player in their appeal brief submitted during prosecution:

> [P]artitioning code for accessing web services into an Application and a Player has an advantage for maintaining websites.  Thus, for example, code that is device specific may be maintained separately from code that [is] web service specific.  If a new device comes on the market, or if it is found that the device-dependent code for a specific device needs an update, a new Player is developed and provided to those specific devices.  Likewise, if new capabilities are provided for certain web services, or if a new web service is available, then a new Application is developed for those web services, and provided to devices requesting those services.[160]

179.   A POSA would recognize that applicants were describing the claimed application and player as entirely separate sets of code, so that one or the other could be changed, debugged, and updated independently..  The import of the statement above is, for example, that once a Player is developed for a particular mobile device architecture, it need not be updated each time an application is changed to incorporate new features, or indeed each time a new application is distributed.

180.   Mr Weadock makes several statements concerning the Player / Application architecture (Weadock Decl. ¶ 80) which indicate that the two are "interdependent".  Of course this is true, as the Player "executes" the Application.  The statements about the Player "adapting" the Application to a particular device have nothing to do with the logic or operation of the Application, but merely how the Player carries out the Applications directives (e.g. in creating the UI objects on the device display) in a manner which is most appropriate for the device.  There is nothing in the specification to suggest that the Player changes the logical operation of

---

[160] *Id.* at 8.

the Application.  Finally, the suggestion that the Application's "instructions" consist of executable code defies the reality that the Application is by design device independent; if the Application included executable code, then a new Application would be required for *every* new mobile device platform; this is precisely the problem the 755 patent seeks to address.

181.    This argument, based on the concept of "interdependence," misses basic software engineering practices in which many pieces of separate and independent code can be made to work together.   For example, independent software developers may build a software package (often open source) entirely on their own, or as an ad hoc team, store this code on their own servers, and some other team in some other organization may make use of it in a product.  Of course they are "interdependent" in that changes in the package may change the behavior of the product, yet the two code lines remain independent.

182.    Similarly, the argument that independence is belied by statements in the specification concerning "integration" into a "client/server Application" have no impact on concepts of separateness or independence.  If anything, a "client/server" relationship *emphasizes* both concepts.  In a client/server relationship, two (for example) completely separate programs execute on two completely separate computers (or at least two separate processes if run on a single computer).  Each of these programs is based on code developed and maintained independently.  What *is* required is that the programmatic interface, i.e. how the client and server communicate, and what data they must communicate, is well specified, but this is not a subject of construction.

183.    Mr Weadock cites a paragraph in the specification which he alleges shows that the Application "can be in an integrated whole with the 'Player'" (¶ 79).  This discussion is problematic for several reasons.    First, the specification is poorly written on this point, lacking specificity and at best confusing in, for example, the antecedent to "it" at 7:35.   Second, Mr. Weadock's own statement is ambiguous; what does it mean to be "in an integrated whole with" something?  He seems to be somehow concluding that in this embodiment the Application and Player become one.  That is not how I read the specification here at all.

184.    The Player is device-dependent code on the device which interprets or executes the Application, with the Application being described in terms of a PDL (the "database" of the 735 patent family).  The PDL constitutes an "abstraction interface" (the entirety of column 7 is discussion of the role of the PDL).  The very fact that there is any "abstraction interface" actually clarifies separateness; an interface describes the methods by which two separate and independent components communicate.  This particular example is describing a situation in which the Application and or Player on the device have a *further* requirement to communicate with a remote server, which executes "business logic".   This simply means that software on the phone must communicate with a central server in order to function.  Consider a car rental app, for example.  The Player can draw the screen.  The Application could put up check boxes or pull down menus through with a user can enter the city, date, and perhaps type of car they wish to rent.   But in order to actually quote price and availability, the mobile device must obtain that information from the server (and will similarly have to send reservation details back to the server, else the renter may find no car reserved upon arrival).   As the rest of the paragraph points out, the "abstraction interface" allows one version of the Application to run on different devices by utilizing the particular Player for that device.  The key point here is the "abstraction interface" which is precisely what allows Application and Player to be separate and independent.  It is only in the *absence* of some form of agreed upon interface that Application and Player would be required to be a single integrated piece of software.

185.    In *Shopify* this court rejected adding a limitation of "partitioned" to the construction in deference to an embodiment in the specification in which the Player and Application are integrated on a single server.  But as the Court further noted, "they presumably remain separate sets of code"[161]   Although I maintain that the term "partition" as understood by a POSA would not prevent such a configuration, avoiding it and using "separate and independent" still adds clarity in line with the specification.   Two programs can be separate (e.g

---

[161] *Shopify* Claim construction order, p 8

in distinct files on the same computer) and be maintained from independent code bases with nothing preventing them from executing on a single server.

### F.   Player / player

186.    The terms "Player" / "player" appear in claims 1, 3–7, 11, 12, 14–18 and 22 of the '755 patent, claims 1, 3-7, 11–13, 15, 17–21 and 25–27 of the '287 patent, and claims 1, 3–7, 11–13, 15, 17–21 and 25–27 of the '044 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
| --- | --- |
| executable device-dependent code which contains instructions for a device and which is separate and independent from the Application | software code that facilitates the execution of an application on a device |

187.    I believe that the requirements set forth in Defendant's proposed construction accurately reflect the definition one of ordinary skill in the art would assign to this term based on the intrinsic record.  I further note, as I did with "Application", that this construction conforms with this Court's previous construction in *Shopify*, with the additional requirement of "independent", which I have discussed above.

188.    First, one or ordinary skill would recognize that the Player is an executable file. The specification states that "system 100 provides permits a user of authoring platform 110 to provide instructions to each of the plurality of devices 130 in the form of a device- or device-platform specific instructions for processor 135 of the device, referred to herein and without limitation as a 'Player[.]'"[162]  "Instructions for the processor" would be understood by the ordinary artisan to refer to executable code, as a processor must receive instructions in the form

---

[162] '755 patent at 5:9–12; *see also id.* at 5:57–59 (explaining that the Player takes the device-independent code of the Application and transforms it "into device-specific instructions that are executable by [the] device."); *id.* at 5:60-64 ("the Application may include Java programming for generating a display on screen 137, and the Player may interpret the Java and instruct processor 135 to produce the display according to the Application for execution on a specific device 130 according to the device platform.")

of executable code in order to operate.  My understanding is confirmed by the file history, where the applicant repeatedly equated "device dependent" or "device specific" code with executable code.[163]

189.    Second, the intrinsic record also confirms that the claimed Player is device-specific or device-dependent code.  The specification states that instructions "in the form of a device- or device-platform specific instructions for [a] processor of the device" is "***referred to herein and without limitation*** as a 'Player[.]'"[164]  This is confirmed by the file history, where the applicant stated: "The present patent application ***consistently use*** [sic] the words 'Application' (with a capital A) and 'Player' (with a capital P) to refer to code that is provided to devices for accessing web services, where . . . a Player is **device-dependent code.**"[165]

190.    Third, one of ordinary skill in the art would also recognize that the Player is separate and independent from the Application and interprets and executes the Application for the same reasons discussed above, with respect to Application.

191.    XMO's proposed construction is, with the exception of the additional word "code" as in "software code" (a meaningless addition, as "software" is "code"), identical that

---

[163] *See* Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 8 ("the device receives an executable code in the form or a Player."); *id.* at 10 ("device dependent (executable) code"); Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 10 ("executable, device-dependent code"); *id.* at 13 ("device-dependent codes . . . that execute on a device"); Excerpt from 9,063,755 File History, Reconsideration after Non-Final Rejection, Jan. 17, 2014 at 9 ("Player (being device-dependent) is executed").

[164] '755 patent at 5:8–24; *see also* Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 4 (applicant referencing paragraph [0048], i.e. 5:8-24 as issued, as supporting the disclosure of a Player).

[165] Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 9-10 n.2 (first emphasis added).  *See also* Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 11 ("device dependent code (such as the claimed Player)"); *id.* at 12 ("device-dependent code (the Player)"); *see also* Excerpt from 9,063,755 File History, Reconsideration after Non-Final Rejection, Jan. 17, 2014 at 11 (distinguishing prior art as it "teaches only generating device independent code," and providing no teaching or suggestion for "generating or providing device-dependent code (a Player)."); Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 8 ("If a new device comes on the market, or if it is found that the device-dependent code for a specific device needs an update, a new Player is developed and provided to those specific devices."); *id.* at 12 (claiming that the prior art taught the generation of a Player "since the code is generated to run on a specific device").

already rejected by the Court in *Shopify*.   As I noted then, "facilitates the execution" is hopelessly vague and unhelpful.

192.    The proposed construction also attempts to avoid the "device-specific" aspect of the Player. I disagree with Mr. Weadock's opinion that the Player is not device-specific or device-dependent code.  Mr. Weadock points to a statement at column 1, lines 59-62 as supporting his view that the Player is not device-specific or device-dependent.[166]  With respect to the statement in the specification that Mr. Weadock relies on, this sentence is confusing and is at best ambiguous.  To the extent the clause "has no device specific dependencies" is not a typographical error (of which there are numerous throughout the specification), it is my opinion that it is referring to the programming language having no "device specific dependencies," not the Player.  Specifically, the sentence could in fact be read as "In one embodiment, one of the codes is a Player, which is a thin client architecture that operates in a language that **[1]** manages resources efficiently, **[2]** is extensible, **[3]** supports a robust application model, and **[4]** has no device specific dependencies."[167]  That is, the numbered items modify "language," not "Player." I believe this interpretation is much more consistent with the specification, and in fact, is supported by the discussion at column 6, lines 48-56 of the Portable Description Language ("PDL") being a common language for the authoring tool, Application, and Player.[168]

193.    This interpretation also better conforms to how a POSA would understand the sentence, because the four criteria listed could more easily be understood as characteristics of a language rather than of an architecture.  A language utilizes resources in the form of how it represents program variables in memory, and languages are often extensible.  It is reasonable to consider what a language is capable of modelling, given its syntax and semantics.  And most to the point, most high level languages have no device specific dependencies at all, but rather rely on the operating system utilities or libraries which support the language to worry about such

---

[166] Weadock Decl. ¶ 97.

[167] '755 patent at 1:59-62 (annotated).

[168] I discuss this passage in greater detail in connection with the construction of "device-dependent" code.

details.  For example, the Java language statement `System.out.println ("Hello World!");` writes "Hello World!" on the screen.  All the details of how to do that is handled in a system utility that the programmer need know nothing further about.

194.    In contrast, if describing instead a thin client *architecture*, the statement (without correction of the typo) makes no sense at all, because a "thin client" is all about device dependence.  A thin client architecture is one in which almost everything is done in a server on the network, and the client itself just worries about about outputs (drawing on the screen) and inputs (key presses, touches, mouse, etc.); this is why the client is referred to as "thin".  To a POSA, the concept of a thin client with no device specific dependencies would be nonsensical.

195.    Mr. Weadock also includes a list of citations to various portions of the specification, but it is unclear why Mr. Weadock includes these citations, because he does not discuss any of them in detail, and an examination of the statements in fact confirms applicant's representation to the PTO that "a Player is device-dependent code."[169]  The table below illustrates how none of the citations provided by Mr. Weadock support a different reading:

| Citation | Interpretation by Person of Ordinary Skill in the Art | My Opinion |
|---|---|---|
| 3:58–62 | This section refers to device-specific routines, "that is, codes that are specific to the operating system, programming language, or platform of specific devices."  The citation continues after the section cited by Mr. Weadock to state that the invention is not limited to using Java-based systems, but that "one skilled in the art could provide Players for devices using routines provided on a platform."  '755 patent at 3:62–67. | Supports idea that Player is device specific / device dependent |
| 5:8–24 | This citation is to the statement that "system 100 provides | Supports idea that |

---

[169] Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. §1.192, Nov. 26, 2014 at 9-10 n.2 (first emphasis added). *See also* Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 11 ("device dependent code (such as the claimed Player)"); *id.* at 12 ("device-dependent code (the Player)"); *see also* Excerpt from 9,063,755 File History, Reconsideration after Non-Final Rejection, Jan. 17, 2014 at 11 (distinguishing prior art as it "teaches only generating device independent code," and providing no teaching or suggestion for "generating or providing device-dependent code (a Player)."); Excerpt from 9,063,755 File History, Appeal Brief filed under C.F.R. § 1.192, Nov. 26, 2014 at 8 ("If a new device comes on the market, or if it is found that the device-dependent code for a specific device needs an update, a new Player is developed and provided to those specific devices."); *id.* at 12 (claiming that the prior art taught the generation of a Player "since the code is generated to run on a specific device").

| Citation | Interpretation by Person of Ordinary Skill in the Art | My Opinion |
|---|---|---|
| | permits [sic] a user of authoring platform 110 to provide instructions to each of the plurality of devices 130 in the form of a device- or device-platform specific instructions for processor 135 of the device, referred to herein and without limitation as a "Player[.]" | Player is device specific / device dependent |
| 5:42–55 | This citation states that the authoring tool may "produce and store within memory 111*a* a plurality of Players (for different devices 130)." It continues: "A Player need be provided once or updated as necessary, and thus may be used to display a large number of Applications." It goes on to state that "This is advantageous for the authoring process, since all of the device-dependent programming is provided to a device only once (or possibly for some small number of upgrades)[.]" | Supports idea that Player is device specific / device dependent |
| 5:56–6:3 | This citation states that "in one embodiment, the Player transforms device-independent instructions of the Application into device-specific instructions that are executable by device 130." | Supports idea that Player is device specific / device dependent |
| 6:9–17 | This citation states that "The Player may include code that is device-specific—that it, each device is provided with a Player that is used in the interpretation and execution of Applications." | Supports idea that Player is device specific / device dependent |
| 7:13–20 | This citation refers to a PDL, which is discussed in the context of the Application, and not the Player. *See* '755 patent at 7:1–2 ("The terminology used here is a PDL, that is the 'internal database' of Rempell is equivalent to the PDL of the present Application."); *id.* at 6:4–6 ("The Application is preferably code in a device-independent format, referred to herein and without limitation as a Portable Description Language (PDL)."); *id.* at 6:48–49 ("In certain embodiments, the applicant model used in developing and providing Applications is a PDL.") An ordinary artisan would understand the discussion of this citation to be referring to the Application. | Citation is irrelevant to question of whether Player is device specific / device dependent |
| 7:30–40 | This citation is referring to how the Player is used to "separate[] all device, operating system and virtual machine dependencies from the Player's Application model business logic[.]" An ordinary artisan would understand the discussion of this citation to be referring to the Player including device, operating system, and virtual machine dependencies, i.e. that the Player is device-dependent, and an "abstraction interface" of the Player is used to allow the Application and server to interact with the device. | Supports idea that Player is device specific / device dependent |
| 8:7–17 | This citation is referring to how a "response director" determines the appropriate "Player (each usable by *certain* devices)". It also states that the device provides "device-specific information" in order to allow the "response director" | Supports idea that Player is device specific / device dependent |

74

| Citation | Interpretation by Person of Ordinary Skill in the Art | My Opinion |
|---|---|---|
| | to "determine[] the appropriate Player for the device." An ordinary artisan would understand this to be disclosing that device-specific information needs to be provided to the response director because Players are device-specific. | |
| 8:27–35 | This citation states how the authoring tool can produce both an Application and a Player, and how the Application is intercepted, via a Player, in order to show a screen. An ordinary artisan would understand it to be referring to how the authoring tool produces the Player and the Player intercepts the Application, not whether the Player is device-dependent or not. | Citation is irrelevant to question of whether Player is device specific / device dependent |
| 9:4–10 | This citation states how the Player receives outputs of web services and binds the data to the UI components in the Application. An ordinary artisan would understand this statement to be referring to how the authoring tool produces the Player and the Player performs various functions. This is consistent with the notion that the Player is device-specific code, as performance of functions is accomplished through device-specific code for a processor. | Supports idea that Player is device specific / device dependent |
| 11:41–51 | This citation states how the Player instructs a processor to carry out some acts. As discussed above, instructions to a processor are by definition device-dependent codes. | Supports idea that Player is device specific / device dependent |
| 17:66–18:3 | This citation states how there can exist a "Universal Player" that includes "all the code libraries for the Player." An ordinary artisan would understand this statement to be referring to how Players can have different libraries, not whether a Player is device-dependent or not. | Citation is irrelevant to question of whether Player is device specific / device dependent |
| 23:43–46 | This citation states that the authoring tool generates a Player "specific to device 130 of Fig. 4B." | Supports idea that Player is device specific / device dependent |
| 33:12–15 | This citation states that the Player decompresses objects "in compliance with the programming APIs of device 130." An ordinary artisan would understand that this paragraph describes various functions the player performs. This is consistent with the notion that the Player is device-specific code, as performance of functions is accomplished through device-specific code for a processor. | Supports idea that Player is device specific / device dependent |
| 33:26–28 | This citation discusses how the response director "provide[s] the correct Player to a given device based on the information the device sent to it," similar to the statement at 8:7–17. An ordinary artisan would understand this to be disclosing that device-specific information needs to be provided to the response director because Players are device-specific. | Supports idea that Player is device specific / device dependent |

| Citation | Interpretation by Person of Ordinary Skill in the Art | My Opinion |
|---|---|---|
| Fig. 2A | Fig. 2A is described as "a schematic of a system 200 of an embodiment of system 100 illustrating the communications between different system components." '755 patent at 7:63–65. An ordinary artisan would understand this figure to show how the authoring platform sends all Players to the response director, and the response director provides a device-specific Player to the device. *See id.* at 8:7–17 (discussing the role of the response director shown in Fig. 2A). | Supports idea that Player is device specific / device dependent |
| Fig. 2B | Fig. 2B shows the various software components that require space in and access to the heap in memory. The term "heap" relates to memory management. The boxes show various aspects that need space in the heap. *See* '755 patent at 10:62–11:2. In addition, the connections are described as "logical connection[s] between the different types of programming stored in [the] heap." *Id.* at 11:36–40. An ordinary artisan would understand Figure 2B to relate to memory management, and not whether the Player is device-dependent or not. | Citation is irrelevant to question of whether Player is device specific / device dependent |

196.    As discussed above, nothing Mr. Weadock points to suggests in any way that the Player is not device-dependent code.

### G.    Preferred UI object

197.    The term "preferred UI object" appears in all claims of the '287 patent, and all claims of the '044 patent. The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| a UI object associated with a data type that is favored over the other UI object candidates in that data type. | a UI object associated with a data type that is favored |

198.    "UI" is a term of art in computer science and web design fields and refers to "user interface." Table I of the specification shows the disclosed set of data types. Each disclosed data type has at a preferred input or output UI object. Some data types have multiple UI objects listed. When there is a single UI object available for a data type, that UI object is the "preferred" UI object. When there are multiple UI objects available for a data type, one of them is always listed as the "preferred" UI object. This conforms precisely to the proposed construction.

76

**H.      Related Settings**

199.    The term "related settings" appears in claims 1 and 15 of the 044 patent.  The parties' presently proposed constructions are set forth below:

| Defendant's Construction | Express Mobile's Construction |
|---|---|
| Settings for a particular object | No construction necessary |

200.    The claim language makes it clear that the settings are "representative of said defined UI object" and it would be erroneous to infer that the settings could be "related" to anything other than the particular UI object with which they are representative.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on Feb 5, 2021 at Winchester, Massachusetts.

_____
CHRIS SCHMANDT

I declare under penalty of perjury under the laws of the United States of America that the foregoing corrections to the February 5, 2021 version of my declaration are true and correct. Executed on February 23, 2021 at Winchester, Massachusetts.

_____
CHRIS SCHMANDT