**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EXPRESS MOBILE, INC., )<br><br>            Plaintiff, )<br><br>       v. )<br><br>GODADDY.COM, LLC, )<br><br>            Defendant. ) | Civil Action No.1:19-cv-01937-RGA |

## <u>SUPPLEMENTAL JOINT CLAIM CONSTRUCTION BRIEF</u>

## <u>TABLE OF CONTENTS</u>

I.      CONSTRUCTION OF "VIRTUAL MACHINE" IN THE '397 PATENT ...................... 1

     1.     EXPRESS MOBILE'S SUPPLEMENTAL OPENING BRIEF............... 1

          A.     THE INTRINSIC RECORD SUPPORTS EXPRESS MOBILE'S CONSTRUCTION.................................................... 3

          B.     EXPRESS MOBILE'S CONSTRUCTION IS CONSISTENT WITH THE ORDINARY AND WELL UNDERSTOOD MEANING OF VIRTUAL MACHINE TO THE POSA .......................................................................... 8

          C.     GODADDY'S CONSTRUCTION OF "VIRTUAL MACHINE" WOULD IMPROPERLY EXCLUDE NUMEROUS VIRTUAL MACHINE EMBODIMENTS FROM THE SCOPE OF THE CLAIMS .................................... 14

     2.     DEFENDANT'S SUPPLEMENTAL ANSWERING BRIEF................ 20

          A.     THE INTRINSIC RECORD DEMONSTRATES THAT THE "VIRTUAL MACHINE" SOFTWARE EMULATES PHYSICAL PROCESSOR CHARACTERISTICS.................... 21

          B.     THE ONLY *RELEVANT* EXTRINSIC EVIDENCE SUPPORTS GODADDY'S CONSTRUCTION BECAUSE IN 1999 "VIRTUAL MACHINE" HAD NO DEFINED MEANING............................................................................... 28

          C.     EXPRESS MOBILE'S MULTIPLE CONSTRUCTIONS ARE FURTHER FLAWED BECAUSE THEY ASSUME "VIRTUAL MACHINE" IS THE SAME AS THE SEPARATELY CLAIMED "BROWSER." ............................... 31

          D.     GODADDY'S CONSTRUCTION WOULD NOT EXCLUDE ANY DISCLOSED EMBODIMENTS OR IMPART IMPROPER LIMITATIONS ON THE VIRTUAL MACHINE AS CLAIMED. .................................... 32

          E.     IF THE COURT ADOPTS EXPRESS MOBILE'S NEWLY PROPOSED CONSTRUCTION, THEN THE COURT MUST LIMIT "VIRTUAL MACHINE" TO THE SINGLE EMBODIMENT DISCLOSED IN THE SPECIFICATION – A JAVA VIRTUAL MACHINE............... 35

     3.     EXPRESS MOBILE'S SUPPLEMENTAL REPLY BRIEF ................. 38

A. THE INTRINSIC RECORD IS CONSISTENT WITH EXPRESS MOBILE'S CONSTRUCTION, AND UNDERSCORES THAT VIRTUAL MACHINE IS NOT LIMITED TO EMULATING A PHYSICAL PROCESSOR OR TO PARTICULAR TYPES OF VIRTUAL MACHINES ................................................................. 40

B. THE EXTRINSIC RECORD REINFORCES THAT VIRTUAL MACHINE WAS A WELL-UNDERSTOOD TERM AS OF THE PRIORITY DATE ....................................... 48

C. GODADDY'S CONSTRUCTION EXCLUDES EMBODIMENTS AND IMPOSES IMPROPER LIMITATIONS ON THE SCOPE OF THE VIRTUAL MACHINE TERM ....................................... 51

D. EXPRESS MOBILE'S CONSTRUCTIONS DO NOT ASSUME THAT THE BROWSER AND THE VIRTUAL MACHINE IS THE SAME ........................................ 53

E. GODADDY'S BELATED NEW ARGUMENT THAT "VIRTUAL MACHINE" SHOULD BE CONSTRUED AS A MEANS-PLUS-FUNCTION TERM IS UNSUPPORTED AND IMPROPER .......................................... 54

4. DEFENDANT'S SUPPLEMENTAL SUR-REPLY BRIEF ................... 55

A. THE COURT SHOULD LOOK TO THE CONTEXT OF THE INTRINSIC RECORD SHOWING THE CLAIMED "VIRTUAL MACHINE" IS SOFTWARE THAT EMULATES A PHYSICAL PROCESSOR. ............................... 56

B. IF VIRTUAL MACHINE IS ANY FORM OF SOFTWARE AS XMO CLAIMS, THEN THE COURT SHOULD CONSTRUE IT AS LIMITED TO A JAVA VIRTUAL MACHINE UNDER § 112 ¶ 6. ................................ 63

II. CONSTRUCTION OF PLAYER IN THE '044 PATENT ............................................. 66

1. EXPRESS MOBILE'S SUPPLEMENTAL OPENING BRIEF ............. 66

2. DEFENDANTS' SUPPLEMENTAL ANSWERING BRIEF ................. 72

A. THE COURT CORRECTLY FOUND THE "PLAYER" MUST BE "DEVICE-SPECIFIC" FOR ALL THREE PATENTS AND SHOULD DO SO HERE AGAIN FOR ADDITIONAL REASONS. ........................................ 73

B.      THE '755 PATENT PROSECUTION HISTORY
DISCLAIMERS APPLY EQUALLY TO THE '044
PATENT'S CLAIMED "PLAYER" BECAUSE
"PLAYER" IS THE SAME COINED TERM WITHIN
THE FAMILY AND THE ALLEGED DIFFERENCES IN
CLAIMS LANGUAGE ARE INSIGNIFICANT. ...................... 76

C.      EXPRESS MOBILE'S ARGUMENTS DO NOT MEET
THE STANDARDS OF ITS OWN CASE LAW ...................... 81

3.      EXPRESS MOBILE'S SUPPLEMENTAL REPLY BRIEF ................. 84

A.      THE MATERIAL DIFFERENCES BETWEEN THE
CLAIMS OF THE '044 PATENT AND THE '755 AND
'287 PATENTS COMPEL THE CONCLUSION THAT
THE PROSECUTION HISTORY OF THE '755 PATENT
DOES NOT CARRY FORWARD TO THE '044 PATENT ...... 85

B.      THE PROSECUTION HISTORY OF THE '044 PATENT
REINFORCES THAT THE '755 PATENT
PROSECUTION HISTORY IS IRRELEVANT TO THE
SCOPE OF THE '044 PATENT'S PLAYER ............................ 88

C.      THE SPECIFICATION SUPPORTS THAT THE
PLAYER CAN BE A DEVICE-INDEPENDENT CODE,
REINFORCING THAT THE '044 PATENT'S PLAYER
SHOULD NOT BE CONSTRUED TO REQUIRE
DEVICE-SPECIFIC CODE .......................................................... 90

4.      DEFENDANT'S SUPPLEMENTAL SUR-REPLY BRIEF .................. 92

A.      XMO'S NEWLY ALLEGED "DIFFERENCES" IN THE
'044 CLAIMS LANGUAGE ARE IMMATERIAL TO
THE EXTENT THEY ARE DIFFERENCES AT ALL. ............. 92

B.      THE PATENT'S SINGLE, VAGUE REFERENCE TO A
"THIN CLIENT" PLAYER DOES NOT OVERRIDE THE
REST OF THE RECORD SHOWING "PLAYER" HAS
DEVICE-SPECIFIC CODE .......................................................... 94

C.      XMO HAS NOT OVERCOME THE HIGH BAR FOR
AVOIDING CARRYING FORWARD THE '755
PATENT'S PROSECUTION HISTORY DISCLAIMERS. ....... 95

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                       **Page(s)**

*ACTV, Inc. v. Walt Disney Co.*,
  346 F.3d 1082 (Fed. Cir. 2003)................................................................25

*Affymetrix, Inc. v. Hyseq, Inc.*,
  132 F. Supp. 2d 1212 (N.D. Cal. 2001) ...........................................55, 65

*Amdocs (Israel) Limited v. Openet Telecom, Inc.*,
  2018 WL 1699429 (E.D. Va. 2018)...................................................55, 65

*Applied Med. Res. Corp. v. United States Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006)................................................................58

*Bennett Marine, Inc. v. Lenco Marine, Inc.*,
  549 F. App'x 947 (Fed. Cir. 2013) ..........................................................37

*Biovail Corp. Int'l v. Andrx Pharmaceuticals Inc.*,
  239 F.3d 1297 ..........................................................................................71

*Broadridge Fin. Sols., Inc. v. Inveshare, Inc.*,
  No. CIV.A. 10-075-RGA, 2012 WL 1245723 (D. Del. Apr. 11, 2012) .........................*passim*

*Carefusion 303, Inc. v. Hospira*,
  No. 11-762-RGA, 2013 U.S. Dist. LEXIS 17899 (D. Del. Feb. 11, 2013) ................34, 52, 53

*D Three Enters., LLC v. SunModo Corp.*,
  890 F.3d 1042 (Fed. Cir. 2018)........................................................27, 47

*E. I. du Pont de Nemours & Co. v. Unifrax I LLC*,
  2016 U.S. Dist. LEXIS 3926 (D. Del. Jan. 3, 2016).................................58

*Egenera, Inc. v. Cisco Sys., Inc.*,
  972 F.3d 1367 (Fed. Cir. 2020)................................................................64

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
  93 F.3d 1572 (Fed. Cir. 1996)..........................................................31, 53

*Fin Control Sys. Pty. Ltd. v. OAM, Inc.*,
  265 F.3d 1311 (Fed. Cir. 2001)................................................................79

*Hockersen-Halberstadt, Inc. v. Avia Grp. Int'l*,
  222 F.3d 951 (Fed. Cir. 2000)..................................................................60

*Ingenio, Filiale de Loto-Quebec, Inc. v. GameLogic, Inc.*,
  445 F. Supp. 2d 443 (D. Del. 2006).................................................34, 52

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)......................................................................................67

*Intellectual Ventures II LLC v. FedEx Corp.*,
   No. 2:16-CV-00980-JRG, 2017 WL 5896180 (E.D. Tex. 2017) ...........................................64

*Intermec Techs. Corp. v. Palm Inc.*,
   738 F. Supp. 2d 522 (D. Del. 2010)................................................................................28

*IP Innovation, L.L.C. v. Ecollege.com*,
   156 F. App'x. 317 (Fed. Cir. 2005) ..........................................................................27, 47

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)........................................................................................17

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
   215 F.3d 1281 (Fed. Cir. 2000).......................................................................................92

*Nozomi Commc'ns v. Arm Holdings, PLC*,
   403 F.3d 1364 (Fed. Cir. 2005).......................................................................................17

*O'Reilly v. Morse*,
   56 U.S. 62 (1853)...............................................................................................27, 47

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)................................................................................72, 79

*Personalized Media Commc'ns, LLC v. Apple, Inc.*,
   952 F.3d 1336 (Fed. Cir. 2020).......................................................................................79

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .............................................................................. *passim*

*Power Integrations, Inc. v. Fairchild Semiconductor, Int'l, Inc.*,
   2012 WL 938926 (D. Del. March 13, 2012).........................................................................17

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006).......................................................................................79

*Ranpak Corp. v. Storopack, Inc.*,
   No. 98-1009, 168 F.3d 1316, 1998 U.S. App. LEXIS 16348 (Fed. Cir. July 15,
   1998) ...........................................................................................................................37

*ResQNet.com, Inc. v. Lansa, Inc.*,
   346 F.3d 1374 (Fed. Cir. 2003)............................................................................ *passim*

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
   824 F.3d 999 (Fed. Cir. 2016).........................................................................................22

*SandBox Logistics LLC v. Proppant Express Invs. LLC*,
  813 F. App'x. 548 (Fed. Cir. 2020) ................................................................27, 47

*Savvy Dog Sys. LLC v. Pa. Coin, LLC*,
  2020 U.S. Dist. LEXIS 239416 (M.D. Pa. Dec. 21, 2020).........................15, 34, 52

*SimpleAir, Inc. v. Google LLC*,
  884 F.3d 1160 (Fed. Cir. 2018)..................................................................79, 89, 96

*Smartflash LLC v. Apple Inc.*,
  2015 WL 4208754 (E.D. Tex. July 7, 2015) .........................................................55

*Smartflash LLC v. Apple Inc.*,
  No. 6:13-CV-447-JRG-KNM, 2015 U.S. Dist. LEXIS 91669 (E.D. Tex. July
  7, 2015) ...............................................................................................................65

*Sunovian Pharm., Inc. v. Teva Pharm. USA, Inc.*,
  731 F.3d 1271 (Fed. Cir. 2013)..............................................................................79

*Thorner v. Sony Computer Ent't America LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)..................................................................48, 49, 62

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
  728 F.3d 1309 (Fed. Cir. 2013)..................................................................69, 81, 82

*Transcend Med., Inc. v. Glaukos Corp.*,
  No. 13-830, 2015 U.S. Dist. LEXIS 5268 (D. Del. Jan. 16, 2015) ........................62

*Ventana Med. Sys. V. Biogenex Labs.*,
  473 F.3d 1173 (Fed. Cir. 2006)..........................................................................90, 96

*Verint Sys. Inc. v. Red Box Recorders Ltd.*,
  166 F. Supp. 3d 364 (S.D.N.Y. 2016).....................................................................65

*WhitServe LLC v. GoDaddy.Com, Inc.*,
  65 F.Supp. 3d 317 (D. Conn. 2014).................................................................55, 65

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015).................................................................... *passim*

*X. Commerce, Inc. v. Express Mobile, Inc.*,
  2018 WL 10704439 (N.D. Cal. Sept. 12, 2018) .....................................................17

*Zimmer Tech., Inc. v. Howmedica Ostenoics Corp.*,
  397 F. Supp. 2d 974 (N.D. Ind. 2005) ....................................................................25

**Statutes**

35 U.S.C. § 112..................................................................................................21, 35

**TABLE OF ABBREVIATIONS / EXHIBITS**

| Description | Exhibit or Abbreviation |
|---|---|
| Declaration of Timothy Devlin in support of Express Mobile's Opening Claim Construction Brief | Ex. 1 |
| *Express Mobile, Inc. v. eGrove Sys. Corp.*, No. 1:17-cv-00703-RGA (D. Del. Aug. 22, 2018), D.I. 35 | Ex. 1A |
| *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-00130-JRG-RSP, (E.D. Tex. Feb. 7, 2018), D.I. 97 | Ex. 1B |
| *X.Commerce, Inc. v. Express Mobile, Inc.*, 3:17-cv-02605-RS, (N.D. Cal September 10, 2018), D.I. 79 | Ex. 1C |
| *Express Mobile, Inc. v. eGrove Sys. Corp.*, No. 1:17-cv-00703-RGA (D. Del. Aug. 22, 2018), D.I. 23 | Ex. 1D |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. June 23, 2020), D.I. 137 (*Shopify* Claim Construction Opinion) | Ex. 1E |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. June 30, 2020), D.I. 142 (*Shopify* Claim Construction Order) | Ex. 1F |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. June 5, 2020), D.I. 128 (*Shopify* Claim Construction Hearing Transcript, held on May 20, 2020) | Ex. 1G |
| Excerpt from Reply Expert Report of Kevin C. Almeroth, dated November 3, 2020 submitted in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 1H |
| Certificate of Correction for U.S. Patent No. 6,546,397 | Ex. 1I |
| *Orthophoenix LLC, v. Stryker Corporation*, et. al., C.A. No. 13-1628-LPS (D. Del.), D.I. 180, dated February 2, 2016 | Ex. 1J |
| *Express Mobile, Inc. v. Svanaco, Inc.*, 2:17-cv-00130-JRG-RSP, D.I. 82-10, dated December 11, 2017 | Ex. 1K |
| *Shopify, Inc. v. Express Mobile, Inc.*, No. 19-cv-439-RGA (D. Del. May 8, 2020), D.I. 117 (*Shopify* Joint Claim Construction Brief) | Ex. 1L |
| Declaration of Glenn E. Weadock regarding Claim Construction, dated January 8, 2021 | Ex. 2 |
| Curriculum Vitae of Glenn E. Weadock | Ex. 2A |
| Excerpt from '397 File History, June 5, 2001 Appl. Amendment | Ex. 2B |
| https://javascript.info/intro | Ex. 2C |
| Excerpt from John P. Slone, *Local Area Network Handbook* (6th Ed. 1999) | Ex. 2D |

| Description | Exhibit or Abbreviation |
|---|---|
| https://www.stackchief.com/blog/The V8 JavaScript Engine | Ex. 2E |
| Excerpt from *The Dictionary of Computing & Digital Media: Terms & Acronyms* (Brad Hansen, 1999) | Ex. 2F |
| Excerpt from *The Dictionary of Multimedia: Terms and Acronyms* (Brad Hansen, 1999) | Ex. 2G |
| Excerpt from *Encyclopedia of Computers and Computer History*, Vol. 2 (Rojas, 2001) | Ex. 2H |
| Excerpt of Blackie's Dictionary of Computers (2008) | Ex. 2I |
| Definition of "abstract machine" from Wolfram Mathworld | Ex. 2J |
| Definition of "abstract machine" from Wikipedia | Ex. 2K |
| Reply Expert Report of Bhuvan Urgaonkar, Ph.D., dated November 3, 2020 submitted in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 2L |
| Excerpt from *Virtual Machines*, (Smith and Nair, 2005) | Ex. 2M |
| Excerpt from Microsoft Press Computer Dictionary, Fourth Edition (1999) | Ex. 2N |
| Excerpt from Microsoft Press Computer Dictionary, Third Edition (1997) | Ex. 2O |
| Excerpt from Webster's New World Computer Dictionary, Tenth Edition (2003) | Ex. 2P |
| Excerpt from *Administering Active Directory* (Mark Wilkins, McGraw-Hill 2001) | Ex. 2Q |
| Excerpt from *Managing the Windows 2000 Registry* (Paul Robichaux, 2000) | Ex. 2R |
| D. Theotokis et al., *Distributed Information Systems Tailorability: A Component Approach, in Future Trends of Distributed Computing Systems* (IEEE 1999) | Ex. 2S |
| Excerpt from Glenn E. Weadock & Mark Wilkins, *Windows 95 Registry For Dummies* (1998) | Ex. 2T |
| Excerpt from Merriam Webster's Collegiate Dictionary, Tenth Edition (1996) | Ex. 2U |
| W3C, Web Services Glossary, W3C Working Group Note (February 11, 2004) (https://www.w3.org/TR/2004/NOTE-ws-gloss-20040211/) | Ex. 2V |
| Excerpt from the '755 File History, Reply "B" Under 37 C.F.R. § 1.116(e), May 30, 2013 | Ex. 2W |
| Excerpt from *Web Server Technology* (Yeager and McGrath, Morgan Kaufmann, 1996) | Ex. 2X |

| Description | Exhibit or Abbreviation |
|---|---|
| Transcript of S. Rempell Deposition, taken on March 29, 2018 in *Express Mobile, Inc. v. Svanco, Inc.*, 2:17-cv-00130 (E.D. Tex.) | Ex. 2Y |
| Transcript of S. Rempell Deposition, taken on May 1, 2018 in *Express Mobile, Inc. v. Svanco, Inc.*, 2:17-cv-00130 (E.D. Tex.) | Ex. 2Z |
| Declaration of Timothy Devlin in support of Express Mobile's Reply Claim Construction Brief | Ex. 3 |
| Deposition Transcript of Christopher Schmandt, taken on December 13, 2017 in *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-00130-JRG-RSP (E.D. Tex.) | Ex. 3A |
| Deposition Transcript of Christopher Schmandt taken on April 17, 2020 in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc*., 1:19-cv-00439-RGA (D. Del.) | Ex. 3B |
| Deposition Transcript of Glenn Weadock taken on March 25, 2020 in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc*., 1:19-cv-00439-RGA (D. Del.) | Ex. 3C |
| Declaration of Chris Schmandt, dated April 2, 2020 submitted in *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc*., 1:19-cv-00439-RGA (D. Del.) | Ex. 3D |
| Express Mobile Inc.'s Opposition to Shopify's Motion for Summary Judgment and to Exclude Expert Opinions Relating to Damages, dated December 15, 2020, D.I. 273, *Shopify Inc. and Shopify (USA), Inc., v. Express Mobile, Inc*., 1:19-cv-00439-RGA (D. Del.) | Ex. 3E |
| Second Supplemental Declaration of Chris Schmandt in Support of Defendants' Claim Constructions, dated January 25, 2021 submitted in *Express Mobile, Inc. v. Wix.com, Ltd., et al.*, 3:19-cv-06559-RS (N.D. Cal.) | Ex. 3F |
| Deposition Transcript of Christopher Schmandt taken on February 24, 2021 | Ex. 3G |
| Supplemental Declaration of Glenn E. Weadock regarding Claim Construction, dated February 26, 2021 | Ex. 4 |
| Williams College "Programming Languages" (CS334) Spring 2000 Lecture Notes (retrieved from https://cs.pomona.edu/~kim/cs334/s00/Lectures/Lec6/Lec6.html) | Ex. 4A |
| Virginia Tech "Programming Languages" Lecture Notes, Benjamin J. Keller, Spring 2002 Lecture Notes (retrieved from http://courses.cs.vt.edu/~cs3304/Spring02/lectures/lect02.pdf) | Ex. 4B |
| Princeton University "Programming Languages" (CS 441) Fall 1998 Lecture Notes (retrieved from https://www.cs.princeton.edu/courses/archive/fall98/cs441/Lectures/Lec5/Lec5.html) | Ex. 4C |
| Excerpt from David Flanagan, *JavaScript: The Definitive Guide*, Fourth Ed. (2001) | Ex. 4D |
| *Manipulating Strings with JavaScript*, TechRepublic (2004) | Ex. 4E |

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpt from Robert W. Sebesta, *Tenth Edition of Concepts of Programming Languages* (2012) | Ex. 4F |
| Excerpt from M. Gabbrielli, S. Martini, *Programming Languages: Principles and Paradigms, Undergraduate Topics in Computer Science*, DOI 10.1007/978-1-84882-914-5_1, (Springer-Verlag London Limited 2010) | Ex. 4G |
| Excerpt from McGilton and Morgan, *Introducing the UNIX System* (1983) | Ex. 4H |
| Excerpt from Danesh, *Teach Yourself JavaScript in a Week* (1996) | Ex. 4I |
| Excerpt from Husain and Levitt, *JavaScript Developer's Resource* (1997) | Ex. 4J |
| Excerpt from McFarlane, et. al., *Professional JavaScript* (1999) | Ex. 4K |
| Excerpt from Jaworski, *Mastering JavaScript* (2001) | Ex. 4L |
| U.S. Patent No. 6,201,611 (Carter) | Ex. 4M |
| Robb, *Managing OS Diversity*, ComputerWorld, Nov. 19, 2001 | Ex. 4N |
| Excerpt from *Microsoft Computer Dictionary* (Fourth Ed. 1999), pp. 317, 441 | Ex. 4O |
| Excerpt from Martin and Weadock, *Bulletproofing Client/Server Systems* (1997) | Ex. 4P |
| Excerpt from *The Dictionary of Multimedia: Terms and Acronyms*, definition of "abstract machine" (Brad Hansen, 1999) | Ex. 4Q |
| Excerpt from *The New Penguin Dictionary of Computing* (2001) | Ex. 4R |
| What Is Node.js for Java Developers (Dzone Java) (Ratha KM Dec. 22, 2016) | Ex. 4S |
| *U.S. v. Microsoft Corp.*, 253 F.3d 34, 66 (D.C. Cir. 2001) | Ex. 4T |
| "An examination of software engineering work practices," Singer, Lethbridge, Vinson and Anquetil, *Proceedings of the 1997 conference of the Centre for Advanced Studies on Collaborative research* (1997) | Ex. 4U |
| Declaration of Jonathon A. Talcott in support of GoDaddy's Claim Construction Sur-reply Brief | Ex. 5 |
| Dictionary of Information Technology (3d. Ed. 2002), *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-1, Exhibit 19) | Ex. 5A (GD_Ex. 5A) |
| U.S. Patent No. 5,842,020 ("Faustini") | Ex. 5B (GD_Ex. 5B) |
| Excerpts from Donald Turnbull's May 16, 2018 deposition transcript in *Express Mobile, Inc. v. Svanaco, Inc.,* No. 2:17-cv-00130 (E.D. Tex.) (Dkt. 123-2 Exhibit 13) | Ex. 5C (GD_Ex. 5C) |

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpts from Robert W. Sebesta, *Concepts of Programming Languages* (10th Ed. 2009), *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-2, Exhibit 22) | Ex. 5D (GD_Ex. 5D) |
| Excerpts from Ian D. Craig, *Virtual Machines* (2006) | Ex. 5E (GD_Ex. 5E) |
| Brent W. Benson, *JavaScript*, in ACM SIGPLAN Notices, April 1999, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-2, Exhibit 29), available at https://dl.acm.org/doi/10.1145/312009.312023) | Ex. 5F (GD_Ex. 5F) |
| About MathWorld, content from https://mathworld.wolfram.com/about/, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) (Dkt. 123-2, Exhibit 30) | Ex. 5G (GD_Ex. 5G) |
| Using a Mac at Goizueta, content from https://community.bus.emory.edu/ITHelp/Documents/Mac%20Requirements.pdf | Ex. 5H (GD_Ex. 5H) |
| Supplemental Declaration of Christopher Schmandt in support of GoDaddy's Claim Construction Sur-reply Brief<br><br>Appendix A – Schmandt References Cited | Ex. 6 |
| [Corrected] Declaration of Jonathon A. Talcott in support of GoDaddy's Claim Construction Response Brief | Ex. 7 (GD_Ex. 1) |
| Microsoft Press Computer Dictionary (3rd Ed. 1997), excerpt for definition of "database" | Ex. 7A (GD_Ex. 3A) |
| March 25, 2020 Deposition Transcript of Glenn E. Weadock, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.) | Ex. 7B (GD_Ex. 3B) |
| [RESERVED] | Ex. 7C (GD_Ex. 3C) |
| McGraw-Hill Dictionary of Scientific and Technical Terms (6th Ed.), and Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/machine (accessed 2/5/2021) | Ex. 7D (GD_Ex. 3D) |
| The New Penguin Dictionary of Computer (2001), at 532 (XMO_GD00030649-30654) | Ex. 7 E (GD_Ex. 3E) |
| Excerpts of March 25, 2020 Deposition Transcript of Glenn E. Weadock, *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439-RGA (D. Del.), and *Express Mobile, Inc. v. iCrossing, Inc.,* 1:18-cv-01176-RGA (D. Del.) (Dkt 120-1) | Ex. 7F (GD_Ex. 3F) |

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpts from December 6, 2017 Deposition Transcript of Andre Kruetzefeldt, *Express Mobile v. Svanaco, Inc.*, 2:17-cv-00130 (E.D. Tex.) and *Shopify v. Express Mobile*, 1:19-cv-00439, RGA (Dkt. 120-1) | Ex. 7G (GD_Ex. 3G) |
| Excerpts from Microsoft Computer Dictionary (4th Ed.), *Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc.*, 1:19-cv-00439, RGA (D. Del.) and *Express Mobile, Inc. v. iCrossing, Inc.,* 1:18-cv-01776-RGA (D. Del.) (Dkt. 120-2, Exhibit 10) | Ex. 7H (GD_Ex. 3H) |
| Microsoft Computer Dictionary, 4th Ed. At 332 (XMO_GD00156617) | Ex. 7I (GD_Ex. 3I) |
| Shopify's (redacted) Opening Brief in Support of its Motion for Summary Judgment and to Exclude Opinions of Express Mobile's Experts Relating to Damages, Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc., 1:19-439-RGA, (D.Del.) (Dkt. 219) | Ex. 7J (GD_Ex. 3J) |
| (a) Excerpts from B. Hansen, Dictionary of Computer & Digital Media: Terms & Acronyms (1999), p. 2, defining "abstract machine" (Dkt. 120-2, Exhibit 6); (b) Excerpts from B. Hansen, Dictionary of Multimedia: Terms and Acronyms (1999) (Dkt. 120-2, Exhibit 7); and (c) Excerpts from Microsoft Computer Dictionary (3d. Ed.), Shopify Inc. and Shopify (USA), Inc. v. Express Mobile, Inc., 1:19-cv-00439, RGA (D. Del.) 1997 (Dkt. 120-2, Exhibit 9) | Ex. 7K (GD_Ex. 3K) |
| [Corrected] Declaration of Christopher Schmandt in support of GoDaddy's Claim Construction Response Brief, with: Appendix A – Schmandt Curriculum Vitae Appendix B – Schmandt References Cited | Ex. 8 (GD_Ex. 2) |
| Declaration of Timothy Devlin regarding Supplemental Joint Claim Construction Brief | Ex. 9 |
| Transcript of *Markman* hearing held on April 8, 2021 | Ex. 9A |
| Excerpt from the '397 File History, Notice of Allowability, September 7, 2002 | Ex. 9B |
| Excerpt from the '755 File History, Notice of Allowability, April 16, 2015 | Ex. 9C |
| Excerpt from the '287 File History, Notice of Allowability, June 20, 2016 | Ex. 9D |
| Excerpt from the '044 File History, Preliminary Amendment as part of the Original Disclosure Under 37 CFR §1.115(a)(1), September 17, 2017 | Ex. 9E |
| Excerpt from the '044 File History, Specification, Claims and Abstract submitted with application, September 17, 2017 | Ex. 9F |

| Description | Exhibit or Abbreviation |
|---|---|
| Excerpt from the '044 File History, Notice of Allowability, November 15, 2017 | Ex. 9G |
| Supplemental Declaration of Andrew M. Hensley in support of Joint Supplemental Claim Construction Brief | Ex. 10 |
| Excerpt from Amendment After Final Under 37 C.F.R. § 1.116, December 13, 2001 | Ex. 10A |
| Excerpt from Preliminary Amendment for National Phase Application of PCT/US2009/039685, September 29, 2010 | Ex. 10B |
| Excerpt from Preliminary Amendment B: for Appl'n No. 14/708,074, July 16, 2015 | Ex. 10C |
| Excerpt from Preliminary Amendment as Part of the Original Disclosure Under 37 CFP § 1.115(a)(1), September 17, 2017 | Ex. 10D |
| Excerpt from Written Opinion of the International Searching Authority, August 21, 2009 | Ex. 10E |
| Excerpt from Information Disclosure Statement Pursuant to 37 CFR § 1.56 and §§ 1.97-1.98, October 19, 2017 | Ex. 10F |
| Excerpt from Terminal Disclaimer, November 2, 2017 | Ex. 10G |
| Excerpt from Notice of References Cited, November 15, 2017 | Ex. 10H |
| Defendant GoDaddy.com, LLC | GoDaddy or GD |
| Plaintiff Express Mobile, Inc. | XMO |
| Java Virtual Machine | JVM |
| Virtual Machine | VM |
| Person of Ordinary Skill in the Art | POSA |
| U.S. Patent No. 6,546,397 | '397 |
| U.S. Patent No. 7,594,168 | '168 |
| U.S. Patent No. 9,063,755 | '755 |
| U.S. Patent No. 9,928,044 | '044 |
| U.S. Patent No. 9,471,287 | '287 |
| Joint Claim Construction Chart (D.I. 42) | JCCC |
| "run time engine" or "runtime engine" | RTE |
| "run time file" | RTF |
| "virtual machine" | VM |
| Java Virtual Machine | JVM |
| Certificate of Correction | COC |
| Joint Claim Construction Brief (D.I. 64) | JCCB |

# I.   CONSTRUCTION OF "VIRTUAL MACHINE" IN THE '397 PATENT

| Express Mobile Construction | Defendant's Construction |
|---|---|
| software that emulates a physical machine<br><br>-or-<br><br>software that emulates computing functionality | software that emulates a physical processor |

## 1.   Express Mobile's Supplemental Opening Brief

Fundamentally, the claim construction dispute at issue here is about one component of the claims of the '397 patent—a virtual machine—that is recited in the context of an inventive, ordered combination, and is mentioned a single time in the specification.  The '397 patent teaches the use of a browser-based web-design tool that works in tandem with a run time engine and stores settings in an external database to generate webpages. (*accord* D.I. 65-6, Ex. 1E, *Express Mobile v. Shopify*, No. 19-cv-439, D.I. 137, at 1-2 ("Shopify Order"); D.I. 69-22, ¶ 54 (Schmandt)).  As discussed below, the virtual machine's role in the invention is to ensure that source code used to implement the invention (including the runtime engine and user selected settings) carries out the functionality recited in the claims (*i.e.*, displaying a webpage).

Express Mobile's construction of virtual machine is the same as the construction that was previously adopted by this Court: "software that emulates a physical machine."[1]  (D.I. 65-6, Ex. 1E, at 4-5; D.I. 65-7, Ex. 1F, at 1).  As set forth in detail below and in Express Mobile's prior briefing, Express Mobile and the Court's prior construction is supported by the intrinsic and extrinsic evidence and GoDaddy's attempt to improperly limit the claims should be rejected.

---

[1] Although the Court expressed hesitancy about the word "abstract machine," Express Mobile maintains that "abstract machine emulated in software" is a proper construction of virtual machine, as Judge Seeborg in the Northern District of California and this court have previously recognized. (D.I. 65-4, Ex. 1C, at 6; D.I. 65-2, Ex. 1A.).

To the extent, based on its statements at the *Markman* hearing, that the Court is considering adopting a construction that does not use the "physical machine" language, Express Mobile proposes an alternative construction of "software that emulates computing functionality."[2]   This, in Express Mobile's view, would clarify any potential confusion surrounding the word "physical machine" in the Court's prior construction.   GoDaddy acknowledged in its previous briefing that a "'machine' is essentially any 'device for performing a task,'" (D.I. 64, JCCB at 6), and Express Mobile's construction clarifies that the virtual machine pertains to software that emulates a device (a "comput[er]") that performs tasks ("functionality").[3]   This clarification, moreover, is consistent with the "POSA's understanding that virtual machines emulate functionality of computer systems" in the context of the '397 patent, as explained by Dr. Bhuvan Urgaonkar, an expert in virtual machines for more than 20 years.  (D.I. 66-13, Ex. 2L ¶ 28).[4]   Both constructions proposed by Express Mobile are consistent with the broad meaning of this term as used in the intrinsic record, as understood by a POSA and this Court's previous construction and Order.   (D.I. 65-8, Ex. 1G, *Shopify v. Express Mobile*, No. 19-cv-439, D.I. 128 at 39:25:40:3 ("give virtual machine as broad a definition as I can since it seems to be a broad term, and I don't expect to take the derivative of a definition to indicate what it means.")).

As discussed below, moreover, Express Mobile's construction is consistent with the claims, specification, and prosecution history, which are all directed toward software that emulates

---

[2] This is consistent with the position Express Mobile's counsel expressed repeatedly throughout the *Markman* hearing. (*See* Ex. 9A, *Markman* Tr. at 7:3-6, 11:6-10, 12:21-23).

[3] In the context of programming languages, "the term 'machine' refers clearly to a computing machine." (D.I. 68-8, Ex. 4G at XMO_GD00156887).

[4] It is also consistent with the experts' common understandings in this case, and the understandings in the *Shopify* case, where, "[t]he parties agree[d] that a 'virtual machine' is a software program that emulates the *functions* of a physical machine. (D.I. 65-6, Ex. 1E, Shopify Order at 4 (emphasis added)).

2

computing functionality—specifically, functionality related to generating a website display.  The claims, specification, and prosecution history are not concerned with, and certainly do not limit, the particular type of virtual machines that emulate the recited computing functionality. Moreover, as of the 1999 priority date, the term "virtual machine" was well understood as software that emulates computing functionality of either hardware or software, as each of the experts in this case agree.  Therefore, Express Mobile's proposed construction is supported by both the intrinsic and extrinsic evidence from both parties, and should be adopted.

GoDaddy advances a construction of "virtual machine" that limits the term to "software that emulates a physical processor."  Such a narrow construction is not supported by the intrinsic record and would impart requirements, such as "intermediate code" and "instruction set," that this Court already rejected.  GoDaddy improperly attempts to read in limitations to the term virtual machine based on the specification and prosecution history's discussion of a completely different term, runtime engine.  GoDaddy's lawyers also incorrectly asserted that the term virtual machine was not known to POSA, but all of the experts, including GoDaddy's expert, agree that virtual machines were well known and existed at the time of the invention.  GoDaddy's construction should be rejected for the reasons set forth below.

> **a.**     **The Intrinsic Record Supports Express Mobile's Construction**

Each of the claims, specification, and prosecution history are consistent with Express Mobile's proposed constructions of "software that emulates a physical machine" or, alternatively, "software that emulates computing functionality."  Each of these disclosures confirms that virtual machine was intended to be a broad term.

**The Claims** "provide substantial guidance as to the meaning of particular claim terms," and "the context in which a term is used in the asserted claim is highly instructive."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  Here, the context of the claim delineates the

precise role that the virtual machine plays in the invention: the independent claims recite "a virtual machine capable of generating displays," and "commands to said virtual machine for generating the display of said one or more web pages." ('397 Patent at 65:44-46, 66:22-24). As Mr. Weadock explained, this claim language reflects the fact that the recited virtual machine is "used to render the web page," and that "[t]he claims of the '397 patent family use the 'virtual machine' term broadly without deviating from [the term's] commonly understood meaning." (D.I. 66-1, Ex. 2 ¶ 26). Dr. Urgaonkar, a virtual machines expert who has been in the field for more than two decades, agrees that "the virtual machine at issue here serves the purpose of rendering and displaying webpages within a browser as is made clear by the claim language of the '397 patent." (D.I. 66-13, Ex. 2L ¶¶ 2-10 & XMO_GD00157900-157919 (Dr. Urgaonkar's qualifications and CV), ¶ 38 (quotation)). Dr. Urgaonkar also confirmed that virtual machine is a "broad term" to a POSA. (D.I. 66-13, Ex. 2L ¶¶ 26, 38).[5] There is no dispute that "rendering and displaying webpages" is a form of computing functionality that can be emulated by the software of a virtual machine, consistent with Express Mobile's construction.

**The Specification**—"the single best guide to the meaning of a disputed term," *Philips*, 415 F.3d at 1321—also supports Express Mobile's construction of "software that emulates computing functionality." Just ask GoDaddy's expert Mr. Schmandt, who explains that "the virtual machine is consistently utilized in the '397 patent family specification" in relation to "[e]xecution of code in various forms and *to perform various tasks*." (D.I. 69-22, Ex. 8 ¶ 67 (Schmandt) (emphasis added) (citing '397 Patent at 45:45, 46:19-21, 46:26-27, 46:43-44)). The tasks that Mr. Schmandt is referencing in the specification include, among others, the tasks that "generat[e] . . . web pages."

---

[5] Through dozens of pages of expert testimony, GoDaddy's expert Mr. Schmandt does not directly discuss the '397 patent's claim language at all when discussing the virtual machine claim term.

('397 Patent at 46:19-21).  The "code" that Mr. Schmandt alludes to would be understood as software that emulates computing functionality (i.e., webpage display rendering functionality). This is further corroborated by the single reference to the JAVA Virtual Machine in the specification, which is contained in a paragraph that discusses web page animation, images, and text button objects on webpages that are displayed at runtime.  ('397 Patent at 35:34-45).

The specification, along with the POSA's understanding thereof, confirms that virtual machines may support a variety of different programming languages besides Java, and that virtual machines distinct from the Java Virtual Machine are within the scope of the claims.  While the browser-based build engine described in the specification is Java-based (consistent with the patent's disclosure of a Java Virtual Machine), the patent makes clear that the purpose of the invention is to implement the technology in a "full featured programming language."  ('397 Patent at 1:52-54).  The patentee noted that other "full featured" programming languages besides Java can be used to practice the invention, particularly as browsers developed over time.  (*See* '397 Patent at 32:21-25, 62:33-36).  Specifically, the patentee explained that "as the then popular browsers support more robust versions of programming languages, those new capabilities can be employed to further enhance the capability of the invention," and that the "full-featured programming languages supported by browsers [would] evolve." (*Id.*).  This is why the specification explains that the required functionality "wa[s] implemented entirely in JAVA (or *any other browser-based full featured programming language*)."  ('397 Patent at 11:5-8 (emphasis added)).  All of the experts agree that the invention is not limited to being implemented in Java using the Java Virtual Machine.  (D.I. 66-1, Ex. 2 ¶ 27 (Weadock) (the '397 patent specifies that "other programming languages can be used to practice the invention, particularly as browsers develop over time"); D.I. 68-1, Ex. 4 ¶ 20 (Weadock) (the patentee "contemplated that other

languages could be suitable to implement a website building tool consistent with the principle of the invention"); D.I. 67-3, Ex. 3B at 138:4-139:7 (Schmandt Shopify Dep.) (the invention "certainly isn't limited to Java"); D.I. 66-13, Ex. 2L ¶ 43 (Urgaonkar)).

One of ordinary skill in the art would have understood these disclosures in the specification to contemplate virtual machines that supported other web-based programming languages, such as JavaScript. JavaScript "had already evolved into a full-featured language as of 1999, and the POSA would have understood as much." (D.I. 66-13, Ex. 2L ¶ 43 (Urgaonkar)). This was because, at that time, "the features of JavaScript as of 1999 were becoming comparable to other interpreter-based languages," and "JavaScript had all the features needed to build complex applications" at that time. (*Id.* ¶ 46 (Urgaonkar)). As of 1999, "[e]arly JavaScript engines" were available, and "would have been understood by the POSA to be high-level language, process virtual machines that fall within the Court's construction and could be characterized as software that emulates the functions of a physical machine within the Court's construction" (or, alternatively, software that "emulate[s] the functionality of a physical machine" (i.e. computer) "that renders a display within a browser"). (*Id.* ¶¶ 39, 40, 46 (Urgaonkar)).[6] Notably, "these virtual machines do not necessarily use intermediate code or bytecode," and could include a type of virtual machine known as a "pure interpreter" as discussed below. (*Id.* ¶ 39 (Urgaonkar); *see also id.* ¶¶ 34, 37; D.I. 68-1, Ex. 4 (Weadock) (explaining that JavaScript virtual machines could be "pure interpreters")).

Express Mobile's construction of the virtual machine claim term is therefore supported by the specification and is the proper construction.

---

[6] Additionally, Mr. Weadock explained that "by some accounts JavaScript was a full featured programming language as of the priority date, as it was rapidly being developed." (D.I. 68-1, Ex. 4 ¶ 22 (Weadock)). Consistent with this *JavaScript: The Definitive Guide* (O'Reilly, 2002), had already explained shortly thereafter that JavaScript was "a full-featured programming language, as complex as any and more complex than some." (D.I. 68-5, Ex. 4D at 2).

**The Prosecution History** also supports Express Mobile's construction of virtual machine. When the claims with the "virtual machine" language were introduced during prosecution, the applicant's accompanying remarks made clear that the virtual machine is nothing more than software that emulates computer display functionality.  The claim language, at that time, recited "a virtual machine capable of generating displays." (D.I. 66-3, Ex. 2B at XMO_GD00000852 (New Claim 2)).  Against that backdrop, the applicant explained that "the claimed invention is for an apparatus that produces and generates websites within a browser," and is "a program to generate web pages."  (*Id.* at XMO_GD00000860).  To be consistent with these disclosures, the virtual machine must be software ("a program") that performs computing functionality (the rendering, display, and "generat[ion] [of] web pages").

Moreover, the prosecution history confirms, consistent with Dr. Urgaonkar's testimony, that "the virtual machine is not the core invention recited in the claims" and that the term was intended to have a broad scope.  (D.I. 66-13, Ex. 2L ¶ 43 (Urgaonkar)).  During prosecution, the "virtual machine" claim language was incorporated into new claims that clarified that the invention was "for producing Internet websites on and for computers having a browser," and further clarified specific details about the interface, browser, build engine, and run time files (or run time engine) that are recited within those claims.  (D.I. 66-3, Ex. 2B at XMO_GD00000852 (New Claim 2)). The inventor characterized this as a "rewording" of "the original claim." (*Id.* at XMO_GD00000859).  After the new claims were rejected over the Faustini reference, Express Mobile amended the claims to specify that the run time engine "utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more webpages."  (D.I. 42-7, JCCC, Ex. 7 at XMO_GD00000906-907; *see also* XMO_GD00000904 (similar)).  The "virtual machine" language in the claims that ultimately

issued was not added to limit the '397 patent to a particular type of virtual machine, as the Faustini reference itself repeatedly disclosed a "virtual machine"—indeed, the very same Java Virtual Machine that is referenced in the '397 patent's specification.  (D.I. 69-3, Ex. 5B (Faustini) at 7:47-64, 8:58-9:8, 10:26-36, Figs. 2-3).  Mr. Weadock reviewed the prosecution history and came to the same conclusion, noting that "virtual machine" "was never limited to a specific type of virtual machine, or to a virtual machine having some sort of limited functionality relative to its general definition."  (D.I. 66-1, Ex. 2 ¶ 29 (Weadock)).  The claims were ultimately allowed because the prior art "d[id] not show a run time file utilizing user selected settings stored in a database to generate virtual machine commands for generating web sites."  (Ex. 9B, XMO_GD00000919 (Notice of Allowance)).  The patent and prosecution are thus entirely agnostic to *how* the virtual machine might carry out the computing functionality of generating and rendering web pages, or whether that virtual machine might emulate "processor" functionality.

> **b.** **Express Mobile's Construction Is Consistent with the Ordinary and Well Understood Meaning of Virtual Machine to the POSA**

Apart from the intrinsic evidence, the term "virtual machine" had an ordinary and well-understood meaning as of the priority date that is likewise consistent with Express Mobile's construction.  As Mr. Weadock explains, "[a]t the time of the invention, virtual machines were well known and had been developed for many different programming languages including Java and Pascal."  (D.I. 66-1, Ex. 2 ¶ 24 (Weadock)).  At the time of the invention, as discussed below, "[p]rogramming language interpreters existed for language such as BASIC, Lisp, Tcl, and Ruby (all virtual machines that existed at the time of the invention) that did not use intermediate code."  (D.I. 68-1, Ex. 4 ¶ 19 (Weadock)).



And Dr. Urgaonkar likewise explained that there were "general (and broad) understandings of the meaning of the virtual machine claim term" as of the priority date, and that those virtual machines included high-level language virtual machines (such as JavaScript engines). (D.I. 66-13, Ex. 2L ¶ 47 (Urgaonkar)). GoDaddy's expert Mr. Schmandt, for his part, admits that "[a]s of 1999, there were various virtual machines that had been developed." (D.I. 69-22, Ex. 8 ¶ 44 (Schmandt)). Thus, various different virtual machines were well known to the POSA at the time of the invention and they did not require the specific, narrow limitations GoDaddy attempts to read into this claim term (such as intermediate code, instruction sets, memory, and other requirements). This is directly contrary to GoDaddy's arguments at the *Markman* hearing, where it asserted that "[w]e don't think" that virtual machine was a term of art in computer science as of 1999. (Ex. 9A, *Markman* Tr. at 21:12-19).

The experts in this case have each characterized the "virtual machine" term as referring to software that emulates computing functionality, as reflected in Express Mobile's alternative construction. Mr. Schmandt, GoDaddy's expert, explained that "in computer science, *virtualizing* refers to rendering in software the function of *any hardware*, such as memory, disk, etc."—this, for example, could be understood to include the functionality of display hardware. (D.I. 69-10, Ex. 6 ¶ 13 (Schmandt) (second emphasis added)). Likewise, Dr. Urgaonkar, characterizes the claimed virtual machine as "emulat[ing] functionality of physical machines" (i.e., of computers) "that renders the requisite display needed to design and view webpages within a browser." (D.I. 66-13,

Ex. 2L ¶ 47 (Urgaonkar)).

These understandings of the experts are corroborated by the extrinsic record of dictionaries,[7] lecture notes, textbooks, and numerous other contemporaneous materials in the record, which confirm that "virtual machine" was a term of art as of the priority date that could refer to the three different classes of software that can emulate computing functionality in different ways—including pure interpreters (which interpret source code, such as JavaScript, and execute it directly), pure compilers (which compile code from the source language such as JavaScript to machine language and then execute it), and hybrids between the two (such as the Java Virtual Machine, which translates source code to an intermediate form, such as Java bytecode, before executing it).

In Fall 1998 Computer Science Lecture Notes from Princeton University, professor Kim Bruce explain that, in its simplest form, a "pure interpreter" could be characterized as a virtual machine that "interprets a high-level language directly and does not use intermediate code."  A "pure interpreter," as note above, would simply take a source code program (such as that written in JavaScript or some other high-level programming languages), perform interpretation, and output results on the computer to emulate computing functionality.  (D.I. 68-1, Ex. 4 ¶ 18 (Weadock); D.I. 68-4, Ex. 4C at 4).[8]

---

[7] The Court inquired about the meaning of "abstract machine" during the *Markman* hearing. (Ex. 9A, *Markman* Tr. at 9:16-11:10). "Abstract machine" has been defined, for example, as software ("any set of data structures and algorithms") that can emulate computer functionality ("perform the storage and execution of programs written in [a programming language]").  (D.I 68-8, Ex. 4G at XMO_GD00156888).  This is also consistent with Express Mobile's construction of virtual machine and contrary to GoDaddy's construction improperly attempting to limit virtual machine.

[8] This understanding is also consistent with computer science lecture notes given by the same professor at Williams College in Spring 2000 (D.I. 68-2, Ex. 4A), and with lecture notes from Professor Benjamin J. Keller at Virginia Tech—the latter of which confirms that a pure interpreter "[s]imulates [a] virtual machine."  (D.I. 68-3, Ex. 4B at 9 (XMO_GD00156787).

**POSA Identify Interpreters as Virtual Machines**



Mr. Schmandt does not dispute that these "pure interpreters" for high-level languages existed as of the priority date, such as interpreters for BASIC. (*See* D.I. 69-10, Ex. 6 ¶¶ 28, 30, 42 (Schmandt)). These interpreters would be understood to be "High-Level Language" virtual machines, as a POSA "would understand that the simplest 'High-Level Language' virtual machines can be a pure interpreter." (D.I. 66-13, Ex. 2L ¶¶ 33-34 (Urgaonkar)). These virtual machines, again, "would not require the execution of intermediate code." (*Id.*). That high-level language interpreters were a common class of "virtual machine" is not a controversial proposition, and is supported by several dictionaries and textbooks.[9] Thus, virtual machines that were pure

---

[9] The Dictionary of Computer & Digital Media (1999) explains that a "virtual machine" is an "abstract computing machine for which an interpreter exists," and that "[v]irtual machines are used to implement portable executors for high-level languages." (D.I. 66-7, Ex. 2F; D.I. 66-8, 2G). Blackie's Computer Dictionary is in accord, reciting the same definition. (D.I 66-10, Ex. 2I at 2). An interpreter, consistent with these definitions, was contemporaneously understood (according to the Microsoft Computer Dictionary (1997)) as "[a] program that translates and then executes each statement in a program written in an interpreted language," which are identified to include Basic and LISP—two of the languages noted above that had corresponding virtual machines as of the priority date. (D.I. 69-21, Ex. 7K at p. 25). Robert W. Sebesta's well-regarded textbook, Concepts of Programming Languages (10th ed. 2012), corroborates the above understandings that were known as of the priority date—it explains that "[t]he [pure] interpreter program acts as a

interpreters were known and existed at the time of the invention and should not be excluded from the meaning of this term as argued by GoDaddy.

Apart from pure interpreters, pure compilers would have also been understood to be within the scope of the virtual machines contemplated by the patent. Such compilers are similar to interpreters, but rather than translate and execute code directly, they "take[] time to translate the high-level language into machine code and then execute it, rather than real-time translation with an interpreter." (Dictionary of Information Technology (3d Ed. 2002) (D.I. 69-2, Ex. 5A at 204). Again, because pure compilers compile the original source code directly to machine code, pure compilers do not employ intermediate code. The computer science lecture notes from Princeton, Williams College, and Virginia Tech likewise characterize pure compilers as virtual machines, consistent with both Mr. Weadock's and Dr. Urgaonkar's testimony, as illustrated below. (D.I. 68-4, Ex. 4C at XMO_GD00156801-156802; D.I. 68-2, Ex. 4A at XMO_GD00156773-156774; D.I. 68-3, Ex. 4B at XMO_GD00156788).

---

software simulation of a machine whose fetch-execute cycle deals with high-level language program statements rather than machine instructions. This software simulation obviously provides a virtual machine for the language." (D.I. 68-7, Ex. 4F at XMO_GD00156874). Further corroborating the above understandings, Sebesta explains that "early languages of the 1960s (APL, SNOBOL, and LISP) were purely interpreted," underscoring that such virtual machines were known in the art. (Id.). And, in more recent times, the same applies to JavaScript—as Sebesta writes consistent with the evolution of JavaScript described above, "in recent years, pure interpretation has made a significant comeback with some Web scripting languages, such as JavaScript and PHP, which are now widely used." (Id.).



There is no credible dispute that pure compilers are software that emulate computing functionality.

Finally, as noted above, there are virtual machines that are a hybrid between interpreters and compilers that use intermediate code.[10]  These virtual machines likewise are software that emulates computing functionality consistent with the '397 patent because they ultimately ensure that computing functionality programmed in high-level programming languages is successfully carried out.  These hybrid virtual machines are similar to the Java Virtual Machine disclosed in the '397 patent, which uses intermediate code (known as bytecode).

Nothing in the specification, claims, or prosecution history suggests, however, that the virtual machine recited in the claims must be limited to the particular class of virtual machines that use intermediate code to the exclusion of other virtual machines known at the time that emulated computing functionality using any one of a pure interpreter, pure compiler, or hybrid between the two.  Express Mobile's proposed constructions, unlike GoDaddy's construction, properly reflect that a virtual machine is not limited to a preferred embodiment or one implementation of virtual machine that were well known to a POSA.

---

[10] The Princeton and Williams College lecture notes point this out as well, noting that, beyond "pure interpreters" or "pure compilers," one "[c]an go farther and compile into intermediate code (e.g., P-code) and then interpret."  (D.I. 68-4, Ex. 4C at XMO_GD00156802).  Sebesta likewise describes these types of virtual machines as "a compromise between compilers and pure interpreters."  (D.I. 68-7, Ex. 4F at XMO_GD00156875).

      **c.**     **GoDaddy's Construction of "Virtual Machine" Would Improperly Exclude Numerous Virtual Machine Embodiments from the Scope of the Claims**

      **1.**  **GoDaddy's Construction of "Virtual Machine" Is Not Supported by the Intrinsic Record**

GoDaddy's construction is not supported by the intrinsic record. Nothing in the claim language or specification references any need for the virtual machine to emulate a physical processor. Indeed, neither the claim language nor the specification references physical processors or hardware processors *at all*.[11] To the extent that GoDaddy has attempted to cite to the specification as intrinsic support for its construction, its specification cites refer to the Java Virtual Machine discussed above ('397 Patent at 35:33-36), and to discussion of various tasks that are performed by ***the run time engine and other components*** to generate web pages ('397 Patent at 45:45, 46:19-27, 46:19-44, FIG. 29). Each of the other citations relied on by GoDaddy and its expert specifically relate to tasks performed by the runtime engine (not the virtual machine). (*See* D.I. 64, JCCB at 7 (GD citing the '397 patent's discussion of disclosures in columns 45 and 46 pertaining to Figure 29, which relates to the runtime engine)). GoDaddy admitted as much at the *Markman* hearing, stating that its processor construction is "tied to the run time engine functionality" disclosed in the intrinsic record. (Ex. 9A, *Markman* Tr. at 20:14-16, 20:21-25). None of these disclosures reference "processors" or emulating "processors," the need for specific instruction sets or memory, or that any of these elements are requirements of the runtime engine, much less requirements of the virtual machine (which they admittedly do not even relate to). GoDaddy's efforts to infer a "physical processor" requirement from these disclosures for the virtual machine claim term are thus improper and strained.

---

[11]   The only two instances of the term "processor" in the specification refer to "word processors," such as Microsoft Word, but never to a physical processor or a hardware processor.

GoDaddy's reliance on *Savvy Dog Sys. LLC v. Pa. Coin, LLC* underscores the strained nature of its proposed construction.  During the *Markman* hearing, GoDaddy asserted that the "Savvy Dog case" lends support to the notion that "courts, including this one, construe software patent terms with the term processor."  (Ex. 9A, *Markman* Tr. at 28:3-5).  And in its prior briefing, GoDaddy relied on *Savvy Dog* to assert that "[t]he term 'processor' is also plainly self-evident for the jury."  (D.I. 64, JCCB at 12).  But this case is no "*Savvy Dog*."  *Savvy Dog* involved a construction of "game processor"—a term recited in the claims that expressly included the word "processor."  *Savvy Dog Sys. LLC v. Pa. Coin, LLC*, 2020 U.S. Dist. LEXIS 239416, at *28-*30 (M.D. Pa. Dec. 21, 2020).  The intrinsic record there actually supported a construction that included a "processor," which makes complete sense given that the word "processor" appeared in the claims themselves.  Contrary to GoDaddy's repeated arguments, *Savvy Dog* does not support reading a "physical processor" requirement into the claims where the intrinsic record does not reference any physical processors at all.

Finally, GoDaddy's construction is not supported in any way by the prosecution history.  As discussed above, the prosecution history supports Express Mobile's construction.  (*See supra* pp. 7-8).  Indeed, as the Court correctly observed, GoDaddy did not reference or cite to the prosecution history a single time in support of its "physical processor" construction across the entirety of its briefing on the virtual machine claim term. (Ex. 9A, *Markman* Tr. at 18:8-19:15; *see* D.I. 64, JCCB at 6-9 (GoDaddy Response), 11-13 (GoDaddy Sur-Reply)).  Nonetheless, GoDaddy asserted at the *Markman* hearing for the first time that the virtual machine was added to the claims to distinguish over Faustini prior art. (Ex. 9A, *Markman* Tr. at 17-6-16).  But that argument is nonsensical because Faustini expressly disclosed the use of the Java Virtual Machine, as noted above and as also noted at the hearing.  (*See supra* pp. 8-9; Ex. 9A, *Markman* Tr. at 23:2-24:19).

To the extent that GoDaddy attempted to articulate a basis for its prosecution history argument, it stated that the applicant "argue[d] the novelty of the run time engine's interaction with the database which in the claims interacts with the virtual machine" (Ex. 9A, *Markman* Tr. at 28:13-24).  But even if true, the fact that the virtual machine, run time engine, and database have a recited interrelationship does not demonstrate that the virtual machine itself is limited to "emulating a physical processor" in the ways that GoDaddy suggests.[12]  And though GoDaddy asserted that this argument was raised by Mr. Schmandt, it was not—neither of Mr. Schmandt's expert declarations asserted or provided any basis for an argument that the prosecution history supported GoDaddy's construction of "virtual machine."

### 2. GoDaddy's Construction of "Virtual Machine" Would Reinject the "Intermediate Code" Requirement that this Court Has Already Rejected

GoDaddy's construction is another attempt to import additional extraneous limitations—including "that executes intermediate code" and "in the instruction set of that machine"—into the claim construction.   But this Court and another court have repeatedly rejected adding the "intermediate code" limitation to the construction of virtual machine (D.I. 65-6, Ex. 1E at 4-5, D.I. 65-4, Ex. 1C at 6).   As this Court explained, the specification references the "Java Virtual Machine" once, and "a Java virtual machine (JVM) uses Java bytecode, which is a type of intermediate code. . . . . But the 'Java Virtual Machine' mentioned in the specification is clearly just one possible embodiment, not the invention itself.  It is improper to 'import a feature from a preferred embodiment into the claims.'" (D.I. 65-6, Ex. 1E at 4 (quoting *Acumed LLC v. Stryker*

---

[12] Under GoDaddy's theory, if an applicant ever argued about any claim element, all claim elements would be limited because they are part of the same claim and interact with one another. Such an argument is nonsensical and virtual machine should not be limited to emulating specific components of a processor because Express Mobile argued that the prior art did not disclose a run time engine in combination with user selected settings.

*Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007)); *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).   This Court further explained, consistent with the Court in *X.Commerce, Inc. v. Express Mobile Inc.*, that even though the "JVM" may have been "the then-dominant virtual machine," it "does not follow . . . that the patent claims are limited to virtual machines that execute compiled code," and that it likewise does not follow that the claims are limited to virtual machines that "execut[e] intermediate code in the instruction set of th[e] machine."  (D.I. 65-6, Ex. 1E at 4-5 (citing *X. Commerce, Inc. v. Express Mobile, Inc.*, 2018 WL 10704439, at *3 (N.D. Cal. Sept. 12, 2018) (rejecting a "similar argument" to Shopify's "intermediate code" argument)).

Moreover, as noted above, Express Mobile's construction (which would not be limited to "intermediate code" or specific processor requirements) is consistent with the claim language.   As this Court has explained, when a construction (like Express Mobile's) is supported by "the plain language of the claims," the scope of the claims should not be "limited to" embodiments in the specification.  *Power Integrations, Inc. v. Fairchild Semiconductor, Int'l, Inc.*, 2012 WL 938926, at *6 (D. Del. March 13, 2012); Philips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *see also Nozomi Commc'ns v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (holding claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

In GoDaddy's prior briefing, it insisted that any arguments about "intermediate code" and "instruction set" were "a straw man" because those "words are not recited by GoDaddy's construction."  (D.I. 64, JCCB at 8).  But GoDaddy nowhere disputed that it was trying to bootstrap those requirements into its "physical processor" construction.   Indeed, while Mr. Schmandt

asserted in his opening declaration that he has "dropped that requirement from [his] proposed construction" (D.I. 69-22, Ex. 8 ¶ 74), he made his intentions to add back intermediate code clear in his supplemental declaration, where he states that "Defendant's proposed construction . . . requires intermediate code in the instruction set of a virtual machine, *consistent with a virtual machine emulating processor functionality*" and that "*a virtual machine emulates a physical processor*, such as *by executing intermediate code in the instruction set of the virtual machine.*" (D.I. 69-10, Ex. 6 ¶¶ 33, 35 (Schmandt) (emphasis added)). Mr. Schmandt also confirmed at his deposition that in his opinion emulation of a physical processor requires intermediate code:

> Q. . . . The intermediate representation is the instruction set that is used to emulate a physical processor; right?
>
> A.     The abstract machine emulates a processor.  *A processor has an instruction set.  The input to the virtual machine is intermediate code in that instruction set.*

(D.I. 67-8, Ex. 3G at 90:12-21 (Schmandt Dep.) (emphasis added)).  He later reiterated that his "opinion in all of these cases is that the virtual machine requires intermediate code."  (*Id.* at 94:18-24).  In each of the prior cases Mr. Schmandt testified—including in the *BigCommerce*, *Shopify*, and *Wix* cases—Mr. Schmandt has insisted on an "intermediate code" requirement (see D.I. 65-11, Ex. 1K ¶ 19 (BigCommerce); D.I. 67-5, Ex. 3D ¶¶ 69-71 (Shopify); D.I. 67-7, Ex. 3F ¶¶ 11-12 (Wix)), and Mr. Schmandt admitted at deposition that a "physical processor" requirement was not needed in any of those prior cases.  (D.I. 67-8, Ex. 3G at 98:18:22).

These are the exact requirements that this Court has already considered and rejected. (D.I. 65-6, Ex. 1E at 4-5).  GoDaddy and Mr. Schmandt only insist upon using a "physical processor" requirement now because the Court already specifically rejected the "intermediate code" language.

It is clear that GoDaddy is attempting an end run around this Court's prior ruling.  The Court should reject GoDaddy's "physical processor" construction for this additional reason alone.

> ### 3.  GoDaddy's Construction of "Virtual Machine" Would Inject Additional Improper Requirements of "Physical Processors" Into the Court's Construction

Beyond "intermediate code," GoDaddy seeks to read a bevy of additional "processor" requirements into the construction of virtual machine that would exclude yet more virtual machine embodiments from the scope of the claims.  As discussed in Express Mobile's previous briefing, GoDaddy's "emulate a physical processor" construction incorporates many components of a processor that GoDaddy argues need to be emulated. Mr. Schmandt testified during his deposition that, at minimum, both an instruction set and a memory model would be required to "emulate a physical processor." (D.I. 67-8, Ex. 3G at 87:21-88:7, 92:20-93:21).  And Mr. Schmandt stated in his declaration that a physical processor also includes registers, stack, logic units, circuits, random access memory, and numerous other components, and admitted that his "physical processor" construction would "[t]ypically" require some of these additional components as well. (D.I. 69-22, Ex. 8 ¶ 65 (Schmandt); D.I. 67-8, Ex. 3G at 90:22-91:17, 98:23-101:21).

Though GoDaddy originally represented during the *Markman* hearing that these various other processor components are "not in GoDaddy's construction" (*Markman* Transcript at 28:6-9), GoDaddy backtracked and argued that "a processor . . . has . . . instructions, and memory, and it performs tasks," consistent with some of these additional requirements. (*Id.* at 28:9-11).  Indeed, GoDaddy's brief states that "the [GoDaddy] construction's 'processor' need[s]" to have at least "a basic instruction set for processing commands, and memory."  (D.I. 64, JCCB at 12). These additional requirements (beyond the already improper "intermediate code" requirement) that are implicated by GoDaddy's construction exclude additional embodiments of virtual machines that

may not emulate one or more of these processor components, but do emulate computing functionality recited in the '397 patent claims.

### 2.      Defendant's Supplemental Answering Brief

GoDaddy's proposed construction for "virtual machine" in the '397 and '168 patents as "software that emulates a ***physical processor***" best comports with the intrinsic support for that term *as claimed* amidst the myriad notions of virtual machines understood by POSAs at the time of the claimed invention in 1999 – not in the years that followed, as XMO postulates. During the *Markman* hearing, the Court rightfully noted concerns over the vagueness of XMO's originally proposed "abstract machine" construction, observing that with that construction, the patents are "virtually non-understandable." *Markman* Tr. at 11:19-12:13 (noting plain meaning of "machine" could include things "like a thresher, or a hammer, or maybe not a hammer, but, you know, it has a certain meaning" that in the context of abstract machines "is just being tossed out"). Construing "virtual machine" as software that emulates a physical processor resolves those concerns while remaining true to the intrinsic record and the only relevant extrinsic evidence.

XMO does not dispute that a "processor" is a well-known computing device that processes data by applying logic to information (i.e., data) that is stored in computer memory. (*See* Ex. 8 ¶ 65; Joint Claim Construction Brief ("JCCB") at 4-6, 9-11.) While those limitations are not recited (or even necessarily required) by GoDaddy's construction, they will equip the trier of fact to ultimately decide what qualities the claimed "virtual machine" must have in order to read on the accused products and prior art. Indeed, this is the entire point of claim construction. XMO originally agreed with GoDaddy that VM is "software that emulates" something "physical." Failing to come up with any example of what type of "physical machine" is being emulated by the VM software, XMO is now advancing the completely unhelpful, entirely *new* construction that this "physical machine" is actually just plain old "computing functionality." But that is no

"machine" or structure at all.  Rather, XMO wants this term to be purely functional.  XMO's proposal that the "virtual machine" that is claimed need only emulate any type of generic "computing functionality" is just as broad as "machine" in the computer context.  In essence, XMO is back to claiming any and all "software," but this time in a purely functional context—software emulating its own instructions or functions, which is even worse.[13]  While GoDaddy acknowledges that the "machine" is a virtual version of a "computer" component – i.e., a processor – the claim term cannot conceivably be "computing *functionality*," as that is simply too abstract and fails to address the Court's concerns.

In short, XMO cannot be correct that the "virtual machine" *as claimed* in the '397 and '168 patents is as broad as suggested.  If the Court finds that it is, however, then the Court is effectively determining that "virtual machine" is a nonce word that must be construed according to means-plus-function principles under 35 U.S.C. § 112.  In that case, the parties agree that the *only* embodiment disclosed in the specification is a "Java Virtual Machine."  The better alternative to all of this is GoDaddy's construction, which is representative of what is claimed and is supported by both the specification and prosecution history.[14]

### a. The Intrinsic Record Demonstrates that the "Virtual Machine" Software Emulates Physical Processor Characteristics.

Claim construction requires construing the disputed term within the metes and bounds of the intrinsic record's overall disclosure – not just in a vacuum to give the term the broadest

---

[13] The Court may use its common sense in observing that "software" is essentially a set of instructions that tell a computer what to do.  In an almost Forrest Gump-like approach, XMO is advancing "software is as software does" to construe virtual machine.  *Forrest Gump* was a great movie; it is not the preferred approach to claim construction.

[14] XMO misconstrues the dispute over "virtual machines" as being "about one component of the claims of the '397 patent."  (*Supra* p. 2.)  The construction of "virtual machine" also applies to the '168 patent because the "runtime engine" claimed in the '168 patent also must "generate virtual machine commands."  (D.I. 65, JCCB at 38-44.)  The parties agree that "runtime engine" should be construed the same for both patents, so "virtual machine" should be, too.  (*Id.* at 38.)

meaning possible, as XMO seeks here. *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1003-1004 (Fed. Cir. 2016) (citing *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998)) (affirming district court's construction importing characteristics of "communications path" term that were disclosed in the specification because the claims and specification provided little guidance for that term).   Here, as GoDaddy emphasized at the *Markman* hearing, "virtual machine" must be construed according to all of the evidence – both direct and indirect – of its characteristics based on its role described in the claims, specification, and prosecution history.  (*Markman* Tr. at 15:23-18:2.)

In addition to the specification's single embodiment of a "Java Virtual Machine," the overall evidence demonstrates that the "virtual machine" is intimately tied to the patent's other key elements of a browser-based build tool, database of user-selected settings, and runtime engine – all of which interact with the virtual machine as they would with a physical processor.



('397, Fig. 2 (annotated); *Markman* Tr. at 15:23-18:2.)

1.  **The Claims and Specification Tie the Virtual Machine, Runtime Engine, and Database Interactions Together and Support GoDaddy's Construction.**

The claims expressly recite the "virtual machine" as working together with the separately claimed "browser" to "generat[e] displays" according to the rest of the claims language.  ('397 patent, claims 1, 2, 37.)  As XMO acknowledges, this means the virtual machine, as part of the browser-based web design tool, "works in tandem with a run time engine and stores settings in an external database . . . ."  (*Supra* p. 1.)  That is confirmed by the rest of the applicable claims language, which states that the "virtual machine" receives both (i) commands corresponding to user-selected settings for the webpage elements, and (ii) commands from the runtime file (that the parties agree includes the runtime engine) reading information from the database to display *part* of the webpage.  (*E.g.*, '397 patent, claim 1(a) & (e).)  XMO admits the virtual machine's ties to the runtime engine and database, arguing that "the virtual machine's role in the invention is to ensure that source code used to implement the invention (including the ***runtime engine*** and ***user selected settings***) carries out the functionality recited in the claims . . . ."  (*Supra* p. 2.)  The virtual machine in this regard is software that emulates a physical processor.

2.  **The Prosecution History Ties Applicant's Amendments to Overcome the Prior Art to the added Virtual Machine, Runtime Engine and Database Limitations.**

The '397 patent's prosecution history confirms that the virtual machine, runtime engine, and database form the core of the alleged invention.  Clearly, the '397 applicant did not simply volunteer the additional "virtual machine" claim element as a mere "rewording" of the claims as XMO posits.  (*Supra* p. 16.)  To the contrary, "virtual machine" was added during prosecution to more particularly describe the claimed invention to overcome anticipation rejections based on the *Faustini* prior art reference.   (Joint Claim Construction Chart ("JCCC") Ex. 2B at XMO_GD00000852.) Juxtaposed immediately with the applicant's addition of "virtual machine"

23

to the claims, the applicant repeatedly argued the novelty of the runtime engine's interaction with the database, which the runtime engine reads to generate commands to the virtual machine for display. (JCCC Ex. 2B at XMO_GD00000859-61.)

XMO's characterization of GoDaddy's argument that "virtual machine" was added to overcome Faustini as "nonsensical" because Faustini allegedly "expressly disclosed the use of the Java Virtual Machine" falls of its own weight. XMO already admitted at the *Markman* hearing that "virtual machine" was added in conjunction "with other changes and the combination of virtual machine with the run time engine and user selected settings stored in a database" as "what was argued over the prior art" (*viz.*, Faustini). (*Markman* Tr. at 24:1-6.) This "combination" refers to the applicant's arguments to overcome Faustini based on asserting new claims that, for the first time, recited that the runtime engine must use information from the database to generate *virtual machine* commands for displaying the webpage on the fly. (JCCC Ex. 2B at XMO_GD00000859-61; Ex. 10A at XMO_GD00000899-900 ("In each of the pending independent claims," which included new claim 2 adding "virtual machine," "the cooperation between run time files, databases, and the actions for generating web pages are recited to clearly distinguish over the prior art.").) Whether Faustini disclosed a "Java Virtual Machine" is irrelevant, because the '397 applicant never distinguished that aspect of Faustini. Rather, the applicant distinguished Faustini's reliance on "Visual Java Tools" and Java "applets" referenced by the Examiner in his rejection. (*See* JCCC Ex. 2B at XMO_GD00000859-60, -869; Ex. 10A at XMO_GD00000899.) Consistent with this, the Notice of Allowance specifically referred to the "virtual machine commands" aspect of the claimed invention as distinguishing over the prior art. (Ex. 9B, September 7, 2002 Notice of Allowance at XMO_GD00000919.)

Thus, the virtual machine was an integral component of the allegedly novel runtime engine

and database combination, since the net result of that combination was to generate "commands" to the virtual machine.  Once again, the runtime engine, database, and virtual machine are all one ball of wax, so XMO is wrong that prosecution statements concerning one claim element do not affect claim construction of other claim elements.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he context in which a term is used in the asserted claim can be highly instructive."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those [disputed] terms."); *Zimmer Tech., Inc. v. Howmedica Osteonics Corp.*, 397 F. Supp. 2d 974, 980 (N.D. Ind. 2005) ("The entire claim must be interpreted in context, not as single elements in isolation.").

### 3. The Totality of Intrinsic Evidence Supports Construing "Virtual Machine" According to its Disclosed Processor Operations.

Given the virtual machine's connections to the Java Virtual Machine and runtime engine, construing that term to be software that emulates a "physical processor" makes perfect sense.  The virtual machine is the component that executes the runtime engine, which is similar to a physical processor executing the runtime engine "code" for that engine.  (Ex. 1E at 2; Ex. 8 ¶¶ 66-69; *supra* p. 2 (characterizing runtime engine as "source code".)  A "processor" is simply the physical component of a computer that performs processing, i.e. *executes* programs (like the virtual machine executes the runtime engine), by performing arithmetic and logical operations on data.  (Ex. 8 ¶ 65; Ex. 1E at 2.)  The portion of GoDaddy's construction referring to "emulat[ing] a physical processor" means that the virtual machine performs the standard types of processing occurring in a conventional physical processor – just in software.  Thus, programs like the runtime engine are compiled by and executed on the "virtual machine" just as they would be for a generic physical processor.  (*Id.* ¶¶ 66-68.)

The claims and specification consistently refer to operations tied to the virtual machine in terms of executing code in various forms to perform a variety of tasks using data stored in memory. For instance, the virtual machine receives "commands" from the runtime engine during its operation, as would a processor. ('397, claims 1, 2, 34.) The runtime engine "read[s]" the external database, and a POSA would understand that "reading" is an input operation to memory for access by, and computation upon, a processor. ('397, 45:45; Ex. 8 ¶ 67.) The runtime process that generates "virtual machine commands" is described to be "*executed* simultaneously with the generation of all the other web pages at 192 by means of *multiprogramming* using *thread technology*" – like a processor. ('397, 46:19-21 (emphasis added), Fig. 29; Ex. 8 ¶ 67.)

Also during the runtime process, "[t]he *Boolean, integer, string, and floating point* fields for these web pages [generated by the runtime process] are initialized" and a "*calculation* for the object's width is performed" which are references to computer variable data types. ('397, 46:26-27, 43-44 (emphasis added); Ex. 8 ¶ 67.) These characteristics – "generating," "reading," "executing," "multiprogramming using thread technology," "calculation," and "integer, floating point, and Boolean data types – are *all* associated with the virtual machine and *all* correspond to physical processor operations. (Ex. 6 ¶ 8; *see also* JCCC, Ex. 8 at 10 (the '397 applicant described a Java Virtual Machine as "*execut[ing]*" Java applet code, which is emulating the program execution functionality of a processor). The Court should construe virtual machine according to these disclosures, rather than what the patents do *not* disclose, as XMO argues.

### 4. Express Mobile Lacks Intrinsic Support for its "Virtual Machine" Construction

XMO's supplemental briefing does not undermine GoDaddy's construction. XMO admits that the only "browser-based build engine described in the specification is Java-based" and that the only specification reference to virtual machine is to "Java Virtual Machine" which, as set forth

above, supports GoDaddy's construction.  (*Supra* p. 6.)  Arguing for unlimited breadth of "virtual machine," XMO attempts to expand the patent's support for virtual machine by cobbling together vague specification references to browsers and programming languages "evolving" over time to support a "full featured programming language."   (*Id.* at 5-6.)   Based on that boilerplate draftsmanship language, under XMO's flawed logic, XMO's patents are somehow entitled to monopolize even those later-developed innovations, such as modern JavaScript-based browser technologies, notwithstanding the indisputable fact that nothing in the patents shows Steven Rempell invented them.[15]   *See O'Reilly v. Morse*, 56 U.S. 62 (1853) (rejecting claims to an invention "however developed"); *SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x. 548, 553 n.8 (Fed. Cir. 2020) (upholding district court's construction and rejecting argument that boilerplate language in the specification called for a broader construction, explaining that "such boilerplate language, without more, is not sufficient to overcome the explicit description of the present invention") (internal quotation marks omitted); *D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018) ("[B]oilerplate language . . . is not sufficient to show adequate disclosure of the actual combinations and attachments used in the . . . [c]laims."); *IP Innovation, L.L.C. v. Ecollege.com*, 156 F. App'x. 317, 321 (Fed. Cir. 2005) (explaining that "common boiler plate" language did not disclose an alternative embodiment to support a broader construction of asserted claims).

What's more, XMO's "evolution" passages themselves actually distinguish the '397/168 patents' claimed invention from later developed browsers that support more robust programming languages, by saying only that such "evolve[d]" browsers and programming languages would

---

[15] *See* Joseph E. Root, *Rules of Patent Drafting: Guidelines from Federal Circuit Case Law* (Bender 2021 Ed.) at Section 2.04[3] (noting such boilerplate language in patents is purely "for the apparent purpose of warding off evil spirits and narrow claim construction").

"enhance" the claimed invention such that the runtime engine "may be configured" in the future –
not that they are *part* of the invention, let alone the "virtual machine," as claimed. (*See* '397,
32:21-25, 62:33-36.) Regardless, the passages simply are not relevant; they do not describe the
aspects of the virtual machine recited by the claims as of 1999. Indeed, to support its interpretation,
XMO relies entirely on parroting the *ipse dixit* of an expert from another case and on a book
allegedly describing JavaScript published three years *after* the patent's priority date. (*Supra* p. 7.)
*See Intermec Techs. Corp. v. Palm Inc.*, 738 F. Supp. 2d 522, 546-49 (D. Del. 2010).

> **b.      The Only *Relevant* Extrinsic Evidence Supports GoDaddy's
>      Construction Because In 1999 "Virtual Machine" Had No
>      Defined Meaning.**

Extrinsic evidence is of limited value to claim construction. *Phillips*, 415 F.3d at 1318-19.
Here, as with XMO's prior briefing, the vast majority of its extrinsic "evidence" is largely
irrelevant because it has nothing to say about what a "virtual machine" was at the time of the
'397/168 patents in 1999. Indeed, XMO even relies on a references dated in 2012 – over a decade
after the relevant timeframe. (*Supra* p. 12 n.9 (citing Ex. 4F).) What XMO's mountain of extrinsic
records do clearly show, however, is that the meaning of "virtual machine" was all over the map
back in 1999 and certainly had no well-known meaning to a POSA. (*See Markman* Tr. at 7:12-18
(stating that a POSA was aware of "different types of virtual machines that were available at that
time").)

The only apparently relevant treatise to which XMO cites is the Smith & Nair textbook
called "Virtual Machines" that published in 2004. As GoDaddy pointed out at the *Markman*
hearing, this text actually supports GoDaddy's proposal that the meaning of "machine" is too
abstract, and that a virtual machine possesses attributes of a *processor* (shown on next page):

> **Virtual Machine Basics**
>
> To understand what a virtual machine is, we must first discuss what is meant by *machine*, and, as pointed out earlier, the meaning of "machine" is a matter of perspective. From the perspective of a *process* executing a user program, the machine consists of a logical memory address space that has been assigned to the process, along with user-level registers and instructions that allow the execution of code belonging to the process. The I/O part of the machine is visible

(Ex. 2M at XMO_GD00156994 (emphasis added); Ex. 8 ¶69.)  However, as Smith & Nair goes on to describe,  the definition of a "virtual machine" even as of 2004 (let alone 1999) was random, as shown in Smith & Nair's diagram setting forth all of the possible kinds of virtual machines:



A Taxonomy of Virtual Machines.

(Ex. 6 ¶¶ 11-12.)  Clearly, such a maze of possible virtual machines is *not* supported by the intrinsic record, despite XMO's attempts to sweep anything under the sun into the construction of the "virtual machine" that is actually *claimed* in the '397/168 patents as allegedly invented by Mr. Rempell.  Regardless, the types of "system" and "process" virtual machines identified by XMO's expert and broadly discussed by Smith & Nair all share aspects of a physical processor, including some type of instruction set and memory model, consistent with GoDaddy's construction.  (Ex. 6 ¶ 12; Ex. 8 ¶71; Ex. 2M at XMO_GD00156991, -156996, -157000, -157008-010.)

Contrary to XMO's position based solely on extrinsic evidence, the claimed "virtual machine" is not just an "interpreter" or "compiler" for translating software source code into lower level code (which ironically conflicts with XMO's rejection of any "byte code" or "intermediate code" limitations).  Those superfluous concepts are nowhere recited or described in the patent claims, specification, or prosecution history.  Rather, XMO once again argues these extraneous concepts are within the scope of the claimed "virtual machine" by pointing to a parade of cryptic

undergraduate course notes, lecture notes, and dictionary definitions, accompanied by the logos of various companies' programming languages for which XMO contends "interpreters" existed and were prior art virtual machines (Basic, Lisp, Tcl, and Ruby).  (*Supra* pp. 9-13.)

These extrinsic materials are suspect at best, and the Court should give them minimal, if any, weight.  Not only would a POSA, who XMO contends would have education or experience beyond a college-level computer science major, be unlikely to rely on such unauthoritative lecture notes that are by definition incomplete as unaccompanied by the oral lecture itself explaining them, but in truth they only refer to "virtual machines" as teaching tool for explaining the general computer science or programming concept of "abstraction" – which a POSA would understand is the process of generalizing lower-level concepts such as machine-level code and processor characteristics to a higher-level, more useful level of generality which would be the programming language itself.  (Ex. 6 ¶¶ 20-23; *see* Exs. 4A at 1, 4B at 3-4, 4C at 1.)  Thus, all these lecture notes or texts do is confirm the obvious – that higher level programming languages are generally used to write software.  (Ex. 6 ¶¶ 24-30.)  They shed no light on what the meaning of the *claimed* "virtual machine" may be.

Ultimately, XMO's overly complex extrinsic evidence either renders its virtual machine virtually meaningless or requires an expert by the trier of fact's side at all times to understand what XMO means by the alleged "pure interpreters," "pure compilers," "hybrids between the two," and "high-level language virtual machines" (another circular definition).[16]  (Ex. 6 ¶ 17.)  Perhaps that is why XMO's new broad construction – "software that emulates computing functionality" – sweeps in all of these foreign concepts.  But this is not how claim construction should work.

---

[16] Further muddying the waters concerning the foggy relationship between an interpreter and virtual machine, XMO asserts that an "interpreter exists" for a virtual machine.  (*Supra* p. 11 n.9.)  That suggests that "interpreter" and "virtual machine" are not interchangeable or coextensive.

> c.   **Express Mobile's Multiple Constructions are Further Flawed Because they Assume "Virtual Machine" is the Same as the Separately Claimed "Browser."**

XMO's proposed constructions for virtual machine are also flawed because XMO assumes that the "virtual machine" is the same software as the separately claimed "web browser."  It is not. XMO repeatedly refers to the claims language as supporting its position that the only limitation on virtual machine software is that it is "capable of generating displays."  (*E.g.*, *supra* p. 5.)  But that is not the whole story, since that phrase *also* modifies "a browser" that is recited separately by all of the claims. Different words are presumed to have different meanings, particularly when they are recited within the same claim.  *See, e.g.*, *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (reversing lower court's ruling that a "pusher assembly" and a "pusher bar" have the same meaning).

In this case, while there is no dispute that the virtual machine is software that contributes to generating web pages along with the web browser, it is claimed to be more than that.  The rest of the claims language shows that (i) a panel of settings presented through browser, with at least one of the settings, correspond to commands to the virtual machine (*not* to the browser), and (ii) at least one runtime file (i.e., the runtime engine) reads the database to "generate virtual machine commands" for the display.  Through that combination of requirements, the claimed "virtual machine" generates the display of "a *portion*" of the web pages (such as the more resource-intensive "multimedia" object portions) that browsers at the time alone could not generate, while the otherwise claimed "browser" creates the rest of the webpage display.  ('397, claims 1(e), 2(d), 37(c).)

The patent's specification confirms that this is what the claimed process is intended to do, distinguishing the claimed "build tool" (which the patentee ultimately claimed "generate[s] virtual machine commands") from then-existing "browsers" alone.   As the patent explains,

"conventional" browsers at the time interpreting HTML and JavaScript did not have the "computational power" to execute "full featured programming languages" so as to be able to create webpages with "serious multimedia applications" and "reformatting text and scaling buttons or images dynamically." ('397, 1:11-49.)

The claimed "build tool" allegedly solved that problem, ultimately (to overcome Faustini) combining the conventional browser with the claimed "virtual machine" to boost the browser's processing power and enable it to run those "serious multimedia applications" and dynamic scaling of text, buttons and images. (*See id.*, 2:1-3:6.) The patentee specifically pointed to JAVA-enabled browsers that at the time were the only ones that could perform such intensive operations. To do so, the patent teaches that JAVA-enabled browsers required a particular type of virtual machine called a "Java Virtual Machine." (*See id.*, 1:52-67; *accord id.*, 11:1-17 & Fig. 6 (describing distinctions between browser-executed HTML/JavaScript operations and JAVA operations executed by the Java Virtual Machine).)

Therefore, XMO's position (based largely on extrinsic evidence) that the claims only require the "virtual machine" to display the webpage without any distinction from the browser's separate role in displaying the remainder of the less "computational power"-intensive portion of that webpage misses the mark.

### d. GoDaddy's Construction Would Not Exclude Any Disclosed Embodiments or Impart Improper Limitations on the Virtual Machine as Claimed.

XMO complains that GoDaddy's proposal for a concrete construction of "virtual machine" is overly limited, allegedly excluding "embodiments" and injecting the "intermediate code" or "byte code" that XMO remains myopically fixed upon. GoDaddy has already explained numerous times that its construction for virtual machine does not recite the requirement of intermediate code or byte code. By continuing to argue that it does, XMO admits that GoDaddy's construction of

"software that emulates a physical processor" properly encompasses but is not limited to the lone "virtual machine" embodiment disclosed in the specification – i.e., the Java Virtual Machine that indisputably contains intermediate byte code.  (Ex. 1E at 4 ("a Java virtual machine (JVM) uses Java byte code, which is a type of intermediate code"); *supra* p. 17.)  And just because GoDaddy's proposed construction may encompass such an embodiment, that does not mean it excludes others, particularly since XMO does not dispute that a "processor" can execute many other forms of code (e.g., machine code).  (*Supra* p. 13.)

XMO claims GoDaddy's processor construction "excludes" embodiments of the virtual machine without ever identified specifically what embodiments are excluded, how, or why.  While XMO continues to misconstrue Mr. Schmandt's opinions in attempt to undermine his credibility, this time using convenient ellipses to exploit an ambiguous reference to "intermediate code" in Paragraph 33 to his supplemental declaration, Mr. Schmandt and GoDaddy in fact have remained firm that their construction advanced *in this case* does not require such a limitation.  (*Supra* p. 18.)  Similarly, GoDaddy's construction does not require all of the possible, exemplary processor components identified by Mr. Schmandt during his broader discussion of processors generally that XMO elicited from him during his deposition.  (*See* Ex. 3G, 84:1-108:12; Ex. 6 ¶¶ 12-15.)  XMO's arguments on those points are therefore irrelevant because Mr. Schmandt was not offering them as part of his proposed construction, which certainly does not recite that a virtual machine is "software that emulates *all structure, functions, and any other aspects of* a physical processor."

XMO's outright rejection of even the most basic, minimal requirements for a processor as using instructions and information from memory – despite those aspects being clearly within the scope of XMO's proposed "computing functionality" – further undermine XMO's position.  XMO's concerns with the mere potential implication of GoDaddy's construction requiring such basic general processing notions are entirely misplaced, for an "instruction set" is simply a set of commands to the "machine" carrying out its directives and memory simply stores the information to be processed.  (Ex. 6 ¶ 15.)  By comparison, even worse than XMO's prior proposal for "physical machine," XMO's "computing functionality" would have literally endless possibilities for what

33

type of functions the virtual machine could perform – a list that far exceeds the exemplary features of a processor identified by Mr. Schmandt.

Moreover, GoDaddy's proposed "processor" construction here is indeed like "*Savvy Dog*," despite XMO's attempts to distinguish that case.  In *Savvy Dog*, the court construed the term "game processor," concluding that the defendants' construction was proper in view of the entire intrinsic record.  *Savvy Dog Sys., LLC v. Pa. Coin, LLC*, No. 3:19-CV-01470, 2020 U.S. Dist. LEXIS 239416, at *28–30 (M.D. Pa. Dec. 21, 2020).  Contrary to XMO's interpretation, the court's construction did not construe "microprocessor" exactly as it existed in the claim language, showing that courts find that the term "processor" is readily understandable by lay jurors.  *See id.*  Indeed, this Court has also adopted constructions that contained technical terms, such as "processor," showing that it too trusted the jury to understand the term "processor" in reaching a verdict.  *See, e.g.*, *Ingenio, Filiale de Loto-Quebec, Inc. v. GameLogic, Inc.*, 445 F. Supp. 2d 443, 455-56 (D. Del. 2006) (construing terms to mean "processor," showing such a term is readily understandably by jurors); *Carefusion 303, Inc. v. Hospira*, No. 11-762-RGA, 2013 U.S. Dist. LEXIS 17899 (D. Del. Feb. 11, 2013) (construing disputed terms without providing a construction for "processor").

XMO also claims GoDaddy's construction is wrong because the word "processor" is not recited verbatim by the patents.  But though the '397 and '168 patents may not expressly recite the term "processor," they are clearly directed to computer and software technology that without question involves processors.  By arguing this novel (nonexistent) canon of claim construction, XMO undermines its own three proposed constructions, for the patents also contain no references to a "physical machine," "computing functionality," or "abstract machine."[17]

---

[17] XMO has backed away from its "abstract machine" construction, but at the *Markman* hearing, XMO's counsel did not deny that an abstract machine could be a "lever" or any "piece of software."  (*Markman* Tr. at 9:16-10:1.)  In any event, XMO's own dictionary definitions show "abstract machine" invokes the concept of a processor.  (JCCC Ex. 6; Ex. 11; Ex. 7K.)

e.      **If The Court Adopts Express Mobile's Newly Proposed Construction, then the Court Must Limit "Virtual Machine" to the Single Embodiment Disclosed in the Specification – a Java Virtual Machine.**

As set forth above, XMO cannot be correct that the "virtual machine" as *claimed* in the '397 and '168 patents is as broad as it says it is.  If for some reason it is, then the Court should find that "virtual machine" is a nonce word that must be construed according to means-plus-function principles under 35 U.S.C. § 112.

The determination of whether §112, ¶ 6 applies to a claim limitation begins with whether the limitation uses the word "means." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-04 (Fed. Cir. 1998)).  If the claim lacks the word "means," there is a rebuttable presumption that the claim does not invoke § 112, ¶ 6.  *Id.*  However, this rebuttable presumption is overcome when the term does not "have a sufficiently definite meaning as the name for structure." *Id.* (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996) ("What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art.").  Moreover, while the Federal Circuit previously concluded that the rebuttable presumption was "strong" and "not readily overcome," the *Williamson* court determined that such a high presumption "is unwarranted, is uncertain in meaning and application, and has the inappropriate practical effect of placing a thumb on what should otherwise be a balanced analytical scale." *Id.* at 1349.  Thus, the "high bar" to clear the hurdle of whether a claim invokes § 112 ¶ 6 no longer exists.  It is also a question of law to be determined by the Court.  *Id.* at 1346.

Here, to the extent it even makes sense for software to "emulate" computing functionality when software itself almost by definition performs computing functionality, XMO's proposed construction amounts to a purely function, "nonce" word that, if adopted, the Court should analyze

as a means-plus-function claim.  *See Williamson*, 792 F.3d at 1350 (finding that "generic terms such as 'mechanism,' 'element,' and 'device,' [are] nonce words that reflect nothing more than verbal constructions").  In effect, XMO is merely defining virtual machine as "software" for performing the functions recited by the claims.  Further underscoring that "virtual machine" is a purely functional nonce word, XMO goes so far as to say the intrinsic record is "entirely agnostic to *how* the virtual machine might carry out the computing functionality" that is claimed.  (Cite.) XMO's counsel made repeated statements on the record at the *Markman* hearing that drive this point home:

- *Markman* Tr. at 6:16-7:8 ("Virtual machines were software that could perform different functions . . . .  ***It's just a piece of software that can perform a function***.  It's a piece of software that's capable of generating a website display, and so that's all that's required and that's what people understood virtual machines to be.  ***It's a piece of software that performs a certain function***, and the patent and the claims tell us what function the virtual machine needs to perform in this case.") (emphasis added);

- *Id.* at 8:22-9:1-2 (a virtual machine "could be" the "***world's simplest program*** to . . . make a beep sound every hour");

- *Id.* at 9:12-15 (admitting "emulates" just means "***perform some function***") (emphasis added);

- *Id.* at 10:2-11 (admitting that a virtual machine "could be" just "***software that performs the function of software***") (emphasis added);

- *Id.* at 10:23-11:10 (when asked to give "some hint as to what the boundaries of abstract machine are," stating "***it's hard to draw, you, know, a specific box around what exactly that would be***.  The point is ***it's some machine, whether it's a piece of software or otherwise, that performs a function***.") (emphasis added);

- *Id.* at 12:14-23 ("abstract machines are typically thought of and are described in terms of the set of functions that they perform.  So it's ***software that performs certain types of functions as opposed to being tied to a specific piece of hardware***.") (emphasis added);

- *Id.* at 13:3-14:3 ("virtual machine is ***software that performs a function***" and "[i]t doesn't have to be of a physical machine") (emphasis added).

In fact, XMO even suggested itself at the *Markman* hearing that "virtual machine" should

be construed as a means-plus-function claim. *Markman* Tr. at 14:10-15:11 (despite some "hesitancy," XMO counsel agreeing that the means-plus-function interpretation of "virtual machine" in the claims would be "virtual machine for displaying website"; and agreeing that "whatever functions it is that [XMO is] claiming for this virtual machine" are "spelled out" in the claims). These serial admissions strongly show that XMO's meaning for "virtual machine" as used in the claims are used is a generic term or "black box" abstract recitation of structure, just like other software claim terms the Federal Circuit has held invoke § 112 ¶ 6. *See Williamson*, 792 F.3d at 1350-51 (construing "distributed learning control module" as means-plus-function); *Ranpak Corp. v. Storopack, Inc.*, No. 98-1009, 168 F.3d 1316, 1998 U.S. App. LEXIS 16348 (Fed. Cir. July 15, 1998) (construing "settable control module" term as means-plus-function). Virtual machine is no different from such black box, purely functional software "modules" according to XMO's newly proposed construction, so the Court should construed "virtual machine" as a means-plus-function term.

Once a court determines that a claim term is a means-plus-function term, the court "next determine[s] whether the specification discloses sufficient structure that corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. Here, though GoDaddy contends that other claim terms like "runtime engine" shed light on the meaning of the claimed "virtual machine," the parties do not dispute that a "Java Virtual Machine" is the *only* structure expressly disclosed in the specification that embodies all of the claimed functions of the "virtual machine" for displaying the claimed "portion" of a webpage. Accordingly, in the event the Court adopts XMO's proposed construction for "virtual machine" as "software that emulates computing functionality, the Court should likewise construe that term as a means-plus-function limitation and limit it to the only structure corresponding directly to the claimed "virtual machine" in these patents, and its equivalents. To wit: a "Java Virtual Machine." *See Bennett Marine, Inc. v. Lenco Marine, Inc.*, 549 F. App'x 947, 954 (Fed. Cir. 2013) (citing *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1295-96 (Fed. Cir. 2012)) (finding district court erred by failing to limit a means-plus-function term to the "only one specific type of circuit" structure disclosed in the specification for

performing the claimed function).

### 3. Express Mobile's Supplemental Reply Brief

GoDaddy admits that its entire argument regarding the intrinsic evidence is premised on other claimed elements, not virtual machine. GoDaddy simply ignores that the claims and specification say nothing whatsoever about physical processors, let alone anything about emulating them. Even if considered, at best those other elements of the claims perform functions that may involve processors, but there is no disclosure, much less requirement, that any element of the claim emulates the functions of a processor. GoDaddy's assertion that virtual machine should be limited based on some undisclosed potential functionality of another component is strained, unsupported, and should be rejected. GoDaddy also asserts that the term processor is a well-known and understood term. But that is not a reason to read in an extraneous limitation, especially when processor is not described or discussed in the patent, much less with respect to the virtual machine.

GoDaddy admits that there were "myriad notions of virtual machines understood by POSAs at the time of the claimed invention in 1999." (*Supra* p. 20). This is exactly the point. Different types of virtual machines were well-known pieces of software that existed as of the priority date: these included pure interpreters, pure compilers, and hybrids between the two. These types of software were well-understood to emulate computing functionality written in high level programming languages, including languages like Java, JavaScript, Basic, Lisp, and others. Express Mobile's construction is consistent with the understanding of POSA at the time of the invention. GoDaddy's construction, on the other hand, would improperly and without any basis

selectively eliminate certain types of virtual machines.[18]

Express Mobile supports the construction that this Court previously adopted for the virtual machine claim term—"software that emulates a physical machine."  Despite its references to threshers and hammers, GoDaddy's brief nowhere disputes that the only machine implicated by the claims at issue here is a computer, and that a computer is used to implement webpage display functionality in the context of the specification and claims.  Thus, when circumscribed by the claim language, "software that emulates a physical machine" is an acceptable construction.  Nonetheless, to the extent that the Court is inclined to adopt a construction that provides further clarity to the jury, Express Mobile has advanced "software that emulates computing functionality" as an alternative.  GoDaddy casts this construction as "unhelpful" (*Supra* p. 20), but it ignores that Express Mobile's construction clarifies the machine being emulated (i.e., a computer) and that the virtual machine "perform[s] a variety of tasks" (i.e., functionality), as it admits. (*Supra* p. 26). This construction is consistent with both the intrinsic and extrinsic record.

GoDaddy incorrectly asserts that Express Mobile's construction encompasses "any and all 'software'" and "anything under the sun"; that it has "unlimited breadth"; and that it is "purely functional." (*Supra* pp. 21, 27, 29).  But Express Mobile's construction is not "any and all software" and is limited to software that *emulates computing functionality*, which is a particular type of software that accepts high level source code as input, and through interpretation, compilation, or a mix of the two, produces output that emulates computing functionality.  (*See supra* pp. 9-14). And Express Mobile's construction is not purely functional because it recites

---

[18] GoDaddy states that the claimed virtual machine cannot be a pure interpreter or pure compiler, even though those concepts are encompassed in the understandings of the POSA as of the priority date.  (*Supra* p. 30) ("[T]he claimed 'virtual machine' is not just an 'interpreter' or 'compiler.'"). Thus, GoDaddy's construction would improperly exclude those concepts.

*software*, which connotes structure.  GoDaddy also ignores that the virtual machine software is expressly circumscribed by the claim language, which establishes that the virtual machine must be "capable of generating displays."  GoDaddy's strained attempt to suggest (here for the first time) that the virtual machine term should be construed under 112(6) principles lacks any credibility.

Finally, GoDaddy admits that its construction would add additional structural elements beyond those recited in the claims such as an instruction set, memory model, other processor requirements, and (possibly still) intermediate code.  There is no basis for adding these requirements, which have never appeared in any constructions adopted by any courts and (in the case of intermediate code) have been rejected by those courts.

### a.   The Intrinsic Record Is Consistent with Express Mobile's Construction, and Underscores That Virtual Machine Is Not Limited to Emulating a Physical Processor or to Particular Types of Virtual Machines

The intrinsic record is consistent with Express Mobile's proposed construction of virtual machine, not GoDaddy's.  GoDaddy mischaracterizes and sidesteps the actual words recited in the claim language, specification, and prosecution history—none of which actually reference physical processors or emulating them in any way, but instead emphasizes a virtual machine is capable of generating computer display functionality.  GoDaddy's arguments are entirely based on other components, not virtual machine.  (*Supra* pp. 21-22 ("overall" disclosure, "indirect" evidence, "interact" "with other key elements")).  Even if considered, nothing in the intrinsic record relating to the run time engine or user selected settings supports limiting virtual machine to a physical processor as argued by GoDaddy.  Moreover, nothing in the intrinsic record suggests that the patentee intended that the virtual machine was limited to the Java Virtual Machine or to virtual machines that support a particular full featured programming language, such as Java.  GoDaddy

cannot escape the simple fact that "virtual machine" was meant to be a broad term in the context of the '397 patent.

### 1. The Claim Language Supports Express Mobile's Construction

Neither GoDaddy nor its expert could rely on the claim language to support GoDaddy's proposed construction because none of the claim language recites anything relating to a processor or physical processor.  In this round of supplemental briefing, GoDaddy repeatedly supplies its own emphasis in insisting that its construction is most consistent with the invention as "*claimed*." (*Supra* pp. 20, 21, 29, 30).  However, GoDaddy points to no claim language that refers to physical processor (or emulation of processors), and no claim language that purports to limit the types of virtual machines that are meant to fall within the scope of the invention.  Indeed, to the extent that GoDaddy discusses claim language, it attempts to assert that the "virtual machine" does all of the work recited in the claim (including that of the runtime engine and the database),[19]  but does not explain in any coherent way how this requires that the virtual machine be limited to one that "emulates a physical processor." (*See supra* p. 24).  GoDaddy's strained attempt to cobble together different components (that do not discuss or require a processor) shows that the claims do not support GoDaddy's construction.

Express Mobile explained that the virtual machine plays a relatively limited role—the claims simply recite a "virtual machine capable of generating displays," and "commands to said virtual machine for generating the display of at least a portion of said one or more web pages."

---

[19] In one instance, it even misquotes Express Mobile, suggesting that Express mobile stated that the virtual machine "works in tandem with a run time engine and stores settings in an external database." (*Supra* p. 23 (quoting *supra* p. 1)).  But Express Mobile stated, in a sentence that does not mention the virtual machine at all, that the "browser-based web-design tool" as a whole "works in tandem with a run time engine and stores settings in an external database to generate webpages." (*Supra* p. 1).

('397 Patent at 65:44-46, 66:22-24).  GoDaddy does not dispute that this is the only claim language that references the "virtual machine."  Nor does it dispute that the claims of the '397 patent use the term in a broad sense, or that "generating a display" is computing functionality that can be emulated using software, as both Mr. Weadock and Dr. Urgaonkar explained.  (D.I. 66-1, Ex. 2 ¶ 26; D.I. 66-13, Ex. 2L ¶¶ 26, 38).  Mr. Schmandt, GoDaddy's expert, did not dispute any of this, and did not discuss the '397 patent's claim language at all in reference to the construction of virtual machine.  (*See supra* p. 4 n.5).

### 2.  The Specification Supports Express Mobile's Construction

Nothing in GoDaddy's response suggests that the virtual machine should be construed narrowly in view of the specification.  To the extent GoDaddy discusses the specification at all, it had to annotate Figure 2 of the '397 patent to insert a virtual machine into the figure to argue that virtual machine sits between the runtime engine and calls to the database of user-selected settings.  (*Supra* p. 23).  Based on its annotated figure, GoDaddy then asserts, without any analysis or citation to the specification, that the runtime engine and database "interact with the virtual machine as they would with a physical processor."  (*Id.*).

GoDaddy then refers to the "totality" of the intrinsic evidence, but its references to the specification are really to descriptions of the run time engine in the specification, not the virtual machine.  (*See supra* p. 25).  Indeed, it emphasizes in support of its construction here that the "runtime process" or "runtime engine 'read[s]' the external database," generates "virtual machine commands" that use "thread technology," and initializes variables and performs calculations.  (*Supra* p. 26 (citing '397 at 45:45, 46:19-21, 46:26-27, 46:43-44)).  It insists that the "totality" of these and other functions "are *all* associated with the virtual machine and *all* correspond to physical processor operations."  (*Supra* p. 26 (citing Ex. 6 ¶ 8; JCCC, Ex. 8 at 10)).  But these references relate to the runtime engine, not the virtual machine and are therefore irrelevant.  But even if the

42

recited disclosures were relevant, the disclosures again do not reference "processors" or emulating "processors," or a requirement that the virtual machine include particular components such as instruction sets, memory, or anything else that would result from a construction of "software that emulates a physical processor."[20]   To the extent that GoDaddy asserts that these operations refer to "physical processor operations," the specification does not say that they are such operations or that they are intended to limit the scope of the virtual machine claim term.  Moreover, there can be no dispute that these disclosures actually refer to operations that relate to "computing functionality," consistent with Express Mobile's proposed constructions.

As with the claims, the specification supports Express Mobile's construction because it confirms that (1) the virtual machine is described broadly as software that is used to ensure webpages are properly displayed in a browser in the context of the invention; and (2) the recited computing display functionality could be emulated using many different programming languages.

*First*, GoDaddy does not dispute that the virtual machine is relied upon to ensure that the browser can "perform various tasks," including tasks that "generat[e] . . . web pages," as discussed in Express Mobile's opening brief and admitted by GoDaddy's expert.  (*Supra* p. 4 (citing D.I. 69-22, Ex. 8 ¶ 67 (further citing '397 Patent at 45:45, 46:19-21, 46:26-27, 46:43-44))).  Nor does GoDaddy dispute that the lone reference to the JAVA Virtual Machine in the specification is in the context that addresses the display of web page animations, images, and text button objects on a computer's web browser.  (*Supra* p. 5 (citing '397 Patent at 35:34-45)).  None of these disclosures suggest that the virtual machine is required to emulate a physical processor, or any particular components thereof.

---

[20] While Shopify attempted to limit virtual machine to a characteristic of a virtual machine preferred embodiment (e.g., intermediate code), GoDaddy attempts to limit virtual machine to numerous alleged undisclosed characteristics of a different term (i.e., runtime engine).

*Second*, GoDaddy does not dispute that the specification contemplated virtual machines that could support a variety of different programming languages besides Java, and that the specification does not limit the type of virtual machines that are in the scope of the claims.  It ignores the specification's statement that the required functionality of the invention "wa[s] implemented entirely in JAVA (or *any other browser-based full featured programming language*)." ('397 Patent at 11:5-8 (emphasis added)).  It also ignores that the experts agreed that the invention was not limited to being implemented in Java.  (*Supra* pp. 5-6).  Indeed, the specification makes this clear, referencing Java as an example of a language that could be used to implement the invention (as was described in the preferred embodiment).  ('397 Patent at 1:52-54 ("In one aspect the invention includes a Browser Based build engine that is written entirely in a web based full featured programming language (e.g., *JAVA*)." (emphasis added)).  Therefore, GoDaddy cannot credibly argue that the virtual machine is limited to virtual machines that support the Java language, or to the Java Virtual Machine.   The virtual machine recited in the claims is nothing more than an off-the-shelf piece of software that ensures that computing functionality programmed in a full featured language can be properly carried out and displayed on a web browser.

### 3.  The Prosecution History Supports Express Mobile's Construction

The prosecution history also reinforces that the virtual machine was not meant to be limited to any particular type of virtual machine.  Once again, GoDaddy does not dispute the key points— that the virtual machine must be "capable of generating displays" (D.I. 66-3, Ex. 2B at XMO_GD00000860), and that the claims were amended to recite the virtual machine language along with several clarifications about other aspects of the claims, including specific details about the interface, browser, build engine, and run time files (or run time engine).  (*Supra* pp. 7-8).

GoDaddy cannot credibly dispute that these additions to the claims, including the addition of the virtual machine language, were not the basis for patentability. Indeed, GoDaddy does not dispute (or even rebut) that the claims were allowed when they were amended to clarify that the run time engine "utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more webpages." (D.I. 42-7, JCCC, Ex. 7 at XMO_GD00000906-907; *see also* Ex. 9B at XMO_GD000000919). Nothing during prosecution was concerned with the form the virtual machine (or "virtual machine commands") would take, or what programming languages could be supported by the claimed virtual machine. This is consistent with a broad construction of virtual machine, and with Mr. Weadock's and Dr. Urgaonkar's testimony that the virtual machine "is not the core invention" and was not intended to be limited beyond the POSA's ordinary understandings. (*See supra* pp. 7-8 (citing D.I. 66-13, Ex. 2L ¶ 43; D.I. 66-1, Ex. 2 ¶ 29)).

GoDaddy also does not dispute that Faustini—the reference the examiner applied during prosecution—taught a Java Virtual Machine, just like that referenced in the specification of the '397 patent. GoDaddy asserts that Faustini's disclosure of the Java Virtual Machine was somehow "irrelevant." (*Supra* p. 24). But the Faustini disclosure is relevant because any reference to the Java Virtual Machine in the '397 patent *would not have been a distinguishing feature of the invention over the prior art*. This only reinforces (consistent with the claims and specification), that the use of other virtual machines besides the Java Virtual Machine would have been well within the scope of the patent. It also reinforces, as discussed in Express Mobile's opening brief, that the patentee was not concerned about *how* the virtual machine might emulate computer display functionality or that it must do so by emulating a physical processor. Indeed, nothing in

45

GoDaddy's discussion of the prosecution history explains how the prosecution history supports its "physical processor" construction.

### 4. The Intrinsic Record Supports the Use of Virtual Machines and Is Not Limited to Only the Preferred Embodiment

GoDaddy further asserts that the intrinsic record does not support Express Mobile's construction to the extent that it would include virtual machines that support other full featured programming languages besides Java, such as JavaScript. As noted above, such an argument is fundamentally flawed because the Java Virtual Machine is a preferred embodiment (as this Court previously ruled), and the intrinsic record does not limit the claimed virtual machine to those that only support Java. The specification, again, states that the invention could be implemented in "JAVA (or *any other browser-based full featured programming language*)," and references JAVA as an example. ('397 Patent at 11:5-8 (emphasis added); id. at 1:52-54 ("a web based full featured programming language (e.g., JAVA)")).

GoDaddy ignores these disclosures and incorrectly asserts that Express Mobile is "[a]rguing for unlimited breadth of 'virtual machine.'" (*Supra* p. 27). Not so. Express Mobile is asserting that virtual machines that harness full featured, web-based programming languages are within the scope of the invention. This includes JavaScript engines, which were available as of the priority date. (D.I. 66-13, Ex. 2L ¶¶ 39, 40, 46 (Urgaonkar)). And GoDaddy cannot credibly dispute that "JavaScript had already evolved into a full-featured language as of 1999, and the POSA would have understood as much." (D.I. 66-13, Ex. 2L ¶ 43 (Urgaonkar)). This testimony was not from a random expert, but from an expert in virtual machines who was familiar with the status of JavaScript as of the priority date. And the testimony was consistent with the teachings of a second expert, and of *JavaScript: The Definitive Guide*, which likewise noted that JavaScript

was rapidly developing as a full featured programming language around the timeframe of the priority date.  (*See supra* pp. 5-6 & n.6 (citing D.I. 68-1, Ex. 4 ¶ 22 & D.I. 68-5, Ex. 4D, at 2)).[21]

GoDaddy also does not dispute that the patentee contemplated the "full-featured programming languages supported by browsers [would] evolve" over time, which shows that the patentee did not view the universe of possible programming languages or virtual machines that could be used with the invention as being limited to Java.  (*See supra* p. 5 (citing '397 Patent at 32:21-25, 62:33-36)).  GoDaddy dismisses these disclosures as "boilerplate" without explanation, even though those disclosures specifically refer back to the evolution of the "full featured programming languages" which can be employed to harness the invention, as discussed above. GoDaddy then cites irrelevant cases that are not directed toward claim construction, including cases that are directed toward patent eligibility and written description.  *See O'Reilly v. Morse*, 56 U.S. 62 (1853) (patent eligibility); *D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018) (written description).  It also cites two nonprecedential Federal Circuit cases, *SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x 548, 553-554 (Fed. Cir. 2020) and *IP Innovation, L.L.C. v. Ecollege.com*, 156 F. App'x 317, 321 (Fed. Cir. 2005).  In *SandBox Logistics*, the Federal Circuit simply construed the term "bottom" in the claims as "bottom wall" in view of the specification and prosecution history's collective teachings that limited the invention to a "bottom wall" based on the prior art's teachings. 813 F. App'x at 553-554.  No similar limitation on the "virtual machine" applies here.  And in *IP Innovation*, the Court declined to credit "boilerplate language" that "d[id] not specifically address the inventive features in any detail." 156 F. App'x at 321.  Here, the relevant language about the evolution of full-featured

---

[21] That the book was published in 2002 does not undermine the fact that the POSA would have understood JavaScript to be a potential full featured, web-based programming language to use in the context of the invention.

languages was not merely boilerplate and specifically addressed the types of programming languages that might be employed with virtual machines that are used in connection with browsers in the context of the invention.

In sum, the passages in the specification that GoDaddy criticizes as "boilerplate" reflects the patentee's understanding of the invention.  Rather than an "effort to monopolize . . . later-developed innovations," they simply underscore that the virtual machine in the '397 patent is nothing more than an off-the-shelf component that is used to properly display the claimed functionality within the browser.  Mr. Rempell, the inventor, never purported to invent a specific virtual machine or JavaScript-based browser technology.  What he invented was a browser-based web design tool that used a build tool, runtime engine, and external database that work together to generate webpages, wherein a virtual machine is but a component of the invention.  This is precisely why Mr. Rempell's invention, as claimed, does not "monopolize . . . later-developed innovations," as GoDaddy suggests.  (*Supra* p. 27).  Anyone who wants to use current browser engines of JavaScript engines may do so—what they cannot do is used those components in connection with the other claimed components as recited in the claims.

### b.    The Extrinsic Record Reinforces That Virtual Machine Was a Well-Understood Term as of the Priority Date

In light of the broad sense in which the virtual machine is referenced in the claims, specification, and prosecution history, extrinsic evidence is useful evidence regarding the scope of the virtual machine claim term in the context of the '397 patent.  GoDaddy asserts extrinsic evidence is irrelevant, but extrinsic evidence "may be useful to the court" when it is "considered in the context of the intrinsic evidence," which here does not provide a definition of the virtual machine term.  *Philips*, 415 F.3d at 1319.  Moreover, "claim terms must be given their plain and ordinary meaning to one of skill in the art."  *Thorner v. Sony Computer Ent't America LLC*, 669

F.3d 1362, 1367 (Fed. Cir. 2012).  Significantly here, "[t]he patentee is free to choose a broad term and expect to *obtain the full scope of its plain and ordinary meaning* unless the patentee explicitly redefines the term or disavows its full scope."[22]   *Id*. (emphasis added).

GoDaddy asserts that "virtual machine" was "all over the map and did not have a "well-known" meaning to the POSA.  But the extrinsic evidence confirms what GoDaddy admits: there were "myriad notions of virtual machines understood by POSAs at the time of the claimed invention in 1999." (*Supra* p. 20).  GoDaddy does not provide any testimony or evidence disputing that "virtual machines were well known" as of the priority date, or that there were many types of virtual machines.  (*See supra* pp. 8-13).  Nor could it.  *All three experts* agree that virtual machines were well known as of the priority date, and each identified programming languages that employed virtual machines, including Basic, Lisp, Tcl, Ruby, JavaScript, and others.[23]   (*Id*.).  GoDaddy does not dispute that pure interpreters, pure compilers, or software that performs both interpretation and compilation were all described as virtual machines in lectures given to Computer Science students at Princeton University, Virginia Tech, and Williams College as of the priority date, or that a seminal textbook about programming languages by Robert W. Sebesta (a professor at the University of Colorado) likewise corroborates those same understandings, which have been consistent over many years.  (*See supra* pp. 10-13).

---

[22] Even direct "criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner*, 669 F.3d at 1366 (citing *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)).
[23] Though GoDaddy suggests that Express Mobile just provided the logos of Basic, Lisp, Tcl, and Ruby, the existence of virtual machines supporting those languages was based on expert testimony and documentary evidence in the extrinsic record.  (*See supra* pp. 11-12 & n.9).

While GoDaddy critiques some of the extrinsic sources, it admits that the Smith and Nair *Virtual Machines* textbook is "apparently relevant." (*Supra* p. 28).[24]   The Smith and Nair book confirms that virtual machine is a broad term and that there are many different types of virtual machines, including High-Level Language Virtual Machines (labeled "HLL VMs" in Smith & Nair's diagram).  Dr. Urgaonkar, a virtual machine expert who taught from the Smith and Nair textbook, explained that a POSA "would understand that the simplest 'High-Level Language' virtual machines can be a pure interpreter." (D.I. 66-13, Ex. 2L ¶¶ 33-34, 47).  GoDaddy argues that Smith and Nair's diagram of different virtual machines somehow shows that the definition of virtual machine was "random."  Actually, the diagram reinforces the point that there was more than one type of virtual machine and that virtual machines were well known. It certainly does not mean that virtual machines should be arbitrarily limited to only certain types.

GoDaddy also asserts that the Smith and Nair textbook suggests that all virtual machines "share aspects of a physical processor, including some type of instruction set and memory model, consistent with GoDaddy's construction." (*Supra* p. 29).  Not so.  Virtual machines that emulate processors are but one type of virtual machine—virtual machines "have been developed in a number of contexts – operating systems, programming languages and compilers, and computer" and "processor architectures." (D.I. 66-14, Ex. 2M at XMO_GD00156975).  This reinforces that a virtual machine is not simply software that emulates a "physical processor," but is more

---

[24] GoDaddy incorrectly asserts that the "vast majority" of evidence does not relate to the time of the invention.  To the contrary, Express Mobile submitted significant evidence regarding the POSA's understanding of virtual machine at the time of the invention.  (*See generally supra* pp. 8-14 & nn. 9-10; *see also* D.I. 66-13, Ex. 2L ¶¶ 33-34, 39, 40, 43, 46, 47 (Urgaonkar); D.I 66-1, Ex. 2 ¶ 29 (Weadock); D.I. 68-1, Ex. 4 ¶ 19 (Weadock); D.I 69-10, Ex. 6, ¶¶ 28, 30, 42 (Schmandt); D.I. 69-22, Ex. 8 ¶ 44 (Schmandt); D.I 68-4, Ex. 4C at 4 (Princeton); Ex. 4A (Williams College); D.I. 66-7, Ex. 2F & D.I. 66-8, 2G (Dictionary of Computer & Digital Media (1999); D.I. 69-21, Ex. 7K at 25 (Microsoft Computer Dictionary (1997)).

generically software that emulates numerous aspects of "computing functionality" consistent with Express Mobile's construction.

### c.    GoDaddy's Construction Excludes Embodiments and Imposes Improper Limitations on the Scope of the Virtual Machine Term

GoDaddy asserts that its construction would not improperly exclude embodiments or impose improper limitations on the asserted claims.  (*Supra* pp. 32-34).  But GoDaddy's attempt to indirectly read in improper extraneous limitations belies its argument.

*First*, GoDaddy, as discussed above, does not agree that pure interpreters or pure compilers would fall within its construction, even though those types of virtual machines ensure that computing functionality is successfully emulated and carried out, just as the Java Virtual Machine does, albeit without the use of intermediate code.  As discussed above, several programming languages that were available and well known to the POSA emulated computing functionality using pure interpretation, such as Basic and Lisp.  (*See supra*, Section I.C).

*Second*, GoDaddy states its construction "does not recite" intermediate code, but GoDaddy has not disavowed or disputed Mr. Schmandt's statements that "software that emulates a physical processor" limits "virtual machines" to those that execute intermediate code.  (*See supra* pp. 17-18).  Therefore, assuming that GoDaddy's construction is adopted, nothing prevents its expert from continuing to assert at trial that the construction still substantively requires intermediate code, despite this Court's (and other courts') prior rulings that a virtual machine is not limited to one that executes intermediate code.  Express Mobile's concern is not that GoDaddy's construction includes embodiments with "intermediate code," its concern is that the construction would require "intermediate code."

*Third*, GoDaddy has asserted at times that its construction would require that the virtual machine software emulate numerous additional processor components.  (*See supra* pp. 19-20).

These requirements include an instruction set and a memory model, as well as components such as registers, a stack, logic units, circuits, and other components. (*Id.*) In response, GoDaddy does not suggest that these additional requirements would not be within its construction, but instead emphasizes that "instructions and information from memory" are "the most basic, minimal requirements for a processor." (*Supra* p. 33). Just as the specification refers nowhere to physical processors, it does not refer to "memory" a single time. There is simply no basis in the intrinsic record to bootstrap any of these requirements into the Court's construction.[25]

GoDaddy admits that that the '397 patent does not recite a "physical processor," but argues that the "physical processor" requirement should be imposed because it is "clearly directed to computer and software technology that without question involves processors." (*Supra* p. 34). In GoDaddy's world, it is thus acceptable to impose "processor" requirements on claims that do not recite "processors" simply because a claim is "directed to" computer technology. But that does not warrant a further narrowing of the claims beyond "software that emulates computing functionality," or beyond the broad and general understandings of virtual machine that were known in the art. (*See supra*, Section I.A.3).[26] GoDaddy's *Savvy Dog* case simply reinforces Express Mobile's point, because, again, that case *expressly* recited a "microprocessor" in the claims. So too do the *Ingenio* and *Carefusion* cases, which had claims expressly reciting "processor within a computing device" and "processor[s]" in "communication with" clinical devices and memory. *Ingenio, Filiale de Loto-Quebec, Inc. v. Gamelogic, Inc.*, 445 F. Supp. 25 443, 455-56 (D. Del.

---

[25] GoDaddy incorrectly asserts that Express Mobile's construction would require information from memory, using instructions and commands to a machine. (*Supra* 34.) These requirements are not part of Express Mobile's construction, nor should they be as they would eliminate, for example, process or emulator virtual machines.

[26] GoDaddy points to certain dictionary definitions of "abstract machine" that invoke the concepts of a processor. (*Supra*. P. 35 n.17). But GoDaddy provides no explanation of why this requires that the claimed "virtual machine" in the '397 and '168 patents must emulate a physical processor.

2006); *Carefusion 303, Inc. v. Hospira*, No. 11-762-RGA, 2013 U.S. Dist. LEXIS 17899, at *5-*7, *13-*16 (D. Del. Feb. 11, 2013).   The question is not whether the word "processor" is understandable to jurors, but whether imposing an "software that emulates a physical processor" construction is appropriate in view of the intrinsic and extrinsic records here.  It is not.

### d.  Express Mobile's Constructions Do Not Assume that the Browser and the Virtual Machine Is the Same

Without reference to the actual claim language or any expert testimony, and for the first time, GoDaddy asserts that Express Mobile's constructions are somehow flawed "because XMO assumes that the 'virtual machine' is the same software as the separately claimed 'web browser.'" (*Supra* p. 31).  Not so.  Express Mobile is not asking for a construction of "virtual machine" as a "browser," or saying that those terms have the exact same meaning.[27]   In the context of the claim language, the virtual machine is a piece of software that works with the browser to generate the required display—this is reflected in the claim language, which recites a "browser and a virtual machine capable of generating displays," and "virtual machine commands for the display of at least a portion of said one or more web pages," which are displayed in the browser.  ('397 Patent, Claim 1).  Indeed, GoDaddy admits that "there is no dispute that the virtual machine is software that contributes to generating web pages along with the web browser."  (*Supra* p. 31).  That is exactly Express Mobile's position.

To the extent that Express Mobile can discern GoDaddy's argument on this issue, it appears that GoDaddy suggests that the virtual machine must be used to generate distinct portions of the webpage display that a browser alone could not generate. (*Supra* p. 31).  However, nothing in the claim language suggests that the browser and virtual machine must distinctly generate any

---

[27] This makes GoDaddy's citation to *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) irrelevant.

particular portions of the webpage.  The virtual machine was used to ensure that programming in full-featured programming languages (such as Java), could be used to enhance web browsers that did not support those full-featured programming languages without the virtual machine (*see supra* pp. 31-32), but this does not provide any basis to limit the claimed virtual machine to only Java enabled browsers or to any other limitations GoDaddy attempts to impose throughout its brief. GoDaddy's strawman argument about a distinct "browser" and "virtual machine" should thus be rejected.

   e.   **GoDaddy's Belated New Argument That "Virtual Machine" Should Be Construed as a Means-Plus-Function Term Is Unsupported and Improper**

In a last-ditch attempt to narrow the claimed virtual machine to the Java Virtual Machine, GoDaddy makes a new argument, never before asserted by GoDaddy or any other Defendant despite the numerous times this claim term has been briefed, argued, and construed, asserting that virtual machine somehow triggers § 112, ¶ 6 applications.  But this argument is legally wrong. GoDaddy admits that claim language that lacks the word "means" (as here), is presumed to not invoke § 112, ¶ 6.  (*Supra* p. 36 (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348)). Nonetheless, it suggests that Express Mobile's construction of virtual machine involving "software [that] 'emulate[s] computing functionality" somehow "amounts to a purely function[al], 'nonce' word that, if adopted, the Court should analyze as a means-plus-function claim."  (*Id*.).  This argument is wrong for several reasons.[28]

---

[28] GoDaddy also suggests that Express Mobile's proposed construction is purely functional citing certain statements from the *Markman* hearing.  (*See supra* p. 36).  These statements are all consistent with a virtual machine being software that emulates computing functionality by receiving code, interpreting or compiling it, and generating a display output and do not render Express Mobile's construction purely functional.

*First*, the term "virtual machine" itself has structure and is not a nonce word based on the understandings of the POSA as of the priority date. (*See supra*, Section I.3.c). *Second*, Express Mobile's construction includes structure, as the word "software" itself connotes sufficient structure. GoDaddy has previously argued this very issue and has been admonished that "the term 'software' is not a generic structural term equivalent to 'mechanism,' 'means,' or 'element,' nor is it a nonce word." *WhitServe LLC v. GoDaddy.Com, Inc.*, 65 F.Supp. 3d 317, 321 (D. Conn. 2014). Other courts have similarly confirmed that terms like "code" or "computer code" connote sufficient structure, even though different types of code may be used to implement different types of computing functionality.[29] GoDaddy cites no case to the contrary, and therefore GoDaddy's discussions about the functional aspects of Express Mobile's construction ("that emulates computing functionality") over the structural aspect ("software") are irrelevant. (*See supra* pp. 36-37). Finally, GoDaddy's references to a hypothetical means-plus-function interpretation and supposed "admissions" simply confirmed that the "structure" of the virtual machine is "software," and that the functional aspects of the software are further spelled out by the claim language. (Ex. 9A, *Markman* Tr. 14:21-15:11). Software, as noted above, is not the same as the "modules" (an actual nonce word) recited in *Williamson* and other cases. (*Supra* p. 38).

### 4.    Defendant's Supplemental Sur-Reply Brief

XMO's construction of "virtual machine" meanders along a trail of esoteric discussion concerning every conceivable type of such machine in the late 1990s and early 2000s. With XMO's "supplemental" briefing, the Court is no closer to understanding the specific "virtual

---

[29] *See Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 2018 WL 1699429, at *16-18 (E.D. Va. 2018) (holding that "computer code" provides structure and that "[s]imply because a claim term is capable of performing numerous functions, the term is not devoid of structure"); *Smartflash LLC v. Apple Inc.*, 2015 WL 4208754, at *3 (E.D. Tex. July 7, 2015) ("[T]he word 'code' refers to a particular type of structure"); *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) ("[C]omputer code' is not a generic term").

machine" that Steven Rempell claimed as his invention in 1999 than it would be by casually observing this apparent nonce term in a first reading of the claims.

XMO does agree however that a "virtual machine" emulates a physical processor, as in GoDaddy's construction. But for XMO, that is not broad enough. It says a "virtual machine" is *any software* "generating a webpage display." This means of course that XMO's "virtual machine" is virtually any code that displays anything online. XMO's limitless breadth allows "virtual machine" to read on any modern Internet browser (*see* D.I. 47 ¶ 47), which is why the term's meaning is hotly contested throughout the country. But this result can't be right. XMO's "virtual machine" is not an "off-the-shelf piece of software" as claimed, as if anyone could simply buy a "virtual machine" in 1999 at Best Buy. The "virtual machine" must be something anchored in the intrinsic record, such as "software that emulates a physical processor" per GoDaddy's construction. Otherwise, if XMO is correct, the term is a mere nonce word *e.g.,* "software."

<blockquote>

a. **The Court should look to the context of the intrinsic record showing the claimed "virtual machine" is software that emulates a physical processor.**

1. **XMO Agrees that the "Virtual Machine" Emulates a Processor.**

</blockquote>

Citing no authority, XMO claims the Court cannot look to surrounding context in the claims, specification, and prosecution history for what "virtual machine" means. XMO is wrong. The Federal Circuit has instructed that a court should indeed take into account a term's interaction with the surrounding claim terms. *Phillips*, 415 F.3d at 1314.

Here, as set forth in GoDaddy's prior briefing, the intrinsic record inextricably ties the claimed "virtual machine" to the runtime engine and database of user-selected settings and describes the virtual machine in terms of processor-type operations. (JCCB at 7–8, 12; *supra* pp. 27-28.) XMO agrees that the virtual machine "works together" (or "in tandem") with these claim

elements,[30] and XMO does not deny that the claims require the virtual machine to *execute* the runtime engine program and receive *commands* from the runtime engine based on what it reads from the database.  That is what processors do.  (Ex. 8 ¶ 67.)  In turn, the specification repeatedly describes the runtime process implemented by the virtual machine, runtime engine, and database combination as performing processor-type operations, and the specification's only reference to the Java Virtual Machine similarly refers to it as performing processor-type functions of "execut[ing]" "thread" programs also tied to the runtime engine.  (*Supra* p. 27; *see* '397 patent at 35:34–45; *see also* JCCC Ex. 2B at XMO_GD00000860 (describing the Java Virtual Machine as "execut[ing]" Java applet code).)

XMO admits these disclosures "may involve processors."  (*Supra* p. 39.)  XMO also agrees a virtual machine may take the form of software that emulates a physical processor, which should end the debate, but XMO seeks boundless breadth.  (*See supra* p. 51 ("Virtual machines that emulate processors are but one type of virtual machine[.]").)

Indeed, rather than providing any true affirmative support from the specification, XMO resorts primarily to attacking GoDaddy's extensive intrinsic support.  XMO's attempts to divorce the virtual machine from any ties to the runtime engine, database, and other aspects of the claims – other than the generic capability of "generating displays" as recited by the preamble – are ineffective. XMO insists that a "processor" construction is inappropriate because the "specification

---

[30] Ironically, XMO claims that GoDaddy "misquotes" XMO's statement on this point, but that is what XMO said because the virtual machine is of course part of the "browser-based web-design tool" to which XMO referred.  It is counterproductive for GoDaddy to address each of XMO's numerous mischaracterizations about what GoDaddy "admits" or "does not dispute" in the limited space here. Of note, XMO reaffirmed its allegedly misquoted position in its Supplemental Reply, stating that what Mr. Rempell claims to have invented includes a "virtual machine" that, with the runtime engine and external database "***work together*** to generate web pages."  (*Supra* p. 49 (emphasis added).)

does not say" the word "processor," does not recite that the claimed virtual machine characteristics "are for a processor," and does not "intend[] to limit the scope of the virtual machine claim term." But those are not requirements for construing claims, and XMO cites no authority to the contrary. "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *E. I. du Pont de Nemours & Co. v. Unifrax I LLC*, 2016 U.S. Dist. LEXIS 3926, at *3–4, *31 (D. Del. Jan. 3, 2016) (claim construction is a factual finding based on intrinsic and extrinsic evidence for the meaning of the terms to one skilled in the art at the time of the invention); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

### 2. XMO Fails to Explain Any Differences Between Its Constructions for Virtual Machine and the Separately Claimed "Browser."

It is a fundamental principle of claim construction that different terms *within the same claim* cannot share the exact same meaning. *Applied Med. Res. Corp. v. United States Surgical Corp.*, 448 F.3d 1324, n.3 (Fed. Cir. 2006). XMO's repeated blurring of the lines between the separately claimed "browser" and "virtual machine" violates this principle and ignores the patent's clear distinction between the two different claim terms.

XMO admits the virtual machine is not the same thing as the browser, but it fails to offer any distinction between them. In doing so, XMO completely ignores the express language of the claims that state "at least one" – not all – of the user-selected settings result in the generation of virtual machine commands, and that the virtual machine generates only a "portion" of the webpage to be displayed. But it is precisely that special "portion" of the webpage based on a subset of user-selected settings that the virtual machine generates – *not* the browser. The '397 patent's background confirms this, describing the inability of prior art browsers that did not run JAVA (i.e., did not utilize a virtual machine) to generate more processor-intensive "serious multimedia applications" and dynamic scaling. (*Supra* p. 33; '397, 1:11–67, 2:1–3:6.) XMO fails to address

these critical distinctions.

The only reference in the specification to a Java Virtual Machine confirms that it is these more intensive operations for which the virtual machine is responsible – and not for routine webpage elements as XMO posits – showing that the higher-level "user input techniques" and animation processing is done entirely using Java (and by implication, using the Java Virtual Machine).  Indeed, the patent distinguishes these very operations from those implemented using HTML and JavaScript that the browser alone interprets without the aid of the virtual machine. (*See* '397 patent at 11:1–17, 35:34–45, Figs. 6 & 19.)

While the portion of the display for which the virtual machine is responsible may be displayed "in the browser" window as XMO claims, this does not mean the browser software itself creates the more resource-intensive portion.  Again, the remaining, less intensive settings and portions of the webpage display can be generated solely by the browser.  Logically, the browser and virtual machine thus *must* generate different portions of the webpage, otherwise there would be no point in claiming the virtual machine in addition to the browser.  Yet again, XMO fails to account for these differences, resulting in a construction that conflates two separate claim terms.

### 3.  XMO's Construction Has No Other Specification Support.

When distilled to its core, XMO's proposed construction for "virtual machine" has no actual support in the specification.  XMO first claims the specification somehow refers to a virtual machine as an "off-the-shelf" piece of software without identifying any exemplary products that one could actually buy off the shelf.  (*Supra* p. 49.)  XMO's only other alleged support for its virtual machine construction is the well-trodden boilerplate "evolution" portions of the specification that XMO contends means Mr. Rempell's alleged invention can "evolve" over time to ensnare others' innovations. But that cannot be as those portions of the specification have little if anything to do with the claimed "virtual machine."

Besides Java, the patent's passing reference to other "full featured programming language[s]" as being capable of someday implementing the claimed invention does not mean that "virtual machine" is without any limits.  And "full featured" programming language is far from clear; it is not a term of art and the '397 patent otherwise fails to describe it, let alone identify its "features."  (Ex. 6 ¶¶ 44–49.)  All that can be derived is that "full featured" programming language *could be* Java, C++, and Visual Basic, on the one hand, and that "full featured programming language" *cannot* be HTML, JavaScript, or CSS, on the other.  (*See, e.g.*, '397 patent at 1:10–50 (explaining that, unlike full featured programming language, "HTML and JavaScript are incapable of reformatting text and scaling buttons or images dynamically" among other shortcomings).)  Thus, whatever "full featured" language is that implements the claimed virtual machine, it is decidedly *not* JavaScript.  None of this advances XMO's cause.

In light of this, XMO resorts to a supposed expert who is not even opining in this case, Dr. Urgaonkar,[31] who contends that JavaScript itself *in 1999* was also "full featured" language within the scope of the claimed virtual machine.  (*Supra* pp. 47-48.)  That is not the case.  Contrary to XMO's characterization, GoDaddy vigorously disputes that JavaScript was a "full featured" programming language in 1999, a position corroborated by the patentee's own statements disclaiming JavaScript as incapable of implementing the alleged invention.  (*See* Ex. 6 ¶¶ 44–49; *see also Hockersen-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[S]tatements made during prosecution commit the inventor to a particular meaning of a claim term that is binding during litigation.").  XMO's citation to the book *JavaScript: The Definitive*

---

[31] The Court should not rely on Dr. Urgaonkar.  He did not receive his doctorate degree until 2005 and, based on his CV, he did not teach his only undergraduate course on virtual machines until 2006 (and only in 2006).  *See* http://www.cse.psu.edu/~buu1/CV.pdf; Ex. 2L at 29–47 (CV of Bhuvan Urganokar, Ph.D.). He has no scholarly opinions or papers on virtual machines anywhere near the relevant timeframe: 1999.

*Guide* that published in 2002, three years after the '397/168 patents were filed (and critically two years into the early 2000s internet boom), remains irrelevant.  Even if some people did consider JavaScript to have ultimately "evolved" into such a full featured programming language by 1999, Mr. Rempell represented the exact opposite to the Patent Office.  And that is what matters.

### 4.   XMO Misinterprets the Prosecution History.

XMO is incorrect that "[n]othing during prosecution was concerned with the form the virtual machine . . . would take." (*Supra* p. 46.)  To the contrary, the entire point of the applicant adding "virtual machine" expressly in conjunction with the newly recited runtime engine, database, and "virtual machine commands" was to overcome Faustini.  The applicant argued that the combination of those three elements distinguished the claimed invention from Faustini because Faustini used "Java applets" that the applicant characterized as "programs that exist in a web page, much as an image on a web page." (JCCC Ex. 2B at XMO_GD00000860.)   Thus, the applicant was arguing that Faustini's system did not utilize the Java Virtual Machine in the same way the applicant's claimed virtual machine did, operating together with the runtime engine and user settings database to generate the website dynamically on the fly rather than statically from a flat file.  (*See id.* (arguing Faustini "discloses software for designing applets that run in a browser.  In contrast the claimed invention is for an apparatus that produces and generates websites within a browser.  The invention accomplishes this by first creating the runtime files.  The websites are generated by the runtime engine reading and interpreting and then building the web pages dynamically."))  The applicant's description of Faustini implementing its Java Virtual Machine in a different way thus renders Faustini's disclosure of that singe Java Virtual Machine relevant only to the fact that the applicant, Mr. Rempell, did *not* claim entitlement to all virtual machines as XMO now asserts.

**5. XMO's Extrinsic Evidence Continues to Obfuscate the Meaning of "Virtual Machine" Rather than Aid in its Construction.**

XMO's reply provides no clarity to the waters muddied by its parade of extrinsic evidence on virtual machines. XMO cites no case that supports its novel theory that extrinsic evidence spanning over a decade after the patent should be used to broaden what (in XMO's view) is already a broad claim term as of 1999. XMO cites *Thorner* to obtain unlimited scope of "virtual machine," including meanings that contradict one another. (*Supra* pp. 49-50.) But in in *Thorner*, the Federal Circuit's opinion focused on whether the patentee's mere criticism of one embodiment was sufficient to constitute disavowal. 669 F.3d at 1367. *Thorner* does not give XMO a blank check for the term "virtual machine." XMO's reliance on *Thorner* to support the Court's assessment of its extrinsic evidence should likewise be ignored. While a court may give extrinsic evidence minimal weight when it sheds light on a term's "plain and ordinary meaning," here, XMO's patchwork of arcane lecture notes, books, dictionaries, and biased expert pronouncements provide nothing of value to the Court, and it would be wise to ignore them in their entirety. *See Transcend Med., Inc. v. Glaukos Corp.*, No. 13-830, 2015 U.S. Dist. LEXIS 5268, at *20 (D. Del. Jan. 16, 2015) ("[E]xtrinsic evidence may not be used to vary, contradict, expand, or limit the claim language from how it is defined.") (internal quotation marks omitted). What's more, the "myriad notions" of virtual machine in 1999 do not give the term any "ordinary" meaning at all, but instead provide conflicting theoretical interpretations that go well beyond the scope of the patents and claims at issue, essentially rendering the term meaningless.

XMO's odd interpretation of undergraduate lecture notes (two that are nearly identical and from the same professor) that virtual machines are "pure interpreters," "pure compilers," and everything "hybrid" in between continues to confuse the issue. Though those concepts are not discussed anywhere in the patents or prosecution history, XMO claims they show that a virtual

machine is nothing more than a mere "translator" that simply converts one form of code to another (e.g., from source code to byte code or machine code). Yet that fails to capture the otherwise claimed features of the virtual machine that include executing the run time engine operations described in the specification in terms of far more complicated processor-type commands. While GoDaddy's construction would not "exclude" such basic interpreter-compiler embodiments (as a processor could also perform that functionality), it requires more from the virtual machine so that it can actually perform its functions as claimed, *viz.*: executing the runtime engine, directing it to read the database, and generating the higher-powered "portion" of the webpage to be displayed.[32]

XMO further argues that the web of possible virtual machines available by 2004 as depicted in Smith & Nair "reinforces the point" that more than one type of virtual machine existed in 1999. But even if that were the case (nothing from 1999 shows it is),[33] XMO makes no effort to tie that expansive set to the claimed virtual machine here. That is because there is no such tie. Ultimately, the claimed virtual machine cannot be "nothing" and "everything" all at the same time.

>      **b.**     **If Virtual Machine is Any Form of Software as XMO Claims,**
>              **then the Court Should Construe it as Limited to a Java Virtual**
>              **Machine Under § 112 ¶ 6.**

XMO's new functional characterization of the virtual machine as simply an "off-the-shelf piece of software" to generate a display underscores that the virtual machine is the equivalent of a

---

[32] The fact that Java Virtual Machines use intermediate code does not limit the functionality of such software to simply converting source code to bytecode – it also performs operations by executing that code before translating it to machine code. And though XMO cannot let go of its misplaced concerns that GoDaddy's construction "substantively requires" intermediate or byte code, for the umpteenth time, GoDaddy is not arguing that construction.

[33] *See* The Dictionary of Computing & Digital Media: Terms & Acronyms (Brad Hansen, 1999) (Ex. 2F); The Dictionary of Multimedia: Terms and Acronyms (Brad Hansen, 1999 (Ex. 2G); Encyclopedia of Computers and Computer History, Vol. 2 (Rojas, 2001) (Ex. 2H); Smith & Nair (2005) (Ex. 2M); Blackie's Dictionary of Computers (2008) (Ex. 2I). In addition, XMO cites to two other sources having no clear date. *See* (Ex. 2J) and (Ex. 2K).

"black box" or structure-less "module" subject to means-plus-function interpretation under *Williamson*.[34]  (*See supra* p. 45; *see also id.* at 8 (asserting the "patentee was not concerned *how* the virtual machine might emulate computer display functionality"), *id.* at 13 (referring to a virtual machine as "***generically*** software that emulates numerous aspects of 'computing functionality.'") (emphasis added), *id.* at 11 ("Mr. Rempell, the inventor, never purported to invent a specific virtual machine or JavaScript-based browser technology."); *Supra* p. 9 (intrinsic record is "entirely agnostic to *how* the virtual machine might carry out" the claimed functionality); *supra* p. 37.)  Such quintessential "nonce" structure mandates means-plus-function treatment.

XMO proposes that its new construction "provides further clarity" because it is "limited to software that emulates computing functionality."  (*Supra* p. 40.)  But that is what any piece of software does, and XMO saying it is a "particular type" or "off-the-shelf" hardly makes it so.  Even XMO's additional new spin describing this "particular software" as being that which translates high level source code to an output that "emulates computing functionality" is not particular in the slightest.  (*Supra* p. 40.)  Software that emulates software is still software, period.  Multiple courts have interpreted similar generic software terms claimed in purely functional fashion to be nonce words subject to § 112 ¶ 6.  *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1372–75 (Fed. Cir. 2020) (interpreting "logic" as nonce word where plaintiff argued it was a "common term of art meaning software, firmware, circuitry, or [a] combination thereof"); *Intellectual Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2017 WL 5896180, at *33 (E.D. Tex. 2017) ("tool" was nonce word where specification indicated that it was "a software module executed by a processor"); *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 166 F. Supp. 3d 364, 372–73 (S.D.N.Y.

---

[34]  XMO ironically calls GoDaddy's MPF argument "belated" when it is simply rebutting the construction raised *for the first time* by XMO after original briefing and the Markman hearing.

2016) ("computer application" was nonce word).  The Court should rule the same here.

XMO's case law is not to the contrary.  GoDaddy was not "admonished" against making this same argument in *WhitServe*.  That opinion issued before *Williamson* and turned on the court's application of the "strong," "high bar" presumption against means-plus-function interpretation that *Williamson* overturned, so it is no longer good law.  *See Whitserve*, 65 F. Supp. 3d at 320.  So, too, for *Affymetrix*.  In *Amdocs*, the court relied on extensive evidence showing the different term "computer code" connoted sufficient structure to avoid means-plus-function.  *Amdocs*, 2018 U.S. Dist. LEXIS 60078, at *45–46.  Here, unlike *Amdocs*, there is no specific "code" at issue nor any claim language specifically describing the functions of computer code for "receiving" and "correlating network accounting records" – far more specific than the broad "generating a display" claim function to which XMO points.  *Smartflash LLC v. Apple Inc.*, No. 6:13-CV-447-JRG-KNM, 2015 U.S. Dist. LEXIS 91669 (E.D. Tex. July 7, 2015) is equally unavailing.  That case involved substantially detailed claim language providing the "code" actual structure, again, unlike here.

All told, the "virtual machine" advanced in this case by XMO aligns squarely with the "module" that the *Williamson* court construed as means-plus-function.  In such a scenario, Congress decided that the patentee is *only* entitled to the scope of invention of the structure disclosed in the specification – which here, is the indisputable sole embodiment of a Java Virtual Machine.

## II.        CONSTRUCTION OF PLAYER IN THE '044 PATENT

| Express Mobile Construction | Defendant's Construction |
|---|---|
| software code that facilitates the execution of an application on a device | device-specific code which contains instructions for a device and which is separate and independent from the Application<br><br>-or-<br><br>device-specific code which contains instructions for a device and which is separate and distinct from the Application |

### 1.   Express Mobile's Supplemental Opening Brief

The appropriate construction of "player" is "software code that facilitates the execution of an application on a device." (D.I. 66-1, Ex. 2 ¶¶ 81-83).  Express Mobile previously set forth its position on this term in its briefing in *Express Mobile v. Shopify*.  (*See* D.I. 65-12, Ex. 1L, *Express Mobile v. Shopify*, No. 19-cv-439, D.I. 117, at 73-75, 76-79; D.I. 66-1, Ex. 2 ¶¶ 81-83; D.I. 68-1, Ex. 4 ¶¶ 79-83).  Express Mobile understands that this Court did not adopt its previous proposed construction in the Shopify case, but respectfully maintains its view that its proposed construction is correct and raised and briefed this issue again in this case.[35]   The Court requested additional briefing on this issue during the *Markman* hearing, specifically on the question of whether any prosecution disclaimer from the '755 patent prosecution history should apply to the '044 patent.

Each of the claims of the '755 and '287 patent recite that the "Player" is device-dependent code, but the claims of the '044 patent do not recite such a requirement.  Express Mobile respectfully submits that the Player term does not necessarily require device-dependent code in the claims of the '044 patent. The specification of the '044 patent in the "Disclosure of the Invention" section explains that the invention "produc[es] code that, when executed on the platform, provides

---

[35] Additionally, GoDaddy's requirements that the "Player" be both "separate" and "independent" from the Application are again inappropriate for the reasons given with respect to the Application claim term in the Joint Claim Construction Brief. (D.I. 66-1, Ex. 2 ¶¶ 78-80).

. . . selected component on the display of the platform," and that one of the produced codes is a "Player." ('044 Patent at 1:55-67). The specification teaches that a "Player" can be such that it has "*no device specific dependencies*" (i.e., device-independent), or it can be such that it "extends the operating system and/or virtual machine of the device" (i.e., device-dependent). (*Id.*)  In either case, a Player can facilitate the execution of an application on a device.  Additionally, the Player "*may*"—but not must—"include code that is device-specific." ('044 Patent at 1:55-67, 6:14-16). Reflecting this flexibility in whether the Player is device-dependent, each claim in the patent family specifies whether the Player requires device-specific code when intended. *Compare* '755 Patent, claims 1, 12, 27 and '287 Patent, claim 1, *with* '044 Patent, claims 1, 15.  Other disclosures in the specification show that "Players" within the '044 patent may be either device-dependent or device-independent. (*See, e.g.*, '044 Patent at 3:59-63, 5:13-28, 5:46-59, 5:60-6:7, 6:14-21, 7:21-28, 7:38-48, 8:15-25, 8:35-43, 9:13-21, 11:61-12:4, 18:14-18, 24:1-4, 33:54-57, 34:1-4, Figs. 2A, 2B). Although the Abstract of the '755 patent states that "[d]evices are provided with Players specific to each device," that language does not restrict Players to device-specific code. (D.I. 66-1, Ex. 2 ¶ 83).  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004) (the patent abstract does not "weigh heavily when considering" the meaning of a claim term).  Indeed, the Court recognized in its prior opinion that "courts should be cautious not to give the Abstract too much weight in claim construction."  (D.I. 65-6, Ex. 1E, Shopify *Markman* Order at 9).

To the extent that the Court imposed a "device-specific code" requirement on the player term in the '044 patent, it relied on prosecution history disclaimer based on statements that the patentee made during the prosecution of the '755 patent.  (D.I. 65-6, Ex. 1E at 12-13). During prosecution of the '755 patent, the examiner explained that the "prior arts of record do not

expressly teach or render obvious" certain limitations recited in the claims, including the requirement that the "Application is a device-independent code" and the "Player is a device-dependent code." (Ex. 9C, XMO_GD00003039-3040 ('755 Patent); *see also* Ex. 9D, XMO_GD00003290 (same in allowance for '287 Patent)). However, the prosecution history of the '044 patent does not make any statements suggesting that the "player" recited in the '044 patent must be device-specific, or that the invention of the '044 patent was distinguished over the prior art on the basis of being device-specific. Indeed, the reason for allowance for the '044 patent does not reference any requirement that the player is device-specific or device-dependent, or that this was a basis for allowance. Instead, the reason for allowance of the '044 patent claims was that the "prior arts of record" did not "teach or render obvious" a system or method, as claimed, that:

> store[s] information representative of said defined UI object and related settings in a database; retrieve[s] said information representative of said one or more said UI object settings stored in said database; and build[s] an application consisting of one or more web page views from at least a portion of said database utilizing at least one player, where said player utilizes information stored in said database to generate for the display of at least a portion of said one or more web pages, wherein the application and player are provided to the device and executed on the device."

(Ex. 9G, XMO_GD00003514).

The difference between the prosecution histories is not surprising. Consistent with the reasons for allowance referenced above, the "player" recited in the '044 patent uses stored information in a database, including UI object settings, to generate website displays as reflected in the block quoted language above, and is materially distinct from the player recited in the claims of the '755 and '287 patent. Mr. Weadock, Express Mobile's expert, agrees, explaining that "the claims [of the '044 patent] have materially different substance from the claims recited in the '755 patent" because they, for example, "recite that the 'player utilizes information stored in [a]

database to generate for the display of at least a portion of said one or more web pages,' which is different from the player referenced in the '755 and '287 patents" which "do not reference a database at all." (D.I. 68-1, Ex. 4 ¶ 83 (Weadock); *Compare* '755 Patent, claims 1 (37:29-30), 12 (38:39-40) and '287 Patent, claim 1 (38:19-20), *with* '044 Patent, claims 1 (38:20-25), 15 (39:52-56)).[36]   Mr. Schmandt does not dispute anywhere that the player recited in the '044 patent is materially distinct from that recited in the '755 and '287 patents. GoDaddy also did not dispute this fact in the last round of briefing. Instead, GoDaddy misleadingly cast Express Mobile's argument as only "capitalization-based" and did not discuss, much less dispute, that the player limitation recited in the '755 and '287 patents is materially distinct from that recited in the '044 patent claims. (D.I. 64, JCCB at 67).

The material differences between the prosecution history and claims of the '755 and '287 patents, and those of the '044 patent, underscore that this court should not construe the "Player" recited in *all three patents* to require device-specific code. "Although a parent patent's prosecution history may inform the claim construction of its descendent . . . prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language." *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003); *see also Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) (noting that "arguments made

---

[36] GoDaddy previously highlighted portions of the prosecution history from the '755 patent family to assert that that the patent applications used "the words 'Application' (with a capital A) and 'Player' (with a capital P) to refer to code that is provided to devices for accessing web services, where . . . a Player is device-dependent code." (D.I. 64, JCCB at 64-65). This was true for the '755 and '287 patents, which likewise refer to the Player with a capital "P" in the claims and expressly recite a device-dependent code requirement for the Player in each and every claim. But this is not true for the claims of the '044 patent, which recite the player with a lowercase "p." (D.I. 68-1, Ex. 4 ¶¶ 82-83 (Weadock)). Given the differences in claim scope, moreover, the arguments the patentee made during prosecution to overcome McCain that might have been relevant to the scope of the Player in '755 and '287 prosecutions were ancillary at best to the scope of the player in the '044 patent's claims.

in a related application do not automatically apply to different claims in a separate application," and that "disclaimers do not apply" "[w]hen . . . purported disclaimers are directed to specific claim terms that that have been . . . materially altered in subsequent applications").   In *ResQNet.com*, two "related patents [we]re similar," but "their claims [we]re not identical," as additional language of significance was "[s]andwiched with the functional language." 346 F.3d at 1382.  The Federal Circuit held that the parent patent's "prosecution history [was] irrelevant to the meaning of th[e] limitation" in light of the differences in claim language, and held that the prosecution record "evince[d] no 'clear and unmistakable' disavowal of claim scope that would compel a result different from the claim language." (*Id.* at 1383).

During the *Markman* hearing, the Court asked Express Mobile whether it is "important" that "the same term" (here, "player") is being construed across the parent ('755 Patent) and child ('044 Patent) applications.  (Ex. 9A, *Markman* Tr. at 91:16-93:9). As Express Mobile explained, "the case law doesn't say if you're construing the same term, you just carry forward the prosecution" from the parent to the child.  (*Id.*).  Indeed, this Court's own prior opinion, following *ResQNet.com*, confirms as much.   Specifically, in *Broadridge Financial Solutions, Inc. v. Inveshare, Inc.*, this Court considered whether prosecution disclaimer in a parent patent that limited the scope of "electronic solicitation message" should travel to the construction of the same claim term in a child application. 2012 WL 1245723, No. 10-cv-075-RGA, at *2-*6 (D. Del. Apr. 11, 2012).  In the parent prosecution, the applicant had amended the claims to specify in light of prior art that an "electronic solicitation message *include[d] an electronic proxy ballot*," and Broadridge asserted that this italicized requirement should have been carried forward to the construction of "electronic solicitation message" in a child patent.  (*Id.* at *3 (emphasis added)).  But much like how the child application here recites a "player," but no "device-dependent"

70

requirement, the child application there recited the "electronic solicitation message," but not the "electronic proxy ballot" requirement.  This Court explained that the "close relation of subject matter" between the patents "does not conclusively answer the question of whether the disclaimer travels between generations" because disclaimer does not apply where claim terms have been materially altered.  *Id.* at *4 (citing *Saunders Group Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007); *Ventana Med. Sys. V. Biogenex Labs.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006)). Noting that "[r]elatively nuanced variations in claim language between patent generations have barred importing a disclaimer to a child claim," this Court held that the "electronic solicitation message" in the child application "cover[ed] a broader set of material" than that of the parent, and that the "fine distinction" in claim language confirmed that the claim language "was not synonymous." *Broadridge*, 2012 WL 1245723, at *4-*6 (citing *ResQNet.com*, 346 F.3d at 1382-83).  Thus, "the Court decline[d] to extend the [parent patent] application prosecution disclaimer to the term "electronic solicitation message" of the [child patent]." *Broadridge*, 2012 WL 1245723, at *6.  Here, the distinction between the players is not merely a "fine" one, it is a materially distinct difference that is of a different scope.[37]

Ultimately, in the *Shopify* case this Court acknowledged the differences between the capitalization of the claims between the '755 and '287 patents as opposed to the '044 patent (Ex. 1E at 12),[38]  but did not consider the differences in the claims' substance or their distinct

---

[37] GoDaddy cited *Biovail Corp. Int'l v. Andrx Pharmaceuticals Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) in the previous Joint Claim Construction briefing to assert that "prosecutions of the earlier applications govern here." (D.I. 64, JCCB at 67). But the *Biovail* case stands for the unremarkable proposition that prosecution histories may carry forward where parent and child applications contain claims with the exact "same claim limitation." *Biovail*, 239 F.3d at 1301. That is not the case here.

[38] While not dispositive, as explained at the *Markman* hearing the differences in capitalization in the "player" terms across the patents lend atmospheric support to the argument that the prosecution

prosecution histories.  Meanwhile, the Court acknowledged that the Player is expressly referred to in the specification as having "no device specific dependencies" ('755 Patent at 1:55-67), and expert testimony confirms that this referred to the Player, not simply to a programming language as Shopify suggested.  (D.I. 68-1, Ex. 4 ¶ 81).  While this may not have been enough to "override" the prosecution history disclosures in the Court's previous opinion, Express Mobile submits that in light of this disclosure and the differences in the prosecution histories and claim scopes the '044 patent's player should not be construed as necessarily being device dependent.

## 2.   Defendants' Supplemental Answering Brief

"[A]n interpretation asserted in the prosecution of a parent application can also affect continuation applications, continuation-in-part applications, and even related continuation-in-part applications arising from the same parents."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).  Where, as here, the disputed term is the same throughout the patents of the family, and the patentee made a clear and unmistakable disclaimer of claim scope in the parent application, the court should "presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Id.* (citing *Fin Control Sys. Pty. Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001).

In *Shopify*, this Court thoroughly analyzed whether the term "player" and required "device-dependent" or "device-specific" code in all three of the '755, '287, and '044 patents, finding *it did*. (Ex. 1E at 9-14.)  Despite that guidance, in this case, XMO returns back to its original proposal for "player" that is wrong on its face, over-broadening the scope to any "software code" that merely "facilitates" execution of application code on a device.  This claim scope is wholly unsupported by the intrinsic record for this indisputably "coined" term and, in any event, was disclaimed during

_____

of the parent patent should not carry forward to the '044 patent. (Ex. 9A, *Markman* Tr. at 93:10-94:6).

prosecution of the '755 patent that indeed applies equally to the same claim term "player" despite its lower-case letter "p." XMO's attempts to manufacture differences between the various claims across this family of patents fails to salvage its argument.[39]

> **a.   The Court Correctly Found the "Player" Must Be "Device-Specific" For All Three Patents and Should Do So Here Again for Additional Reasons.**

The Court previously found that "player" (regardless of capitalization) should be construed the same across all three patents because of extensive support throughout the intrinsic record that the patentee intended for only one, "coined" meaning of that term.  (Ex. 1E at 12; *Markman* Tr. at 84:25-85:11 (XMO agreeing that it is "fair" to characterize "application" and "player" as "coined terms"); *id.* at 92:3-9 ("here you've got the same claim term" across all three patents).)   This conclusion was the result of an exhaustive analysis of all three patents' claims, specification, and prosecution history –nearly 100% of which confirms unequivocally that the "player" requires device-specific code.  (Ex. 1E at 9-14.)

As GoDaddy's prior briefing on this issue demonstrated, the Court's reasoning in *Shopify* for "player" stood on rock solid grounds.  (JCCB at 64-65, 67 (citing '755 patent at Abstract, 3:58-62, 5:8-24, 5:42-55, 5:56-6:3, 6:9-17, 11:41-51, 23:34-46, 33:12-15, 33:26-28, 34:37-45; Ex. 8 ¶¶ 189-92, 195-96; Ex. 6 ¶¶ 104-113).)  Despite yet another chance, XMO has failed to point to any new passage in the patents' specification or elsewhere that supports its contention that the "Player '*may*'—but not must—'include code that is device-specific.'" (*Supra* pp. 68-69.)  As before, these passages' ambiguities or simple silence about device-specific code are entirely overridden by the

---

[39] Additionally, the Court should adopt GoDaddy's requirements that the "Player" be "separate and independent" or, alternatively, "separate and distinct," for the reasons set forth in GoDaddy's prior claim construction briefing for the "Application" and "Player" terms.  (JCCB at 57-67.)

otherwise clear definitions for "player" and "application" that the patentee used throughout the rest of the intrinsic record.  Nothing has changed.

Nevertheless, GoDaddy here has *added* to the record beyond what was before the Court in *Shopify* to further underscore the need for the "player" to contain device-specific code.  At the *Markman* hearing, GoDaddy presented the most representative figure depicting how the claimed invention in *all three* patents works, Figure 2A, which further underscores the "player" being device-specific, showing that there are multiple different "players" that could be sent to any particular device, and the selection of the appropriate "player" depends on which particular device requests it – *i.e.,* it depends on what specific software platform such as operating system, processor, programming language, and web browser the device uses (as a modern example, iPhone and Android differ in all four respects) for the appropriate player to be sent.  This figure is reproduced atop the next page.



FIG. 2A

('044 patent, Fig. 2A (annotated); *Markman* Tr. at 94:9-95:20; Ex. 6 ¶.)  How else could the claimed player "facilitate execution" of the claimed device-independent application as XMO contends? XMO provides no explanation that still meets the patent's alleged solution of the prior

art problem of programming across the "myriad" kinds of mobile devices over the Internet that is otherwise "time-consuming and expensive" given the "limit[ed] ability of service providers to update the capabilities of mobile devices." (*See* '044 patent, Background.)  The only way for this solution to work is for the *player* to have the device-dependent code.

In addition, unlike in *Shopify*, here, the parties have thoroughly briefed, presented expert testimony, and argued the merits of single passage on which XMO relies in the '044 patent specification, the one referring to "Player" as able to be implemented in a "thin client architecture" to the effect that the "Player" can be device-independent code.  It cannot.  To the extent the clause "has no device specific dependencies" is not yet another typographical error (*see* Ex. 1E at (noting the "frequency of typos" in the prosecution history), a POSA would understand that the "no device specific dependencies" characteristic in this single passage is referring to the *programming language*—not the Player.  Specifically, the sentence should be parsed as follows:

> In one embodiment, one of the codes is a Player, which is a thin client architecture that operates in a language that **[1]** manages resources efficiently, **[2]** is extensible, **[3]** supports a robust application model, and **[4]** has no device specific dependencies.

('755 patent at 1:59-62 (bracketed numbers added); Ex. 8 ¶¶ 192-94; Ex. 6 ¶¶ 105-110.)  That is, the numbered items refer to and modify the "language" of the "thin client architectures"—not to any characteristics of the "Player."  A POSA would understand that the four criteria listed would be understood as characteristics of a *language* for the architecture.  (Ex. 8 ¶ 193.)  As Mr. Schmandt explains, a software "language" **[1]** manages resources in the form of how it represents program variables in memory, **[2]** languages are "often extensible," **[3]** languages are "capable of modelling, given that they are defined by "syntax and semantics," and **[4]** "most high level languages have no device specific dependencies at all, but rather rely on the operating system utilities or libraries which support the language to worry about such details."  (*Id.*)

Mr. Schmandt's interpretation is also much more consistent with the specification, and in fact, is supported by the discussion at '755 patent column 6, lines 48-56 of the Portable Description Language ("PDL") being a common language for the authoring tool, application, and player.  (Ex. 8 ¶ 193; Ex. 6 ¶ 106.)  Though a device-independent "thin client" within a typical client-server architecture does not necessarily make sense given the "client" operates on the device as opposed to the back-end server, if anything, the "thin client" having "no device specific dependencies" merely refers to a hypothetical embodiment where the player-application combination operates over a client-server network architecture.  (Ex. 8 ¶ 194; Ex. 6 ¶¶ 107-113; Ex. 7H (defining "client/server architecture").)  Just because a client is "thin" also does not mean it need not have device-specific code to operate on the device, which *is* the client.  (Ex. 6 ¶¶ 108-113.)

These additional considerations further support this Court's *Shopify* order and construction of "player" as requiring device-dependent code across all three patents.

> **b.** **The '755 Patent Prosecution History Disclaimers Apply Equally to the '044 Patent's Claimed "Player" Because "Player" is the Same Coined Term Within the Family and the Alleged Differences in Claims Language Are Insignificant.**

XMO does not dispute that all three patents share the same specification or that their claims all recite the "coined" terms of "player" and "application," which outside of these patents, do not have established definitions in the art.  XMO overstates this Court's reli[ance]" on the doctrine of prosecution history disclaimer in *Shopify* to construe "player" with device-dependent code across all three patents, as the Court issued that ruling "looking at th[e] *intrinsic evidence as a whole*" and noted that, "even 'when the prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction."  (Ex. 1E at 12-13 (citing *Personalized Media Commc'ns, LLC v. Apple, Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) and *Sunovian Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013).)

In any event, as the Court found before, the prosecution history of the '044 patent "also meets the higher standard of prosecution history disclaimer." (Ex. 1E at 13 (citing *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) for proposition that prosecution history disclaimer can occur "when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art"); *id.* ("Here, the patentee distinguished the prior art McCain by pointing to the 'device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application).").)  Again, XMO's supplemental briefing fails to move the needle on this revisited issue.

> **1. The '755 and '287 Patent Prosecution Histories Apply with Equal Force to the '044 Patent's "Player" Based on Binding Admissions by the '044 Applicant.**

The '044 patent would not have issued but for the same arguments over which the '755 patent issued, which advanced their common applicant's unequivocal position that "player" *must* have device-specific code.  As this Court observed in *Shopify*, the device-dependent characteristics of the "player" were critically necessary to overcome the prior art in all three patents:

> During the prosecution, the applicant represented the 'device-independent' Application and the ***'device-dependent' Player as central to the invention***.  In particular, the applicant cited these features as the key innovations over the prior art of McCain.

(Ex. 1E at 12 (emphasis added).)  In this case, XMO has made no effort to explain how the '044 claims could overcome McCain based on the allegedly "materially different" claim language, despite reciting the same "player" term that was front-and-center in distinguishing McCain for the '044 patent's parent applications.  For that reason alone, the Court should reject XMO's position.

The prosecution histories of the subsequent '287 and '044 patents are entirely consistent with the "device-dependent" limitations required for the '755 patent to issue over the prior art McCain reference.  XMO first relies on the three patents' Notices of Allowance to conclude that

the '044 patent's claims do not require device-dependent code in the player.  However, the Court should give these Notices of Allowance little (if any) weight in this analysis, because in all three patents the Patent Office Examiner essentially just regurgitates the entirety of the issued claims language, which is not uncommon and for which, as XMO notes, the '044 claims do not expressly recite "device-dependent code" for the player.

XMO then glosses right over the entire *rest* of the '287 and '044 patent prosecution histories.  Understandably, because a closer look at them reveals that the applicant for the '044 patent viewed the "player" term in that application to be exactly the same as the "player" recited by the '755 patent claims.  The '287 patent application initially did not recite the "player" at all and then, voluntarily, the applicant amended the originally filed claims to add the phrase "device-specific code," arguing that this amendment introduced "[n]o new matter."  (Ex. 10B at XMO_GD00003175, -3179.)  Later, the applicant again voluntarily amended the claims to recite a "Player, where said Player is a device-dependent code" (and adding the "Application" as device-independent code), arguing that the amendments introduced "[n]o new matter" and choosing not even to mention the addition of "device-dependent code" as materially altering the scope of the claims. (Ex. 10C at XMO_GD00003207, -3211.)

Similarly, during prosecution of the '044 patent, the application initially recited "device specific code" that the applicant voluntarily deleted via preliminary amendment.  (Ex. 10D at XMO_GD00003345.)  In doing so, rather than claiming that dropping "device specific code" meant the claims differed from the '755 or '287 patent claims, the applicant in fact argued that that these amendments were "to differ from Claim 1 of [*sic*] the allowed parent case, US Patent Serial No. 15/370,990" – an entirely different application from the '755 and '287 patents. (Ex. 10D at XMO_GD00003351.) What's more, the '044 applicant once again argue that changes to the claims

dropping "device specific code" introduced "[n]o new matter" and otherwise felt no need to address the removal of that language. (*Id.*) Critically, the '044 applicant went on to argue that, with these amendments, "the present application is patentable for ***at least the reasons as***" the '755 patent claims – i.e., the "device-dependent" characteristics of the "player." (*See* Ex. 10D at XMO_GD00003352; *see also* Ex. 10E at XMO_GD00003466; Ex. 10F at XMO_GD00003483; Ex. 10G at XMO_GD00003501; Ex. 10H at XMO_GD0003520.) Facing the music, the '044 patent applicant *also* admitted that the '044 patent claims were not "patentably distinct" from the '755 or '287 patent claims by disclaiming the '044 patent's term that would extend beyond the expiration date of the '755 and '287 patents. (Ex. 10G at XMO_GD00003501-02.) *See SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018) ("[A] terminal disclaimer is a strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent.").

These binding admissions in both the '287 and '044 patent prosecution histories flatly contradict XMO's position that the difference between the '287 patent claims reciting "device-dependent code" or not were "material" as XMO now claims. Yet XMO fails even to address them despite its numerous opportunities to do so.  XMO should not raise new arguments against this history in its Supplemental Reply. (*Markman* Tr. at 90:13-22.)

### 2.   The Differences Between the Three Patents' Claims Language Concerning "Player" Are Not Material.

The prosecution history statements and disclaimers in the '755 and '287 patents presumptively apply to the '044 patent and, as set forth above, that presumption is reinforced by the '044 applicant's own statements during that patent's prosecution as the predominant case law confirms.  *Omega Eng'g*, 334 F.3d at 1334; *Fin Control Sys.*, 265 F.3d at 1318; *Personalized Media Commc'ns*, 952 F.3d at 1340; *Sunovian Pharm.*, 731 F.3d at 1276; *Purdue Pharma*, 438

F.3d at 1136.

XMO argues, however, that the allegedly "materially distinct" claim language for "player" in the '044 patent should effectively ignore the prosecution history and override that presumption. The only "materially distinct" language that XMO could identify in the '044 patent claims is that its "player" does not expressly recite "device-dependent code" and that the '044 patent claims "use[] stored information in a database, including UI object settings." (*Supra* p. 69.)  Both lack merit.  On the first point, as noted above, the prosecution history of the '044 patent demonstrates that removal of device-specific code from the claims language did not materially alter the claims, that the '044 claims were patentable for the same reasons, and, lest there be any doubt, that the '044 claims were not "patentably distinct" from the '755 and '287 patent claims.  Moreover, the "application" claimed by the '044 patent also contains no recitation of "device-independent code" – yet XMO fails to explain why "application" admittedly retains the "device-independent" recitation from the '755 and '287 patent claims.  ('044 patent, claims 1, 15; JCCB at 55 (taking position that "application" should be construed as having "device-independent software code" and otherwise the same across all three patents.)

XMO's second and only other basis for contending the '044 patent claims are materially distinct also falls flat.  Relying on its expert, XMO argues that the '044 patent's "player" utilizes information stored in a "database" unlike the "Player" of the '755 and '287 patent claims.  (*Supra* pp. 69-70.)  But the database of UI object settings in the '044 patent is no different (and certainly not "materially" different) from the "registry" storing that same information and used by the same "player" recited by the '755 and '287 patent claims.  XMO (and its expert) agree that the "registry" in those claims can be a "database."  (JCCB at 45; Ex. 2 ¶ 64.)

In addition, XMO also contends elsewhere that "UI object" information stored in the '044

80

patent's "database" and the "symbolic names" stored in the '755/287 patents' "registry" are essentially the same information, specifically relating to the inputs and outputs of a "web service" or "web components."  (JCCB at 53 (citing '755, 37:26-27 and Ex. 2 ¶ 75); *see also id.* at 68-69 (discussing "preferred UI object" in reference to '755 patent at 17:4-15 & Table 1); '755, 8:18-47 (discussing registry as being a database for binding web service and web component user-interface object elements); *id.* '755, 17:16-26 (connecting UI objects to web services).)  XMO's expert's statement that the '755 and '287 patents "do not reference a database at all" or claim to encompass UI objects, and XMO's reliance thereon, therefore strains credulity.  (Ex. 4 ¶ 83.)  They are materially the same claim elements.

Finally, XMO has demoted its "capitalization-based argument" to a footnote.  (*Supra* p. 70 n.36; *see also Markman* Tr. at 93:10-94:6 (XMO no longer "hanging [its] hat on capitalization here").)  Rightfully so.  As GoDaddy set forth in its Sur-Reply brief, the '755/287/044 patent specifications show patentee used capital and lower-case letters interchangeably when referring to Application and Player, and XMO did not rebut that in its supplemental brief.  (JCCB at 67; Ex. 6, ¶¶104-106; '755 at 23:34-46, 34:37-45.)  XMO advances the novel proposition that the capitalization should provide "atmospheric support," whatever that means, for its arguments.  As set forth extensively above, XMO has no support for its position, "atmospheric" or otherwise.

### c.   Express Mobile's Arguments Do Not Meet the Standards of Its Own Case Law

XMO primarily relies on three cases to support its position on the '044 patent's "player": *Trading Techs.*, *ResQNet.com* and *Broadridge Fin. Solutions*. But these cases are all distinguishable, as follows.  In *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, the Federal Circuit refused to apply prosecution history estoppel to the child patent (the '055 Patent) because the child patent "include[d] extensive disclosures that were not present in the [parent patents] and those

subsequent disclosures *directly contradict* the prosecution-based surrenders of claim scope." 778 F.3d 1309, 1323 (Fed. Cir. 2013). The child patent in that case also lacked the language "do not move" that accompanied the term "static" in the parent patents, and included "express language *requiring* automatic movement of the static price axis." *Id.* In other words, unlike here, the claims of the child were in direct contravention to the intrinsic record and disclaimed scope found in the parent patent.

In *ResQNet.com, Inc. v. Lansa, Inc.*, the Federal Circuit determined that the claims between the parent and child patents were not identical. 346 F.3d 1374, 1382 (Fed. Cir. 2003). Both the parent and child patents contained claims in means-plus-function format, but the Federal Circuit determined the claims were not sufficiently identical to apply the parent's prosecution history to the child patent, because the child patent had an additional clause "sandwiched within the functional language" that rose to a substantial difference between the patent claims. *Id.* (the parent patent recited the limitation "being generated as a function of the number, location, and length of *each field* in said first image," while the child patent recited "based upon a position[,] length and type of *each of a plurality* of fields."). By contrast, here, such a substantive difference does not exist because there are no words "sandwiched" between the single, coined "player" claim term at issue. To be sure, the '044 patent claims completely satisfy the *ResQNet* test quoted by XMO, because all three patent claims "share the same claim language" of the "coined" term *player*.

In *Broadridge Fin. Solutions, Inc. v. Inveshare, Inc.*, this Court decided that the parent's prosecution history should not apply to the child patent because of the distinction in the claims recited between the two patents. No. 10-075-RGA, 2012 U.S. Dist. LEXIS 51246, at 13-15 (D. Del. Apr. 11, 2012). Notably, the claim language between the parent and child patents differed significantly by reciting completely different actions with respect to the claimed "electronic

solicitation message" – with the parent claim term "*creating*" the message and the child claim term "*receiving*" the message – two readily distinguishable functions having separate meanings. *Id.* at *13. Moreover, the parent patent claim's description of "electronic solicitation message" was limited to "including an electronic proxy ballot and solicitation content" while the child patent's description additionally disclosed the message as "providing shareholder access to a solicitation content." *Id.* This Court reasoned that the second distinction was significant because "providing access to" and "including" were not synonymous terms, and their differences mattered. *Id.* at *14. In fact, the specifications differed to the extent that the child patent's specification was broader than the parent "because such solicitation content is not 'included' within the 'electronic solicitation message' itself." *Id.* at *15.  The Court found this significant difference rose to the level of differences between claim terms addressed by the *ResQNet.com* court.

XMO's likening of *Broadbridge* to this case is itself a bridge too far.  Here, the '044 child patent's claims merely removed the term "device-dependent" or "device-specific" that the patentee effectively admitted during prosecution was not a material distinction or relevant to whether the '044 claims were patently distinct over the '755/287 claims and their own patentability over the prior art.  Also, unlike in *Broadbridge*, the parent '755 and '287 patents both include these *same* disclosures as in the '044 patent.  The remaining claim differences are immaterial as set forth *supra*, and those differences do not amount to materially different claim elements as was the case in *Broadridge*.

Accordingly, the Court should construe "player" in the '044 patent as requiring "device-dependent" or "device-specific" code just the same as for that exact same "coined" term in the '755 and '287 patent claims.

### 3.       Express Mobile's Supplemental Reply Brief

The claim construction issue on the "player" term is a narrow legal issue relating to whether the "player" recited in the '044 patent should necessarily require device-specific code. Express Mobile does not dispute that the "player" term must include device-dependent code in the '755 and '287 patents, which recite "device-dependent" code. But the claims of the '044 patent recite a different player with a materially different scope that does not include "device-dependent code," in the context of a specification that contemplates a player with "no device specific dependencies." Previously, the Court held that the claim language and specification disclosures were "not enough to override" the disclaimers in the '755 patent's prosecution, and applied those disclaimers to the '044 patent. (D.I. 65-6, Ex. 1E, *Shopify Markman* Order at 12). The central legal question here is whether the Court's previous holding of prosecution history disclaimer should be carried forward from the '755 patent to the '044 patent.

As this Court previously recognized, "the doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language." *Broadridge Fin. Sols., Inc. v. Inveshare, Inc.*, No. CIV.A. 10-075-RGA, 2012 WL 1245723, at *4 (D. Del. Apr. 11, 2012) quoting *Ventata Med. Sys. v. Biogenex Labs.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006). Here, Express Mobile advanced undisputed testimony from the perspective of the POSA confirming that the '044 patent uses materially different language when claiming "at least one player" compared to both the '755 and '287 patents that distinctively recite "a Player, where said Player is a device-dependent code." Moreover, during prosecution, the patentee expressly distinguished the claim language of the '044 patent as being distinct from that disclosed in the '755 and '287 patents.

GoDaddy suggests that "the disputed term is the same throughout the patents of the family." (*Supra* p. 72). But GoDaddy simply glosses over the differences in claim language relating to the player across the patents, which are significant and confirm that the prosecution of

the '755 patent should not be carried forward to the '044 patent. When considering these material differences in claim language in view of intrinsic record as a whole, the "player" in the '044 patent should not be limited to one that is device specific.

      **a.**    **The Material Differences between the Claims of the '044 Patent and the '755 and '287 Patents Compel the Conclusion that the Prosecution History of the '755 Patent Does Not Carry Forward to the '044 Patent**

Without actually addressing the claim language, GoDaddy asserts that Express Mobile "manufactures differences" in claim language across the '755, '287, and '044 patents.  But the differences are not "manufactured," but come directly from the claim language.  When one considers the relevant claim language of each of the '755, '287, and '044 patents side-by-side (using claim 1 of each as representative), the differences are obvious:

| Claim 1 '755 patent | Claim 1 '287 patent | Claim 1 '044 patent |
|---|---|---|
| computer memory storing a registry of:<br>a) symbolic names …<br>b) the address of the web service | computer memory storing a registry of:<br>a) symbolic names …<br>b) the address of the web service | computer memory storing:<br>a) symbolic names …<br>b) the address of the web service |
| an authoring tool configured to: | an authoring tool configured to: | an authoring tool configured to: |
| …<br>produce an Application including the selected symbolic name of the defined UI object, where said Application is a device-independent code, and | …<br>produce an Application including the selected symbolic name of the defined UI object, where said Application is a device-independent code; and | …<br>store information representative of said defined UI object and related settings in a database;<br>… |
| produce a Player, where said Player is a device-dependent code; | a Player, where said Player is a device-dependent code, | build an application consisting of one or more web page views from at least a portion of said database utilizing at least one player, where said player utilizes information stored in said database to generate for the display of at least a portion of said one or more web pages. |
| such that, when the Application and Player are provided to the device and executed on the device, and | wherein, when the Application and Player are provided to the device and executed on the device, and | wherein when the application and player are provided to the device and executed on the device, and |
| …<br>3) said Player receives the output symbolic name and corresponding one or more output values and provides instructions for a display of the device to present an output value in the defined UI object. | …<br>3) said Player receives the output symbolic name and corresponding one or more output values and provides instructions for the display of the device to present an output value in the defined UI object. | …<br>and the player receives the output symbolic name and corresponding one or more output values and provides instructions for the display of the device to present an output value in the defined UI object. |

Each of the patents recites a player. In all of the patents, the players "receive[] the output symbolic name and . . . output values" to display a UI object's output value (blue highlights). But that is where the commonality of the players ends. Only the players of the '755 and '287 expressly recite "device-dependent code" (gray highlights), and only the player of the '044 patent (pink

highlights) takes "information representative of said defined UI object and related settings [stored] in a database," and utilizes that information to "build[] an application consisting of one or more web page views from at least a portion of [the] database" to generate a webpage display.

Mr. Weadock explained that the '044 patent's player "is different from the player referenced in the '755 and '287 patents," which "do not reference a database at all." (D.I. 68-1, Ex. 4 ¶ 83). GoDaddy argues (without support from its expert) that "the database … in the '044 patent is no different … from the 'registry' … recited by the '755 and '287 patent claims." (*Supra* p. 81). GoDaddy is wrong. The database recited in the '044 patent "store[s] information representative of said defined UI object and related settings" that pertain to a graphical object to be displayed on a webpage. That is distinct from the registry of the '755 and '287, which (as shown in yellow above) simply stores "symbolic names" and an "address of a web service" (not representative information or settings of a "UI object"), and thus has nothing to do with the "database" used by the player in the '044 patent.[40]

GoDaddy's attempt to distinguish this case from *Broadridge* fails. (*Supra* pp. 82-83). GoDaddy asserts that the claims at-issue in *Broadridge* "differed significantly by reciting completely different actions with respect to the [claim term at-issue]." (*Id.*). But here too the players also perform different actions—the player in the '044 harnesses a database that stores UI object information and settings that is not even present in the '755 and '287 patents in order to display a portion of a webpage; it is directed to something more than the '755 and '287 patents. As in *Broadridge*, the child patent's claims cover a broader set of material than the parent patent,

---

[40] Indeed, the components of the "registry" is the '755 and '287 patents are the same as those stored in "computer memory" of the '044 patent, which are cited in a completely separate portion of the claim from the player limitations. *Compare* '044 Patent at 37:50-61 and '755 Patent at 37:7-14 (same computer memory / registry limitations), *with* '044 Patent at 38:20-25 and '755 Patent at 37:29-30 (contrasting player limitations).

and are materially distinct.  Just like the "fine distinction" the Court recognized in *Broadridge*, the various distinctions underscore that any prosecution disclaimer should not be extended from the '755 patent to the '044 patent.  GoDaddy's attempt to distinguish *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1382 (Fed. Cir. 2003) also fails.  Though GoDaddy asserts that "there are no words 'sandwiched' between the single, coined 'player' claim term at issue," the "player" claim language (highlighted in pink in the chart above) for the '044 patent is indeed "sandwiched" between the language that appeared in the '755 and '287 patents.  346 F.3d at 1382.

> **b.**  **The Prosecution History of the '044 Patent Reinforces that the '755 Patent Prosecution History Is Irrelevant to the Scope of the '044 Patent's Player**

The prosecution history of the '044 patent only reinforces that the '755 patent and its prosecution are irrelevant to the scope of the claim.  GoDaddy does not dispute that there were no statements in the '044 patent's prosecution that require that the player be device specific, and that the reason for allowance had nothing to do with any device-specific requirement for the player. (*See supra* pp. 77-78).  Indeed, the claims of the '044 were allowed because the prior art did not teach, among other things, a player that utilizes stored settings and information in the aforementioned database to generate portions of a webpage display.  (Ex. 9G, XMO_GD00003514).

GoDaddy suggests that Express Mobile made "binding admissions" during the prosecution of the '044 patent, but these alleged "admissions" do not undermine that the patentee intended to claim a different "player" in the '044 patent.  For example, GoDaddy points to a preliminary amendment during the '044 prosecution where Express Mobile dropped the device-dependent code requirement from the player.  At the same time, however, Express Mobile amended the claim "to differ from Claim 1 of [] the allowed parent case" by incorporating the materially distinct player requirements—including those involving the use of a database that is not recited anywhere in the

claims of the '755 and '287 patents. (Ex. 9E, XMO_GD00003351).[41]     These "principal differences" show that the '044 patent's player is different from those recited in the '755 and '287 patents.

> Claim 1 is amended to differ from Claim 1 of the allowed parent case, US Patent Serial No. 15/370,990, with the principal differences being: reciting that the authoring tool is configured to:
>
> > store information representative of said defined UI object and related settings in a database;
> > retrieve said information representative of said one or more said UI object settings stored in said database; and
>
> > an application consisting of one or more web page views from at least a portion of said database utilizing at least one player, where said player utilizes information stored in said database to generate for the display of at least a portion of said one or more web pages.
>
> Support for this amendment are found, for example, in paragraphs [0034], [0066], [0076], [0092], and [0205]-[0250] of the original specification.

(Ex. 9E, XMO_GD00003351).[42]     GoDaddy asserts that this amendment was somehow problematic because it introduced "[n]o new matter," but statements about whether there was "new matter" relate only to whether the amended claims were supported by the specification, which was the case here because the specification discloses players that are not necessarily device-dependent. Finally, though the Applicant filed a terminal disclaimer while prosecuting the '044 patent, there is no "presumption that a patent subject to a terminal disclaimer is patentably indistinct from its parent patents." *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018).  Indeed, the Federal Circuit has held that filing a terminal disclaimer simply overcomes a double patenting

---

[41] The allowed parent case was U.S. Patent No. 9,766,864, which recites a device-dependent player that performs substantially the same functionality as that of the player in the '755 and '287 patents.
[42] Paragraphs 205-250 of the original specification, which provided written description support for these claims, describe in part, aspects of the internal database disclosed in the '397 Patent that is incorporated by reference in the '044 patent.  For example, paragraph 211 (column 29, lines 8-15) directly references the "process for compacting a 'database' (that is, generating a compact PDL)" described in the '397 patent.  (*See* Ex. 9F, XMO_GD00003409).

rejection, and is not an "admission" that equates a parent patent to a child patent with different limitations. *Ventana Med. Sys., Inc. v. Biogenex Labs, Inc.*, 473 F.3d 1173, 1184 n.4 (Fed. Cir. 2006).

Despite the material differences between the '044 patent and the '755 patent, GoDaddy asserts that the prosecution statements of the '755 patent should still apply because the claims of the '044 patent would have been rejected over the *McCain* reference without a "device-specific code" requirement. Not so. Not only did the '044 patent's player leverage a database in unique ways that were not contemplated in McCain (as confirmed in the Notice of Allowance), McCain was also readily distinguishable because "McCain teaches only providing a self-contained, device-dependent code to a device that can communicate with a web service"—not two codes that included a device-independent application and a player that each performed distinct functionalities recited in the claims. (D.I. 42-18, JCCC, Ex. 18 at 17 (emphasis added); Ex. 4 ¶¶ 69-71).[43]

<blockquote>

**c.      The Specification Supports that the Player Can Be a Device-Independent Code, Reinforcing that the '044 Patent's Player Should Not Be Construed to Require Device-Specific Code**
</blockquote>

Given the patentee's intentions as expressed in the '044 patent's claims and prosecution history, the "player" of the '044 patent should not be construed to require device-specific code. As Mr. Weadock described, a POSA would understand that the specification also describes a device-independent embodiment., what he calls the "thin-client model." (D.I. 68-1, Ex. 4 ¶ 80). This model involves the player being "a thin client architecture that operates in a language that manages resources efficiently, is extensible, supports a robust application model, and has ***no device specific dependencies***" and "would run 'on the device as a client' but mainly focus on 'conveying

---

[43] Given that McCain only taught a device-dependent code, moreover, Express Mobile's agreement that the "application" is device-independent is an actual distinction from McCain. This further reinforces that the "player" need not necessarily be device-dependent.

input and output between the user and the server.'" (*Id. quoting* '755 patent 1:59-62 (emphasis added) and 6:22-30). He explained that, consistent with the specification's disclosure of a "thin client architecture" and with teachings in the art, "both the Application and Player could be device-independent" in this embodiment "because both the Application logic and the Player logic can be found on a server, with the user device only being use[d] for [input/output] operations." (D.I. 68-1, Ex. 4 ¶ 80 (citing Ex. 4N; Ex. 4O at 441; Ex. 4M; Ex 4P at 43-44)). This was consistent with the specification's disclosure that the Player "may"—but not must—"include code that is device-specific." ('755 Patent at 6:9-10).[44]   GoDaddy admits that the specification supports this alternative embodiment, but tries to discredit it as a "hypothetical embodiment." (*Supra* p. 76). But as shown above based on Mr. Weadock's testimony, the embodiment is far from "hypothetical."

GoDaddy attempts to distract from the issue by pointing to details of the other player embodiments, such as those actually described by the '755 and '287 patents and not the player embodiment claimed in the '044 patent. For example, GoDaddy includes an annotated version of Figure 2A in its Answering Brief arguing that it does not represent an embodiment supportive of a device-independent player. (*Supra* p. 74). But Figure 2A is irrelevant to the embodiment claimed in the '044 patent. It does not depict the database in that embodiment, or anything to do with "utilizing at least one player" to "build an application consisting of one or more web page views from at least a portion of said database." Nor does it have any connection to the "thin client

---

[44] GoDaddy continues to make a grammatical case about whether the "no device specific dependencies" as quoted at column 1 lines 59-62 are describing the "language" of the player or the player itself. But even if "no device specific dependencies" directly modifies the word "language," GoDaddy cannot ignore that the sentence as a whole refers to "a Player, which is a thin client architecture" that uses a programming language with "no device specific dependencies." GoDaddy's grammatical argument does nothing to dispute the fact that a Player with a "thin client architecture" may be device-independent.

architecture" in the player's device-independent embodiment.  It would be improper to limit the claims of the '044 patent to a single, different embodiment of the '755 and '287 patents.  *See N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293 (Fed. Cir. 2000).

### 4. Defendant's Supplemental Sur-Reply Brief

This is a classic case of a downstream patent sharing the same specification and claiming the exact same, "coined" claim term: *player*.  Under such circumstances, Federal Circuit precedent compels applying the '755 patent's disclaimers to the '044 patent claims, which never would have issued over the prior art McCain reference without incorporating both a device-dependent "player" and device-independent "application."

Despite its third hurl of this Hail Mary, XMO still has yet to identify any materially different claim language with respect to the "player" claimed in all three patents.  Try as it might through its confusing color-splattered chart, XMO has not shown how or why the '044 patent's "player" operates any differently compared to its predecessors vis-à-vis code that is device-specific.  Rather, XMO points to irrelevant additional details claimed in the '044 patent pertaining to how the "defined UI object" is stored and retrieved – again, having nothing to do with the distinctions over McCain asserted for the claimed "application" and "player" codes.  And XMO still fails to harmonize its inconsistent positions that the "application" is the same in all three patents despite that, at the same time, "player" must be treated differently.  It should not be.

### a. XMO's Newly Alleged "Differences" in the '044 Claims Language Are Immaterial to the Extent They are Differences at all.

XMO's repeated suggestion that the '044 claims' player is "materially different" from the "player" claimed by its predecessor patents rings hollow.  When looking to the actual similarities between the three patents' "player" claims language, the Court will see the '044 patent's "player" is no different from its predecessors.

XMO asserts that the '044 player does not require device-specific code because, according to XMO, the '044 patent claims the player (i) takes "information representative of said defined UI object and related settings [stored] in a database" and (ii) utilizes that information to "build[] an application consisting of one or more web page views from at least a portion of [the] database" to generate a webpage display.  But neither of those two tasks has anything to do with whether the "player" code is device-specific or not.  More telling, XMO also has not explained how the player reading and using web component information (i.e., the "defined UI object and related settings") in the '044 claims is any different from the player performing these exact same functions in the '755 and '287 patent claims.  Those difference are thus not even relevant, let alone material.

When looking at the actual claims language (as opposed to XMO's self-serving colorful translation of them), the only differences in the '044 patent claims are for adding characteristics of the "UI object" that is defined by the authoring tool.  The '044 claims specify that the UI object is either selected by the authoring tool or automatically selected by the system as a "preferred" UI object, and further specify that the defined UI objects are stored in a database. ('044 patent at 38:1– 7, 38:12–19.)  That portion of the claims is notably absent from XMO's color-coded chart.  From there, the "player" operates upon the UI objects just the same as in the predecessor patents – the player processes the web service's output symbolic name for displaying that output value in the UI object presented on the device's display.  (*Supra* p. 87 (blue highlights).)  Once again, XMO fails to explain why the UI object differences compel a different construction for the '044 patent's "player" but not for the "application" – despite the claims reciting that the application is provided to the user's device along with the player just the same as in the predecessor patents.

Likewise, whether or not the "registry" of symbolic names and the "database" of UI objects and related settings are part of the same or different memory is immaterial – they are both memory.

Again, XMO fails to explain how any differences in these two terms materially impacts the *player*, despite admitting that a "registry" can be a database.  They store materially the same information, whether it is symbolic names or UI objects – both relating to inputs/outputs of a web service or web components as displayed on the claimed device.  (*Supra* p. 83.)  In any event, the storage of different data has nothing to do with whether the "player" may contain device-specific or device-independent code.

> **b.      The Patent's Single, Vague Reference to a "Thin Client" Player Does Not Override the Rest of the Record Showing "Player" Has Device-Specific Code.**

Whether the Court adopts the superior interpretation of the "thin client" passage advanced by GoDaddy or XMO's strained interpretation, its rank ambiguity should give the Court pause in overturning the otherwise clear specification and file history statements disclaiming anything but device-specific "player" code.  ('755 at 1:59–62; JCCB at 64–65, 67; *supra* pp.74-77.)  There is even a third possible interpretation that GoDaddy points out in its Supplemental Response, which is that the "player" code incorporated into a "thin client architecture" of this scenario may have device-independent code located at the client but also device-dependent code hosted at the server along with (but still separate and independent from) the entire "application" code.  (*Supra* p. 76 (citing Ex. 8 ¶ 194; Ex. 6 ¶¶ 107–113; Ex. 7H).)  That would be consistent with the other reference to Application/Player being integrated on the same server.  ('755 at 7:30–36.)

XMO does not dispute that the "client" in its "thin-client" scenario must run on the mobile "device" claimed to operate the application/player code.  But ultimately that device, of course, has to run its own device-specific code.  In other words, if the "player" were limited to such a "thin-client" operating on the device to "convey[] input and output between the user and the server," then the player must somehow translate the server's device-independent code to the user device's device-specific code.  Otherwise, the server could not communicate to various devices with

different platforms, which is the entire point of the claimed invention.  ('044 at 1:12–29.)  Notably, a construction requiring the application to have device-specific code does *not* preclude the "player" from also having additional device-independent code that could run on the "server" side along with the application.  So even if XMO's interpretation of this passage is correct (it is not), GoDaddy's construction remains the right one.

**c.    XMO Has Not Overcome the High Bar For Avoiding Carrying Forward the '755 Patent's Prosecution History Disclaimers.**

XMO still has not adequately explained how the '044 patent could overcome the prior art McCain reference without containing a device-specific player and device-independent application.  In its Reply, XMO oversimplifies the applicant's binding disclaimers during prosecution of the '755 patent to overcome McCain, asserting that the '044 patent still overcomes McCain just because there are "two codes" regardless of their device-dependencies.  XMO completely ignores the applicant's unequivocal statements required to overcome McCain, which are worth repeating:

> There is no teaching or suggestion in McCain of an authoring tool that provides two separate codes: a device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application). . . . There is no teaching or suggestion in McCain of using such a solution database in an authoring tool to generate both a device-dependent and device-[in]dependent codes, as claimed.

(JCCC Ex. 17 at 11–13; JCCC Ex. 14 at 10–11; JCCC Ex. 18 at 8–9; Ex. 1E at 10–12.)  Parlaying these disclaimers into obtaining issuance of the '044 patent, the '044 applicant represented to the Patent Office that "the present application is patentable for ***at least the reasons***" as the '755 patent.  (*Supra* p. 80 (citing '044 patent prosecution history at XMO_GD00003345, -3351, -3352, -3466, -3483, -3501–3502) (emphasis added).)  That means that whatever XMO points to as far as the additional "defined UI object" storage details, the '044 patent's player and application must share the same device-dependency characteristics as in the '755 patent claims.

XMO's argument that the rest of the '287 and '044 patents' prosecution somehow provides

95

affirmative evidence supporting its position is not persuasive.  XMO fails to explain why the applicant or Examiner chose not to make any characterization that *adding back in* "device-specific" code to the "player" materially altered the scope of the claims.  (*Supra* p. 80 (citing '287 prosecution history at XMO_GD00003175, -3179, -3207, -3211).)  The removal of "device specific code" by voluntary amendment at the outset of the '044 patent's prosecution was also not noted by either the applicant or Examiner. (*Id.*)  That is because it did not materially change the claims.

XMO also asserts that the '044 patent applicant's statement that the amendments were to "differ" from the "allowed parent case" were in reference to the "allowed parent's" device-specific code limitation on the player.  But that is not the case.  The "principal differences" referred to in the very amendment XMO relies upon omit any reference to device-specific versus device-independent code, focusing instead on how the UI object settings are stored, which has no affect (other than defining their location) for how the player processes those UI objects using device-specific code.  XMO fails to address that connection, and it does not exist.

Finally, while XMO downplays the significance of the terminal disclaimer the '044 applicant filed, it remains the law that such a disclaimer is at a minimum a "strong clue" by the applicant of a "concession" that the '044 claims have no "patentable distinction" over the '755 and '287 patent claims. *Simple Air*, 884 F.3d at 1168.  XMO relies on *Ventana Med. Sys. v. BioGenex Labs., Inc.*, 473 F.3d 1173, 1184 (Fed. Cir. 2006) to support its position that prosecution disclaimer should not apply.  But in *Ventana*, the Federal Circuit refused to find prosecution disclaimer carried over from the parent patent to the child patent because the parent patent claimed a dispensing limitation that was the basis of a § 103 rejection, which was also absent from the child patent. 473 F.3d at 1184.  Yet here, the "player" of the '044 Patent is the same as that of the '755 Patent.  This

"strong clue" is consistent with the rest of the intrinsic clues demonstrating that the '044 patent's

"player" must be device-specific code, too.


DATED: MAY 28, 2021

BALLARD SPAHR LLP

By: */s/ Brian S.S. Auerbach*

Beth Moskow-Schnoll (No. 2900)
Brittany Giusini (No. 6034)
Brian S.S. Auerbach (No. 6532)
**BALLARD SPAHR LLP**
919 N. Market Street, 11th Floor
Wilmington, DE 19801-3034
(302) 252-4465
moskowb@ballardspahr.com
giusinib@ballardspahr.com
auerbachb@ballardspahr.com

OF COUNSEL:

Brian W. LaCorte (*pro hac vice*)
Jonathon A. Talcott (*pro hac vice*)
Andrew M. Hensley (*pro hac vice*)
**BALLARD SPAHR LLP**
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
(602) 798-5400
lacorteb@ballardspahr.com
talcottj@ballardspahr.com


*Counsel for Defendant/Counterclaimant
GoDaddy.com, LLC*

DEVLIN LAW FIRM LLC

By: */s/ Timothy Devlin*
Timothy Devlin (No. 4241)
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010
tdevlin@devlinlawfirm.com

*OF COUNSEL:*

James R. Nuttall (*pro hac vice*)
Michael Dockterman (*pro hac vice*)
Katherine H. Johnson (*pro hac vice*)
Robert F. Kappers (*pro hac vice*)
Tron Fu (*pro hac vice*)
**STEPTOE & JOHNSON LLP**
227 West Monroe, Suite 4700
Chicago, IL 60606
(312) 577-1300
jnuttall@steptoe.com
mdockterman@steptoe.com
kjohnson@steptoe.com
rkappers@steptoe.com
tfu@steptoe.com

Christopher Suarez (*pro hac vice*)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
csuarez@steptoe.com

*Attorneys for Plaintiff Express Mobile, Inc.*