**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **EXPRESS MOBILE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 1:19-cv-01937-MFK** |
| | ) | |
| **GODADDY.COM, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Express Mobile, Inc. has sued GoDaddy.com, LLC for infringement of five patents:  U.S. Patent No. 6,546,397 (the '397 patent); U.S. Patent No. 7,594,168 (the '168 patent); U.S. Patent No. 9,063,755 (the '755 patent); U.S. Patent No. 9,471,287 (the '287 patent); and U.S. Patent No. 9,928,044 (the '044 patent).  The first two patents (collectively, the "Web Design Patents") claim a browser-based tool for building websites.  The remaining patents (collectively, the "Web Component Patents") are directed to tools for displaying content on mobile devices.  Express Mobile contends that two of GoDaddy's products—the Website Builder (WSB) and Managed WordPress (MWP)—infringe numerous claims of the asserted patents.[1]

GoDaddy has moved for summary judgment on all of Express Mobile's claims and additionally seeks the exclusion of certain testimony by two of Express Mobile's

---

[1] Express Mobile contends that GoDaddy infringes claims 1, 2, 3, 11, and 37 of the '397 patent; claims 1, 2, and 3 of the '168 patent; claims 1, 3, 12, 16, and 22 of the '755 patent; claims 1 and 13 of the '287 patent; and claims 1, 11, 13, 17, and 19 of the '044 patent.

expert witnesses—Dr. Kevin Almeroth and Walter Bratic.  Express Mobile has moved

for partial summary judgment on certain issues and to exclude certain expert opinions of

David Perry.  While these motions were being briefed, the parties each filed an

additional motion to strike regarding evidence submitted for the first time during

summary judgment.  In this opinion, the Court rules on all four of these motions and sets

forth its construction of certain disputed claim terms.

**Background**

**A.      The asserted patents**

There are two families of patents at issue in this case.  The Web Design Patents

claim a browser-based tool for building websites.  The two patents share the same

specification, which describes a method of website design where a web designer can

make selections on various menus, and the system can preview what the page will look

like.  To do this, attributes of objects on a website (for example, fonts) are stored in an

external database.  When an end user browses on the website, the user's browser

downloads a "run time engine" that reads the database and uses that data to generate

the website.

In contrast, the Web Component Patents are directed to displaying content on

mobile devices, such as smartphones.  The Web Component Patents relate to two

concepts that allow web designers to integrate third-party web services into their

websites.  First, the patent family discloses an authoring tool that generates two sets of

code, a device-independent Application and a device-specific Player.  Second, the

patents disclose an authoring tool that allows for integration of web services into the

Application and Player.

**B.     The accused products**

Two GoDaddy products are at issue in this case.  The WSB is a browser-based website creator, designed to allow users with little to no website design experience to quickly create and publish a website.  The MWP, in contrast, targets more advanced users.  It comprises a set of custom functionalities that GoDaddy has added to WordPress, an open-source (i.e. free) platform for creating websites.  Both the WSB and MWP allow for incorporation of features, such as YouTube videos or embedded Twitter feeds, into a user's website.  GoDaddy provides several free themes for use in designing the website, but users can also buy third-party themes for use with the MWP platform.

**C.     The instant suit**

Express Mobile filed this lawsuit against GoDaddy on October 11, 2019.  The case was assigned to Judge Richard Andrews.  On April 8, 2021, the Court held a *Markman* hearing to address several disputed terms of the asserted patents.  At the hearing, the Court directed the parties to submit supplemental briefing on claim construction issues pertaining to the terms "virtual machine" and "Player."  On June 1, 2021, the Court issued an order construing the other disputed claim terms.  *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. 19-1937-RGA, 2021 WL 2209868 (D. Del. Jun. 1, 2021).

On November 17, 2021, both parties filed combined summary judgment and *Daubert* motions.  During briefing, each party filed an additional motion to strike evidence that it contended was disclosed for the first time during summary judgment. The case was subsequently reassigned to the undersigned District Judge.

## Discussion

This opinion concerns four motions and two disputed claim terms.  The Court starts by construing the disputed claim terms.  It then addresses the parties' motions to strike.  Lastly, the Court rules on the parties' combined summary judgment/*Daubert* motions.

**A.    Claim construction**

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  During claim construction, a court is to construe the words of a claim in accordance with their "ordinary and customary meaning," namely "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  Sometimes, the meaning of a term is not immediately apparent, and a court will need to look to other sources to determine "what a person of skill in the art would have understood disputed claim language to mean."  *Innova*, 381 F.3d at 1116.  These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.*

       **1.    "Virtual Machine"**

            a.    *Express Mobile's proposed constructions:*

                  i.    "software that emulates a physical machine"; or

                  ii.    "software that emulates computing functionality"

            b.    *GoDaddy's proposed construction:*

         i.      "software that emulates a physical processor"

    c.     *The Court's construction:*

         i.      "software that emulates computing functionality"

The parties dispute the meaning of the term "virtual machine" in the '397 patent. The '397 patent claims "[a] method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays . . . ."  '397 patent at 65:44–46.  The invention discloses a "run time file," "where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages." *Id.* at 65:66–66:2.

The construction the Court adopts—"software that emulates computing functionality"—is consistent with the patent's claim language and specification.  The patent is directed toward software that emulates computing functionality, specifically, functionality related to the generation of website displays.  *See, e.g., id.* at 65:44–46; *id.* at 65:66–66:2.  As Express Mobile's experts Bhuvan Urgaonkar and Glenn Weadock explain, the claim language reflects the fact that the virtual machine is used to render and display websites within a browser.  Dkt. no. 66-1, ex. 2 ¶ 26; dkt. no. 66-13, ex. 2L ¶¶ 38.

GoDaddy's proposed construction is too narrow.  The claims and shared specification indicate that the term "virtual machine" was meant to be interpreted broadly.  For example, the specification confirms that virtual machines can support a variety of different programming languages, not just Java, as GoDaddy contends.  *See* '397 patent at 11:5–8 (stating that the required functionality "wa[s] implemented entirely

in JAVA (*or any other browser-based full featured programming language*)") (emphasis added).  And although the Java Virtual Machine is the only virtual machine listed in the specification, this merely provides an example of a virtual machine and does not limit the claim scope to only such a virtual machine.  It is generally inappropriate to use the preferred embodiment outlined in the specification to limit the scope of a patent claim.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (noting that it is improper to "import a feature from a preferred embodiment into the claims").

GoDaddy contends that "virtual machine" is limited to processor functions because the specification describes an interaction between the virtual machine, run time engine, and database where the virtual machine executes processor-like commands from the other two.  But nothing in the claims indicates that this is the only function of a virtual machine.  Instead, the claim language repeatedly refers to the virtual machine as being capable of generating displays.  It would be inappropriate to use another term in the patent, namely "run time engine," to narrow the ordinary meaning of virtual machine.

In addition to being supported by the language of the claims and specification, the Court's adopted construction is consistent with the prosecution history.  Dr. Urgaonkar emphasizes that the term was meant to have a broad scope and that the patentability of the invention was not dependent on it possessing a particular kind of virtual machine.  Dkt. no. 66-13, ex. 2L ¶ 43.  GoDaddy disagrees, arguing that it was the specific processor-like interactions between the virtual machine and the run time engine that distinguished the patented invention from the prior art.  The prosecution history suggests otherwise, however.  The prior art also disclosed use of a virtual machine—specifically the Java Virtual Machine.  As such, the addition of the term virtual

machine could not have distinguished the patents from the prior art.

The Court's construction is also supported by extrinsic evidence of what a person of ordinary skill in the field would have understood the term to mean. Express Mobile provides a variety of evidence to establish that, as of the priority date, the term virtual machine was understood to refer to several different kinds of software. *See* dkt. no. 120 at 8–13. Express Mobile cites dictionary definitions, lecture notes, and textbook entries—all of which support a broad construction of the term that encompasses more than processor-like virtual machines. *Id.*

GoDaddy makes several objections to Express Mobile's evidence. Some of these have merit. For example, the Court agrees that the lecture notes and any evidence drafted after the priority date are irrelevant to the claim construction analysis. It does not agree, however, that Express Mobile's evidence demonstrates that the meaning of "virtual machine" was "all over the map" and had no well-known meaning in 1999. *Id.* at 28. Although the evidence does show that the definition was broad, it does not show that the term was unclear. Considering all of the relevant extrinsic evidence, the Court concludes that, in 1999, virtual machines were understood to come in many different types but were all understood to emulate computing functionality.

GoDaddy makes three final arguments against Express Mobile's (and the Court's) construction. First, GoDaddy argues that the construction assumes that a virtual machine is the same as the separately claimed browser. Not so. As Express Mobile explains, the patent discloses a virtual machine that works *with* the browser to generate a display. Specifically, the virtual machine enhances browsers that do not support certain kinds of programming languages. So, although the two are related, the

construction does not assume they are the same.

Next, GoDaddy argues that Express Mobile's construction inappropriately claims innovations that were developed after the patents were issued.  This argument, however, misinterprets the adopted construction.  Express Mobile's evidence shows that, at the priority date, there were many different kinds of virtual machines.  Any of these virtual machines (and others developed after the priority date) could be used in the patented invention.  But compatibility with newer-developed virtual machines does not amount to a patent of those virtual machines.  As Express Mobile explains, if anything it "underscore[s] that the virtual machine in the '397 patent is nothing more than an off-the-shelf component that is used to properly display the claimed functionality within the browser."  Dkt. no. 120 at 48.

GoDaddy's final argument is also unpersuasive.  It contends that the Court's construction renders "virtual machine" a so-called nonce word, and as such, the Court must limit the term to a specific kind of virtual machine, namely, the Java Virtual Machine.  Under patent law, claims involving nonce words are means-plus-function claims that must meet the additional requirements in 35 U.S.C. § 112.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  When considering a means-plus-function claim, a court must identify both the claimed function and the corresponding structure in the written description for performing that function.  *Id.*  GoDaddy contends that there is no claimed structure in the construction "software that emulates computing functionality" and thus the claim must be confined to the Java Virtual Machine.  The Court disagrees.  Its adopted construction of "virtual machine" does not render it a nonce word.  First, as previously explained, the term had a well-

established meaning as of the priority date and would have been understood as such by a person of ordinary skill in the field.  Additionally, the adopted construction provides sufficient structure through the use of the word "software" and also explains what the software does, namely "emulates computing functionality."  *See, e.g.*, *WhitServe LLC v. GoDaddy.com, Inc.*, 65 F. Supp. 3d 317, 321 (D. Conn. 2014) (noting that "[software] is a noun with a specific structural meaning, defining the set of coded instructions and programs governing the operation of computer hardware").

    **2.**    **"Player"**

        a.    *Express Mobile's proposed construction:*

            i.    "software code that facilitates the execution of an application on a device"

        b.    *GoDaddy's proposed constructions:*

            i.    "device-specific code which contains instructions of a device and which is separate and independent from the Application"

            ii.    "device-specific code which contains instructions for a device and which is separate and distinct from the Application"

        c.    *The Court's construction:*

            i.    "device-specific code which contains instructions of a device and which is separate from the Application"

The parties dispute the meaning of the term "Player" as it appears in the '044 patent.  There are two points of disagreement.  First, the parties dispute whether "Player" refers to device-specific code in the '044 patent.  They agree that the term when used in the '755 and '287 patents refers to device-specific code, but Express

Mobile contends that the term as used in the '044 patent is different and does not require device-specific code.  Second, the parties' constructions differ in that GoDaddy's constructions state that the Player and Application are either "separate and independent" or "separate and distinct," whereas Express Mobile's construction does not require separation of the Player and Application.

On the first issue, the Court concludes that "Player" in the '044 patent refers to device-specific code.  The issue of whether "Player" necessarily refers to device-specific code previously came up in a related case, *Shopify Inc. v. Express Mobile, Inc.*, CA No. 19-439-RGA, 2020 WL 3432531 (D. Del. June 23, 2020).  In adopting the same construction as it does here, the Court (Judge Andrews) concluded that "a person of ordinary skill in the art, looking at this intrinsic evidence as a whole, would understand the Player to be 'device-specific.'"  *Id.* at *6.  The Court noted that the shared specification of the Web Component Patents repeatedly recites a Player with device-specific instructions.  *Id.* at *5 (citing the '755 patent at 5:8-24; 23:43-46; 33:12-15; 33:26-28).

Additionally, the Court in *Shopify* found that "the applicant made 'repeated and consistent remarks' indicating that the Player was device-specific" during patent prosecution.  *Id.* at *6 (quoting *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020)).  For example, the patentee stated:

> One embodiment is an authoring tool that generates files which together provide content over a network. The files include a Player (sometimes referred to herein as a "first code") specific to each device (that is, the code is "device-dependent") and an Application (sometimes referred to herein as a "second code") that is device-independent.

*Id.* (citation omitted).  The patentee's statement suggests that he believed the

device-specific nature of the Player to be a central component of the invention's patentability.  This further supports the Court's adopted construction.  *See Personalized Media*, 952 F.3d at 1340 ("[A] applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the invention.").

Express Mobile argues that the '044 patent specification supports its construction, citing two passages.  The first passage, in its entirety, reads:  "In one embodiment, one of the codes is a Player, which is a thin client architecture that operates in a language that manages resources efficiently, is extensible, supports a robust application model, *and has no device specific dependencies*."  '044 patent at 1:55–67 (emphasis added).  Express Mobile contends that the phrase "has no device specific dependencies" refers to the Player, lending support to its contention that a Player need not be device specific.  GoDaddy disagrees.  It contends that "has no device specific dependencies" refers to "thin client architecture" and does not suggest that a Player can be device-independent.  Both interpretations are plausible grammatically, and neither party provides the Court with a sufficiently persuasive reason to choose one interpretation over the other.  As such, the Court gives this language little weight and looks instead to the other language in the claims and specification.

The second passage that Express Mobile cites is "The Player may include code that is device-specific . . . ."  '044 Patent at 6:14–16.  The Court agrees with Express Mobile that the patent's use of the term "may" instead of "must" lends some support to Express Mobile's construction, but it is important not to overstate its significance.  The drafter's intention behind the word "may" is less than clear.  It could be the result of

11

sloppy drafting; it could have no intended meaning at all.  Either way, the Court finds

that this "single reference . . . is not enough to override the repeated references in the

prosecution history and the specification to the 'device-specific' or 'device-dependent'

Player." *Shopify*, 2020 WL 3432531, at *6.  On balance, the claims, specification, and

prosecution history of the patents indicate that "Player" must be device specific.

Express Mobile also makes several arguments contending that the claims,

specifications, and prosecution history of the '755 and '287 patents should not be used

to interpret the '044 patent.  It identifies three distinctions between the first two patents

and the third that it contends justify a different construction for the disputed term.  First,

Express Mobile points to the fact that the claims of the '044 patent do not recite "Player"

as device-dependent code, whereas the claims of the '755 and '287 patents do.  The

prosecution history, however, shows that this omission was not meant to change the

meaning of the patents.  When the claims were amended to omit the "device-

dependent" language, the patentee claimed that this was "[n]o new matter."  Dkt. no.

120, ex. 10D at XMO–GD00003351.  Additionally, the '044 patent claims do not state

that the Application is "device-independent" code, yet both parties agree that the

Application is device-independent code.  *See* '044 patent at 38:20–28.  The Court thus

concludes that the omission of "device-dependent code" is not meant to suggest that

the Player can be device-independent.

Second, Express Mobile argues that the patents should be interpreted differently

because the '755 and '287 patents use the term "registry," whereas the '044 patent uses

the term "database."  This is not a significant difference.  The function of a database

and registry are the same, the information in each is the same, and Express Mobile

concedes that a registry can be a database.

Lastly, Express Mobile contends that the difference in capitalization use between the '755 and '287 patents and the '044 patent suggests that the terms should not be construed the same.  Not so.  As GoDaddy points out, the patentee used capital and lower-case letters interchangeably in the shared specification when referring to the Application and Player.  There is no support for the proposition that the use of capital versus lower-case letters was intended to be significant.  For these reasons, the Court concludes that Player must refer to device-specific code. [2]

On the second issue—whether to include the "separate and independent" or "separate and distinct" language—the Court finds that the construction should include the term "separate" but not "independent" or "distinct."  As previously explained in *Shopify*, the patentee emphasized the separate nature of the Application and Player codes during patent prosecution.  *Shopify*, 2020 WL 3432531, at *4.  For example, the patentee stated:  "[T]he claimed invention, in contrast, operates by partitioning the code required for functionality into device-independent code and device-dependent code."  *Id.* (citation omitted).  This partitioned code was described as an "advantage for maintaining websites."  *Id.* (citation omitted).  Because the separate nature of the Player and Application codes was critical to the novelty of the patent, it must be reflected in the construction.

Express Mobile argues that incorporation of "separate" into the construction is

_____

[2] GoDaddy further contends that Express Mobile is estopped from arguing that the term "Player" in the '044 patent is not device specific given the patentee's representations during the '755 patent prosecution.  The Court notes that the argument is plausible but declines to address it, as it is not necessary for the resolution of the issue.

inconsistent with the specification, which states that the Application can be integrated with the Player. The Court disagrees. Even if the Application is integrated with the Player, it still constitutes separate code from the player. The Court thus agrees with GoDaddy that the Application and Player codes must be "separate."

The Court declines to adopt GoDaddy's "independent" or "distinct" language, however. As Express Mobile points out, the term "independent" is misleading because it incorrectly suggests that the Player and Application do not work together. *See* '755 patent at 8:27–35, 13:46–49; *id.* at 5:32–41. Additionally, GoDaddy's proposed constructions could be potentially confusing to a jury. "Independent" and "distinct" seem to be synonyms of "separate," and GoDaddy does not explain what function adding these terms would serve that the word "separate" does not already provide. The Court thus declines to adopt this part of the proposed construction.

## B. Motions to strike

Both parties have filed motions to strike evidence that they contend was disclosed for the first time during summary judgment briefing. Express Mobile's motion concerns declarations by GoDaddy engineers Franklin Jarrett and Aaron Silvas that were filed as exhibits to GoDaddy's motion for summary judgment. GoDaddy's motion concerns a supplemental report by Express Mobile's expert Kevin Almeroth that was filed as an exhibit to Express Mobile's response to GoDaddy's summary judgment motion.

Federal Rule of Civil Procedure 26 sets out the default guidelines for parties' pretrial disclosures. Fed. R. Civ. P. 26. It requires certain pretrial disclosures to be made at least 30 days before trial, "[u]nless the court orders otherwise." Fed. R. Civ. P.

26(a)(3).  It also sets out the rules concerning expert discovery.  Under Rule

26(a)(2)(B), the disclosure of an expert witness must be accompanied by a written

report containing a statement of all opinions the witness will express at trial, as well as

all of the facts and data underlying the witness's opinions.  A party who fails to disclose

a witness as required by Rule 26 can be precluded from relying on that evidence on a

motion or at trial unless the failure to disclose was "substantially justified or harmless."

Fed. R. Civ. P. 37(c)(1).  Rule 37(c)(1) also permits a court to decline to exclude the

evidence and instead impose "other appropriate sanctions."  *Id.*

In the Third Circuit, courts look to the so-called *Pennypack* factors to determine

whether to exclude evidence as a sanction.  *Meyers v. Pennypack Woods Home

Ownership Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977).  These factors are: (1) prejudice or

surprise to the other party; (2) the ability of the injured party to cure the prejudice; (3)

the likelihood of disruption to the trial schedule; (4) any bad faith or willfulness involved

in not complying with the disclosure rules; (5) the violating party's explanation for

noncompliance; and (6) the importance of the evidence to the party offering it.  *Id.*

Although the Third Circuit has stated that the last factor is the most important, it has

advised that courts must look to the "overall balance" of the factors.  *ZF Meritor, LCC v.

Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012); *see also, e.g., Wyeth Holdings Corp. v.

Sandoz, Inc.*, No. 09-955-RGA-CJB, 2012 WL 1669555, at *4 (D. Del. May 10, 2012).

    **1.**    **Express Mobile's motion to strike**

In support of its summary judgment motion, GoDaddy filed declarations from

Silvas and Jarrett, two of its engineers who worked on the WSP and MWP, respectively.

Express Mobile argues that this disclosure ran afoul of Rule 26, for two reasons.  First, it

argues that GoDaddy failed to set forth the facts alleged in the declarations during fact or expert discovery, thus failing to comply with the deadlines in Rule 26(a), Rule 26(e), and the Court's scheduling order.  Second, Express Mobile contends that the declarations contain expert testimony that was not properly or timely disclosed.

On the first point, the Court agrees with Express Mobile.  The parties completed fact discovery on June 16, 2021, and expert discovery on November 3, 2021.  During discovery, Express Mobile sought GoDaddy's bases for noninfringement.  One of its interrogatories stated:

> For each claim of the patents in suit that you assert you do not infringe, describe in detail the factual and legal bases for your assertion, including providing a claim chart for each Accused Instrumentality showing on a limitation-by-limitation basis any limitations that you believe are not satisfied, and identifying all evidence upon which you rely and the persons with relevant knowledge.

Pl's Int. No. 8.  In response to this request, GoDaddy stated that it would respond through its expert disclosures and did not otherwise disclose any bases for noninfringement.  None of the expert disclosures, however, disclosed the facts included in the disputed declarations.  And it was not until November 17, 2021, long after the close of fact and expert discovery, that GoDaddy disclosed the disputed declarations. This violated the Court's scheduling order and GoDaddy's continuing disclosure obligations set out in Rule 26(e).

GoDaddy's attempts to justify this delay are unpersuasive.  First, GoDaddy argues that the declarations are timely because they rely on evidence previously disclosed to Express Mobile.  Although it is true that Silvas's and Jarrett's new testimony relies on evidence, such as source code, that was previously disclosed, the declarations still provide new facts and arguments derived from that evidence that

cannot fairly be said to be restatements of that previously disclosed evidence.

GoDaddy further argues that, even if the declarations were untimely, this delayed disclosure was substantially justified because of Express Mobile's actions.  Specifically, GoDaddy contends that Express Mobile shifted infringement positions in its expert reply report and second amended infringement contentions.  It contends that this change in positions was unforeseeable, so it could not have previously disclosed facts necessary to address the new position.

The Court agrees that Express Mobile's position in these later filings did differ from its position in its earlier expert reports.  It appears that this shift in position was in response to the ruling in *Shopify Inc. v. Express Mobile, Inc.*, No. 19-439-RGA, 2021 WL 4288113 (D. Del. Sept. 21, 2021).  Although Express Mobile's expert discussed the instantiation theory in his opening report, his explanation was relatively cursory, and it was not until the reply expert report that any actual evidence was cited in support of this theory.

This explanation does not get GoDaddy off the hook, however.  The need to address Express Mobile's new instantiation theory evidence is only a partial explanation for why GoDaddy proceeded with the declarations as it did.  It explains why GoDaddy offered the new declarations but not why it waited until summary judgment to do so.  Express Mobile's second amended infringement contentions and expert reply report were disclosed on June 16, 2021 and October 1, 2021, respectively, well over one month before the end of expert discovery.  GoDaddy thus had plenty of time to disclose these declarations or seek an extension of the discovery deadline.  It did neither.  For this reason, the Court finds that GoDaddy's delayed disclosure of the Silvas and Jarrett

declarations was not substantially justified, and a sanction is warranted.[3]

Noncompliance with discovery deadlines does not automatically result in the striking of the untimely evidence.  To determine whether an untimely declaration should be stricken, courts in the Third Circuit apply the above-listed *Pennypack* factors.

### a.    Prejudice

GoDaddy's late disclosure of the Silvas and Jarret declarations caused prejudice to Express Mobile.  Because the declarations were filed after the fact and expert discovery deadlines, Express Mobile was not able to depose the witnesses or conduct additional discovery to address the new testimony.  The Court notes that Express Mobile asked to depose Silvas and Jarrett after the disclosure of their declarations, but GoDaddy refused.  GoDaddy contends that Express Mobile was not prejudiced because it previously deposed the declarants.  This argument is unpersuasive, however, because Express Mobile did not have the benefit of having the declarations prior to or during these depositions.  At that time, Express Mobile did not know that the declarants would be used as support for the defendant's non-infringement arguments and thus could not effectively question them on the issue.

### b.    Opportunity to cure and disruption to the trial schedule

The trial is currently set for February 27, 2023, which gives the parties plenty of time to conduct additional discovery on the issue.

### c.    Explanation for failure to disclose

GoDaddy's explanation for its delayed disclosure is that Express Mobile changed

---

[3] Because the Court agrees that the declarations were not timely disclosed, it is unnecessary for it to analyze Express Mobile's second argument regarding whether the declarations contain expert testimony.

its infringement position, creating the need for GoDaddy to respond with the disputed declarations.  As previously explained, however, Express Mobile disclosed its new instantiation theory more than a month before the end of the discovery deadline.  GoDaddy fails to explain why it waited until summary judgment to offer the evidence in question.

        **d.**    **Willfulness or bad faith**

Aside from the violation itself, there is no evidence of willfulness or bad faith on the part of GoDaddy.

        **e.**    **Importance of evidence**

This last factor is the most important in determining whether to strike untimely evidence.  *ZF Meritor*, 696 F.3d at 299.  The Court finds that the disputed declarations are critical to GoDaddy's noninfringement contentions.  Because Express Mobile did not fully flesh out its instantiation theory until its later disclosures, the Silvas and Jarrett declarations are the only evidence that directly addresses these new arguments.

*      *      *

Considering the factors together, the Court declines to strike the declarations.  Although GoDaddy's delayed disclosure resulted in prejudice to Express Mobile, this prejudice can be cured by allowing Express Mobile to depose the declarants on the points in their declarations.  There is no evidence of bad faith, and the weightiest factor, the importance of the evidence, points in favor of keeping the declarations in.  Instead of striking the evidence, the Court instead orders GoDaddy to make Silvas and Jarrett available for deposition within the next thirty days, with the depositions limited to 90 minutes for each.  GoDaddy will also be required to pay for three hours of Express

Mobile's attorney's fees, as well as the court reporter's appearance fees for the two depositions.

### 2.      GoDaddy's motion to strike

In response to GoDaddy's summary judgment motion and accompanying declarations, Express Mobile filed a supplemental report by its expert witness Dr. Kevin Almeroth.  GoDaddy seeks to strike this report, contending that it discloses yet another new theory of infringement.  The Court agrees with GoDaddy that the supplemental report presents a new version of the instantiation theory that was not previously disclosed.  After considering the *Pennypack* factors, however, it concludes that exclusion is not warranted.

#### a.      Prejudice

GoDaddy is prejudiced by the late disclosure of a new theory of infringement because it was not able to address it with its own expert report and because it was not able to conduct additional discovery to respond to the point.

#### b.      Opportunity to cure and disruption to the trial schedule

There is an opportunity to cure the prejudice before trial, which is scheduled for February 2023.

#### c.      Explanation for failure to disclose

The Court finds Express Mobile's explanation for its late disclosure persuasive. Because GoDaddy filed the Silvas and Jarrett declarations during summary judgment, Express Mobile needed to submit the supplemental report to cure the prejudice caused by this late disclosure.

### d.   Willfulness or bad faith

The Court finds no evidence of willfulness or bad faith.  It rejects GoDaddy's argument that the fact that Express Mobile is represented by competent counsel suggests willfulness.  Just because a party is represented by competent counsel does not mean that a discovery violation is willful.

### e.   Importance of evidence

The parties agree that the evidence is important, but they disagree over the implication of this fact.  Contrary to its statements in its other filings, GoDaddy now argues that the importance of a piece of evidence weighs in favor of *exclusion*. *Compare* dkt. no. 213 at 18 (stating that "[i]mportance here weighs against exclusion"), *with* dkt. no. 251 at 9 (arguing that Third Circuit precedent supports "excluding 'critical' evidence where disclosure deadlines have been flouted").  GoDaddy's new argument is unpersuasive.  As previously stated, the law in the Third Circuit is that the importance of the evidence weighs *against* exclusion. *See, e.g.*, *ZF Meritor*, 696 F.3d at 299.  The importance of the report thus indicates that the Court should impose a remedy that addresses the prejudice without totally excluding the evidence.

*         *         *

Overall, the Court concludes that the factors weigh against striking the supplemental report.  There is prejudice to GoDaddy, but this can be cured given the long amount of time before trial.  Express Mobile's explanation for its failure to disclose is reasonable, and there is no evidence of bad faith.  Lastly, the weightiest factor, the importance of the evidence, points in favor of keeping the report in.  Instead of striking the report, the Court allows GoDaddy to depose Dr. Almeroth for no more than 90

minutes on his new testimony.  The parties are responsible for their own costs and fees, with Express Mobile covering Dr. Almeroth's expert fee relating to his appearance at the deposition (but not for preparation).

**C.      GoDaddy's combined summary judgment/*Daubert* motion**

**1.      Motion for summary judgment**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In evaluating the summary judgment motion, courts must view all facts "in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor."  *Id.* (citation omitted).

**a.      Infringement of the '397 and '168 patents**

Claims 1, 2, 3, 11, and 37 of the '397 patent each require a "run time file," and claims 1, 2, and 3 of the '168 patent each require a "run time engine."  According to this Court's claim constructions, a "run time engine" is a "run time file" that must meet two requirements:  (1) it must be "downloaded or created when a browser is pointed to a web page or website" and (2) it must "read[] information from the database."  Dkt. no. 129 at 2.  GoDaddy contends that it is entitled to summary judgment on the '397 and '168 patent claims because the accused products do not meet the "run time engine" limitations of these claims.

Express Mobile contends that four categories of files in the accused products

constitute run time engines:  (1) preview render files; (2) DPS render files; (3) JavaScript sent to customers' browsers; and (4) PHP templates.  Preview render files are files on the WSB server that are triggered when a GoDaddy customer presses the button to "preview" the website he is creating.  DPS render files are files on GoDaddy's Dynamic Page Server (DPS) that handle dynamic content—for example, from Twitter or Yelp—that is embedded in a website.  Category 3 includes the JavaScript in files sent to a visitor's browser to build the web display in the browser (a visitor is a person browsing the GoDaddy customer's published website).  Lastly, PHP templates are files used to create themes for websites designed using the MWP.

GoDaddy disputes that these four categories of files meet either requirement of a run time engine.

### i.      Downloaded or created

Express Mobile argues that the files in Categories 1, 2, and 4 meet the "downloaded or created" requirement because they are created at runtime.  Specifically, it contends that, at runtime, an "instance" of the files is created in the RAM memory of GoDaddy's server from the static code files stored on GoDaddy's server disk and that this "instantiation" meets the "created" requirement.  In support of its instantiation theory, Express Mobile cites testimony from its experts, documents, and source code.

GoDaddy argues that Express Mobile's cited evidence is insufficient to support its instantiation theory.  It contends that Express Mobile fails to cite evidence specific to its source code or products and instead cites evidence that talks only generally about instantiation.  The Court agrees.  Almeroth fails to identify any actual line of code that represents the "instantiated" version of the accused run time engine files.  The other

evidence that Express Mobile cites is either outdated, not specific to GoDaddy or the accused products, not specific to run time engine files, or a combination of the three.

Although the files in Categories 1, 2, and 4 do not meet the "downloaded or created" requirement, the Court finds that those in Category 3 do.  The parties agree that the files in Category 3 are downloaded from the Content Delivery Service (CDN) to the customer's browser.  GoDaddy's only argument is that this does not meet the requirement because the code is not downloaded directly from the DPS database.  But nowhere does GoDaddy point to language in the claim requiring the run time engine to be downloaded directly from its servers.  In fact, the language of the claim states only that the run time engine must be downloaded to a visitor's browser when the browser requests a website.  On this question, Express Mobile has adduced sufficient evidence to create a genuine factual dispute.

GoDaddy also argues that the downloaded JavaScript code cannot constitute a run time engine because it also contains the "virtual machine commands."  GoDaddy contends that Express Mobile's position here creates the same "tension" that the Court recognized in Express Mobile's position in *Shopify*.  *See Shopify*, 2021 WL 4288113, at *9.  Express Mobile disputes whether the JavaScript run time engine is the same file that contains the "virtual machine commands."  It argues that the JavaScript run time engines, such as script.js, "are distinct JavaScript files that are downloaded to a visitor's browser and when executed in the browser's JavaScript engine generate virtual machine commands in the form of additional HTML, CSS, or JavaScript code that update the webpage display."  Dkt. no. 191 at 7.  This is supported by Dr. Almeroth's opening report, Almeroth Opening Report ¶¶ 345–46, and is sufficient to create a

genuine factual dispute on the issue.

ii.     **Reads information from the database**

The second requirement of a run time engine is that it "reads information from the database."  Because the Court concludes that the files in Categories 1, 2, and 4 do not meet the first requirement of a run time engine, it need not determine if they meet the second requirement.  With respect to Category 3, Express Mobile argues that the files "read information from a database by fetching information from the database over the network."  Dkt. no. 191 at 10.  It cites Dr. Almeroth's testimony identifying the function "fetch()" in GoDaddy's source code, which he contends causes information in the database to be downloaded to the browser at runtime.  Almeroth Opening Report ¶¶ 344–46; Almeroth Reply Report ¶¶ 200, 220–21.

GoDaddy argues that the fetch() function does not "read information from the database" because the files rely on several intermediary files to access the database rather than reading the database directly.  The Court agrees.  Express Mobile's position here is similar to its position in *Shopify*.  There, Express Mobile conceded that the alleged run time engine did not read the database directly but rather "triggered the drop file to perform its data fetching function."  *See Shopify*, 2021 WL 4288113, at *10. "Because Express Mobile agrees that the drop file is doing the actual reading and is separate from the claimed run time engine," the Court concluded, "Express Mobile has not shown that the accused Liquid template file is reading from the database."  *Id.*

The same logic applies here.  Express Mobile provides no evidence that the files in Category 3 actually read the database.  Instead, the evidence shows that these files interact only with the CDN and rely on other files to call upon the database.  This is not

25

enough.  Any other interpretation would over-expand the requirement to encompass all of the numerous files in the "pipeline" of files.  Dkt. no. 206 at 5.  It would include the accused file, the file that the accused file invokes, the file that that file invokes, and so on.

Lastly, Express Mobile attempts to argue that even if the accused run time engines do not literally read information from the database, it does the equivalent of reading information from the database.  Not so.  Under Federal Circuit precedent, there can be no infringement under the doctrine of equivalents if the "theory of equivalence would vitiate a claim limitation."  *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998).  Here, Express Mobile's doctrine of equivalence argument vitiates the "reads from" requirement from the claim.  Contrary to Express Mobile's contention, accessing a database by using an API or library is not the equivalent of reading a database.  As GoDaddy's evidence demonstrates, the accused run time engines "do not read from or contain any references to the source of the data at all,  whether through a database-access library or otherwise."  Dkt. no. 163 at 16 (citing Jarrett Decl. ¶¶ 10–29; Silvas Decl. ¶¶ 14–17, 21–30, 34–40).  And there is no support for the proposition that a file that is filled in by another program with information that comes from a database works in substantially the same way as a file that reads from a database.  Express Mobile's theory seems to mimic its previously rejected claim construction argument that an accused run time engine need only "facilitate the retrieval of information" from the database instead of "read from" the database.  *Shopify*, 2020 WL 3432531, at *3.  Express Mobile cannot appropriately use the doctrine of equivalence to attempt to relitigate its unsuccessful claim construction positions.  *See Augme Techs., Inc. v.*

*Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014) ("The concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims.") (citation omitted).  For these reasons, the Court grants summary judgment in favor of GoDaddy with respect to infringement of the '397 and '168 patent claims.

> ### b.    Infringement of the '755, '287, and '044 patents

Each asserted independent claim in the '755, '287, '044 patents requires the accused products to "produce a Player."  As stated above, the Court has construed the term "Player" as "device-specific code which contains instructions of a device and which is separate from the Application."  "Device-specific code," or "device-dependent code," has been previously construed in this case to mean "code that is specific to the operating system, programming language, or platform of a device."  Dkt. no. 129 at 1.  Additionally, the accused Player must "receive[] the output symbolic name [generated by the web service] and corresponding one or more output values and provide[] instructions for a display of the device to present an output value in the defined UI [user interface] object."  '755 patent, claim 1; '287 patent, claim 1; '044 patent, claim 1.

Express Mobile contends that the accused products contain a "Javascript Player" that "spans multiple files . . . that work together to meet the claims as construed by the Court."  Dkt. no. 191 at 15.  GoDaddy makes two arguments in response:  (1) the accused Javascript Player does not "receive[] the output symbolic name . . . to present an output value in the defined UI object" and (2) the output values are not displayed "via 'device-dependent' code."  Dkt. no. 163 at 22–23.  Neither argument is persuasive.

On the first point, GoDaddy contends that a Player must receive an output symbolic name and display that same output value to the end user.  It concedes that the

accused Player receives and displays output values, but it argues that the accused
Player does not display the *correct* value because it is not the same value as the value
received.  But nothing in the language of the claim requires that the received and
displayed output values be the same.  *See, e.g.*, '755 patent at 38:41–57.  The claim
states that the Player presents "*an* output value," not "*the* output value" or "*said* output
value."  The use of the indefinite article rather than these other alternatives indicates
that the Player can display any output value.  It is thus sufficient, as Express Mobile
contends, that the output symbolic name results in a corresponding output value, even if
the value is different.

On the second point, GoDaddy argues that Express Mobile fails to identify any
specific part of the JavaScript Player code that constitutes device-dependent code that
results in output values being displayed to the end user.  It does not dispute that the
JavaScript Player code generally contains device-dependent code, but it argues that
such code spans across several files and that Express Mobile does not show that the
portions of the code that are device dependent are responsible for displaying output
values to the end user.

Again, this issue was addressed in *Shopify*, and the Court adopts the same
reasoning as in that case.  *See Shopify*, 2021 WL 4288113, at *17.  Express Mobile has
provided sufficient evidence to create a genuine factual dispute on the issue.  It points
to several files that perform output display functionality that work with other files that
contain conditional branching.  *See* dkt. no. 191 (discussing the www-embed-player.js
and jquery.min.js files).  For these reasons, summary judgment regarding infringement
on these claims is inappropriate.

### c.    Willfulness

Although patent infringement is a strict liability offense, enhanced damages are available if the defendant's infringement was "willful."  *See XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1286 (Fed. Cir. 2018).  A plaintiff shows willful infringement if it meets the following elements: "(1) [it] knew of the patent-in-suit; (2) after acquiring that knowledge, it infringed the patent; and (3) in doing so, it knew, or should have known, that its conduct amounted to infringement of the patent."  *Välinge Innovation AB v. Halstead New Eng. Corp.*, No. 16-1082-LPS-CJB, 2018 WL 2411218, at *13 (D. Del. May 29, 2018).  GoDaddy contends that Express Mobile cannot meet these requirements.

In support of its contention that GoDaddy willfully infringed, Express Mobile provides two categories of evidence:  (1) testimony that someone representing GoDaddy admitted that GoDaddy infringed the asserted patents and (2) a string of e-mails sent in 2013 and a 2018 letter from Express Mobile to GoDaddy regarding the '397 and '168 patents.  Regarding the first category, GoDaddy contends that the testimony alleging that a GoDaddy representative admitted infringement is inadmissible as hearsay.  The Court agrees.  Contrary to Express Mobile's contentions, the testimony does not meet the requirements of Federal Rule of Evidence 801(d)(2)(D) for agent-admissions.  The deponent was unable to provide any information about the declarant.  He merely states that the admission was made by someone who represented GoDaddy for a possible purchase acquisition and that the declarant might have been the CTO.  Without more, this is not sufficient information to establish that the testimony falls within the Rule.  *See Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1001–02 (3d Cir.

1988).

The cited e-mails and letter, however, are admissible and sufficient to create a genuine factual dispute with respect to the '397 and '168 patents.[4]  The e-mail, sent to GoDaddy in 2013, notified GoDaddy of the asserted patents and contained claim charts of WordPress.  Although the e-mail did not explicitly accuse GoDaddy of infringement, such an inference could be inferred from the exchange.  Additionally, in 2018, Express Mobile sent GoDaddy a letter in which it stated that it "believed that GoDaddy, Inc. has infringed and is infringing one or more of the Express Mobile patents through its business of building web sites and web pages for customers."  Dkt. no. 162-17 at ECF p. 3 of 3.  It again informed GoDaddy of the '397 and '168 patents and referenced the 2013 e-mails.  *Id.*  Considered together, these communications are sufficient to create a genuine factual dispute concerning willful infringement.

   **d. Direct infringement**

Direct infringement occurs where all steps of a claimed method or all elements of a claimed system are performed by or attributable to a single entity.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022–23 (Fed. Cir. 2015); *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011).  For method claims, a single entity can be held liable for the infringement even where more than one actor is involved in practicing the steps if that "entity directs or controls others' performance."  *Akamai*, 797 F.3d at 1022.  For system claims, if the asserted claims encompass user conduct, then there is no direct infringement of the claims.  *See*

---

[4] Express Mobile does not contend—and the evidence does not support—that this evidence informed GoDaddy of the possibility that it infringed the '755, '287, or '044 patents.

*Centillion*, 631 F.3d at 1284.

GoDaddy contends that the asserted claims encompass user conduct.  If that is the case, it contends, then under *Centillion* the Court should grant summary judgment in its favor on the direct infringement system claims.  Additionally, if the asserted claims encompass user conduct, GoDaddy reasons, the Court should grant summary judgment in its favor on the direct infringement method claims because Express Mobile cannot meet its burden under *Akamai* to show that GoDaddy "directs or controls" the conduct of the customers.

The Court disagrees that the claims encompass user conduct.  The claims are structured to focus on the actions of the program provider, not the customer.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) ("A patentee can usually structure a claim to capture infringement by a single party, by focusing on one entity.").  Although the claims contain descriptive language involving the end user, user conduct is not necessary for infringement.  Rather, the user language merely describes the components of the patented product.  This case is thus unlike *Centillion*, in which the plaintiff conceded that part of the claim included a "'front-end' system maintained by an end user."  *Centillion*, 631 F.3d at 1281.

Because the claims do not encompass user conduct, *Centillion* does not control, and the divided infringement test outlined in *Akami* does not apply.  These two contentions underlie the entirety of GoDaddy's direct infringement summary judgment argument.  Accordingly, GoDaddy is not entitled to summary judgment on Express Mobile's direct infringement claims.

### e.    Indirect infringement

"To prevail under a theory of indirect infringement, [the plaintiff] must first prove that the defendants' actions led to direct infringement of the [asserted] Patent." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004). 35 U.S.C. 271 outlines two methods by which a defendant can indirectly infringe on a patent:  (1) induced infringement and (2) contributory infringement.  *Id.* at §271(b)–(c).

### i.    Induced infringement

Induced infringement under 35 U.S.C. § 271(b) requires that the plaintiff show "(1) direct infringement of the asserted patents; (2) [] the defendant knew of the patent; (3) [] the defendant knew or should have known that the induced acts constitute patent infringement, and (4) [] the defendant possessed specific intent to encourage another's infringement."  *Sanofi, LLC v. Watson Labs. Inc.*, 875 F.3d 636, 643–44 (Fed. Cir. 2017).  Specific intent means an "intent to encourage infringement."  *Takeda Pharms. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015).  GoDaddy contends that Express Mobile has failed to show that there is a genuine factual dispute on each of the above-listed elements.  The Court disagrees.

On the first element—proof of underlying direct infringement—GoDaddy simply references the arguments it makes with respect to the direct infringement claims.  For the reasons explained above, the Court overrules these arguments.

On the second and third elements—the knowledge elements—Express Mobile points to the e-mails and letters it sent to GoDaddy in 2013 and 2018.  As discussed in the section concerning willfulness, these letters show a genuine dispute regarding whether GoDaddy (1) knew of the patents and (2) knew or should have known that the

induced acts constituted patent infringement.  The 2013 e-mails informed GoDaddy of the existence of the asserted patents and contained claim charts related to WordPress, and the 2018 letter expressly accused GoDaddy of infringement.

On the last element, specific intent, the Court likewise finds that there is a genuine factual dispute.  Express Mobile cites numerous documents and guides created and distributed by GoDaddy to its customers instructing them on how to use the accused products.  These guides suggest that GoDaddy wanted its customers to use the accused products, including in ways that would infringe upon the asserted patents.  A reasonable jury could thus conclude that GoDaddy possessed the specific intent for its customers to infringe the asserted patents.

### ii.    Contributory infringement

"To establish contributory infringement, the patent owner must show the following elements . . . 1) [] there is direct infringement, 2) [] the accused infringer had knowledge of the patent, 3) [] the component has no substantial noninfringing uses, and 4) [] the component is a material part of the invention."  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).  The first two elements are identical to the first two elements of induced infringement.  For the reasons provided above, the Court finds that a reasonable jury could find in favor of Express Mobile on these issues.  GoDaddy does not dispute that there are genuine factual disputes regarding the last two elements.  Accordingly, GoDaddy is not entitled to summary judgment.

### 2.    *Daubert* motion

GoDaddy requests that the Court exclude certain testimony from Dr. Kevin Almeroth concerning the technical importance of the claimed inventions and from Walter

Bratic concerning damages.  The Court takes each in turn.

a.    **Dr. Almeroth on the technical importance of the claimed inventions**

GoDaddy contends that the Court should exclude Dr. Almeroth's testimony regarding the technical importance of the claimed inventions for three reasons.  None are persuasive.  First, GoDaddy contends that the fact that Dr. Almeroth fails to use its non-infringing WSB V6 product as a baseline for comparison makes his opinions unreliable.  Express Mobile disputes that WSB V6 is an acceptable non-infringing alternative that must be considered.  The Court agrees.  There are significant differences between the two products, meaning that it was not necessary for Dr. Almeroth to consider WSB V6.  For example, WSB V6 is no longer being offered to new customers, and GoDaddy has made efforts to move customers off of the product.  Additionally, testimony from Dr. Almeroth explains that WSB V6 lacks certain critical features of the accused product, including a WYSIWYG (what-you-see-is-what-you-get) website designer.  Almeroth Opening Report ¶¶ 810–11; Almeroth Reply Report ¶ 526.

GoDaddy's second argument is that Dr. Almeroth's opinions are unreliable because he fails to consider GoDaddy's customer survey data.  This is inaccurate.  Dr. Almeroth states in his reply report that he "considered surveys and marketing materials to the extent they exist."  Almeroth Reply Report ¶ 104.  He also considered and cited internal defendant documents that evaluated customer preferences.  Almeroth Opening Report ¶¶ 102–09.

Finally, GoDaddy argues that Dr. Almeroth fails to provide quantitative or mathematical support for his determinations.  Again, this argument holds no water.  Dr.

Almeroth thoroughly explains the basis for his opinion:  he states that he determined the relative weights of the features based on how technical the feature is, whether any technical aspects are standard or conventional, and the extent to which technical difficulty and/or creativity is involved.  Almeroth Opening ¶¶ 825–34.  For these reasons, the Court declines to exclude Dr. Almeroth's testimony concerning the technical importance of the claimed inventions.

### b.    Bratic on damages

GoDaddy asks the Court to exclude Walter Bratic's opinions concerning damages for three reasons.  First, GoDaddy contends that Bratic improperly uses Almeroth's technical weightings as the only basis for his royalty base calculations.  This contention, however, is directly contradicted by Bratic's report, in which states that he looked at "the totality of evidence, including indicators of demand for the Website Builder as reflected in GoDaddy's market surveys."  Bratic Report ¶ 184.

Second, GoDaddy contends that Bratic erred by using subscription count data rather than revenue data in his royalty calculations.  Although it may be that GoDaddy's suggested calculation method is superior to Bratic's, this is not a basis for exclusion. GoDaddy presents numerous reasons to prefer calculations based on revenue data versus calculations based on subscription count data, but ultimately none suggest that a royalty calculation based on subscription count is so unreliable that it should be excluded.  At trial, GoDaddy will have the opportunity to make its arguments to the jury, but for now, there is no basis to exclude the evidence.

Third, GoDaddy contends that the Court must exclude Bratic's opinions because his calculated royalty would be financially catastrophic.  The Court disagrees.  The

parties dispute GoDaddy's worldwide net revenue for the accused products and accordingly dispute whether Bratic's calculation royalty would be an unreasonable percentage of this amount.  It is up to the jury to determine between these competing positions.

**D.      Express Mobile's combined summary judgment/*Daubert* motion**

**1.      Motion for summary judgment**

Express Mobile moves for summary judgment relating to certain invalidity and equitable defenses.

**a.      Patent eligibility**

Express Mobile seeks summary judgment regarding whether the asserted patents are patent-eligible under the *Alice/Mayo* two-step framework.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 566 U.S. 66 (2012).  As an initial matter, GoDaddy does not contest eligibility regarding the '397 and '168 patents, so the Court grants Express Mobile's motion with respect to these patents.  GoDaddy does, however, contest the eligibility of the '755, '287, and '044 patents.

The first step of the *Alice/Mayo* two-step framework asks whether the asserted patent is directed to abstract ideas.  *Alice*, 573 U.S. at 217.  If it is not directed to abstract ideas, then the patent is valid.  *Id.*  If the patent is directed to abstract ideas, the court must ask if the patent claims inventive concepts.  *Id.*  If so, the patent is valid.  *Id.* If not, the patent is invalid.  *Id.*

**i.      Step one**

Express Mobile contends the '755, '287, and '044 patents are not directed to

36

abstract ideas because they are directed to specific computing architecture that allows internet-connected devices to easily connect to and display the content of web services available on the internet.  GoDaddy argues that the asserted patents are directed to the abstract idea of separating code into a device-independent aspect and a device-dependent aspect.  The Court finds that the asserted patents are not directed to an abstract idea and thus that they are patent-eligible.

GoDaddy's interpretation takes much too simplistic a view of the asserted claims. It asserts that the patents are directed to an abstract idea because the segregation of device-independent and device-dependent code is the only new feature disclosed in the patents.  But the first step of the *Alice/Mayo* framework does not ask what inventive concepts the patent claims—that inquiry is reserved for step two.  *Id.*  Instead, step one requires the court to look at "the claims as an ordered combination, without ignoring the requirements of the individual steps."  *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016).  GoDaddy ignores certain parts of the claims because it contends they are "well known, routine, and conventional."  Dkt. no. 189 at 30.  This is not the proper analysis.  Looking at the claims as an ordered combination, the Court finds that the patents are directed to specific computing architecture and not an abstract idea.  It thus grants summary judgment in favor of Express Mobile on the issue of patent eligibility.

### ii.    Step two

Even if the '755, '287, and '044 patents were directed to an abstract idea, the Court would still grant summary judgment in favor of Express Mobile on patent eligibility because the patents claim inventive concepts.  Specifically, the Court finds that these

patents claim a particular architecture that allows for the efficient display of web service content on a device platform.

GoDaddy argues that the patents do not claim inventive concepts because they merely claim implementation of an abstract idea (namely, separating code into a device-independent aspect and a device-dependent aspect) using generic computer components.  In support of its contention, GoDaddy separates all of the individual aspects of the claim and concludes that all but one aspect was previously known in the art.  The problem with this divide-and-conquer approach, however, is the patents' inventive concept is not each aspect of the claim individually.  Rather, the inventive concept is the particular architecture of combining these components in a specific way to create an enhanced benefit.  Summary judgment in favor of Express Mobile on patent eligibility is therefore warranted.

### iii.    Utility argument

Lastly, Express Mobile seeks summary judgment on GoDaddy's argument that certain claims of the '755 patent "fail the requirements of 35 U.S.C. § 101 because the term 'where said Application is a device-dependent code' lacks utility."  Dkt. no. 162, ex. 6 at 35.  GoDaddy does not address this argument in its briefing and thus has waived or forfeited the point.  *See Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 250 (3d Cir. 2013).  The Court accordingly grants summary judgment in favor of Express Mobile on the § 101 defense.

### b.    Definiteness

Section 112 requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention

38

with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). GoDaddy contends that certain of the asserted claims are indefinite in light of the language of the claims. The Court disagrees and grants summary judgment in favor of Express Mobile on this defense.

### i.      "Data format type"

GoDaddy asserted in its invalidity contentions that the claims of the '287 and '044 patents are indefinite because of the language "data format type of the symbolic name." Dkt. no. 162, ex. 6 at 38, 43. In the summary judgment briefing, however, GoDaddy acknowledged that the Court in *Shopify* already decided the issue in favor of Express Mobile, and it declined to provide any new arguments in support of its position. *See Shopify*, 2021 WL 4288113, at *26. The Court thus grants summary judgment in favor of Express Mobile on the defense of indefiniteness regarding these patents.

### ii.      "Data format class type"

GoDaddy also asserts that the claim language "data format class type" that corresponds to a "subclass of User Interface (UI) objects" is indefinite. Dkt. no. 162, ex. 6 at 38, 43. As with "data format type," however, GoDaddy declined to provide any new arguments in its summary judgment briefing and instead incorporated Shopify's arguments to preserve the record. Accordingly, summary judgment in favor of Express Mobile on indefiniteness is granted for the same reasons given in *Shopify*. *See Shopify*, 2021 WL 4288113, at *26.

### iii.      "Utilizes information"

GoDaddy also asserts that the language of the '044 patent stating that the Player "utilized information stored in said database to generate for the display of at least a

portion of said one or more web pages" is indefinite.  Dkt. no. 162, ex. 6 at 42.  Again, GoDaddy declined to make any new arguments in its summary judgment briefs in this case.  Without additional argumentation, the Court finds it appropriate to decide the issue as Judge Andrews did in *Shopify*.  *See Shopify*, 2021 WL 4288113, at *27. Summary judgment is granted in favor of Express Mobile.

        iv.    **"Symbolic names required for evoking one or more web components each related to a set of inputs and outputs of a web service obtainable over a network"**

With respect to the '755 patent, GoDaddy contends that the claim term "symbolic names required for evoking one or more web components each related to a set of inputs and outputs of a web service obtainable over a network" is indefinite.  Dkt. no. 162, ex. 6 at 33–34.  Essentially, GoDaddy's argument is that "symbolic names" is unclear because the parties disagree over the scope of the claim:  GoDaddy contends that the symbolic names relate only to UI components, whereas Express Mobile contends that symbolic names relate to web components generally.  But GoDaddy provides no expert support for its interpretation.  In its briefing, it merely cites to experts that criticize the terminology used by Express Mobile's expert.  These experts, however, do not analyze the specific claim language or support GoDaddy's reading that "symbolic names" relate only to UI components.  This is not enough to show a genuine dispute regarding whether a person of ordinary skill in the field would be able to understand what is claimed.  Summary judgment in favor of Express Mobile is warranted.

        v.    **"UI Object corresponds to"**

GoDaddy contends that certain claims of the '755 and '287 patents are indefinite

based on the language "UI object corresponds to [the/a] web component included in said registry selected from the group consisting of an input of the web service and an output of the web service." *Id.* at 34, 38. Express Mobile disputes that the term is unintelligible and states that a person of ordinary skill in the field "would understand that this claim term . . . simply refers to UI objects on a display (such as text form fields, buttons, YouTube video controls, maps, etc.) that correspond to web components that relate to an input or output of a web service (such as a YouTube or Google Maps web service)." Dkt. no. 158 at 20. Again, GoDaddy's only support for its argument is its experts' testimony criticizing the terminology used by Express Mobile's expert. For the reasons given above, this is insufficient to create a genuine factual dispute, and thus the Court grants summary judgment in favor of Express Mobile.

### vi.    "Authoring tool configured to"

GoDaddy contends that the phrase "authoring tool configured to" in the '287 patent is a nonce word that is subject to 35 U.S.C. § 112, ¶ 6. Dkt. no. 162, ex. 6 at 38–39. The Court disagrees. When a claim does not use the word "means," there is a presumption that the claim language does not invoke § 112, ¶ 6. *Williamson*, 792 F.3d at 1348. Only where the term does not "have a sufficiently definite meaning as the name for structure" is this presumption overcome. *Id.* This is not the case here. "Authoring tool" was previously construed by the Court to mean "a system, with a graphical interface, for generating code to display content on a device screen." Dkt. no. 129 at 1. Contrary to GoDaddy's contention, the Court's construction references a sufficiently specific structure, so § 112, ¶ 6 does not apply.

### vii.   "Said code"

GoDaddy's last argument is that claim 11 of the '287 patent is indefinite because the term "said code" fails to inform a person skilled in the field about the scope of the invention.  Dkt. no. 162, ex. 6 at 39.  Specifically, it contends that "said code" is unclear because it could refer to either the Application code, the Player code, or both.  The Court disagrees.  The most natural reading of the term "said code," in context, is that the term refers to both the Application and the Player code.  This is supported by Express Mobile's experts.  *See, e.g.*, Almeroth Opening Report ¶ 692.  GoDaddy, on the other hand, fails to cite any expert testimony supporting its contention that the term is unclear.  For these reasons, the Court grants summary judgment in favor of Express Mobile on the defense of indefiniteness on this claim.

### a.   Equitable defenses

Express Mobile seeks summary judgment on several equitable affirmative defenses that GoDaddy asserts in its answer to the amended complaint.

### i.   Laches, patent exhaustion, express license, and disclaimer

Express Mobile seeks summary judgment on GoDaddy's laches, patent exhaustion, express license, and disclaimer defenses.  GoDaddy does not address these arguments in its response briefing and thus waives its response.  *See Freeman, LLC*, 709 F.3d at 250.  Express Mobile is entitled to summary judgment on these defenses.

### ii.   Equitable estoppel, implied license, and acquiescence

Express Mobile also seeks summary judgment on GoDaddy's equitable estoppel,

implied license, and acquiescence defenses.  As an initial matter, the Court grants summary judgment in favor of Express Mobile on the implied license defense. GoDaddy fails to make any argument specifically addressing this defense and instead relies on a single sentence in a footnote stating that summary judgment on implied license is improper where summary judgment on equitable estoppel is improper.  *See* dkt. no. 189 at 6 n. 3.  Given this lack of development, the Court finds that the argument is waived.  *See N.J. Media Grp. Inc. v. United States*, 836 F.3d 421, 436 n. 20 (3d Cir. 2016) (determining that an argument was waived based on its "utterly undeveloped character").

Under Federal Circuit precedent, a party raising a defense of equitable estoppel must prove the following three elements:

> (1) The patentee, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. (2) The alleged infringer relies upon that communication. (3) And the accused infringer would be harmed materially if the patentee is later permitted to assert any claim inconsistent with his earlier conduct.

*Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1324 (Fed. Cir. 2004) (citation omitted).  The Court finds that there are genuine disputes of fact regarding each element precluding summary judgment.

On the first element, GoDaddy presents evidence relating to the 2013 discussions between the parties regarding the potential sale of the '397 and '168 patents.  For example, when GoDaddy asked why Express Mobile thought it would be interested in the patents, Express Mobile responded that it thought GoDaddy would be interested because of the "general area in which the patents apply."  Dkt. no. 165-10 at XMO_GD00129671.  There was no suggestion that GoDaddy might be interested

43

because its products infringed Express Mobile's patents.  *See generally id.*  Additionally, the claim charts that Express Mobile sent to GoDaddy involved the WordPress product, not either of the accused products in this case.  *Id.* at XMO_GD00129668.  And, even if GoDaddy should have suspected that Express Mobile believed that it had a claim for infringement, Express Mobile's delay in suing for five and one-half years reasonably suggested to GoDaddy that Express Mobile was not going to sue.

On the second element, GoDaddy has shown that there is a genuine factual dispute regarding whether it relied on Express Mobile's conduct.  A reasonable jury could conclude that, had GoDaddy known that it faced legal liability, it would not have continued to pour money and time into the accused products without seeking a license. GoDaddy provides evidence that it sought licenses in other contexts, which supports its contention that it would have sought a license here.

The last element is whether the alleged infringer would be materially prejudiced if the patentee was allowed to proceed with its claim.  Again, there is a genuine dispute of fact on this issue.  GoDaddy presents evidence that it invested significant resources into the development of the WSB and MWP products, which is sufficient to permit a reasonable factfinder to find prejudice.  For these reasons, Express Mobile is not entitled to summary judgment on GoDaddy's equitable estoppel defense.

Next, the Court concludes that Express Mobile is entitled to summary judgment on the acquiescence defense because it is duplicative of the equitable estoppel defense.  *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1065 (Fed. Cir. 2003) (noting that the trial judge dismissed the equitable estoppel defense because "he deemed that defense duplicative of the acquiescence and consent

44

defense").  Acquiescence is a more general defense that includes defenses like equitable estoppel.  *See Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1357 (Fed. Cir. 2018) ("Although acquiescence furnishes the most apt single label for these reasons, several distinctive principles can be identified [including equitable estoppel].") (internal citation and quotation marks omitted). Because the Court declines to grant summary judgment on the equitable estoppel defense, the acquiescence defense is superfluous.

### iii.    Unclean hands

An unclean hands defense requires a showing of five elements:  "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party (5) and affects the balance of equities between the litigants." *Sun Microsystems, Inc. v. Versata Enters.*, 630 F. Supp. 2d 395, 410 (D. Del. 2009).  The parties dispute whether the second element requires a showing that the alleged conduct is "unconscionable" or that it would "shock the moral sensibilities of the judge." *See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 498 F. Supp. 2d 305, 310 (D. Del. 2005).  The Court need not address this dispute, however, because it concludes that, even under GoDaddy's interpretation, no reasonable jury could find that Express Mobile acted with fraud, deceit, unconscionability, or bad faith.

According to GoDaddy, Express Mobile acted with unclean hands because it intentionally misled GoDaddy into thinking that it was not going to sue for patent infringement.  GoDaddy argues that Express Mobile delayed suing GoDaddy to encourage it to invest more money into its products and continue to grow its business,

thus increasing any potential award from litigation or settlement.  The record does not support GoDaddy's assertions, however.  Although it is true that Express Mobile waited to sue GoDaddy, there is no evidence suggesting that its motivation for waiting was to increase its potential recovery.  The evidence GoDaddy cites suggests that Express Mobile had targeted GoDaddy for litigation in 2014 but needed to delay suit in order to organize its litigation strategy, seek funding, and retain counsel.  Without more, it would be unreasonable for a jury to conclude that Express Mobile acted with fraud, deceit, unconscionability, or bad faith.  For these reasons, the Court grants summary judgment in favor of Express Mobile on the unclean hands defense.

    2.    *Daubert* motion

Express Mobile contends that certain of David Perry's damages opinions should be excluded.  First, Express Mobile argues that certain of Perry's opinions should be excluded because they are based on false circumstances that do not involve a willing licensor and licensee.  Second, Express Mobile argues that certain of Perry's opinions rely on non-existent or misleading transactions.  Lastly, Express Mobile argues that certain of Perry's opinions that rely on certain settlement agreements should be excluded.  The Court disagrees with the first of these contentions but agrees with the other two.

    a.    **False circumstances**

Express Mobile argues that certain of Perry's opinions should be excluded because they are based on three false circumstances that do not involve a willing licensor and willing licensee:  (1) the GE agreement; (2) the RPX offer; and (3) the gross revenues of unlicensed companies.

i.      GE Agreement

Express Mobile was represented by Green Espel for the patent auction. According to Steve Rempell, Express Mobile's CEO, under the agreement between Express Mobile and Green Espel (the "GE agreement"), "Express Mobile could walk away from any offer less than 5 million."  Dkt. no. 190-17 at 286:12-14.  GoDaddy contends that this means that Express Mobile was bound to accept any offer at or above $5 million, and some of Perry's damages opinions are based on this assumption. Express Mobile disputes that Rempell's testimony indicates that Express Mobile was required to accept an offer at or above $5 million.  Accordingly, it contends that the parts of Perry's testimony that relies on this "false circumstance" are unreliable and should be excluded.

The Court finds that the disputed testimony is ambiguous.  Although Rempell stated that the GE Agreement authorized Express Mobile to walk away from any offer less than $5 million, he does not, as GoDaddy contends, address whether Express Mobile was obligated to accept an offer at or above $5 million.  At the same time, Rempell does not state, as Express Mobile suggests, that $5 million was the floor of what Express Mobile would have accepted.

Because the evidence is open to interpretation, both parties' positions are supportable, and Perry's calculations are not automatically unreliable for having interpreted the GE Agreement in the way that he did.  At trial, Express Mobile will have the opportunity to present its interpretation to the jury, and the jury will be able to determine whether Perry's opinions are credible in light of the assumptions on which they are based.

Express Mobile makes one final argument with respect to the GE Agreement: it argues that "Mr. Perry's opinions as the Web Components should be excluded for the additional reason that those patents had not yet issued at the time of the patent auction." Dkt. no. 158 at 35 n. 8. GoDaddy does not address this argument, and the Court finds it persuasive. Any opinion by Perry regarding the Web Component Patents based on the GE Agreement is excluded.

### ii.    RPX Offer

RPX is a patent aggregator that buys patents as a defensive measure to protect its member organizations from suit. During the patent negotiations, RPX invited Express Mobile to make an offer at $3.5 million for the Web Design Patents and cross-licenses. Some of Perry's opinions are based on this offer (to make an offer).

Express Mobile argues that it was improper for Perry to consider the RPX offer because it does not constitute an agreement and as such does not reflect an agreement between a willing licensor and willing licensee. Additionally, Express Mobile emphasizes that the offer was not just for the Web Design Patents: RPX suggested that it would only agree to a $3.5 million offer if cross-licenses were included. Thus, Express Mobile contends, the RPX offer cannot be reliably used to determine the value of the Web Design Patents alone.

The Court overrules this argument. Even if an offer was never made and the agreement never finalized, the invitation to make an offer provides relevant information regarding the perceived value of the patents in question. Specifically, it suggests that the maximum value of the accused patents (as estimated by a third-party buyer) is around $3.5 million. Express Mobile's argument regarding the cross-licenses is similarly

not a reason to exclude Perry's testimony.  These arguments go to the weight of this evidence, not its admissibility.  At trial, Express Mobile may attempt to show that the RPX Offer should not be used to calculate a hypothetical license agreement between itself and GoDaddy.  At this stage, however, there is no proper basis for the Court to exclude the evidence.

### iii.    Gross revenues of unlicensed companies

Express Mobile also argues that some of Perry's opinions should be excluded because they rely on the gross revenues of unlicensed companies and that this does not provide a value for the patented technology.  GoDaddy contends that Perry relies on gross revenue, not to estimate the value of the patented technology, but instead to compare the relative sizes of different companies in accordance with Express Mobile's licensing program.  Express Mobile's licensing program uses the comparative sizes of companies (based on total annual revenues) to determine how much each company should pay to license the patents.

Express Mobile fails to address GoDaddy's argument, and the Court finds it a persuasive one.  Because Perry is not using the gross revenues to directly calculate the value of a hypothetical license, it is irrelevant whether that gross revenue accounts for all the revenue derived from the patented technology.  For this reason, the Court declines to exclude Perry's opinions on this basis.

### b.    Non-existent or misleading transactions

Express Mobile contends that certain of Perry's opinions that rely on non-existent or misleading transactions should be excluded.  The Court agrees.

49

### i.    Bankruptcy filing evidence

Perry discusses two pieces of evidence from Rempell's bankruptcy.  The first is an e-mail from Rempell's attorney stating that his Express Mobile stock was probably worthless.  The second is a bankruptcy filing stating that Rempell's sixty-five percent stake in Express Mobile was worth $6,852, thus suggesting an overall value of $10,541.

Express Mobile contends that the bankruptcy evidence is not relevant because the value of the Express Mobile stock did not include the value of the patents.  This is supported by Rempell's deposition testimony, *see* dkt. no. 162-28 at 313-316, and GoDaddy does not address this point.  The Court thus excludes Perry's opinions that are based on this evidence.

### ii.    CY Digital license agreement

Perry also considers an agreement between Express Mobile and CY Digital in his opinions.  Express Mobile argues that Perry's reliance on the agreement is improper because the agreement was an agreement to invest in CY Digital, not a licensing agreement as GoDaddy so contends.  Express Mobile concedes that it and CY Digital discussed the possibility of executing a licensing agreement, but that agreement was never finalized.  As such, Express Mobile argues that the draft agreement cannot be the basis for Perry's damages opinions.

The Court agrees.  Nothing in the record supports the existence of a licensing agreement.  GoDaddy cites to language in a draft document, but in the final draft, that language was removed.  Dkt. no. 162-30 at 145–47.  Even Perry himself acknowledges that the draft license agreement was never executed:  "CY Digital prepared a document marked draft stating that it had been granted rights to use the Patents-In-Suit.  Express

Mobile states that the agreement with CY Digital was terminated on November 11, 2019." Aug. 31, 2021 Perry Report at 30–31. Without a finalized agreement, it is difficult to draw meaning from the terms of the draft agreement. There is no evidence that the draft agreement actually represented either party's perceived value of a licensing agreement. In particular, it is unclear from the record whether either party offered the terms in the draft agreement to the other or how far along in the negotiating process the parties were when the potential deal was scrapped. Without more, it is unreasonable for Perry to rely on the draft agreement as a basis for his opinions. For this reason, the Court agrees that Perry's opinions arising from this draft agreement should be excluded.

### c.    Non-comparable settlement agreements

Express Mobile entered into fifty-five settlement agreements with companies that it sued. *See* Perry Report at 22–28. In its decision in *Shopify*, the Court ruled that these settlement agreements may be relied on to support opinions regarding the appropriate form of royalties but not the appropriate amount of royalties. *Shopify*, 2021 WL 4288113, at *28. Express Mobile argues that Perry's opinions run afoul of this ruling by using the settlement agreements to support opinions regarding how much the royalty payment should be.

The Court agrees. Although Perry does use the settlement agreements to argue for a lump sum form of royalty, he also uses the information to make opinions about the proper size of the royalty payment:

> Mr. Bratic opines that a hypothetical negotiation between Express Mobile and GoDaddy for a non-exclusive license to the Patents-In-Suit would have resulted in a running royalty structure involving total royalty payments of $346 million through April 2021. Mr. Bratic's opinion of the

royalties due from one of many alleged infringers represents 1,978 times
the largest single lump-sum amount of $175,000 that Express Mobile has
received in any of the 55 agreements.

Perry Report at 28.  Settlement agreements used to determine the proper size of a

royalty payment must be comparable to a hypothetical agreement between the parties.

*See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012)

("When relying on licenses to prove a reasonable royalty, alleging a loose or vague

comparability between different technologies or licenses does not suffice.").  GoDaddy

concedes that Perry did not perform a comparability analysis.  The Court thus excludes

this testimony.

### Conclusion

The disputed claim terms are construed in accordance with the conclusions set

forth in this Memorandum Opinion and Order.  Additionally, the Court denies both

parties' motions to strike [182] [209].  With respect to the parties' combined summary

judgment/*Daubert* motions [156] [157], the Court grants the motions in part and denies

the motions in part.  The Court grants summary judgment in favor of GoDaddy on the

issue of infringement regarding the '397 and '168 patent claims but otherwise denies

GoDaddy's motion for summary judgment.  The Court grants summary judgment in

favor of Express Mobile on GoDaddy's defenses of patent eligibility, utility,

indefiniteness, laches, patent exhaustion, express license, disclaimer, implied license,

acquiescence, and unclean hands but otherwise denies Express Mobile's motion for

summary judgment.  Lastly, the Court excludes the portion of David Perry's testimony

regarding the Web Component Patents that is based on the GE Agreement and the

portion of his testimony that is based on the Rempell bankruptcy evidence, the CY

Digital Agreement, and the settlement agreements but otherwise denies the *Daubert*

motions.  The parties are directed to file by August 15, 2022 a joint status report

addressing any scheduling issues going forward and reporting on the history and

current status of any settlement discussions.  The case is set for a telephonic status

hearing on August 17, 2022 at 8:40 a.m. CT (9:40 a.m. ET), using call-in number 888-

684-8852, access code 746-1053.  The Court reserves the right to vacate the status

hearing if it determines from the status report that a hearing is not needed.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 8, 2022