**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **EXPRESS MOBILE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 1:19-cv-01937-MFK** |
| | ) | |
| **GODADDY.COM, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Express Mobile, Inc. sued GoDaddy.com, LLC alleging that two of GoDaddy's products—Website Builder (WSB) and Managed WordPress (MWP)—willfully infringe numerous claims of certain patents owned by Express Mobile that are directed to tools for building and displaying websites.[1]  Express Mobile's claims regarding the '397 and '168 patents went to a jury trial in early November 2025.  In addition to asserting a defense of non-infringement, GoDaddy contended that Express Mobile's patents were invalid.  The jury found in Express Mobile's favor on the questions of infringement, willfulness, and validity and awarded Express Mobile $170 million in damages.

After the close of Express Mobile's case in chief, GoDaddy moved for judgment

---

[1] At trial, Express Mobile contended that GoDaddy infringes claim 2 of U.S. Patent No. 6,546,397 (the '397 patent) and claim 1 of U.S. Patent No. 7,594,168 (the '168 patent). Express Mobile also previously contended that GoDaddy infringed claims 1, 3, 12, 16, and 22 of U.S. Patent No. 9,063,755 (the '755 patent); claims 1 and 13 of U.S. Patent No. 9,471,287 (the '287 patent); and claims 1, 11, 13, 17, and 19 of U.S. Patent No. 9,928,044 (the '044 patent).  Express Mobile's claims regarding the '755 patent, '287 patent and '044 patent went to a jury trial in 2023.  That jury returned a verdict finding that the '755, '287, and '044 patents were valid but were not infringed.  Those patents are not relevant to the present motions.

as a matter of law under Federal Rule of Civil Procedure Rule 50(a).  The Court took the motion under advisement.  GoDaddy has now renewed its Rule 50 motion and has also moved for a new trial under Federal Rule of Civil Procedure 59(a).  Express Mobile has also filed three post-trial motions:  1) a motion for prejudgment interest, 2) a motion for enhanced damages under 35 U.S.C. § 284, and 3) a motion for post-judgment interest.  For the reasons set forth below, the Court grants GoDaddy's motion for judgment as a matter of law with regard to the willfulness finding; otherwise denies its motion for judgment as a matter of law; and denies GoDaddy's motion for a new trial.  The Court also grants Express Mobile's motions for prejudgment interest and post-judgment interest but denies its motion for enhanced damages.  Finally, the Court taxes costs as set forth below.

## Background

The Court assumes familiarity with this case's factual and procedural background, which the Court has discussed in prior written opinions.  The following background is relevant to the present post-trial motions.

**A.    The asserted patents**

The asserted patents relate to a browser-based tool for building websites.  The two patents share the same specification, which describes a method of website design where a web designer can make selections on various menus, and the system can preview what the page will look like.  To do this, attributes of objects on a website (for example, fonts) are stored in an external database.  When an end user browses on the website, the user's browser downloads a "run time engine" that uses data from a database to generate commands to display a website.

### 1.    Claim 2 of the '397 patent

Claim 2 of the '397 patent describes:

An apparatus for producing Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said apparatus comprising:

(a) an interface to present a viewable menu of a user selectable panel of settings to describe elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;

(b) a browser to generate a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;

(c) a database for storing information representative of said one or more user selected settings; and

(d) a build tool having at least one run time file for generating one or more web pages, said run time file operating to utilize information stored in said database to generate commands to said virtual machine for generating the display of at least a portion of said one or more web pages.

Def.'s Br. ISO R. 50(b) Mot., Ex. B, claim 2.

### 2.    Claim 1 of the '168 patent

Claim 1 of the '168 patent describes:

A system for assembling a web site comprising:

a server comprising a build engine configured to:

accept user input to create a web site, the web site comprising a plurality of web pages, each web page comprising a plurality of objects.

accept user input to associate a style with objects of the plurality of web pages, wherein each web page comprises at least one button object or at least one image object, and wherein the at least one button object or at least one image object is associated with a style that includes values defining transformations and time lines for the at least one button object or at least one image object; and wherein each web page is defined entirely by each of the plurality of objects comprising the web page and the style associated with the object,

3

produce a database with a multidimensional array comprising the objects that comprise the web site including data defining, for each object, the object style, an object number, and an indication of the web page that each object is part of, and

provide the database to a server accessible to web browser;

wherein the database is produced such that a web browser with access to a runtime engine is configured to generate the web site from the objects and style data extracted from the provided database.

Def.'s Br. ISO R. 50(b) Mot., Ex. C, claim 1.

**B.    Claim construction**

The claim terms relevant to the issues decided at trial were construed by the

Court as follows:

| Claim Term | Asserted Patent | Court's Construction |
|---|---|---|
| multi-dimensional array(s) / multidimensional array(s) | '397 and '168 | a uniquely identifiable indexed set of related elements, wherein each element is addressed by a set of two or more indices, each index corresponding to a dimension of the array |
| storing information representative of said one or more user selected setting in a database | '397 | storing data in a database, which data pertains to one or more attributes of an object available for selection by a user |
| transformation | '397 and '168 | the changing of an object from one state to another based on a timer control, subject to user settings |
| settings | '397 | attributes of an object available for selection |
| at least one run time file / one or more run time files | '397 | one or more files, including a run time engine, that are downloaded or created when a browser is pointed to a web page or website |
| build engine | '397 | build tool |
| run time (runtime) engine | '168 | file that is executed at runtime that utilizes information from the database and generates commands to display a web page or website |
| virtual machine | '397 | software that emulates computing functionality |
| style | '168 | a collection of one or more settings that is defined separately from any single object but can be associated with one or more objects, with the understanding that "associated with one or more" means capable of being associated with both one object and more than one object |

Final Jury Instructions, dkt. no. 458, at 17.

4

## C.    Evidence at trial

As relevant to the contentions GoDaddy has made in its motions, the following witnesses testified during the trial:

- Dr. Kevin Almeroth, Express Mobile's infringement expert
- Peter Kent, GoDaddy's infringement expert
- Aaron Silvas, GoDaddy engineer
- Walter Bratic, Express Mobile's damages expert
- David Perry, GoDaddy's damages expert

GoDaddy's customers can use WSB to build and publish websites.  Tr. 176:1–3. The customer chooses the desired settings from the WSB database to build the look and feel of the website.  Tr. 188:1–9.  When a website is published, WSB creates an HTML file that contains the user-selected website settings from the WSB database.  Tr. 186:17–188: 25, 204:19–22, 512:12–24.  The HTML file provides a frame for the website as well as instructions that direct a browser to retrieve other objects and data from the consent delivery network (CDN) or another server to complete the website.  Tr. 521:2–13, 600:4–602:3, 813:6–815:5.  The CDN is like renting space on a server on the internet so that some objects can be stored there.  Tr. 190:1–10.  The instructions in the HTML file include JavaScript code that directs the browser to retrieve JavaScript, or script.js, files from a server.  Tr. 553:5–10, 601:8–12; 814:1–4.  The script.js files include objects and data that complete the website.  Tr. 189:15–190:10.

At runtime, GoDaddy sends the HTML file to a visitor's browser where it is downloaded.  Pl.'s Resp. in Opp. to R. 50(b) Mot., Ex. 25 at 13; Tr. 204:9–16.  Dr. Almeroth testified that the HTML file then generates commands for the virtual machine as part of a chain reaction.  The HTML file provides instructions to the browser to retrieve the script.js file.  Tr. 206:1–13.  A JavaScript engine then executes the

commands contained within the script.js file.  Tr. 813:12–16, 814:17–21.  In summary, Dr. Almeroth testified that the HTML file generates commands for the virtual machine by providing instructions to the browser to retrieve the script.js file—containing commands—and the JavaScript engine executes the commands found in the script.js file after retrieval of the file.  Tr. 205:2–17.

Dr. Almeroth further testified that the JavaScript engines that are required to execute the script.js files are virtual machines.  Tr. 197:6–25, 804:21–805:1–13.  Mr. Kent disagreed.  Tr. 587:7–10.  Mr. Kent testified on direct examination that the JavaScript engine was not a "virtual machine" because it did not emulate computing functionality.  Tr. 579:6–15.  But, on cross examination, Mr. Kent admitted that Mozilla, Apple and Google previously stated that the JavaScript engines used in their browsers are "virtual machines."  Tr. 593:1–598:20.

Dr. Almeroth also testified that GoDaddy's WSB database has a multidimensional array.  Tr. 819:4–25.  Specifically, he testified that the web pages have a hierarchical structure, with multiple pages and multiple objects.  *Id.*  Each object has multiple characteristics.  *Id.*  Dr. Almeroth further testified that the WSB database is "provided as information, including in the web pages, to the DPS server.  And that DPS server is accessible to a web browser running in the C1 or C2 computer."  Tr. 218:2–4; *see* Pl.'s Resp. in Opp. to R. 50(b) Mot., Ex. 25 at 13.  GoDaddy engineer Mr. Silvas provided the following illustration of how WSB operates at runtime:



Pl.'s Resp. in Opp. to. R. 50(b) Mot., Ex. 25 at 13.

Express Mobile sent GoDaddy letters in 2013 and 2018 that included information about the '397 and '168 patents. In February 2013, Express Mobile sent GoDaddy a letter informing GoDaddy that the patents were for sale. Def.'s Br. ISO R. 50(b) Mot., Ex. N. GoDaddy then inquired if there was a reason that Express Mobile thought GoDaddy would be interested in the patents. Def.'s Br. ISO R. 50(b) Mot., Ex. O at 3. Express Mobile replied that it thought GoDaddy "might be interested in light of the general area in which the patents apply." *Id.* Express Mobile also provided draft claim charts for eBay, Magento, Shopify, and WordPress. *Id.* at 1. Express Mobile did not provide a claim chart for GoDaddy. In December 2018, Express Mobile sent another letter that broadly accused GoDaddy of infringing the patents. Pl.'s Resp. in Opp. to R. 50(b) Mot., Ex. 10.

On damages, the parties' experts disagreed on the reasonable royalty amount in the event of a finding of liability. Dr. Almeroth testified that he performed an analysis to determine the technical importance of the relevant features in GoDaddy's WSB. Tr.

223:7–17.  To do so, he considered the extent to which a feature in WSB is technical in nature as opposed to something that is commonly offered in these types of systems, then assigned percentages to the sets of features based on their importance.  Tr. 223:11–16.  Then he determined which features were attributable to the '397 and '168 patents.  Tr. 223:16–17.  Dr. Almeroth concluded that the editor functionalities related to the patents and assigned a 65 percent weighting to those functionalities.  Tr. 223:17–20.  He explained that the 65 percent weighting was based on his consideration of the technology of the editor functionalities compared to other features.  Tr. 224:21–25.

Mr. Bratic, Express Mobile's damages expert, calculated the royalty rate by using Dr. Almeroth's 65 percent technical importance, GoDaddy's gross profits that he determined were attributable to the patented technology, and a hypothetical 26.4 percent profit split between GoDaddy and Express Mobile.  Tr. 399:2–17.  Under this hypothetical profit split, 26.4 percent of the profits would go to Express Mobile as the inventor and a little under 74 percent would go to GoDaddy as the promoter.  *Id.*  As the royalty base, Mr. Bratic used GoDaddy's subscriptions during the relevant period, minus the subscriptions attributable to WSB version 6.[2]  Tr. 383:7–23.  He opined that "the revenue information provided a significant understatement of [the] contribution and use made of the patented invention."  Tr. 377:9–18.  Based on this calculation, he opined that a reasonable running royalty—over the life of the patents—would equal as much as $421 million if both patents were infringed.  Tr. 401:19–22.

Mr. Perry, GoDaddy's damages expert, testified that Mr. Bratic's damage estimate of $421 million was "objectively unreasonable and vastly overstated."  Tr.

---

[2] According to Dr. Almeroth, WSB version 6 did not infringe the patents.  Tr. 383:13–14.

687:25 – 688:1.  Mr. Perry testified that, based on his calculations, a reasonable lump-sum royalty is $355,000.  Tr. 648:6–7.  Mr. Perry testified that Mr. Bratic should have focused on GoDaddy's net revenue rather than subscriptions because it is a "much more reliable number that's used in GoDaddy's financials . . . ."  Tr. 635:1–2.  On cross examination, Express Mobile questioned Mr. Perry on an alternative calculation that would include Mr. Bratic's royalty rate but using GoDaddy's total net revenue, including SSL certificates, instead of subscription counts as the royalty base.[3]  Tr. 681:22–684:12.  Mr. Perry confirmed that, using Mr. Bratic's calculation but substituting net revenue for subscription counts, the total reasonable royalty would be approximately $170 million.  Tr. 684:5–12.

GoDaddy has now moved for judgment as a matter of law and for a new trial. Express Mobile has moved for prejudgment interest, enhanced damages under 35 U.S.C. § 284, and post-judgment interest.  Express Mobile has also submitted a bill of costs; GoDaddy objects to several categories of the costs Express Mobile seeks to recover.

<strong>Discussion</strong>

**A.    Judgment as a matter of law**

The law of the regional circuit—here the Third Circuit—governs the standards for deciding a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

---

[3] SSL certificates are a separate product that GoDaddy sells for security related to websites.  Tr. 655:2–4.  Mr. Bratic testified that Dr. Almeroth's 65 percentage allocation accounted for the SSL certificates so "there was no reason for it to be excluded from the revenues reported by GoDaddy" for purposes of the reasonable royalty calculation.  Tr. 376:1–10.

Judgment as a matter of law may be entered against a non-moving party if a court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party."  Fed. R. Civ. P. 50(a).  In ruling on a renewed motion, "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  Fed. R. Civ. P. 50(b).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings."  *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (internal citation omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (internal citation omitted).

"Judgment as a matter of law is to be granted sparingly."  *Fair Hous. Council of Suburban Phila. v. Main Line Times*, 141 F.3d 439, 442 (3d Cir. 1998).  In the Third Circuit, a "court may grant a judgment as a matter of law contrary to the verdict only if the record is critically deficient of the minimum quantum of evidence to sustain the verdict."  *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (internal citation omitted).  A court must also give the "verdict winner[] the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him."  *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991).  A court "may not weigh the evidence, determine the credibility of witnesses, or

10

substitute its version of the facts for the jury's version." *Acumed*, 561 F.3d at 211 (internal citation omitted).

In support of its motion for JMOL, GoDaddy makes three primary arguments related to infringement and validity of the patents:  1) Express Mobile failed to identify a "run time file" or "run time engine"; 2) Express Mobile failed to prove WSB used a virtual machine ('397 patent); and 3) Express Mobile failed to prove WSB used a multidimensional array / database ('168 patent).  GoDaddy also argues that the Court should grant JMOL in its favor on willful infringement because Express Mobile presented no evidence that GoDaddy had a specific intent to infringe.  The Court will address each argument in turn.

### 1.    Infringement and validity

### i.    Run time file / run time engine

GoDaddy argues that no reasonable jury could find WSB infringed on the '397 and '168 patents based on the "run time file" or "run time engine" requirement, for four reasons:  1) Express Mobile's infringement theory fails under *Shopify Inc. v. Express Mobile, Inc.,* No. 2024-1977, 2025 WL 3511442 (Fed. Cir. Dec. 8, 2025); 2) the HTML file does not "utilize information stored in said database to generate commands"; 3) Express Mobile's infringement theory conflicts with the specification and its own position in the *BigCommerce* inter partes review (IPR); and 4) Express Mobile's theory shifted at trial from the theory the Court and the Federal Circuit addressed in pretrial decisions.

The Court will address GoDaddy's first two arguments together.  GoDaddy contends that Express Mobile's theory fails under *Shopify,* because Express Mobile accuses the same JavaScript file to satisfy two requirements of the claim: the

11

"commands" and the "information stored in said database" used to generate those commands.  Def.'s Br. ISO R. 50(b) Mot. at 4.  GoDaddy also argues that Express Mobile failed to identify a file that utilizes information stored in WSB to generate commands.  These arguments both challenge whether Express Mobile presented substantial evidence that the HTML file:  (1) generates commands, and (2) utilizes information stored in the WSB database to generate said commands.

GoDaddy's arguments lack merit.  Express Mobile presented substantial evidence that the HTML file generates commands.  In *Shopify,* the Federal Circuit affirmed the district court's grant of summary judgment for Shopify on noninfringement as to claim 1 of the '397 patent and claim 1 of the '168 patent.  *Shopify*, 2025 WL 3511442, at *5.  In that case, Express Mobile presented evidence that the "virtual machine commands" generated by the "run time file" were HTML, JS, and CSS code.  *Id.*  The court explained that the HTML, JS, and CSS run time files only relied on information and data already included within those files.  *Id.*  The court concluded that these files did not "generate virtual machine commands" because "the files would be generating themselves," "which does not make sense[.]"  *Id.*  Thus the HTML, JS, and CSS files Express Mobile relied on in *Shopify* were not "run time files" or "run time engines" because they did not generate commands.  *Id.*

*Shopify* does not foreclose liability in this case.  Unlike *Shopify*, the HTML file that Dr. Almeroth testified was the "run time file" or "run time engine" in this case does not rely solely on information and data contained within the file itself to generate commands.  Instead, the HTML file contains instructions that, at runtime, cause a dynamic generation of the GoDaddy customer's webpage.  This dynamic generation

begins with instructions within the HTML file that direct the browser to retrieve certain files, including script.js files, from a server.  The script.js files contain commands that are executed by a JavaScript engine after the file is retrieved to ultimately display the website.

GoDaddy also contends that Express Mobile's theory of infringement fails because the HTML file's direction to retrieve the script.js files cannot be considered "generating" commands.  But Dr. Almeroth testified that the script.js commands are not executed unless the HTML file initiates the dynamic process by issuing its "marching orders" to retrieve the relevant files.  Tr. 813:17 – 814:21.  The jury could reasonably find that the HTML file's retrieval of the script.js files, thus causing the script.js files to execute commands, satisfied the requirement that the HTML file generate commands.

Furthermore, Express Mobile presented substantial evidence that the HTML file utilizes information from the WSB database to generate commands.  GoDaddy contends that, even if the "retrieval of the commands satisfies the 'generate' limitation," Express Mobile did not show that the accused generation occurs using information stored in the WSB database.  Def.'s Br. ISO R. 50(b) Mot. at 10.  GoDaddy goes on to argue that the browser, not the HTML file, retrieves the JavaScript file, so the HTML file "cannot 'utilize' anything in the JavaScript file to generate commands before that file is even accessed."  *Id.* at 11.  Express Mobile responds that "[t]he HTML file 'utilizes information from the database' because the website that the HTML file causes to be displayed at runtime reflects the exact settings saved in the [WSB] database when the website was designed and published by the customer."  Pl.'s Resp. in Opp. to R. 50(b) Mot. at 6.

13

GoDaddy's contention that the run time file / engine must *access* information stored in the WSB database *at runtime* is a claim construction argument under the guise of a challenge to the sufficiency of the evidence.  The Court also disagrees with the contention.  Claim 2 of the '397 patent requires that the run time file "operat[e] to utilize information stored in said database to generate commands . . . ."  Def.'s Br. ISO R. 50(b) Mot., Ex. B, claim 2.  The Federal Circuit explained that the phrase "utilizes information stored in said database," "requires no more than that the runtime engine 'utilize[ ]' information from the database" "without saying how the data came into the runtime engine's possession . . . ."  *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. 2023-2265, 2025 WL 1013386, at *5 (Fed. Cir. Apr. 2, 2025).  The court went on to explain that the phrase "does not further limit the runtime engine to interacting with a database in a specific way to obtain data*." Id*.  This Court therefore concludes that the claim does not require the run time file / engine to access information stored in the WSB database at runtime.

Moreover, GoDaddy's reliance on the fact that the script.js files are retrieved after the HTML file provides instructions to the browser does not support the result it seeks.  As discussed, the information included in the HTML file is derived from the customer's selection of information from the WSB database to create the look and feel of the website.  At runtime, the HTML file utilizes that information from the database to retrieve script.js files that correspond to the selected settings.  The script.js files contain commands to the JavaScript engine that ultimately will display the web page or website based on the customer previously selected settings.

It is immaterial where the script.js files are stored or when they are accessed.

14

The HTML file utilizes the information from the WSB database to determine the appropriate script.js files to retrieve.  Based on this retrieval, the script.js files then execute the commands contained within the files.  The chain reaction that leads to the execution of the commands contained within the script.js files begins with the HTML file. The Court concludes that Express Mobile presented substantial evidence that permitted the jury to find that WSB includes a run time file (the HTML file) that operates to utilize information stored in the WSB database (the website settings selected by a customer) to generate commands (commands from the script.js files to the JavaScript engine).

GoDaddy's third argument—that the verdict is unsupported because Express Mobile's infringement theory conflicts with its previous position in the *BigCommerce* IPR—also fails.  GoDaddy contends that Express Mobile cannot now argue that "retrieving is generating" because it previously argued that retrieving a static HTML file does not qualify as "generating commands."  Def.'s Br. ISO R. 50(b) Mot. at 9.  At the outset, the Court agrees with Express Mobile that this argument is misplaced on a Rule 50(b) motion because it does not contest the sufficiency of the evidence.  *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) ("[A] judgment notwithstanding the verdict may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.") (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001))); Fed. R. Civ. P. 50(a)(1).

The argument also fails on the merits.  In the *BigCommerce* IPR, Express Mobile argued that the prior art at issue did not generate a website in the manner described and claimed in the '397 patent because it "retrieves previously stored HTML pages."

15

Def.'s Br. ISO R. 50(b) Mot., Ex. E at 30.  Express Mobile argued that "storing and retrieving the full webpage in HTML format" did not "generate" a website for purposes of the patents.  Def.'s Br. ISO R. 50(b) Mot., Ex. F at 14.  Express Mobile also argued that the "generating commands" requirement of the patent "allowed the invention to dynamically generate the webpage on-the-fly and provide greater flexibility, smaller storage footprint, faster download, and improved rendering."  *Id*.  The Patent Trial and Appeal Board found these arguments persuasive.  *Id.* at 15.

But GoDaddy ignores the key difference between the *BigCommerce* IPR and this case.  As in *Shopify*, the HTML file at issue in the *BigCommerce* IPR included within that file all data and objects required to display the website.  It did not need to retrieve any additional files and thus did not "dynamically generate" a webpage.  *Id.* at 14.  In this case, the HTML file must retrieve script.js files, and the commands within the script.js files ultimately complete the website.  The HTML file created by WSB cannot display a website on its own; it dynamically generates a webpage by directing a browser to retrieve objects and data that reside in other files.

Additionally, Express Mobile presented evidence that the HTML file is not a "static" file.  Dr. Almeroth referred to "static HTML files" based on how GoDaddy characterized the files.  Tr. 189:15-16, 207:13-14.  The substance of his testimony, however, explained that the HTML file includes instructions that direct the browser to retrieve script.js files that are then executed by the JavaScript engine.  Tr. 205:7-17, 206:1-13.  These commands ultimately display the website.  Tr. 205:12-14.

GoDaddy's fourth argument—that JMOL is required because Express Mobile's theory shifted at trial—is similarly unpersuasive.  Again, this is not an argument based

16

on the sufficiency of the evidence.  Instead, GoDaddy argues that, before trial, Express Mobile "never articulated a theory in which an HTML file qualifies as a run time file/engine and in which script.js satisfies the 'virtual machine commands'" requirement. Def.'s Br. ISO R. 50(b) Mot. at 12.

The cases GoDaddy relies on to support the proposition that this entitles it to judgment as a matter of law are inapposite.  GoDaddy does not argue that Dr. Almeroth's testimony was internally inconsistent at trial or that Express Mobile's theory of liability was not disclosed until its closing argument. *See Finesse Wireless LLC v. AT&T Mobility LLC*, 156 F.4th 1221, 1227 (Fed. Cir. 2025) (reversing denial of JMOL because an expert's trial testimony was internally inconsistent); *Jones v. Wells Fargo Bank, N.A.*, 858 F.3d 927, 932–34 (5th Cir. 2017) (setting aside a jury verdict because the defendant's lawyer introduced a new theory of liability in the rebuttal closing argument).   And GoDaddy did not object to Dr. Almeroth's testimony or contend at trial that it could not adequately cross him because his opinions were not disclosed before trial.  *See Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381-82 (Fed. Cir. 2013) (affirming grant of JMOL because the plaintiff's expert failed to disclose his infringement opinions before trial).

If GoDaddy advanced these arguments, they would lack merit.  Dr. Almeroth's reports—which were, of course, disclosed in advance of trial—stated that the HTML file was a run time file.  Def.'s Br. ISO R. 50(b) Mot., Ex. J, ¶ 70; Pl.'s Resp. in Opp. to. R. 50(b) Mot., Ex. 49, ¶¶ 329, 354; Ex. 51, ¶ 32.  Specifically, one of Dr. Almeroth's supplemental reports stated:  "The HTML file contains JavaScript that is needed to display the webpage, as well as references to additional JavaScript code that must be

17

fetched and loaded to fully display the webpage." Pl.'s Resp. in Opp. to. R. 50(b) Mot., Ex. 51, ¶ 32. This is the theory that Express Mobile relied on at trial. Dr. Almeroth's opinions were properly disclosed, and Express Mobile did not introduce a new theory at trial.

For these reasons, the Court concludes that Express Mobile presented substantial evidence that WSB infringed on the '397 and '168 patents based on the "run time file" or "run time engine" requirement. GoDaddy is not entitled to JMOL on this basis.

### ii.    Virtual machine

GoDaddy next argues that no reasonable jury could find infringement because Express Mobile failed to prove that WSB used a virtual machine. The Court agrees with Express Mobile that GoDaddy is asserting a claim construction argument under the guise of a challenge to the sufficiency of the evidence.

The Court previously construed virtual machine as "software that emulates computing functionality." *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. 19 C 1937, 2022 WL 23021894, at *2–4 (D. Del. Aug. 8, 2022); dkt. no. 261 at 5. "A sound claim construction need not always purge every shred of ambiguity, including potential ambiguity arising from the words a court uses to construe a claim term." *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co*., 853 F.3d 1370, 1378–79 (Fed. Cir. 2017) (internal citation omitted). "Such an endeavor could proceed ad infinitum[.]" *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). GoDaddy essentially asks the Court to now hold that a virtual machine must "enhance[] browsers that do not support certain kinds of programming languages." Def.'s Br. ISO R. 50(b)

Mot. at 14.  But the Court did not include this language in the construction of "virtual machines."  *Express Mobile*, 2022 WL 23021894, at *2–4.

Regardless, Express Mobile presented substantial evidence that WSB used a virtual machine under both the Court's construction and GoDaddy's proposed new construction.  Dr. Almeroth testified that the JavaScript engine that is required to display a website created in WSB is a virtual machine.  Tr. 197:6–25, 804:21–805:1–13.  Mr. Kent disagreed.  Tr. 587:7–10.  On cross examination, however, even Mr. Kent agreed that Mozilla, Apple and Google state that the JavaScript engines used in their browsers are "virtual machines."  Tr. 593:1–598:20.  Express Mobile also presented evidence that the JavaScript engine was required to execute the commands in the script.js files.  The JavaScript engine therefore enhances a browser that cannot otherwise execute the JavaScript programming language.  The Court thus concludes that Express Mobile presented substantial evidence that the JavaScript engine is a virtual machine.

### iii.    Multi-dimensional array / database

In its final challenge to the jury's verdict of infringement, GoDaddy contends that Express Mobile failed to offer evidence sufficient to meet two requirements of the '168 patent.

First, GoDaddy contends that Express Mobile "failed to present sufficient evidence that WSB is 'a database with a multidimensional array' as claimed by the '168 patent."  Def.'s Br. ISO R. 50(b) Mot. at 14.  The judge to whom the case was then assigned construed "multi-dimensional array(s) / multidimensional array(s)" as "a uniquely identifiable indexed set of related elements, wherein each element is addressed by a set of two or more indices, each index corresponding to a dimension of

19

the array." *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. 19 C 1937, 2021 WL 2209868, at *5 (D. Del. June 1, 2021). Dr. Almeroth testified that GoDaddy's WSB database includes a multi-dimensional array. Specifically, he testified that the web pages have a hierarchical structure, with multiple pages and multiple objects. Tr. 819: 4–16. He further testified that each object has multiple characteristics and that for each characteristic there are multiple options for what attributes that object can have. *Id*. The Court concludes that this is substantial evidence supporting the jury's verdict that WSB included a multi-dimensional array.

Second, GoDaddy contends that Dr. Almeroth "ignored claim 1 of the '168 patent's requirement that the build tool 'provide the database to a server accessible to a web browser.'" Def.'s Br. ISO R. 50(b) Mot. at 16. But Dr. Almeroth testified that the WSB database is "provided as information, including in the web pages, to the DPS server. And that DPS server is accessible to a web browser running in the C1 or C2 computer." Tr. 218:2-4; *see* Pl.'s Resp. in Opp. to R. 50(b) Mot., Ex. 25 at 13. The Court concludes that Dr. Almeroth's testimony amounts to substantial evidence supporting the jury's verdict.

For these reasons, the Court concludes that GoDaddy is not entitled to JMOL on the issues of infringement and validity regarding claim 2 of the '397 patent and claim 1 of the '168 patent.

### 2.    Willfulness

GoDaddy next argues that Express Mobile failed to present sufficient evidence that GoDaddy willfully infringed. Express Mobile responds that it presented evidence that it gave GoDaddy notice of the '397 and '168 patents in 2013 and 2018.

"To establish willfulness, the patentee must show that the accused infringer had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021). That is, Express Mobile was required to show that GoDaddy knew of the patents and "engaged in 'deliberate or intentional infringement.'" *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1296 (Fed. Cir. 2023). "Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness." *Bayer Healthcare*, 989 F.3d at 988.

GoDaddy argues that the standard for indirect infringement is actual knowledge or willful blindness, higher standards than recklessness and compares this standard to the intent to infringe required to prove willfulness. Based on this comparison, GoDaddy argues that the willfulness standard cannot be met through a showing of recklessness. But these are distinct theories. The jury was correctly instructed that "Infringement is willful if Express Mobile proves by a preponderance of the evidence that GoDaddy knew that it was infringing the patent or acted in reckless disregard of Express Mobile's patent rights." Dkt. no. 458 at 21; *see Ironburg Inventions*, 64 F.4th at 1296. Even under this standard, however, Express Mobile failed to present substantial evidence that would support a finding that GoDaddy willfully infringed.

Express Mobile relies on *Ironburg Inventions*. In that case, the plaintiff accused the defendant's video game controller of infringing on certain claims of its patent. *Id.* at 1283. Before the controller was offered for sale, the plaintiff sent the defendant a letter that not only provided notice of the patent but also notified defendant that its product may infringe on the patent. *Id*. The letter pointed to a specific prototype of the grip

21

buttons on the controller as potentially infringing and noted that "current or future products that incorporate similar features might also infringe." *Id.* At trial, the defendant's general counsel admitted that he never provided the patent to the defendant's engineers, and the jury heard evidence that the defendant did not attempt to design around the patent. *Id.* at 1296. Still, the defendant began selling the final version of the controller that included potentially infringing features even though it knew the product was accused of infringement. *Id.* The court found that the jury heard substantial evidence to support a finding that the defendant "recklessly" disregarded the plaintiff's patent rights and thus willfully infringed. *Id.*

This case is different. The 2013 letter only informed GoDaddy that Express Mobile was ready to entertain offers to purchase the '397 and '168 patents. Def.'s Br. ISO R. 50(b) Mot., Ex. N at 1. It did not notify GoDaddy that WSB potentially infringed on the patents. To the contrary, after GoDaddy inquired if there was a reason that Express Mobile thought GoDaddy would be interested in the patents, Express Mobile replied that it thought GoDaddy "might be interested in light of the general area in which the patents apply." Def.'s Br. ISO R. 50(b) Mot., Ex. O at 3. Express Mobile also provided draft claim charts for eBay, Magento, Shopify, and WordPress. *Id.* at 1. But Express Mobile did not provide a claim chart for GoDaddy. *Id.* Express Mobile further argues that testimony that GoDaddy did not provide the patents to its engineers supports the jury's willful infringement verdict. But, as discussed, the 2013 letter did not put WSB on notice that it was infringing the patents.[4]

---

[4] The Court recognizes that, in denying GoDaddy's pretrial motion to exclude evidence and argument on willfulness, it noted that infringement could be inferred from the 2013

For these reasons, the Court concludes that Express Mobile failed to present substantial evidence supporting a finding that GoDaddy had the specific intent to infringe the '397 and '168 patents.  *See Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 956 (Fed. Cir. 2024) (affirming the district court's grant of JMOL when the plaintiff presented no evidence that the defendant knew of its alleged infringement).  GoDaddy is therefore entitled to JMOL in its favor on the question of willful infringement.

**B.    New trial**

The next question is whether GoDaddy is entitled to a new trial.  The law of the regional circuit—here the Third Circuit—governs the standards for deciding a motion for a new trial under Federal Rule of Civil Procedure 59(a).

A court has discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  Under governing Third Circuit law, a court "should grant a new trial only if the jury's verdict is against the great weight of evidence and either is a miscarriage of justice or cries out to be overturned."  *Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, 996 F.3d 1342, 1352 (Fed. Cir. 2021) (internal citation omitted).

GoDaddy first argues that the Court should grant a new trial on infringement and validity.  GoDaddy next argues that a new trial on damages is warranted because the jury's damages award is against the great weight of the evidence and excessive.  In the alternative, GoDaddy argues that the Court should offer Express Mobile a remittitur.

---

email exchange.  *Express Mobile*, 2022 WL 23021894, at *13.  The Court also noted, however, that it was a close case on whether there was enough evidence to support a willfulness finding.  Pretrial Conf. Tr. 16:8–11.  Based on a review of the full trial record, the Court now concludes that the 2013 exchange was not sufficient to support a willfulness finding.

Finally, GoDaddy argues that the Court should grant a new trial on willfulness. GoDaddy's final argument is moot in light of the Court's conclusion that GoDaddy is entitled to judgment as a matter of law on willful infringement.  The Court addresses the remaining arguments below.

### 1.   Infringement and validity

GoDaddy argues that the jury's liability verdict is against the great weight of the evidence.  As discussed, Express Mobile presented sufficient evidence permitting a reasonable jury to conclude that GoDaddy infringed the '397 and '168 patents.  The Court concludes, based on the evidence discussed above, that the jury's verdict was not against the great weight of the evidence.

GoDaddy adds one new argument:  the jury's obviousness verdict was against the great weight of the evidence.  GoDaddy argues that its expert, Dr. Philip Greenspun, "gave largely unrebutted testimony about how Silverstream mapped onto the asserted claims."  Def.'s Br. ISO Mot. for New Trial at 6.  Primarily, GoDaddy argues that it was undisputed that Silverstream was a browser-based tool.  Express Mobile responds that it presented evidence that Silverstream was a desktop-based tool to design web applications.

Regarding the '397 patent, there was a dispute regarding whether Silverstream was a desktop application or operated from a browser.  Tr. 723:5 – 724:4, 824:7–13, 827:4 – 828:19.  And, regarding the '168 patent, there was a dispute regarding whether Silverstream taught the claimed styles or included a database.  Tr. 736:4–17, 831:11 – 832:12.  The Court concludes that the jury's verdict on obviousness was not against the great weight of the evidence.

24

GoDaddy also argues that the Court erred in excluding evidence of the patents' prosecution history.  Specifically, GoDaddy argues that the Court erred by:  (1) precluding GoDaddy from providing context to the jury that the prior art it was evaluating—primarily the Silverstream system—was not considered by the examiner before issuing the '397 or '168 patents, and (2) preventing GoDaddy from rebutting Express Mobile's "arguments that the '397 and '168 patents are 'foundational' and that it was improper to rely on multiple prior-art references for an obviousness combination."  Def.'s Br. ISO Mot. for New Trial at 6.

These arguments are no more persuasive now than when GoDaddy made them at the pretrial conference and multiple times at trial.  At the pretrial conference, the Court noted that there was no support for impeaching "an expert based on what the party they're testifying on behalf of has said during the prosecution of the patent."  Pretrial Conf. Tr. 69:1–3.  The Court concluded that allowing the prosecution history, re-examination, and submissions and decisions from the *Meta IPR*s presented "a significant Rule 403 problem, if nothing else."  *Id.* at 81:14–23.  At trial, the Court reiterated this ruling when GoDaddy sought to introduce evidence that prior art was considered or not considered by the Patent Office.  Tr. 10:22–24, 679:1–2, 710:12–20.  GoDaddy has presented no compelling reason for the Court to reverse its previous rulings.  The prosecution history of the '397 and '168 patents, including information on whether the Silverstream system was considered by the patent examiners, was properly excluded.

Finally, GoDaddy argues that it was substantial error to prevent GoDaddy from filing a second motion for summary judgment in view of the reexamination decision

while also precluding evidence regarding the reexamination at trial.  GoDaddy asserts this argument in a conclusory paragraph that is not supported by citations to any case law.  Thus the argument is waived or forfeited.  *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997).

The argument also lacks merit.  The law did not require the Court to allow a new summary judgment motion.  This argument is also confusing, as GoDaddy argues that it was prejudiced by this error because the Court "in effect prevented any possibility of presenting [evidence of the prosecution history, reexamination, and IPRs of the asserted patents] to the factfinder."  Def.'s Br. ISO Mot. for New Trial at 8.  It is unclear how permitting summary judgment briefing would somehow render the prosecution history of the patents admissible, which is what GoDaddy seems to be suggesting.  As discussed, the Court properly excluded this evidence at trial because it presented a significant Rule 403 problem.

For these reasons, the Court concludes that GoDaddy is not entitled to a new trial on infringement and validity.

### 2.    Damages

GoDaddy next argues that the damages award is against the clear weight of the evidence, based on speculation, and excessive.  The Federal Circuit has stated that when "reviewing damages awards in patent cases," a court must "give broad deference to the conclusions reached by the finder of fact."  *Monsanto Co. v. McFarling*, 488 F.3d 973, 981 (Fed. Cir. 2007).  The Federal Circuit has also instructed that a jury's damages award "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork." *Id.* (internal

26

citation omitted).

GoDaddy argues that:  1) Express Mobile improperly introduced a new damages theory in its closing argument, 2) the award is based on an inflated royalty base, 3) the award is based on an improper royalty rate, 4) the damages are excessive, and 5) a new trial is required because the PTAB found that the '168 patent is invalid.

### i.    New damages theory

GoDaddy contends that Express Mobile improperly introduced an unsupported and new damages theory in its closing argument.  This argument lacks merit.  During closing, Express Mobile first argued that Mr. Bratic's testimony supported damages as high as $420 million or as low as approximately $100 million.  Tr. 925:14–18.  Then, Express Mobile's counsel stated that there were "other ways to look at damages as well."  Tr. 925:19.  Counsel went on to discuss that applying Mr. Bratic's methodology to GoDaddy's revenue would result in damages of approximately $170 million.  Tr. 925:20–22.  This theory of damages was not new.  It simply combined Mr. Bratic's royalty rate with Mr. Perry's royalty base.  Express Mobile specifically questioned Mr. Perry about this on cross examination.  Tr. 681:10 – 684:12.

GoDaddy also argues the verdict is not supported because the theory that Express Mobile was entitled to $170 million in damages was based on a "hypothetical calculation floated during Express Mobile's cross-examination of Mr. Perry and closing argument, not opinion or an expert model in evidence[.]"  Def.'s Br. ISO Mot. for New Trial at 12 (emphasis omitted).  But GoDaddy's argument ignores that Mr. Perry testified that Mr. Bratic should not have used subscription counts but instead should have focused on the revenues because "[t]hat's a much more reliable number that's used in

27

GoDaddy's financials."  Tr. 634:23 – 635:6; *see also* Tr. 378:3–12 (Bratic testimony). The jury apparently credited Mr. Bratic's royalty rate calculation but credited Mr. Perry's testimony that GoDaddy's revenues should be used as the royalty base instead of subscription counts.  This is a sufficient basis for the verdict.  *Bayer Healthcare*, 989 F.3d at 984 (finding that substantial evidence supported a jury's royalty rate when it was "within the range encompassed by the record as a whole.") (internal citation omitted)); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("[T]he jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate.").  More specifically, there was nothing improper in the jury's determination to adopt part of the analysis of GoDaddy's expert—or in Express Mobile's counsel offering that option to the jury as an alternative to its own expert's higher figure.

### ii.    Inflated royalty rate

GoDaddy's challenge to Express Mobile's royalty rate boils down to an argument that Express Mobile failed to properly apportion the damages calculation to limit it to the patented portions of WSB.  GoDaddy contends that Dr. Almeroth's testimony related to his determinations of relative technical importance should have been excluded because he lacked any reliable methodology.  Recognizing that the Court denied its motion to exclude Dr. Almeroth's testimony, GoDaddy argues that "the trial has confirmed the arbitrariness of Dr. Almeroth's number."  Def.'s Br. ISO Mot. for New Trial at 15.

GoDaddy's argument ignores the "critical distinction between admissibility, which is for the court, and weight and credibility, which are for the jury."  *Willis Electric Co. v. Polygroup, Ltd.,* 166 F.4th 1363, 1373 (Fed. Cir. 2026).  In this regard, the Federal

28

Circuit recently focused on the Advisory Committee's observation that "many courts have incorrectly applied Rules 702 and 104(a) by holding that 'the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment). The court stated that this distinction "is particularly important in the context of patent damages because estimating a reasonable royalty 'necessarily involves an element of approximation and uncertainty.'" *Id.* (quoting *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333,1340 (Fed. Cir. 2025)).

In *Willis Electric*, the defendant argued that the testimony from the plaintiff's damages expert "should have been excluded because she did not adequately explain her methodology to the jury." *Id.* at 1377. In rejecting this argument, the court explained: "As gatekeeper, the district court has the exclusive role of assessing the reliability of the testimony based on the full breadth of information before it." *Id.* "Once a district court has determined the expert's methodology is reliable, challenged testimony does not become unreliable simply because a party believes an expert should have presented information to the jury differently." *Id.*

The question for the Court, then, is whether Dr. Almeroth's methodology satisfied Rule 702. The Court concludes, as it did before trial, that Dr. Almeroth thoroughly and sufficiently explained the basis for his opinion in his expert report. He stated that he determined the relative weights of the features based on how technical the feature is, whether any technical aspects are standard or conventional, and the extent to which technical difficulty and/or creativity is involved. Almeroth Opening Report ¶¶ 825–34. For these reasons, the Court properly declined to exclude Dr. Almeroth's testimony

concerning the technical importance of the claimed inventions. *Express Mobile*, 2022 WL 23021894, at *15–16. Dr. Almeroth's testimony at trial did not change this analysis. *Willis Electric,* 166 F.4th at 1377.

GoDaddy's argument that Dr. Almeroth's trial testimony was speculative and unsupported is more accurately considered as contesting the sufficiency of the evidence. "When the accused technology does not make up the whole of the accused product, apportionment is required." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). "In such cases, the patentee must 'give evidence tending to separate or apportion the [infringer]'s profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative.'" *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

Dr. Almeroth testified at trial that he first determined that the patented technology was important to GoDaddy based on information on GoDaddy's website as well as testimony from its vice president of product and management. Tr. 222:1 – 223:6. Dr. Almeroth then testified that he performed an analysis of WSB features to determine the technical importance of each category of features. Tr. 223:7–11. To do so, he identified the features in WSB and considered the extent to which a feature was technical in nature as opposed being comprised of technology that was offered in similar systems. Tr. 223:11–15. He then testified that he assigned percentages to each set of features based on their technological importance and then determined which features were attributable to the '397 and '168 patents. Tr. 223:15–17. Dr. Almeroth testified that the editor functionalities category related to the patents in this case. Tr.

224:17–20.  Dr. Almeroth explained that he assigned a technology weighting based on whether or not it was the core innovation or technology of WSB.  Tr. 223:24 – 224:3. He explained that matters like security, domains, website hosting, 24/7 support, and categories like that are very common functions and thus received a lesser weighting. Tr. 224:6–16.  Dr. Almeroth explained that he arrived at the 65 percent apportionment for the editor functionalities by comparing those functionalities to the other features.  Tr. 224:21–25.  Based on this analysis, he testified that the technological importance of the editor functionalities amounted to 65 percent of the total WSB functionalities.  Tr. 225:5– 8.

This is not a case where the expert failed to apportion the relevant technology, *see Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014), or where the expert's testimony failed to address facts of the case, *see LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012).  Instead, Dr. Almeroth testified that WSB's editor functionalities were attributable to the patents, and those functionalities comprised 65 percent of WSB's technology.

The Federal Circuit has "never required absolute precision in [determining apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty."  *Virnetx*, 767 F.3d at 1328.  Although it may have been beneficial for Dr. Almeroth to provide additional information to the jury, his testimony communicated the information he obtained from GoDaddy that supported WSB's importance to the company, the features he identified as part of WSB based on his review of the technology, and his assessment of the technological importance attributable to the various WSB features.  *Finjan*, 879 F.3d at 1313 (finding that the

jury's damages award for infringement was based on substantial evidence when the plaintiff's expert apportionment assumptions were based on defendant's own diagram and identification of relevant components).  GoDaddy was free to explore any shortcomings in Dr. Almeroth's analysis on cross examination and by presentation of opposing evidence.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29 (Fed. Cir. 2012) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010))).

GoDaddy also argues that, to opine properly on the value of the patented technology to GoDaddy, Dr. Almeroth "would have needed to engage in some sort of economic analysis[.]"  Def.'s Br. ISO Mot. for New Trial at 16.  This contention ignores that Mr. Bratic did just that when he applied Dr. Almeroth's 65 percent apportionment calculation to his broader reasonable royalty rate analysis.

The most common approach to determining reasonable royalty damages is the hypothetical negotiation approach.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  This approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *Id.* at 1324.  Developing a hypothetical negotiation analysis "necessarily involves an element of approximation and uncertainty."  *Id.* at 1325 (internal citation omitted).  That said, the Federal Circuit has cautioned that damages "must not be left to conjecture by the jury.  They must be proved, and not guessed at."  *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 660 (Fed. Cir. 2017) (quoting *Philp*

32

*v. Nock*, 84 U.S. 460, 462 (1873)).

Mr. Bratic explained that his damages analysis focused on the hypothetical negotiation between GoDaddy and Express Mobile and the resulting reasonable royalty based on those hypothetical negotiations. Tr. 367:2–21. Mr. Bratic used the common formula of applying a royalty rate to a royalty base. Tr. 369:1–11. For the royalty rate, Mr. Bratic explained that he isolated the portion of WSB that was attributable to the patents based on Dr. Almeroth's 65 percent technological apportionment and then applied GoDaddy's gross profit margin on the patented technologies. Tr. 369:15 – 370:1. Then he explained that he applied a 26.4 percent profit split based on his analysis of how GoDaddy and Express Mobile would share in the profits attributable to the patented invention in the hypothetical negotiation. Tr. 370:1–9. For each of these steps, Mr. Bratic explained why he relied on the relevant information and data. Mr. Bratic's royalty rate calculation is therefore distinct from the types of opinions that the Federal Circuit has found to have been "plucked out of thin air." *LaserDynamics*, 694 F.3d at 69; *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018).

### iii.    Inflated royalty base

GoDaddy next contends that the jury's verdict was based on an inflated royalty base. GoDaddy argues that the royalty base "includes royalties pegged exclusively to SSL certificates, a non-infringing product." Def.'s Br. ISO Mot. for New Trial at 13. This is another challenge to apportionment.

As GoDaddy recognizes, Dr. Almeroth's technical importance calculation allocated a percentage of the WSB features to SSL certificates and excluded that

33

percentage from the 65 percent of WSB technology that was attributable to the patents. PDX1-101.   For this reason, Mr. Bratic testified that the SSL certificate revenue should be included if revenues were used as the royalty base for his royalty rate calculation. Tr. 376:1–10.  This testimony was sufficient to support a royalty base that included revenues related to SSL certificates.

### iv.    Profit split

GoDaddy briefly contends that the jury relied on a "nonsensical" profit split calculation.  Express Mobile responds that the calculation was supported by GoDaddy's own documents and used by both damages experts.

GoDaddy's argument is unpersuasive.  Mr. Bratic testified that he developed the profit split based on Express Mobile's position as supplying the invention and GoDaddy as the promoter for the commercial product.  Mr. Bratic explained that he calculated the profit split percentage based on GoDaddy's data about how it acts internally as inventor and promoter.  Tr. 373:8–23.  Specifically, Mr. Bratic analyzed GoDaddy's ratio of research and development expenses to operating expenses to determine that 26.4 percent of the profits would go to Express Mobile as the inventor and a little under 74 percent would go to GoDaddy as the promoter.  Tr. 373:24 – 374:8.  GoDaddy disagreed with Mr. Bratic's analysis.  It was free to—and did—challenge Mr. Bratic on cross-examination.  But GoDaddy's disagreement with Mr. Bratic's chosen data and analysis does not support the argument that his calculation was "nonsensical."  The Court concludes that Mr. Bratic's testimony, and his reliance on GoDaddy's internal data, provided sufficient evidence to support the jury's verdict.

### v.    Excessiveness

GoDaddy argues that the jury's award was excessive for two reasons.

First, GoDaddy argues that the damages are inconsistent with comparable transactions.  In this regard, GoDaddy relies on Mr. Perry's testimony about comparable instances in which the asserted patents were or were attempted to be licensed or sold for far less than $170 million in the same period as the hypothetical negotiation.  Specifically, Mr. Perry testified that Express Mobile's lawyers offered a license program based on the annual volume of sales, using $20 million, $40 million, and $100 million sales.  Mr. Bratic testified that this was not relevant to the hypothetical negotiation because GoDaddy's annual revenues were much higher than $100 million.

Second, Mr. Perry testified that Express Mobile negotiated with RPX in 2013 to potentially license its patents, but the transaction did not go anywhere.  These negotiations involved a potential payment of $3.5 million for the patents.  Mr. Bratic testified that these negotiations were not relevant to the hypothetical negotiation for two reasons:  (1) the activity never resulted in a license, and (2) the $3.5 million did not reflect the value of the patented technology because there was a cross license in consideration.  That is, RPX would have paid $3.5 million in addition to licensing a patent to Express Mobile.  Mr. Bratic testified this meant that there was more value involved in the RPX negotiation than the $3.5 million payment.

Third, a GoDaddy lawyer testified that he was hired for a potential sale of the patents, but that auction never resulted in a sale.  Mr. Bratic testified that this auction was not relevant to the hypothetical negotiation for two reasons:  (1) it never happened, and (2) the lawyer testified that there was no minimum amount that Express Mobile

35

thought was acceptable to sell the patents.

Finally, another company, Akira, transferred the relevant patents to Express Mobile in 2012 for $400,001.  Mr. Bratic testified that this was not relevant to the hypothetical negotiation because the transfer was based on Express Mobile developing products with the patent.  Additionally, Mr. Bratic testified that this was not relevant because the transfer happened in 2012, but GoDaddy's first infringement began in March 2013.  According to Mr. Bratic, Akira and Express Mobile would not know the potential value of the patented technology at that time.

To summarize, Mr. Bratic testified that this evidence was not relevant to the hypothetical negotiation because the extent of the use of the patented technology was not known in almost all of the alternative transactions and there were business risks associated with those transactions that would not be prevalent or present in the hypothetical negotiation.

GoDaddy argues that, given these "real-world benchmarks," the $170 million award "is grossly excessive to the point of indefensible."  Def.'s Br. ISO Mot. for New Trial at 18.  GoDaddy's argument appears to be based on the second *Georgia-Pacific* factor:  "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit."  *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  The Federal Circuit has stated that "[s]ubsumed within this factor is the question of whether the licensor and licensee would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage."  *Lucent Techs., Inc.*, 580 F.3d at 1326.  "Significant differences exist between a running royalty license and a lump-sum license."  *Id.*  "A running royalty structure shifts many licensing

36

risks to the licensor because he does not receive a guaranteed payment." *Id.* "The lump-sum structure also creates risks for both parties." *Id.* In particular, "[t]he licensed technology may be wildly successful, and the licensee may have acquired the technology for far less than what later proved to be its economic value." *Id.* On the other hand, "the licensee may have paid a lump-sum far in excess of what the patented invention is later shown to be worth in the marketplace." *Id.*

But this is only one of the factors relevant to the *Georgia-Pacific* reasonable royalty analysis. Most relevant here, factor 11 requires consideration of "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Georgia-Pacific*, 318 F. Supp. at 1120. The Federal Circuit has stated that "neither precedent nor economic logic requires us to ignore information about how often a patented invention has been used by infringers. Nor could they since frequency of expected use and predicted value are related." *Lucent Techs., Inc.,* 580 F.3d at 1333.

Mr. Perry and Mr. Bratic disputed whether GoDaddy would have agreed to a running royalty. Mr. Bratic testified that the damages owed to Express Mobile—over the life of the patents—could reasonably reach $421 million. As discussed, Mr. Bratic's analysis was supported by substantial evidence. He also explained why, in his opinion, certain real-world transactions were not relevant to the hypothetical negotiation analysis. Mr. Perry disagreed because, in his opinion, the real-world transactions showed that the parties would only agree to a lump-sum royalty payment. Mr. Perry testified that a reasonable lump sum payment would be $355,000. The jury, likely crediting Mr. Bratic's testimony on this point, calculated its award based on a running

royalty, not a lump sum payment.  Mr. Bratic's testimony provided substantial evidence to support the jury's award.

Second, GoDaddy argues that the damages award greatly exceeds GoDaddy's operating profits.  GoDaddy takes issue with Mr. Bratic's reliance on its gross profits (65 percent) rather than operating profits (6 percent) for his royalty rate calculation.  GoDaddy argues that Mr. Bratic's calculation resulted in a royalty that was "about [three] times GoDaddy's operating profit over the relevant period."  Def.'s Br. ISO Mot. for New Trial at 19.

"[E]stimating a reasonable royalty is not an exact science."  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).  And the defendant's revenue over the damages period is not the only relevant factor in determining a reasonably royalty.  *See Lucent Techs., Inc.*, 580 F.3d at 1324 ("[A]warding damages through litigation attempts to assess 'the difference between [the patentee's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.'") (quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552 (1886))).

The fact that the damages amount exceeds GoDaddy's operating profits for the accused technology is insufficient to establish that the award was grossly or monstrously excessive.  Mr. Bratic testified that relying on operating profit was not appropriate in this case because it was calculated based on WSB related sales minus operating expenses.  Tr. 390:9–14.  He also testified that there was no evidence that the operating expenses allocated to WSB were actually incurred to support WSB.  Tr. 390:15–21.  Mr. Bratic testified that the infringement in this case was significant

because there were half a billion subscription months (when infringement occurred) over the relevant ten-year period.  Tr. 402:4–8.  He also explained that a $421 million royalty would only represent a small part of GoDaddy's revenues if the number included the SSL certificate revenues, the value of the free subscriptions, and the value of convoyed sales.  Tr. 402:9–22.

For these reasons, the Court concludes that the jury's verdict was not grossly excessive such that a new trial is called for.[5]

### vi.    PTAB decision invalidating the '168 patent

Finally, GoDaddy argues that a new trial is required because the '168 patent was, following the trial in this case, found invalid in the IPR process.  *See Facebook v. Express Mobile, Inc.*, 2026 WL 126516 (PTAB Jan. 16, 2026).  But the PTAB decision invalidating the '168 patent is not binding on the Court.  *See Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 n.7 (Fed. Cir. 2017) ("The PTAB's decision is not binding on this court . . . .").  In this case, the jury found that the '168 patent was valid.  Thus the Court cannot appropriately order a new trial on this basis.

### C.    Prejudgment interest

Express Mobile seeks an award of prejudgment interest under 35 U.S.C. § 284.  Specifically, Express Mobile requests prejudgment interest from the date of infringement to the date of final judgment at the prime rate, compounded quarterly. "Prejudgment interest is awarded to restore a plaintiff to the position it would have been in had there been no wrongdoing."  *Purewick Corp. v. Sage Prods., LLC*, 666 F.

---

[5] The parties suggest several bases for remittitur if one is ordered.  Because the Court had determined that the jury's verdict was not excessive, a remittitur is not warranted.

Supp. 3d 419, 450 (D. Del. 2023).  "[P]rejudgment interest should ordinarily be awarded absent some justification for withholding such an award."  *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  The "common practice is to award prejudgment interest calculated at the prime rate, compounded quarterly, from the day of the first infringement through the date of judgment."  *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 503 F. Supp. 3d 156, 181 (D. Del. 2020) (collecting cases).

To start, Express Mobile withdrew any dispute regarding the timing of the interest calculation.  That is, the parties now agree that the interest should be distributed across quarters based on GoDaddy's real-world financial performance and calculated at the end of each quarter.

Two disputes remain:  (1) whether Express Mobile unduly delayed prosecuting the case and thus prejudgment interest should be limited; and (2) whether interest should be calculated using the prime or T-Bill rate.

### 1.    Undue delay

The Supreme Court has explained that Congress intended that "prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement."  *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983).  "In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement."  *Id.* at 655.  Because interest is "fixed by the court," a district court has some discretion to decide whether to award prejudgment interest, and "it may be appropriate to limit prejudgment interest, or perhaps even to deny it altogether, where the patent owner has been responsible for

undue delay in prosecuting the lawsuit[.]"  *Id.* at 656–57.  To  "show that delay was undue, a defendant must, at least generally, show that it was prejudiced."  *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1375 (Fed. Cir. 2022).

GoDaddy argues that Express Mobile unduly delayed prosecuting this lawsuit because it believed GoDaddy was infringing by at least January 2014 and began discussing enforcing its patents against GoDaddy by February 2015.  This lawsuit was not filed until 2019.  GoDaddy argues that Express Mobile's delay prejudiced GoDaddy in four ways.

First, according to GoDaddy, the delay caused escalated damages.  But the Federal Circuit has stated that a five-year delay, even after becoming aware of potential infringement, "does not alone justify a finding of undue delay."  *Kaufman*, 34 F.4th at 1374–75.  Damages will always escalate from the date of infringement to the date a lawsuit is resolved.  If delay alone is insufficient to show undue delay, escalation of damages alone is similarly insufficient.

Second, GoDaddy contends that the delay "limited GoDaddy's practical ability to implement remedial measures."  Def.'s Resp. at 5.  GoDaddy argues that, because the '397 patent expired two months after Express Mobile filed its complaint, "Express Mobile now urges the Court to enhance damages in part because GoDaddy did not design around that patent within the cramped window."  Def.'s Resp. at 5.  Contrary to GoDaddy's argument, the award of prejudgment interest does not enhance damages; it ensures that the patent holder is made whole.  *SecurityPoint Holdings, Inc. v. United States*, 156 Fed. Cl. 750, 795 (2021) ("The overarching principle is to make the patent holder whole.").  GoDaddy does not point to any evidence that it would have

41

implemented non-infringing alternatives if Express Mobile had acted sooner.

Third, GoDaddy argues that it was prejudiced because it invested in WSB during the delay. GoDaddy relies on *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990), for this argument. In *Adelberg,* the court noted that "[m]aking heavy capital investment and increasing production can constitute prejudice." *Adelberg Lab'ys*, 921 F.2d at 1272. The court found that expending capital to expand its business to significantly increase production was sufficient to show adequate prejudice for purposes of a laches defense. *Id.* This case is different. GoDaddy only vaguely argues that "GoDaddy had already begun developing Version 8 when XMO sent its 2018 demand letter." Def.'s Resp. at 6. GoDaddy does not point to any evidence of any capital investment—or any other specific investment—to support WSB during the delay.

Finally, GoDaddy contends Express Mobile's delay prevented GoDaddy from cross-examining the patent inventor, Steven Rempell, at trial because he passed away before the trial. As Express Mobile points out, however, Mr. Rempell sat for two depositions in this case. GoDaddy also recognizes that it presented Mr. Rempell's testimony from *Shopify* at trial. Mr. Rempell's unavailability at trial is not attributable to any alleged delay by Express Mobile.

For these reasons, the Court concludes that Express Mobile did not unduly delay prosecuting the case and thus is entitled to prejudgment interest beginning on October 11, 2013.

## 2.   Rate

Courts generally have "wide latitude in the selection of interest rates." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). In this district,

calculating prejudgment interest at a "prime rate is by far the most common practice." *ArcherDX, LLC v. Qiagen Scis., LLC*, No. 18 C 1019, 2022 WL 4597877, at *18 (D. Del. Sept. 30, 2022) (collecting cases). "[T]he Federal Circuit has held that application of the U.S. prime rate is appropriate even if there is no evidence that the patent holder borrowed at the prime rate." *Nox Med. Ehf v. Natus Neurology Inc.*, No. 15 C 709, 2018 WL 4062626, at *7 (D. Del. Aug. 27, 2018) (citing *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991)).

GoDaddy argues that the T-Bill rate is warranted because Express Mobile suffered no injury from any delay in receiving royalties. Express Mobile responds by pointing to testimony that it incurred "considerable debts" that it would have been able to pay with the reasonable royalty GoDaddy owed based on its use of the patented technology. Tr. 330:10–12, 351:15–16. The Court concludes this is a sufficient basis to support an award of prejudgment interest at the prime rate.

### D.    Enhanced damages

Under the Patent Act, a "court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Enhanced damages are "designed as a punitive or vindictive sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016) (internal quotation marks omitted). In other words, conduct described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id*. Accordingly, a "jury's finding of willful infringement is a prerequisite to the enhancement of damages but is not by itself sufficient." *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 17 C 1390, 2022 WL 3973499, at *1 (D. Del. Aug.

31, 2022).

As discussed, Express Mobile failed to present substantial evidence to support a finding that GoDaddy had the specific intent to infringe the '397 and '168 patents. Because the Court found that GoDaddy did not willfully infringe, Express Mobile is not entitled to enhanced damages.

## E.    Post-judgment interest

Section 1961(a) of Title 28 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of the judgment[.]"  28 U.S.C. § 1961(a). "[A]warding post-judgment interest is not a reward, but rather just compensation to ensure that a money judgment will be worth the same when it is actually received as it was when it was awarded."  *Dunn v. HOVIC*, 13 F.3d 58, 60 (3d Cir. 1993).

GoDaddy stated in its response that it does not oppose an award of post-judgment interest at the statutory rate.  Def.'s Resp. at 19.  Express Mobile is entitled to post-judgment interest at the statutory rate.

## F.    Bill of costs

Express Mobile submitted a bill of costs seeking costs as the prevailing party. The authority for granting costs to the prevailing party is found in 28 U.S.C. § 1920 and District of Delaware Local Rule 54.1.  The Supreme Court, discussing § 1920, stated, "Taxable

costs are limited to relatively minor, incidental expenses."  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012).

GoDaddy opposes three categories of the costs Express Mobile seeks to

44

recover:  (1) deposition, pretrial, and trial transcripts; (2) printing for trial exhibits; and (3) certain witness fees.  The Court addresses each dispute below.[6]

### 1.    Transcripts

Express Mobile seeks $76,360.21 for deposition transcripts and $18,019.72 for pretrial and trial transcripts.  GoDaddy objects to Express Mobile's request for transcript related costs in its entirety.  Fees for transcripts "necessarily obtained for use in the case" are authorized by § 1920(2).  Local Rule 54.1 also sets forth additional detail regarding the award of costs and fees associated with depositions and other transcripts.

For deposition costs, Rule 54.1 provides:

> The reporter's reasonable charge for the original and one copy of a deposition and the reasonable cost of taking a deposition electronically or magnetically recorded are taxable only where a substantial portion of the deposition is used in the resolution of a material issue in the case.  Charges for counsel's copies and the expenses of counsel in attending depositions are not taxable, regardless of which party took the deposition.  Notary fees incurred in connection with taking depositions are taxable.

L.R. 54.1(b)(3).

For transcript costs, Rule 54.1 provides:

> The costs of the originals of a trial transcript, a daily transcript and a transcript of matters prior or subsequent to trial, furnished to the Court, are taxable when requested by the Court or prepared pursuant to stipulation.  Mere acceptance by the Court does not constitute a request.  Copies of transcripts for counsel's own use are not taxable.

L.R. 54.1(b)(2).

### i.    Depositions

GoDaddy objects to Express Mobile's request for fees for deposition transcripts

---

[6] Express Mobile withdrew its request for costs associated with filing the notice of appeal.  Thus, no dispute on fees of the Clerk remains and the Court grants Express Mobile's request for the $400 associated with filing the complaint.

in its entirety because it contends that Express Mobile failed to show that the Court relied on substantial portions of the transcripts in resolving dispositive motions, post-trial motions, or other material issues. Rule 54.1 expressly provides for the taxing of costs for the original and one copy of a deposition transcript as well as the reasonable cost of taking the deposition where a substantial portion of the deposition is used in the resolution of a material issue in the case. And 28 U.S.C. § 1920(2) authorizes taxation of costs for transcripts "necessarily obtained for use in the case." Express Mobile points out that every witness either testified at trial or was included in a trial witness list. The Court concludes that it would be unreasonable to expect the parties to prepare for trial without transcripts of the depositions.

GoDaddy also objects to the "extras" for which Express Mobile seeks reimbursement. Specifically, Express Mobile seeks costs associated with exhibits, rough drafts, videos, transmission, expedited delivery, hourly reporter attendance, and real-time. Although exhibits, transmission of the transcripts, and reporter attendance fees are necessary for the depositions to occur and transcripts to be delivered, the additional services are not. Express Mobile broadly argues that the extras are taxable because they are necessary in all "high stakes-patent case[s]". Pl.'s Reply ISO Bill of Costs at 7. Express Mobile provides no further rationale to explain why real-time feed, rough transcripts, and expedited delivery were reasonably necessary to prepare for trial.

The Court is not persuaded that the costs for video transcripts and related costs, rough drafts, expedited delivery, and real-time feed were reasonably necessary. The Court's conclusion is supported by the February 2026 proposed amendment to Local Rule 54.1. If the revision is adopted, the rule will expressly provide that "Additional fees

46

for depositions, such as video recording, synchronization, linked exhibits, and other additions are not taxable unless the addition was required by the Court."  L.R. 54.1(b)(3) (proposed February 2026).  The costs for processing exhibits, transmission of the transcripts, and reporter attendance fees, however, were reasonable costs of the depositions and necessary to prepare for trial.  For these reasons, the Court sustains GoDaddy's objection to the costs for video transcripts and related costs, rough drafts, expedited delivery, and real-time feed but taxes the costs of a certified copy of the transcript plus one copy as well as the processing of exhibits, transmission of the transcripts, and reporter attendance fees.

### ii.    Hearings and trial

GoDaddy argues that the costs for hearing and trial transcripts should be denied in their entirety because Express Mobile "fails to establish [that] any of the hearing or trial transcripts were requested by the Court or prepared pursuant to stipulation."  Def.'s Obj. at 14.  GoDaddy contends that this is dipositive under Local Rule 54.1.  This contention ignores that a court may tax costs for transcripts "necessarily obtained for use in the case" under 28 U.S.C. § 1920(2).  Local Rule 54.1 does not limit this authority.

Another court in this district has found that "Testimony in patent cases is sufficiently complex so that no one can be sure what was said without a transcript. The transcripts are necessary to prepare during the course of the trial or the injunction hearing." *Amgen Inc. v. Sanofi, Aventisub LLC*, No. 14 C 1317, 2025 WL 660818 (Feb. 28, 2025) (citing *Intellectual Ventures I LLC v. Trend Micro Inc.*, 2020 WL 1245125, *3 (D. Del. Mar. 16, 2020)).  The Court agrees.  Express Mobile necessarily obtained the

transcripts from pretrial hearings and trial for use in the case and the costs of those transcripts are taxable.

GoDaddy also objects to the taxation of fees associated with expedited and real-time transcripts.  Express Mobile responds that "[i]t was necessary for Express Mobile to obtain daily transcripts to prepare for examinations and cross-examinations of witnesses, prepare motions, and finalize closing arguments."  Pl.'s Reply ISO Bill of Costs at 8–9.  Express Mobile did not provide any justification for real-time transcripts for pretrial and trial transcripts or expedited pretrial hearing transcripts.  The Court is persuaded that expedited trial transcripts were necessary for trial but is not persuaded that expedited transcripts were necessary for pretrial hearings.  The Court is also not persuaded that real-time transcripts were necessary for pretrial hearings or trial.

For these reasons, the Court sustains GoDaddy's objection to costs associated with real-time feeds during pretrial hearings and at trial as well as expedited pretrial hearing transcripts.  The Court taxes only the costs associated with obtaining the pretrial hearing and trial transcripts.

### 2.    Printing

Based on 28 U.S.C. § 1920(4), Express Mobile seeks $2,501.57 in costs for printing costs related to trial exhibits for four witnesses who testified at trial.  Section 1920(4) provides that the court may tax as costs:  "Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."  28 U.S.C. § 1920(4).

GoDaddy contends that Express Mobile failed to identify "which exemplification materials were admitted in evidence, which (if any) were expressly requested by the

48

Court, or how the materials were used to aid the finder of fact's understanding of the issues."  Def.'s Obj. at 15.  Local Rule 54.1 provides,  in relevant part, that the Court may tax as costs:  "The cost of copies of an exhibit necessarily attached to a document required to be filed and served is taxable. The cost of one copy of a document is taxable when admitted into evidence. The cost of copies obtained for counsel's own use is not taxable."  L.R. 54.1(d)(5).

Express Mobile states that the exhibit binders were obtained for use by witnesses at trial.  This was a matter of convenience for counsel's own use, not necessity.  The February 2026 proposed revisions to Local Rule 54.1 again support the Court's conclusion.  As revised, the rule will expressly provide that "The cost of making copies of trial exhibits for witness binders is not taxable."  L.R. 54.1(b)(5) (proposed Feb. 2026).  The Court sustains GoDaddy's objection to Express Mobile's printing costs.

### 3.    Witnesses

Finally, Express Mobile seeks $6,140.32 for witness fees.  These costs include travel and subsistence costs as well as attendance fees for three witnesses who testified at trial.  GoDaddy objects to witness costs for days that trial was not in session and to certain subsistence costs that it argues are not properly supported by documentation.

Local Rule 54.1 provides, in relevant part:

The rates for witness fees, mileage and subsistence are fixed by 28 U.S.C. § 1821.  Such fees are taxable even though the witness does not take the stand, provided the witness attends Court. Witness fees and subsistence are taxable only for the reasonable period during which the witness is within the district.  Subsistence to the witness under 28 U.S.C. § 1821 is allowable if the distance from the Court to the residence of the witness is such that mileage fees would be greater than subsistence fees, if the witness were to return to his/her residence from day to day. . . .

L.R. 54.1(b)(4).

The Court concludes that it was reasonable for the witnesses to be in the district the day before trial and the evening trial ended. It was not reasonably necessary, as Express Mobile contends, for the witnesses to be in the district for days in advance of their testimony.

For these reasons, the Court overrules GoDaddy's objection to Express Mobile's request for witness fees, in part, and awards $4,317.52 for costs associated with attendance fees, travel, and subsistence for witnesses who attended trial, including the day before trial began through the evening after the trial concluded.

## Conclusion

For the reasons stated above, the Court grants, in part, GoDaddy's renewed motion for judgment as a matter of law [dkt. no. 469] and grants JMOL in GoDaddy's favor on the question of willfulness. The Court denies the remainder of GoDaddy's renewed JMOL. The Court denies GoDaddy's motion for a new trial [dkt. no. 470]. The Court also grants Express Mobile's motions for prejudgment interest and post-judgment interest [dkt. no. 468] but denies its motion for enhanced damages. Finally, the Court taxes costs sought in Express Mobile's bill of costs [dkt. no. 478] as set forth above. The parties shall confer and submit to the undersigned judge's proposed order e-mail address, by May 21, 2026, a proposed final judgment, in Word format, as well as a proposed order regarding costs consistent with the Court's rulings and providing updated totals. The proposed judgment should include resolution of the 2023 verdict related to the '755, '287, and '044 patents and any other portion of the March 6, 2023

50

judgment that the parties believe is necessary to include to bring the matter to a full

conclusion.

                                             _____

                                                   MATTHEW F. KENNELLY
                                    United States District Judge

Date:  May 14, 2026